IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:18-CV-61984-FAM

**POLLY BASSETT**,

     **Plaintiff,**

v.

**WAL-MART STORES EAST, L.P.**,

     **Defendant.**

## PLAINTIFF'S MOTION FOR SANCTIONS
## DUE TO SPOLIATION OF EVIDENCE

**COMES NOW**, the Plaintiff, POLLY BASSETT, by and through undersigned counsel and pursuant to Federal Law, Southern District Rule 7.1, and the Court's inherent authority, hereby files her Motion for Sanctions against WAL-MART STORES EAST, L.P. (hereafter WAL-MART), seeking if necessary to reserve ruling until the close of evidence at trial and before giving jury instructions, due to its Spoliation of Evidence in this case, and as grounds therefor states as follows:

**I.     BACKGROUND**

On December 24, 2016, Plaintiff POLLY BASSETT sustained injuries to Plaintiff's right knee including a clear meniscus tear and partial tear and/or strain of the anterior cruciate ligament and disk bulging at L1/2 through L4/5 with a disk herniation with annular fissure at L5/S1 level. The incident was captured on closed-circuit television ("CCTV") video footage; however, following the receipt of a preservation letter [*See* Exhibit "A", Preservation Letter], WAL-MART caused the destruction and/or loss of said footage, but also on September 25, 2019,

for the first time, produced for trial a still shot of additional video that was not produced (nor was the still shot) during the discovery period.

The Defendant WAL-MART spoiled evidence, but worse, for the first time on September 25, 2019 produced a picture that clearly shows not all of the video was produced in this case. Specifically, Defendant's Exhibit for Trial D-1 just produced as evidence at trial on September 25, 2019, and discussed *infra*, shows a time of 6:12:05 AM, thirty minutes before any video produced during discovery.

In *Long v. Celebrity Cruises, Inc.*, 2013 WL 12092088 (S.D. Fla. July 31, 2013), Magistrate Judge Torres issued sanctions to a cruise line after ruling on a spoliation issue *strikingly similar* to the issue presented here. In *Long*, the security officer charged with the duty to preserve CCTV footage of the incident in that case "permanently lost" the footage when it was overwritten in the normal course. The Southern District held that "[f]or a security officer tasked with investigating a possible claim *in anticipation of litigation* and preserving evidence for that claim to allow the evidence to be lost in this manner is undeniably reckless." *Id.* at *7. As a result, the *Long* court found that Plaintiff "amply" satisfied the burden of showing bad faith sufficient to impose sanctions. *Id.* at *8.

Plaintiff submits that the circumstantial evidence of bad faith in this case goes above and beyond that which was presented to the court in *Long v. Celebrity*. As a result, Plaintiff seeks an adverse inference jury instruction as a result of Defendant's spoliation of evidence.

II.     **LEGAL STANDARD**

Spoliation of evidence is established when the prejudiced party demonstrates, first, that the missing evidence existed at one time; second, that the spoliator had a duty to preserve the evidence; and third, that said evidence was crucial to proving the movant's *prima facie* case.

*Walter v. Carnival Corp.*, 2010 WL 2927962, *2 (S.D. Fla. July 23, 2010). The burden on the party seeking to demonstrate that the evidence was crucial to proving its case is light; as "courts must not hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence because doing so allows the spoliators to profit from the destruction of the evidence." *In re Boston Boat III*, 310 F.R.D. 510, 521 (S.D. Fla. 2015) (citing *Southeastern Mech. Servcs., Inc. v. Brody*, 657 F. Supp. 2d 1293, 1300 (M.D. Fla. 2009)).

The spoliation of evidence rises to the level of a *sanctionable* offense when the party seeking sanctions can show bad faith on the part of the spoliator, "such as where a party purposely **loses or destroys** relevant evidence." *Walter*, 2010 WL 2927962, *2 (citing *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997)) (emphasis added). Bad faith can be demonstrated through circumstantial evidence if direct evidence of bad faith is unavailable. *Id.; see Long*, 2013 WL 12092088, *6 ("Courts recognize that because a movant often faces a difficult burden in proving bad faith, and as direct evidence of bad faith is rarely available, circumstantial evidence can be used." (citations omitted)). Further, bad faith sufficient for sanctions "is not limited to acts of malice or willful intent." *Id.* at *7.

To show bad faith through circumstantial evidence, a party must demonstrate: (1) that evidence once existed "that could fairly be supposed to have been material" to proving a claim in the case; (2) that the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) that the spoliating party did so when it knew of its duty to preserve the evidence; and (4) the spoliating party cannot credibly explain the affirmative act as not involving bad faith for the reason offered by the spoliator. *Walter*, 2010 WL 2927962, *2 (citing *Calixto v. Watson Bowman Acme Corp.*, 2009 WL 3823390, *16 (S.D. Fla. Nov. 16, 2009)).

Upon finding bad faith, a court has broad discretion to impose sanctions, which can include but are not limited to: dismissal of the case, entering a default judgment against a defendant, excluding expert testimony, or issuing an adverse jury instruction that raises a presumption against the spoliator. *Boston Boat*, 310 F.R.D. at 514. Jury instructions can vary with regard to harshness, and may include "imposition of a mandatory, albeit rebuttable, presumption," or a less harsh adverse inference allowing "a jury to presume that the lost evidence is relevant and favorable to the innocent party," where the jury considers rebuttal evidence and then considers whether to draw the adverse inference. *Id.* at 514-15.

### III. MEMORANDUM OF LAW

Plaintiff is entitled to sanctions in this case because she can show WAL-MART's bad faith in the loss or destruction of the CCTV footage, through mounting circumstantial evidence. WAL-MART knew it had a duty to preserve the CCTV footage of the incident. The asset protection manager, Virgil Dixon, stored portions of other camera angles on his cell phone—which was not disclosed without significant efforts by Plaintiff—but did not store the relevant portions of the other cameras in the Vestibule or in the parking lot—including the angle that would show the "greater" standing nearby.

That same asset protection manager failed to complete an internal investigation—in fact, made a unilateral decision to store portions of the other cameras on his cell phone by recording the TV monitor with his cellphone, for reasons unknown and never explained.

WAL-MART had notice of Plaintiff's claim within the timeframe outlined by its own evidence preservation procedures, yet failed to take immediate steps to preserve the evidence in this case, effectively violating its own evidence preservation policies. *Cf. Mitchell v. Royal Caribbean Cruises, Ltd.*, 2013 WL 12066018, *2 (S.D. Fla. May 7, 2013).

Finally, the Defendant for the first time disclosed a screen shot on *September 25, 2019* of a cropped portion of the CCTV video, which when you zoom in on a computer, reads 6:12:05 AM, when the earliest portion of the CCTV ever produced to date was 6:42:00 AM, thirty minutes earlier.

Below, Plaintiff outlines each element in the spoliation analysis, then analyzes each element showing circumstantial evidence of bad faith on the part of WAL-MART. Because the circumstances in this case rise above those presented in an almost identical factual scenario in *Long v. Celebrity*, Plaintiff is entitled to an adverse jury instruction regarding WAL-MART's spoliation of the CCTV footage in this case. *See Long v. Celebrity Cruises, Inc.*, 2013 WL 12092088.

    **A.  Spoliation Element #1: The CCTV footage existed at one time.**

In this case, it is undisputed that CCTV footage depicting the incident alleged in the Complaint existed at one time. The Defendant's asset protection manager destroyed video that showed other angles, without glare, of the incident.

```
13 Q (By Mr. Tucker) Camera 3 on Exhibit 2, did you
14 ever store video from the hour before to the hour after
15 the slip and fall?
16 A No.
17 Q Did you ever store outside of your cell phone
18 any video from Camera 3?
19 A No.
20 Q Could you have?
21 A Yes.
22 Q Could you have saved the hour before to the
23 after from Camera 3?
24 A Yes.
25 Q But you did not?
1 A No.
2 Q Camera 1 on Exhibit 2, did that -- was there
3 video that existed the hour before to the hour after the
4 slip and fall?
5 A Yes.
```

>  6 **Q Did you save it?**
>  7 A No.
>  8 **Q Could you have?**
>  9 A Yes.
> 10 **Q Camera 4, did a video exist from the hour**
> 11 **before to the hour after the slip and fall?**
> 12 A Yes.
> 13 **Q Did you save it?**
> 14 A No.
> 15 **Q Could you have?**
> 16 A Yes.
> 17 **Q Did Camera 3 on Exhibit 2 show the slip and**
> 18 **fall of Polly Bassett?**
> 19 A Yes.
> 20 **Q Did it show folks from Walmart cleaning the**
> 21 **floor of the vestibule?**
> 22 A If I can recall, yes.

[*See* Exhibit "B" Deposition of Virgil Dixon, p. 89 ll. 2-5]. Plaintiff requested video of the incident in a Request for Production on September 26, 2018. [*See* Exhibit "C", Request for Production, Requests 18 and 20]. WAL-MART delayed responding and eventually objected. [*See* Exhibit "D", WAL-MART's Response to Request to Produce, pp. 10-11, Requests 18 and 20]. WAL-MART relented and produced the video—to avoid Plaintiff filing a Motion—on November 13, 2018.

It was not until December 11, 2018, WAL-MART finally provided additional undisclosed CCTV video that was recorded to the asset manger's cell phone—which counsel for WAL-MART admits is not "preserved" video. [*See* Exhibit "E", WAL-MART's Amended Response to Request to Produce, p. 3].

> 11 **Q Has Walmart ever instructed you to record**
> 12 **video from the screen onto you phone?**
> 13 A No.
> 14 **Q Has Walmart ever instructed you not to save**
> 15 **video on your camera phone?**
> 16 A No.
> 17 **Q Why was video preserved from your cell phone**
> 18 **in this case?**

> 19 MS. GUITERREZ: Objection, form.
> 20 MR. TUCKER: What's wrong with the form?
> 21 MS. GUITERREZ: Because you're saying video
> 22 preserved, ***that's not the video that was preserved***
> 23 ***in that case, that's not Walmart's official video.***
> 24 The official video that was preserved is the video
> 25 that was produced hour before and hour after
> 1 directly from the CCTV.
> 2 MS. TUCKER: So, is it -- are you saying on
> 3 the record then that videos one through six that
> 4 were saved on Mr. Dixon's cell phone are not
> 5 considered preserved videos?
> 6 MS. GUITERREZ: That's his personal cell
> 7 phone. Those are his personal videos.
> 8 MR. TUCKER: Is that a no? It wasn't
> 9 preserved?
> 10 MS. GUITERREZ: They are his personal videos.
> 11 He saved them onto his cell phone --
> 12 MR. TUCKER: But they weren't --
> 13 MS. GUITERREZ: They are saved on his cell
> 14 phone, but if we're using the legal term preserve
> 15 from the actual CCTV system, Walmart's official
> 16 video that was preserved is the one hour before and
> 17 the one hour after.
> 18 MR. TUCKER: So, no those aren't preserved
> 19 videos?
> 20 MS. GUITERREZ: I don't understand what you're
> 21 asking, at least make sense.
> 22 MR. TUCKER: Well, you're objecting saying
> 23 that they are not preserved videos.
> 24 MS. GUITERREZ: Because there is a distinction
> 25 **between what's preserved, what's Walmart's actual**
> 1 **video that Walmart preserved versus what Mr. Virgil**
> 2 **preserved on his own personal cell phone during his**
> 3 **investigation.**

[*See* Ex. B, p. 56 l.11-p. 58 l. 3 (emphasis added).  WAL-MART admits that it does not have these other camera angles in its possession, which would have shown areas outside of the CCTV Video where employees can be seen pointing towards the ground [*See* Exhibit "E"].  Even though some of the video produced (late) shows water outside on the ground [*See* Exhibits "F"

and "G"], it was degraded in quality and completeness due to recording it on a cell phone from a computer monitor/tv monitor.

### B. Spoliation Element #2: WAL-MART had a duty to preserve the CCTV footage.

WAL-MART had a duty to preserve the CCTV footage in this case. WAL-MART's corporate representative testified that other video angles existed but were not preserved:

> 20 **Q. Okay. Number 23 asks for whether or not there**
> 21 **are any additional CCTV video that existed but was not**
> 22 **preserved and Number 24 asks whether any additional CCTV**
> 23 **video camera angles existed but was not preserved, but**
> 24 **you're not able to tell me how many cameras even existed**
> 25 **in the vestibule, yes?**
> 1 A. I do not know how many cameras, a total count,
> 2 in the vestibule.
> 3 **Q. How many are you aware of that exist inside**
> 4 **that vestibule?**
> 5 A. I know there's three because there's one on
> 6 each door and there's one back toward the entrance into
> 7 the store. Four? If you were given the information
> 8 there's four then I can pretty say that there are four
> 9 there.

[*See* Exhibit "H", Corporate Rep Deposition of Marie Ladeira, p. 123 l. 20-p. 124 l. 9].

> 10 **Q. So as the Corporate Representative today, all**
> 11 **of our questions in Exhibit 2 that relate to the**
> 12 **preservation you can't answer because you haven't spoken**
> 13 **to Virgil, correct?**
> 14 A. I haven't spoken to Virgil --
> 15 MS. CHAVEZ: Well, let me object because that
> 16 is not correct. She has answered questions and it
> 17 does not talk specifically about this question you
> 18 ask now, okay? As to what he did to, or whether he
> 19 was right in preserving video with his cell phone.
> 20 BY MR. TUCKER:
> 21 **Q. Do you know whether or not any other people**
> 22 **were with Virgil when he reviewed the CCTV video on**
> 23 **December 24th, 2016?**
> 24 A. I do not.

[*See Id.* p. 126 ll. 10-24].

> 22 **Q. Why did Wal-Mart not preserve the other**
> 23 **cameras that were in the vestibule?**
> 24 A. The camera view that was preserved shows the
> 25 full and complete picture of her walking in the store
> 1 and of her falling. I don't know what's on the other
> 2 videos you're talking about so I can't answer for that.

[*See Id.* p. 127 l. 24-p. 128 l. 2].

> 10 **Q. I'm not asking an if. I'm asking specifically**
> 11 **whether Wal-Mart could have saved other camera angles**
> 12 **for the hour before to the hour after but did not?**
> 13 A. Wal-Mart could have saved any camera angle of
> 14 any camera in the store at any time.
> 15 **Q. For the hour before to the hour after?**
> 16 A. For the hour before, the hour after, but if it
> 17 doesn't have anything relevant to this particular
> 18 incident that would not be.
> 19 **Q. Would Wal-Mart agree that another angle**
> 20 **showing the Plaintiff slipping and falling would be**
> 21 **relevant to this case?**
> 22 MS. CHAVEZ: Objection. Form.
> 23 THE WITNESS: Any, I would say any angle
> 24 showing the accident could be relevant.

[*See Id.* p. 140 ll. 10-24]. There were also number of employees that walked through the Vestibule prior to the fall but because WAL-MART only stored video that shows their back, when other video exists that would have showed their face, WAL-MART was unable to identify those witnesses/employees.

> 16 **Q. On December 24th, 2016, Christmas Eve day,**
> 17 **Wal-Mart understood that other camera angles showing the**
> 18 **slip and fall could have been relevant, yes or no?**
> 19 A. Yes.
> \*\*\*
> 13 **Q. Some of those exhibits you can see folks'**
> 14 **faces, correct? And some of them you couldn't?**
> 15 A. Right.
> 16 **Q. In the ones that you couldn't, would the other**
> 17 **camera angles that were not preserved have shown their**
> 18 **faces?**
> 19 MS. CHAVEZ: Objection. Form.
> 20 THE WITNESS: Possibly. There's one on there

21 I saw him very clearly and I have no idea who he
22 is.
23 BY MR. TUCKER:
24 **Q. For example, what was "10" that we provided,**
25 **there's two women walking out of the store?**
1 A. Yes.
2 **Q. And Wal-Mart has not been able to identify**
3 **those, yes?**
4 A. Correct.
5 **Q. And in the corner, which is the one in Exhibit**
6 **3 that we've circled, there's a camera, yes?**
7 A. Yes.
8 **Q. Would that camera have shown those two women's**
9 **faces?**
10 MS. CHAVEZ: Objection. Form.
11 THE WITNESS: Possibly.
12 BY MR. TUCKER:
13 **Q. Do you think, as the Co-manager of Wal-Mart**
14 **and as the Corporate Representative of Wal-Mart, that**
15 **Wal-Mart would have been able to identify those women if**
16 **they would have been able to see their faces in a**
17 **different angle --**
18 MS. CHAVEZ: Objection. Form.
19 THE WITNESS: Possibly.
20 BY MR. TUCKER:
21 **Q. How many people were in that meeting on**
22 **January 16th?**
23 A. The management meeting? Maybe 13.
24 **Q. And 13 folks were looking at these images to**
25 **see if –**
1 A. They could recognize them. And we also showed
2 it to Personnel to see if she could recognize them but
3 this, Personnel usually knows everybody.
4 **Q. How do they know, by looking at their faces?**
5 A. Yes. And a lot of times you know people, like
6 there's Sharon Henry (phonetic). I recognized her and I
7 don't see her face. I see her back but I knew who she
8 was.
9 **Q. Sure, I think we can agree that generally it's**
10 **easier to recognize somebody by their face, yes?**
11 A. Yes.

[*See* Ex. H, p. 141 ll. 16-19];[*Id.*, p. 142 l. 13-p. 44 l.11].

WAL-MART was required to designate a Corporate Representative that could discuss, *inter alia*, (No. 28) Steps WAL-MART took to comply with Plaintiff attorney's January 9, 2017 preservation request; (No. 29) WAL-MART's anticipation of litigation from the date of the slip and fall to the service of the lawsuit in this matter; (No. 30) Steps WAL-MART took to preserve ESI and evidence in this matter; (No. 32) Steps WAL-MART took to stop an automatic overwriting process of the CCTV footage; (No. 33 WAL-MART's decision to remove only a single camera from the automatic overwriting system. [*See* Exhibit "J", Notice of Corporate Rep Deposition].

WAL-MART received the preservation letter and failed to take any steps to preserve all of the relevant cameras, including the three other cameras inside of the store, and cameras outside of the store. [*See* Ex. A].

Therefore, the second element of spoliation of evidence is met in this case. *Walter*, 2010 WL 2927962, *2; *Long*, 2013 WL 12092088, *5.[1]

> **C. Spoliation Element #3 / Circumstantial Bad Faith Element #1: The CCTV footage could fairly be supposed to have been material to the proof of Plaintiff's negligence claim at issue here and WAL-MART knew of its duty to preserve all relevant CCTV footage.[2]**

Plaintiff believes the CCTV footage here depicted not only the incident, but also important events that go to **WAL-MART**'s actual notice of the wet floor, the existence of a

---

[1] Further, as pointed out by the Southern District in *Long*, "Federal law recognizes a litigant's duty to preserve evidence once it knows, or should know, that such evidence may be relevant to any potential litigation, even before litigation commences." *Long*, 2013 WL 12092088, *5 (citation omitted).
[2] In *Walter v. Carnival*, the court held that in order to prove bad faith with circumstantial evidence, the party seeking sanctions must show that "evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case." *Walter v. Carnival*, 2010 WL 2927962, *2. This is similar to the last element required to establish spoliation, proving that "the evidence was crucial to the movant being able to prove its prima facie case or defense." *Id.* The Southern District has noted that this burden is light, otherwise "the spoliators [would] profit from the destruction of the evidence." *In re Boston Boat III*, 310 F.R.D. at 521.

dangerous condition, **WAL-MART**'s failure to warn, and causation of Plaintiff's injuries—all elements of Plaintiff's prima facie negligence claim that Defendant disputes in its Answer and Affirmative Defenses. Boston Boat, 310 F.R.D. at 520.

WAL-MART predictably takes the position that the CCTV footage did not depict anything crucial to Plaintiff's negligence claim in this case, but Plaintiff's burden is light on this issue. *Boston Boat III*, 310 F.R.D. at 521. Six of the deposed eyewitnesses gave varying accounts of the events that occurred immediately before and after the incident causing Plaintiff's injuries, and Plaintiff believes Defendant will attempt to discredit the testimony of these eyewitnesses.

Because a significant amount of video was destroyed, numerous issues, such as whether there was water outside (requiring floor mats according to WAL-MART), whether there was a source of the substance and areas with the substance included additional areas outside of the CCTV video footage, and additional WAL-MART employees who could have testified to actual knowledge of the substance on the ground.

These events would also go to notice, along with the existence of a dangerous condition, which are essential components of Plaintiff's negligence claim. *See Caldwell v. Carnival Corp.*, 944 F. Supp. 2d 1219, 1223 (S.D. Fla. 2013).

As a result of the slip and fall, POLLY BASSETT suffered severe and painful injuries, including an injured right knee. If the CCTV footage showed the areas outside of the CCTV video produced, it would have showed additional water on the ground, as well as the location of the bottled water stored for cart pushers just outside view of the video produced.

In particular, the cart pusher, Albert Scarlette, is seen at 6:45:15 AM, approximately an hour before the slip and fall, holding four bottles of water—***some sideways***, walking right over the area Plaintiff falls.  [*See* Exhibit "K"].  Mr. Scarlette slides between the carts without water

bottles and exits from the CCTV video stage left.  *Id*, p. 1 at 6:43:43 AM.  He reappears from the left and walks to the right with **four** water bottles in hand, while some are held completely sideways.  *Id*.

> **D. Circumstantial Bad Faith Element #2: WAL-MART engaged in an affirmative act**
> **causing the CCTV footage to be lost or destroyed.**

The fact that WAL-MART violated its own evidence preservation procedures in this case lends credit to Plaintiff's theory that WAL-MART's asset protection manager *intentionally destroyed* the CCTV footage when he unilaterally decided—without WAL-MART's permission or direction—to record other camera angles to his cell phone, but not store any relevant portion from those cameras.

> 10 **Q (By Ms. Guiterrez) Is it possible that in this**
> 11 **circumstance you just used your cell phone as part of**
> 12 **your investigation instead of evidence management?**
> 13 A Yes.
> 14 **Q And those videos on your cell phone, those are**
> 15 **not official Walmart videos, correct?**
> 16 A No.
> 17 **Q Is that correct?**
> 18 A Yes.

[*See* Ex. B, p. 10 ll.10-18].

And yet:

> 11 **Q Why did you record video to your cell phone in**
> 12 **this case?**
> 13 A To investigate the incident and follow up.
> 14 **Q Why would you store to your cell phone by**
> 15 **taking a video as opposed to putting it on a CD or the**
> 16 **evidence management system?**
> 17 A I cannot recall why for all the video.

[*See Id.,* p. 109 ll.14-17].  There has never been a valid explanation for destroying the additional camera angles in the Vestibule.

And yet even further, Defendant WAL-MART produced a new piece of discovery—EXHIBIT D-1—never before produced. [*See* Exhibit "L", Defendant's Exhibit for Trial D-1]. Exhibit D-1 is a cropped photo of the CCTV footage from the time 6:12:05 AM, approximately 30 minutes earlier than any previously known time to exist. It tends to show that WAL-MART has additional video that it withheld. Keep in mind, that somebody had to provide this to Defendant's counsel but Defendant's counsel withheld it from Plaintiff for an entire year.

In *Mitchell v. Royal Caribbean Cruises, Ltd.*, 2013 WL 12066018, the Southern District of Florida declined to award sanctions, pointing out that the CCTV "tape recorded over itself within 14 days after the incident, long before Plaintiff commenced this lawsuit." *Mitchell v. Royal Caribbean Cruises, Ltd.*, 2013 WL 12066018, *2.

The CCTV footage in this case admittedly "**no longer exists**" [Ex. "H"]—the same status as the CCTV footage in *Long v. Celebrity* where the court awarded sanctions:

> After 14 days, the ship's CCTV's video, which is maintained on a computer hard drive, is overwritten in the normal course. The original CCTV footage of the Plaintiff's fall was thus **permanently lost** at that point in time. And, as it turns out, neither [the security officer] nor the subordinate unknown Officer he asked for assistance were able to download the video footage onto a thumb drive or [the security officer's] laptop before that happened. Consequently, **the video footage no longer exists**.

*Long*, 2013 WL 12092088, *1 (emphasis supplied). Nor did WAL-MART even know the steps to prevent overriding and couldn't answer Number 32 on the Corporate Rep Deposition Notice, and further has no knowledge about WAL-MART's decision to store only a single camera angle. [Ex. "H" p. 135 l. 1-p. 136 l. 23]. In *Long*, the Southern District found this reckless destruction of evidence sufficient to warrant sanctions.

But Plaintiff submits that there are more circumstances showing bad faith spoliation of evidence in this case than even there were in *Long v. Celebrity*.

> **E. Circumstantial Bad Faith Element #3: WAL-MART knew of its duty to preserve the CCTV footage at the time it was destroyed.**

As discussed in section B, *supra*, WAL-MART knew of its duty to preserve the CCTV footage in this case. *See Long*, 2013 WL 12092088, *5 ("Why else would he have tried to save the video in the first place but for its possible use in future litigation?").

Despite all of this, WAL-MART knew of its duty to preserve all video because the company is "sure" it received the preservation letter from Exhibit A.

> 8 **Q. Did you watch the video as a result of**
> 9 **receiving a Preservation Letter in this case?**
> 10 MS. CHAVEZ: Objection to form.
> 11 THE WITNESS: I didn't receive the
> 12 Preservation Letter.
> 13 BY MR. TUCKER:
> 14 **Q. Wal-Mart didn't receive a Preservation Letter?**
> 15 A. I'm sure -- Wal-Mart is the company who
> 16 received it. I did not personally look at a
> 17 Preservation Letter.

[*See* Ex. H, p. 107 l. 1-17].

> **F. Circumstantial Bad Faith Element #4: WAL-MART cannot credibly explain the loss or destruction of the CCTV footage as not involving bad faith.**

In fact, WAL-MART effectively "hid the ball" from Plaintiff during the course of discovery into this issue. It took months to uncover video and additional digging to find out that additional camera angles existed, were relevant, and were destroyed.

> 20 **Q Did you preserve the hour before and the hour**
> 21 **after -- to the hour after the video of Camera 3?**
> 22 A No.
> 23 **Q Did you preserve the slip and fall itself from**
> 24 **Camera 3?**
> 25 A No.
> 1 **Q Could you have?**
> 2 A Yes.
> 3 **Q Why didn't you?**
> 4 A Because that camera didn't show the complete
> 5 fall during review. First is Camera 2 show more of the

    6 fall and more of her entering the store and the
    7 mechanics of the fall.

[*See* Ex. B, p. 46 l. 20-p.47 l. 7]

    1 **Q Okay. And you testified a moment ago you've**
    2 **said it a few times now that you move video to evidence**
    3 **management when you're investigating?**
    4 A Yes.
    5 **Q And you can export it to evidence management**
    6 **from the DVR?**
    7 A Yes.
    8 **Q Why was that not done in this case?**
    9 A I cant answer that question.
    10 **Q But it wasn't done, right?**
    11 A No, I can't recall it being done.
    12 **Q If it was done, would you have found it?**
    13 A Potentially.
    14 **Q Did you look in this case to try to find video**
    15 **in evidence management?**
    16 A Yes.
    17 **Q Did you find any?**
    18 A No.

[*See* Ex. B, p. 77 lines 1-18].

    3 **Q Could you have preserved more?**
    4 A Yes, if I have been directed to.
    5 **Q Directed by who?**
    6 A Walmart.
    7 **Q Who at Walmart?**
    8 A Claim adjuster.

[*See* Ex. B, p. 134 l.3-8].

    18 **Q (By Mr. Tucker) Is there any reason that you**
    19 **only preserve an hour before to an hour after when this**
    20 **letter dated January 9th requested for 24 hours?**
    21 MS. GUITERREZ: Objection to form. Asked and
    22 answered.
    23 A Because we are required by Walmart to preserve
    24 an hour before and hour after the incident.

[*See* Ex. B, p. 135 l. 18-24].  WAL-MART's argument, despite receiving the preservation letter

[*See* Ex. A] is that WAL-MART's policy is simply to save an hour before and an hour after the

incident. Yet, WAL-MART never produced any policies and procedures relating to the preservation of videos in this case. The more likely explanation is that WAL-MART and the asset protection manager intentionally destroyed video. Of course, Plaintiff may never know—which is why sanctions should be granted based on the foregoing circumstances. *Long*, 2013 WL 12092088, *6 ("Courts recognize that because a movant often faces a difficult burden in proving bad faith, and as direct evidence of bad faith is rarely available, circumstantial evidence can be used." (citations omitted)).

### G. Plaintiff's requested sanctions: adverse jury instruction or striking of defenses.

Upon a finding of bad faith, even with circumstantial evidence, the Court has the discretion to award appropriate sanctions. *Long*, 2013 WL 12092088; *Walter*, 2010 WL 2927962; *Boston Boat*, 310 F.R.D. 510, 514-515 ("Factors to be considered when determining the seriousness of the sanctions to impose against a party for failure to preserve critical evidence in its custody vary according to (1) the willfulness or bad faith of the party responsible for the loss or destruction of the evidence; (2) the degree of prejudice sustained by the opposing party; and (3) what is required to cure the prejudice." (citation omitted)).

Plaintiff respectfully requests that the Court award a mandatory adverse inference jury instruction at trial as a sanction for WAL-MART's intentional destruction of the CCTV footage in this case. Plaintiff's proposed mandatory instruction is as follows:

> **The term "spoliation" refers to the failure to preserve evidence that is necessary to contemplated or pending litigation. The law provides that spoliation creates a rebuttable presumption that the evidence not preserved was unfavorable to the party responsible for the spoliation.**
>
> **The Court has determined as a matter of law that the Defendant is responsible for the spoliation of the CCTV footage of the incident in this case.**
>
> **The Court has further determined that Plaintiff is prejudiced by Defendant's spoliation of evidence.**

> **Accordingly, you must infer or presume that the spoliated evidence was unfavorable or harmful to the Defendant's case, and that it was favorable to the Plaintiff's case. The Defendant may, however, rebut that presumption.**

Plaintiff also recognizes that the Court may not agree that Plaintiff's proposed mandatory adverse inference is appropriate. In the alternative, Plaintiff proposes the following permissive adverse inference instruction (still a rebuttable presumption):

> **You have heard testimony about potential evidence which the Defendant failed to produce. Plaintiff has argued that this evidence was in Defendant's control and would have proven facts material to the issue of negligence.**
>
> **If you find that this evidence was then within Defendant's control, that Defendant could have preserved this evidence so that it was available for the parties in preparing for trial in this case, and that this evidence would have been material in deciding the facts in dispute in this case, then you are permitted, but not required, to infer that the evidence would have been favorable to the Plaintiff and unfavorable to the Defendant.**
>
> **Any inference you make should be based on all of the facts and circumstances in this case.**

## CONCLUSION

As a result of WAL-MART's intentional destruction of the CCTV footage depicting the incident in this case, Plaintiff seeks spoliation sanctions against WAL-MART in the form of a mandatory adverse inference jury instruction, or a permissive adverse inference jury instruction. Plaintiff is undoubtedly prejudiced by WAL-MART's destruction of the CCTV footage in this case. *Boston Boat*, 310 F.R.D. 510, 514-515.

Plaintiff, however, does not request a sanction similar to that the Southern District awarded in *Long v. Celebrity*, where the court barred both parties from referencing the contents of the CCTV footage at trial. *Long*, 2013 WL 12092088, *8. Instead, Plaintiff deservedly believes the destruction of the CCTV footage was the lynchpin in this case, and Plaintiff wants to present this issue to the jury. *Boston Boat*, 310 F.R.D. at 514 ("A party is permitted to ask the

trial court to allow it to introduce into evidence at trial the circumstances surrounding the opposition's failure to retain and produce evidence, even when the trial court rejects the request for an adverse inference jury instruction." (citation omitted)).

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter an Order sanctioning Defendant, WAL-MART, for its bad faith in the destruction of CCTV footage depicting the incident in this case; specifically, Plaintiff seeks a mandatory adverse inference jury instruction at trial, or a permissive adverse inference jury instruction at trial, as set forth above. Should the Court deny Plaintiff's requests for sanctions or reserve ruling, Plaintiff seeks leave of Court to present this spoliation issue to the jury, as recognized in *Boston Boat*. 310 F.R.D. at 514.

## RULE 7.1(a)(3) CERTIFICATION

Pursuant to Local Rule 7.1(a)(3) of the Local Rules for the Southern District of Florida, I hereby certify that undersigned counsel for Plaintiff has conferred with counsel for Defendant who opposes the relief sought.

Respectfully submitted,

Dated: October 3, 2019

By: s/Matthew Sean Tucker
Matthew Sean Tucker
Florida Bar No. 90047
Tucker Law®
200 SE 6TH Street, Suite 405
Fort Lauderdale, FL 33301
Telephone: (954) 204-0444
Facsimile: (954) 358-4946
Matt@TuckerUp.com
*Attorney for Plaintiff(s)*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on October 3, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that service was perfected on all counsel of record and interested parties through this system.

By: s/Matthew Sean Tucker