UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 0:18-61984-CIV-ALTMAN/HUNT

POLLY BASSETT,

     Plaintiff,

v.

WAL-MART STORES EAST, LP

     Defendant.

_____/

### DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendant Wal-Mart Stores East, L.P., by and through undersigned counsel, and under Federal Rule of Civil Procedure 50(a), moves for judgment as a matter of law and states:

### Preliminary Statement

Plaintiff sued Wal-Mart based on an alleged slip and fall incident occurring in their store. (ECF No. 3, Am. Compl.). The only count against Wal-Mart is a simple negligence claim. (*Id.*).

The ultimate issue in a negligence claim, such as this one, is whether there was a dangerous condition in the first instance and whether the defendant had actual or constructive notice of it. Wal-Mart moves for judgment as a matter of law because there is no evidence of a dangerous condition, and assuming one was present, Wal-Mart did not have actual or constructive notice, and therefore, cannot be liable. The facts and inferences point strongly and overwhelmingly for Wal-Mart that

reasonable men could not arrive at a contrary verdict. Accordingly, this Court should remove the case from the jury and enter judgment as a matter of law for Wal-Mart.

## Memorandum of Law & Analysis

### I.  Legal standard for a Rule 50(a) motion for judgment as a matter of law

The Eleventh Circuit has set forth the standard for review on a motion for judgment as a matter of law:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence - - not just the evidence which supports the non-mover's case - - but in light and with all reasonable inferences most favorable to the party opposed to the motion. *If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper.* On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. *A mere scintilla of evidence is insufficient to present a question for the jury.* The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. *There must be conflict in substantial evidence to create a jury question.*

*Von Stein v. Breschner*, 904 F.2d 572, 578 (11th Cir. 1990) (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 374-75 (5th Cir. 1969)) (emphasis added). Judgments as a matter of law are appropriate when there is no substantial conflict in evidence to support a jury question. *See Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.

2

1989) ("there must be a substantial conflict in evidence to support a jury question"); *see also Walker v. NationsBank of Florida N.A.,* 53 F.3d 1548, 1555 (11th Cir. 1995) (to deny a motion for judgment as a matter of law, "there must be a conflict in substantial evidence," so "reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions"). The non-moving party "must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000).

Here, if the Court views the above evidence and all logical inferences in the light most favorable to Plaintiff, there is still no substantial conflict in evidence to support a jury question—there is no evidence, expert or otherwise, which would permit a negligence finding under any theory. Despite the evidence Plaintiff has presented, she had failed to meet her burden and has presented no evidence to establish actual or constructive knowledge of a dangerous condition on Wal-Mart's part. Further, there are no reasonable inferences to be drawn from the evidence submitted that would support her claim for relief. Accordingly, Wal-Mart is entitled judgment as a matter of law.

## II.   Lack of liability absent actual or constructive knowledge of a foreign substance

It is undisputed that Plaintiff was an invitee at Wal-Mart's store at the time of the incident. As a business owner, Wal-Mart owed two duties to invitees: (1) to take ordinary and reasonable care to keep its premises reasonably safe; and (2) to warn of perils known or that should have been known and of which the invitee could not

3

discover. *See Delgado v. Laundromax, Inc.*, 65 So. 3d 1087, 1089 (Fla. 3d DCA 2011). The mere fact, however, an invitee slips and falls on the floor of a defendant's premises does not constitute evidence of negligence; negligence may not be inferred from the mere happening of an accident alone. *See Belden v. Lynch*, 126 So. 2d 578, 581 (Fla. 2d DCA 1961). Rather, a plaintiff must demonstrate a breach in the duty of care owed by the defendant.

Plaintiff's cause of action triggers Florida Statute § 768.0755, titled "Premises liability for transitory foreign substances in a business establishment."[1] Section 768.0755 sets forth the burden of proof Plaintiff must meet to establish such a breach. Section 768.0755 provides that a person who slips and falls on a transitory substance in a business establishment must "prove that the business establishment had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it." The plaintiff may prove the business establishment has constructive knowledge by circumstantial evidence showing:

> (a) The dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition; or
> (b) The condition occurred with regularity and was therefore foreseeable.

*Id.*

---

[1]     A federal court siting in diversity applies the substantive law of the state in which the case arose. *See Pendergast v. Sprint Nextel Corp.,* 592 F.3d 1119, 1132-33 (11th Cir. 2010). Plaintiff's negligence claim arises from alleged injuries sustained at a Wal-Mart store in Florida. (ECF 3, Am. Compl.). Thus, the principles of Florida law govern this action.

4

Florida Statute § 768.0755 does not provide for strict liability standard for slips on transitory conditions—negligence may not be concluded from the mere happening of an accident alone. *See Winn-Dixie Stores, Inc. v. Marcotte*, 553 So. 2d 213, 214 (Fla. 5th DCA 1989) ("An entity in the actual possession and control of a premises, such as a supermarket, to which members of the public are invited, is not an insurer of the safety of such persons…"). Wal-Mart cannot be held liable under a theory of constructive notice without evidence of how long the substance existed on the floor before the alleged incident. *See Berard v. Target Corp.,* 559 F. App'x 977 (11th Cir. 2014) (affirming summary judgment when the plaintiff had not shown the spill existed for such a length of time that the defendant-store should have known about it); *Ayers v. Wal-Mart Stores, E., L.P.*, No. 15-24663-CIV, 2017 WL 747541, at *2 (S.D. Fla. Feb. 27, 2017) ("[*T*]*he mere presence of the substance on the floor is not enough*; the record must have additional facts to create a permissible inference about the time the foreign substance had been on the floor.... without this evidence, a finding of negligence would be sheer speculation.") (emphasis added) (citation omitted).

Plaintiff has presented no evidence to demonstrate Wal-Mart had actual or constructive notice of the presence of any dangerous condition on the floor. Therefore, a judgment as a matter of law is appropriate because Plaintiff has established no breach in the duty of care owed by Wal-Mart.

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, ·Miami, Florida 33131 ·Telephone: 305-379-3686 ·Facsimile: 305-379-3690

### A.    There is no evidence of any dangerous condition.

In the first instance, Plaintiff has presented no evidence establishing a dangerous or defection condition existed that could have caused her fall. *See generally Winn Dixie v. White*, 675 So. 2d 702 (Fla. 4th DCA 1996) (trial court erred in denying Winn Dixie's motion for direct verdict because negligence "may not be inferred from the mere happening of an accident alone"). Wal-Mart's closed circuit television system's video disposes of this case. The video shows *no* water which Plaintiff contends is the dangerous condition that caused her to slip. Plaintiff pleads for this Court to believe her instead of the Court's own eyes.

When a video recording contradicts a party's version of the facts, the Court may accept the video's depiction instead of the party's. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) ("where an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible"). Video footage is reliable evidence in slip-and-fall cases and it can and should be considered when appropriate. *See, e.g., Lavora v. NCL (Bahamas) Ltd.*, No. 15-24285-CIV, 2016 WL 7325592, at *3 (S.D. Fla. Dec. 16, 2016). It is well-established that the plaintiff's speculation regarding the cause of her fall cannot create a genuine issue of material fact for trial. *See generally J.B. v. Amerson*, 519 F. App'x 613, 619 (11th Cir. 2013) (affirming summary judgment due to video footage even with conflicting deposition testimony).

At no point in the hour leading to the fall is there any indication of a spill, leak, or tracking of water, or of any liquid or substance in the area where Plaintiff falls.

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, ·Miami, Florida 33131 ·Telephone: 305-379-3686 ·Facsimile: 305-379-3690

Dozens of customers and many employees walk past and directly over and on the incident location during the period before the incident and no one other than Plaintiff slipped. The video (which provides an unobstructed view of events) is obviously contradictory of Plaintiff's self-serving testimony—the video establishes there was nothing on the floor where Plaintiff slips. After seeing the video, no reasonable jury could conclude there was any foreign substance on the floor. Plaintiff cannot demonstrate she fell because of any dangerous condition at the store or that Wal-Mart breached its duty of reasonable care. The video evidence unquestionably demonstrates Plaintiff did not slip on any liquid. And the undisputed evidence demonstrates Plaintiff did not slip for the reasons she claims. She instead fell because of her own actions (or inactions).

**B.     There is no evidence to support actual knowledge of a foreign substance on the floor.**

There is no evidence to demonstrate Wal-Mart actually knew of the presence of a dangerous condition on the floor before the fall. Plaintiff did not testify that any Wal-Mart employee knew of the substance before her fall, and Plaintiff presented no evidence in this regard. No Wal-Mart employee testified they knew of the substance before the fall. Thus, Plaintiff has presented no evidence to support the allegation Wal-Mart had actual notice of the alleged substance.

**C.     There is a lack of evidence to support constructive knowledge of a foreign substance on the floor.**

There is also no evidence demonstrating Wal-Mart had constructive knowledge of the presence of a foreign substance on the floor before the fall. Just before the

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, ·Miami, Florida 33131 ·Telephone: 305-379-3686 ·Facsimile: 305-379-3690

fall, Plaintiff denies having seen any liquid on the floor. Further, Plaintiff provides no evidence establishing how long the alleged water had been on the floor before her fall. In sum, *Plaintiff has no evidence establishing how the condition was created, who caused it, or that any Wal-Mart employee had constructive knowledge of its presence.*

In *Lester's Dinner II, Inc. v. Gilliam*, 788 So. 2d 283, 284-85 (Fla. 4th DCA 2000), the plaintiff testified that after her fall she saw a man with a tool kit and noticed a very light oil (WD40) on her hands and clothes. She then noticed a waitress and hostess wiping the floor with paper towels. *Id.* at 285. The defendant moved for a directed verdict because the plaintiff failed to prove the nature of the substance on the floor, how it got there, or how long it had been there.

The Fourth District reversed the denial of the defendant's motion for directed verdict and ordered judgment in the defendant's favor be entered. The court held that the plaintiff failed to prove the requirement that the defendant have actual or constructive notice of the dangerous condition as it related to the substance on the floor. *Id.* No one saw any substance, and there was no evidence as to how the oily substance got there or how long it had been there. *Id.*

Further, in *Miami-Dade Cty. v. Jones*, 232 So. 3d 1127 (Fla. 3d DCA 2017), the court held it was reversible error to deny a motion for directed verdict, even after a jury found the defendant liable at trial, where there was no evidence of actual or constructive notice of the dangerous condition (a grease spill on a County-owned sidewalk). The Third District determined the patron who slipped and fell on the

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, · Miami, Florida 33131 · Telephone: 305-379-3686 · Facsimile: 305-379-3690

greasy sidewalk outside a barbecue stand failed to present legally sufficient evidence the County had constructive notice of the grease spill. The plaintiff-patron presented no evidence regarding (i) the cause of a discoloration on the sidewalk, (ii) that anyone had complained of a grease spill, or (iii) that the County inspectors and employees who had previously been in the area saw grease or that inspections were conducted in response to a call relating to a grease spill. *Id.* at 1130.

Likewise, in *Silver Springs Moose Lodge No. 1199 v. Orman*, 631 So. 2d 1119, 1120 (Fla. 5th DCA 1994), an injured patron sued a bingo hall operator for injuries she sustained when she slipped and fell on what she thought was rainwater that came from a dripping umbrella or shoe. Neither the plaintiff nor her companion actually saw water on the floor before she slipped. Similarly, no one could say how long the water had been there before she fell and there was no circumstantial evidence it had been there for any length of time.

On appeal, the Fifth District reversed the trial court's denial of the defendant's motion for directed verdict, finding the initial inference that water had been on the premises long enough to constructively notice the premises owner of the dangerous condition, was not proven to the exclusion of other reasonable explanations. *Id.* at 1121.

Also, in *Palavicini v. Wal-Mart Stores East, L.P.*, No. 18-14329-JJ, 2019 U.S. App. LEXIS 27462 (11th Cir. 2019), Evelyn Palavicini slipped and fell on liquid on the floor of a Wal-Mart store. She did not know how or when the liquid got on the floor, but alleged an unidentified female employee told her an air conditioning vent

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, ·Miami, Florida 33131 · Telephone: 305-379-3686 · Facsimile: 305-379-3690

had been leaking for one week before the incident. She testified, however, that she did not remember seeing the ceiling leak. The store's surveillance camera captured the store's assistant manager walking and standing in the immediate area where Palavicini slipped and fell two minutes before the incident. After falling, Palavicini observed the liquid on the floor to be "yellow" and "dirty" but she saw no liquid before falling.

Ms. Palavicini sued Wal-Mart alleging negligence, and Wal-Mart moved for summary judgment. The district court granted the motion holding that Palavicini failed to provide sufficient evidence to support a reasonable inference Wal-Mart had constructive notice of the liquid on the floor. Ms. Palavicini appealed.

The Eleventh Circuit affirmed. The court held:

> Taken in the light most favorable to Palavicini, the evidence shows that she slipped and fell on a liquid substance on the floor at Wal-Mart. Palavicini did not see the liquid before falling, did not know where the liquid came from, did not know how long it had been present before falling, and did not know of any Wal-Mart employees who were aware of the liquid on the floor immediately before falling. Although she testified that the liquid on the floor appeared to be "yellow" and "dirty," she did not know what caused the liquid to be dirty.

*Id.* at *10-11. The court reasoned that the mere presence of water on the floor is not enough to establish constructive notice and the record must contain additional facts to allow for a permissible inference about the amount of time the water had been on the floor. *Id.* at *13-14. There were no additional facts in the record supporting constructive notice. *Id.* at *13.

10

And in *Berbridge* the plaintiff claimed she slipped and fell on water that had leaked from an overhead AC unit and accumulated in the defendant-Sam's Club's frozen-food aisle. *See Berbridge v. Sam's East, Inc.*, 728 F. App'x 929 (11th Cir. 2018). The district court entered summary judgment in the defendant-store's favor. *Id.* at 929.

On appeal, the Eleventh Circuit determined:

> In the light most favorable to Berbridge, the evidence showed that she slipped and fell on a liquid substance on the floor of the frozen-food aisle at a Sam's Club. She did not see the substance before slipping in it and did not know how long it had been there. She testified that it was "medium size" but "wasn't that big," wet but not sticky, and "dark" and "dirty." She did not know what caused the substance to be dirty. She saw no cart tracks or footprints in the substance, besides the mark caused by her shoe when she slipped. When she informed an employee of her fall and pointed out the substance, the employee noted that an overhead air conditioning unit was dripping from above where she slipped. Before she left the area, she observed a drop of liquid fall from the AC unit. She testified that it was not dripping heavily.

*Id.* at 930-931. Given these facts, the court held that the evidence was "not enough for a reasonable jury to infer that the liquid substance 'had been on the floor for a sufficient length of time to charge the store owner with constructive knowledge of its presence.'" *Id.* at 932.

Florida Statute § 768.0755 places the burden on Plaintiff to establish that as the business owner, the defendant had constructive knowledge of the dangerous condition and should have remedied it. Plaintiff, however, offers no evidence to this

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, ·Miami, Florida 33131 ·Telephone: 305-379-3686 ·Facsimile: 305-379-3690

effect. Nor is there any evidence any Wal-Mart employee observed water on the floor before the fall.

The record evidence establishes exactly the contrary of constructive notice. It demonstrates Wal-Mart was exercising ordinary care in maintaining the premises in a reasonably safe manner so there was no constructive knowledge of a dangerous condition. *See* Fla. Stat. § 766.0755. Plaintiff has presented no evidence showing the alleged substance was on the floor for a sufficient period of time such that Wal-Mart should have known of its presence.

The other manner Plaintiff might establish constructive knowledge would be to demonstrate a substance on the floor was a regular occurrence, and therefore foreseeable. But Plaintiff has presented no evidence about any other slip and fall occurrences in the area where this incident occurred, and there is no testimony regarding any prior slip and falls on water in the area. Therefore, Plaintiff has failed to satisfy her burden of establishing constructive notice.

## Conclusion

Wal-Mart respectfully request the Court enter judgment as a matter of law for Wal-Mart, and for such other, further, and different relief as this Court should deem just and proper.

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200, · Miami, Florida 33131 · Telephone: 305-379-3686 · Facsimile: 305-379-3690

Dated: October 21, 2019

Respectfully submitted,

/s/ Jerry D. Hamilton
Jerry D. Hamilton
Florida Bar No. 970700
jhamilton@hamiltonmillerlaw.com
William H. Edwards
Florida Bar No.
wedwards@hamiltonmillerlaw.com
HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200
Miami, Florida 33131-2332
Telephone:   (305) 379-3686
Facsimile:    (305) 379-3690
**Attorneys for Wal-Mart Stores East, LP**

## CERTIFICATE OF SERVICE

**HEREBY CERTIFY** that on October 21, 2019, I certify that the foregoing is being served this day to: Matthew Sean Tucker, Esq. Tucker Law, 200 SE 6th Street, Suite 405, Fort Lauderdale, Florida 33301, Matt@TuckerUp.com.

/s/ Jerry D. Hamilton
Jerry D. Hamilton, Esq.

13

HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200,  · Miami, Florida 33131 · Telephone: 305-379-3686 · Facsimile: 305-379-3690

 Positive

As of: October 18, 2019 5:41 PM Z

## *Ayers v. Wal-Mart Stores, East, L.P.*

United States District Court for the Southern District of Florida

February 27, 2017, Decided; February 27, 2017, Entered on Docket

Case No. 15-24663-CIV-GAYLES

**Reporter**

2017 U.S. Dist. LEXIS 26986 *; 2017 WL 747541

SERGIO AYERS, Plaintiff, v. WAL-MART STORES, EAST, L.P., Defendants.

## Core Terms

floor, aisle, constructive knowledge, dangerous condition, summary judgment, foreign substance, employees, slipped, liquid, minute, walked

**Counsel:** **[*1]** For Sergio Ayers, Plaintiff: Gary Brian Englander, LEAD ATTORNEY, Englander Peebles, Fort Lauderdale, FL; Kevin Bruce Dennis, Thomas Pearl, Fort lauderdale, FL.

For Wal-Mart Stores, Inc., Defendant: Schuyler Analise Smith, Jerry Dean Hamilton, Hamilton, Miller & Birthisel LLP, Miami, FL.

For Wal-Mart Stores East, LP, Defendant: Schuyler Analise Smith, Hamilton, Miller & Birthisel LLP, Miami, FL.

**Judges:** DARRIN P. GAYLES, UNITED STATES DISTRICT JUDGE.

**Opinion by:** DARRIN P. GAYLES

## Opinion

### ORDER

**THIS CAUSE** comes before the Court on Wal-Mart's Motion for Summary Judgment [ECF No. 24]. The Court has carefully considered the motion and the record, and is otherwise fully advised. Based thereon, the Motion is granted.

## I. BACKGROUND

On July 17, 2014, Plaintiff Sergio Ayers ("Plaintiff") and Merline Melidore ("Melidore") went to one of Defendant Wal-Mart Stores, East, L.P. ("Wal-Mart") stores. At approximately 2:50 p.m., Plaintiff slipped and fell on water in the water aisle of the store. [ECF No. 24 ¶ 3]. Melidor witnessed the incident. *Id.* at ¶ 4.

Approximately one minute before the incident, Wal-Mart Department Manager Carolyn Adderley ("Adderley") walked by the water aisle and did not see any water on the floor. *Id.* at ¶ 6. **[*2]** Adderley was about one foot away from where Plaintiff slipped. [ECF No. 28 at ¶ 20]. After the incident, Adderley, Assistant Manager Rachelle Pericles ("Pericles"), Melidore, and Plaintiff each observed the water on the floor. [ECF No. 24 at ¶¶ 7, 8, 9]. It is undisputed that the water was clean with no footprints, track marks, or smudges. *Id.* Neither Adderley nor Pericles knew there was water on the floor before the incident. *Id.* at ¶¶ 6, 13.

Every day from 2:00 p.m. to 3:00 p.m., Wal-Mart employees, conducting a "Zone Defense," walk through the aisles of the store to ensure they are clean and safe. *Id.* ¶ 5. A Wal-Mart employee, Maxine, was assigned to "zone" the water aisle on the day of the incident. [ECF No. 28 at ¶ 24]. Maxine was not present at the time of Plaintiff's fall. *Id.* at ¶ 25.

On October 21, 2016, Plaintiff filed this negligence action in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida. On December 18, 2016, Defendant removed the action to this Court. On October 3, 2016, Defendant filed its Motion for Summary Judgment.

## II. LEGAL STANDARD

Ayers v. Wal-Mart Stores, East, L.P.

Summary judgment, pursuant to *Federal Rule of Civil Procedure 56(a)*, "is appropriate only if the movant shows that there is no genuine issue as to any **[*3]** material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014)* (per curiam) (quoting *Fed. R. Civ. P. 56(a)*) (internal quotation marks omitted). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)* (emphasis in original). An issue is "genuine" when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party in light of his burden of proof. *Harrison v. Culliver, 746 F.3d 1288, 1298 (11th Cir. 2014)*. And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259-60 (11th Cir. 2004)*. "Where the material facts are undisputed and all that remains are questions of law, summary judgment may be granted." *Eternal Word Television Network, Inc. v. Sec'y of the U.S. Dep't of Health & Human Servs., 818 F.3d 1122, 1138 (11th Cir. 2016)*. The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *SEC v. Monterosso, 756 F.3d 1326, 1333 (11th Cir. 2014)*. However, to prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the **[*4]** jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1050 (11th Cir. 2015)*.

## III. DISCUSSION

Plaintiff asserts that Wal-Mart was negligent in allowing a foreign substance to be on the floor of the store. "Under Florida law, which governs this diversity case, a plaintiff bringing a negligence claim based upon a transitory foreign substance on the floor of a business must prove that the business had 'actual or constructive knowledge' of the dangerous condition and should have taken action to remedy it.'" *Garcia v. Target Corp., Case No. 12-20135-CIV-Dimitrouleas/Snow, 2013 U.S. Dist. LEXIS 188277, 2013 WL 12101087 at * 2 (S.D. Fla. February 26, 2013)* (quoting *Fla. Stat. § 768.0755(1)*).

It is undisputed that Wal-Mart had no actual knowledge of the water on the floor. Plaintiff, therefore, argues that Wal-Mart had constructive knowledge of the dangerous condition. For a defendant to have constructive knowledge of the dangerous condition, it is not enough that the foreign substance was on the floor. Rather, Plaintiff must establish that "the dangerous condition existed for such a length of time that in the exercise of reasonable care the condition would have been known to the defendant." *Grimes v. Family Dollar Stores of Florida, Inc., 194 So.3d 424, 427-28 (Fla. 3d DCA 2016).*[1]

The Court finds that Plaintiff has failed to establish an inference of constructive knowledge. There is no evidence to suggest that the water was on the floor for any **[*5]** length of time such that it would have been known to Wal-Mart. Nor was there evidence that any Wal-Mart employee knew about the water on the floor before the incident. "[T]he mere presence of the substance on the floor is not enough; the record must have additional facts to create a permissible inference about the time the foreign substance had been on the floor. . . . without this evidence, a finding of negligence would be sheer speculation." *Garcia, 2013 U.S. Dist. LEXIS 188277, 2013 WL 12101087 at *2.* (internal quotations omitted). Indeed, the water was devoid of dirt, smudges, or track marks. There was nothing about the clear liquid that suggested that it had been on the floor for more than a minute or two. Accordingly, the Court cannot infer that Defendant knew or should have known about the dangerous condition.

This case is factually indistinguishable from *Garcia*. In that case, the plaintiff slipped on a liquid substance in a Target store. The liquid, like the one Plaintiff slipped on in this case, was clear and odorless. There were two Target employees about 10 to 15 feet away from the aisle during the plaintiff's fall and one Target employee walked through the aisle about twelve minutes before the fall, but did not observe any foreign substance **[*6]** on the floor. The Court found that the plaintiff failed to establish an inference of constructive knowledge.

In this case, the Court concludes that Plaintiff has

---

[1] Plaintiff may also establish constructive knowledge by showing that the condition oc-curred so frequently that it was forseeable. *Garcia, 2013 U.S. Dist. LEXIS 188277, 2013 WL 12101087 at *2*. This is not at issue in this case as there is no evidence that water was routinely on the floor of the aisles of the store.

Ayers v. Wal-Mart Stores, East, L.P.

not demonstrated any questions of fact sufficient to support an inference of constructive knowledge. Essentially, Plaintiff claims that between the time the last employee walked through the area, which is either twelve or twenty minutes, water appeared from an unknown source. Though there were two employees about ten to fifteen feet away in a carpeted area hanging clothes, there is no indication that they had a view of the tiled aisle so that they could have seen the liquid. The liquid was clear and there is no evidence of tracks or dirt that could lead an inference that the water had been there long enough to put Target on notice. It would be sheer speculation for a reasonable finder of fact to conclude that the water had been on the floor for long enough to put Target on constructive notice.

 *2013 U.S. Dist. LEXIS 188277, [WL] at *3*. Similarly, Plaintiff has not established that the water in the Wal-Mart aisle had been on the floor long enough for Adderley, Pericles, or any other Wal-Mart employee to be on constructive notice of the dangerous condition. Although **[*7]** Adderley walked by the aisle about a minute before the incident, there is no credible reason to believe that she would have or could have seen the clear substance on the floor.

Plaintiff relies heavily on *Markowitz v. Helen Homes of Kendall, Corporation, 826 So.2d 256 (2002)*. This Court, like the *Garcia* Court, finds *Markowitz* factually distinguishable. In *Markowitz*, three employees were in the "immediate vicinity" of the area where a nursing home resident slipped and fell on a grape. The Court found a question of material fact as to whether the nursing home had constructive knowledge of the dangerous condition. In this case, the Wal-Mart employees were not standing next to the water. In addition, unlike a grape, the water on the ground was not visible. Accordingly, the holding in *Markowitz* is inapplicable to the facts of this case. There is simply insufficient evidence to support an inference of constructive knowledge.[2]

---

[2] Plaintiff also attempts to argue that Wal-Mart somehow failed to comply with its own zone-defense policy and that, therefore, this creates an issue of fact for the jury. The Court disagrees. This is not a negligent mode of operation action where the Plaintiff asserts that the means by which Wal-Mart operates its stores created the dangerous condition. In addition, the evidence of record does not establish that Wal-Mart failed to follow its own policies. Indeed, the record only reflects that Maxine was not in the aisle at the time of the incident.

## IV. CONCLUSION

Based on the foregoing, it is

**ORDERED AND ADJUDGED** that Wal-Mart's Motion for Summary Judgment [ECF No. 24] is GRANTED. Final Judgement shall be entered separately pursuant to *Federal Rule of Civil Procedure 58(a)*.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 27th day of February, 2017.

/s/ Darrin P. Gayles

DARRIN P. GAYLES

UNITED STATES DISTRICT JUDGE

## FINAL [*8] JUDGMENT

**THIS CAUSE** comes before the Court on the Order of February 27, 2017 [ECF No. 50] in which the Court granted Defendant's Motion for Summary Judgment. Pursuant to *Federal Rule of Civil Procedure 58*, it is

**ORDERED AND ADJUDGED** that judgment is entered in favor of Defendant Wal-Mart Stores, East, L.P., and against Plaintiff Sergio Ayers.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 27th day of February, 2017.

/s/ Darrin P. Gayles

DARRIN P. GAYLES

UNITED STATES DISTRICT JUDGE

---

**End of Document**

 Caution
As of: October 18, 2019 5:41 PM Z

# *Berard v. Target Corp.*

United States Court of Appeals for the Eleventh Circuit

April 4, 2014, Decided

No. 13-14793 Non-Argument Calendar

**Reporter**
559 Fed. Appx. 977 *; 2014 U.S. App. LEXIS 6261 **; 2014 WL 1329268

TAMMY BERARD, Plaintiff-Appellant, versus TARGET CORPORATION, Defendant-Appellee.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [**1]** Appeal from the United States District Court for the Middle District of Florida. D.C. Docket No. 8:12-cv-02599-JSM-AEP.

*Berard v. Target Corp., 2013 U.S. Dist. LEXIS 146732 (M.D. Fla., Oct. 10, 2013)*

**Disposition:** AFFIRMED.

## Core Terms

spill, dangerous condition, clean, floor, business establishment, constructive knowledge, mode of operation, summary judgment, foreseeable, regularity, liquid, light most favorable, length of time, material fact, no evidence, foreclosed, injuries, genuine, always, marks

**Counsel:** For Tammy Berard, Plaintiff - Appellant: Debi Chalik, Chalik & Chalik, PA, Plantation, FL.

For Target Corporation, Defendant - Appellee: James A. Coleman, Law Offices of James A. Coleman, PA, Orlando, FL.

For Service: Mark S. Walker, Mediate First, Inc., Orlando, FL.

**Judges:** Before TJOFLAT, JORDAN, and EDMONDSON, Circuit Judges.

## Opinion

**[*977]** PER CURIAM:

Tammy Berard appeals the district court's grant of summary judgment in favor of Defendant Target Corporation on her claim for negligence. While shopping at one of Target's stores, Berard slipped on a liquid substance on the floor. Although Berard did not fall, she suffered personal injuries as a result of the incident. No reversible error has been shown; we affirm.

We review the district court's grant of summary judgment de novo, and we view the evidence and all reasonable factual inferences in the light most favorable to the nonmoving party. *Skop v. City of Atlanta, 485 F.3d 1130, 1136 (11th Cir. 2007)*. "Summary judgment is appropriate if the evidence establishes 'no genuine issue as to any material fact and that the moving party is **[**2]** entitled to judgment as a matter of law.'" *McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003)*.

Under Florida law, a person who "slips and falls on a transitory foreign substance in a business establishment, . . . must prove that the business establishment had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it." *Fla. Stat. § 768.0755(1)*.

**[*978]** Berard does not argue -- and nothing evidences -- either that Target caused the spill or had actual knowledge of the spill. Thus, to establish Target's liability under the statute, Berard must show that Target had constructive knowledge of the spill. "Constructive knowledge may be proven by circumstantial evidence showing that: (a) the dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition; or (b) The condition occurred with

Berard v. Target Corp.

regularity and was therefore foreseeable." Id.

Berard testified that the liquid substance on the floor appeared to be water. The liquid was "clean," "clear," and not "dirty." The area around the spill was "clean and dry" and, although the spill was in a high **[**3]** traffic area of the store, Berard saw no footprints, cart tracks, or other marks through the spill. Both Berard's daughter-in-law (who was with Berard at the time of the incident) and Target's store manager described the spill as "appear[ing] to be fresh."

Viewing this evidence in the light most favorable to Berard, she has not shown that the spill existed for such a length of time that Target should have known about it. See *Wal-Mart Stores, Inc. v. King, 592 So. 2d 705, 706-07 (Fla. Ct. App. 1991)* (reversing a jury verdict in favor of a slip-and-fall plaintiff when the spilled substance displayed no "obvious signs of age, such as skid marks, smudges, dirt or the like" and nothing evidenced how or when the substance got on the floor). Berard has also presented no evidence that spills occur with such regularity that the dangerous condition was foreseeable to Target.

We reject Berard's contention that this case is analogous to the Southern District of Florida's decision in *Linares v. The Home Depot, U.S.A., Inc., No. 12-60308-CIV-MARRA/BRANNON, 2013 U.S. Dist. LEXIS 47506 (S.D. Fla. 2013).* Although the district court in Linares considered -- as a factor -- that the store did not assign **[**4]** a specific employee to inspect the floors for debris, the court focused on evidence that the store caused the dangerous condition and that the dangerous condition was regularly occurring and, thus, foreseeable. These factors are not present here.

Berard's argument that Target should be held liable under a theory of negligent mode of operation [*] is foreclosed by her testimony that she was a regular shopper at Target's store, that the store always appeared to be clean and well-maintained, and that Target had done nothing wrong to contribute to the incident. See *Delgado v. Laundromax, Inc., 65 So. 3d 1087, 1091 (Fla. Ct. App. 2011)* (noting that plaintiff's

testimony that the facility was "always clean" foreclosed a theory of negligent operation). Berard has provided no evidence that her injuries resulted from a mode of operation employed negligently by Target.

No **[**5]** genuine issue of material fact exists. Summary judgment was proper.

AFFIRMED.

_____

End of Document

_____

[*] "[T]he negligent mode of operation theory merely recognizes the common-sense proposition of negligence law that the duty of care required under the circumstances may consist of taking reasonable precautions so as to minimize or eliminate the likelihood of a dangerous condition arising in the first instance." *Markowitz v. Helen Homes of Kendall Corp., 826 So. 2d 256, 260 (Fla. 2002).*

 Caution
As of: October 18, 2019 5:41 PM Z

# *Berbridge v. Sam's East, Inc.*

United States Court of Appeals for the Eleventh Circuit

March 16, 2018, Decided

No. 17-14234 Non-Argument Calendar

**Reporter**
728 Fed. Appx. 929 *; 2018 U.S. App. LEXIS 6687 **; 2018 WL 1357372

TANIA P. BERBRIDGE, Plaintiff - Appellant, versus SAM'S EAST, INC., d.b.a. Sam's Club, Defendant - Appellee.

**Prior History: [**1]** Appeal from the United States District Court for the Southern District of Florida. D.C. Docket No. 0:16-cv-62681-BB.

*Berbridge v. Sam's East, Inc., 2017 U.S. Dist. LEXIS 132888 (S.D. Fla., Aug. 18, 2017)*

**Disposition:** AFFIRMED.

## Core Terms

dirty, floor, constructive knowledge, dark, summary judgment, slipped, liquid, no evidence, length of time, puddle, circumstantial evidence, reasonable inference, constructive notice, district court, infer, reasonable jury

## Case Summary

### Overview

HOLDINGS: [1]-Where a plaintiff sustained personal injuries when she slipped and fell on a liquid substance while shopping at a retail store, her lawsuit failed because the record lacked any evidence from which a reasonable jury could conclude that the liquid was dark and dirty because it was present on the floor for a period long enough to charge the store with constructive knowledge under *Fla. Stat. § 768.0755(1)*; [2]-In particular, the record showed that the liquid was dripping from an overhead air conditioning unit, but the record did not show that it was on the floor for a period of time sufficient to create constructive notice by the store.

**Outcome**
Decision affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

*HN1*  **Summary Judgment Review, Standards of Review**

Appellate courts review a district court's grant of summary judgment de novo, construing the evidence and drawing all reasonable inferences in favor of the non-moving party.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

*HN2*  **Entitlement as Matter of Law, Appropriateness**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*.

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

*HN3*  **Summary Judgment Review, Standards of Review**

Berbridge v. Sam's East, Inc.

In reviewing the propriety of summary judgment, appellate courts consider the issues anew and are not bound by the district court's reasoning. They may affirm on any ground supported by the record).

Civil Procedure > Preliminary
Considerations > Federal & State
Interrelationships > Erie Doctrine

**HN4**[⬇] **Federal & State Interrelationships, Erie Doctrine**

Where a negligence claim arises under Florida law, it provides the substantive law that federal courts apply in a diversity case.

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

**HN5**[⬇] **Dangerous Conditions, Known Dangers**

In Florida, a person who slips and falls on a transitory foreign substance in a business establishment must prove that the business establishment had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it. *Fla. Stat. § 768.0755(1)*.

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

**HN6**[⬇] **Dangerous Conditions, Known Dangers**

Under *Fla. Stat. § 768.0755*, constructive knowledge may be proven by circumstantial evidence showing that: (a) The dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition; or (b) The condition occurred with regularity and was therefore foreseeable. *Fla. Stat. § 768.0755(1)(a)-(b)*.

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

**HN7**[⬇] **Dangerous Conditions, Known Dangers**

As to whether circumstantial evidence gives rise to an inference that a foreign substance had been on the floor of a business establishment for a sufficient length of time to charge the store owner with constructive knowledge of its presence, circumstantial evidence of the passage of time may include dirt, scuffing, or tracks in a substance. But the mere presence of a substance on the floor is not enough to establish constructive notice.

Civil Procedure > Preliminary
Considerations > Federal & State
Interrelationships > Erie Doctrine

Civil Procedure > Judgments > Summary
Judgment > Motions for Summary Judgment

**HN8**[⬇] **Federal & State Interrelationships, Erie Doctrine**

Although state law provides the substantive rule of decision in a diversity case, a court must decide the propriety of summary judgment in accordance with the federal standards fixed in *Fed. R. Civ. P. 56*. That is, the sufficiency of evidence to require jury submission in diversity cases is a question of federal law. To be sure, in proceedings on motions for summary judgment questions of state law will arise in determining the materiality of particular facts to the claims and defenses of the parties and the factual elements required to establish the claims or defenses of the moving party, but whether a trial is necessary is a matter of federal law.

Civil Procedure > Judgments > Summary
Judgment > Evidentiary Considerations

Evidence > Inferences & Presumptions > Inferences

**HN9**[⬇] **Summary Judgment, Evidentiary Considerations**

Under federal law, an inference must be reasonable to defeat a motion for summary judgment. A reasonable inference is one that a reasonable and fair-minded person in the exercise of impartial judgment might draw from the evidence. Reasonable inferences may rest in part on conjecture, for an inference by definition is at least partially conjectural. But a jury cannot be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. Such an inference is infirm because it is not based on the evidence.

Berbridge v. Sam's East, Inc.

# Opinion

Civil Procedure > Preliminary
Considerations > Federal & State
Interrelationships > Erie Doctrine

Evidence > Inferences & Presumptions > Inferences

Civil Procedure > Judgments > Summary
Judgment > Evidentiary Considerations

**HN10**[⤓]  **Federal & State Interrelationships, Erie Doctrine**

Because a federal standard governs assessment of whether an inference is allowable, federal courts do not apply state-law rules against "pyramiding" or "stacking" inferences. Nor are federal courts bound by state-court decisions on issues of evidentiary sufficiency for trial under state-court summary-judgment rules. Of course, even though such state-court decisions are not binding in the *Fed. R. Civ. P. 56* summary judgment sense, they may still be highly informative, and Florida's summary judgment standard is very similar to that of *Rule 56*. To ensure that a case filed in federal court will be handled in the same way as it would be in the courts of the state where the federal court sits, and to discourage forum shopping, courts aim to reach the same result that the Florida courts would reach based on the same facts.

Civil Procedure > Appeals > Standards of Review

**HN11**[⤓]  **Appeals, Standards of Review**

An appellate court may affirm on any ground supported by the record.

**Counsel:** For TANIA P. BERBRIDGE, Plaintiff - Appellant: Adam J. Richardson, Burlington & Rockenbach, PA, WEST PALM BCH, FL; Jordan M. Kirby, Rubenstein Law, PA, PLANTATION, FL.

For SAM'S EAST, INC., d.b.a. Sam's Club, Defendant - Appellee: Michael John Dono, Gilda M. Chavez, Annalisa Gutierrez, Jerry Dean Hamilton Hamilton Miller & Birthisel, LLP, MIAMI, FL.

**Judges:** Before BARKETT, WILSON and ANDERSON, Circuit Judges.

**Opinion by:** BARKETT

**[*929]**  PER CURIAM:

Tania Berbridge appeals the district court's grant of summary judgment in favor of Defendant Sam's East, Inc. ("Sam's Club"), on her claim for negligence under Florida state law. Berbridge sustained personal injuries when she slipped and fell on a liquid substance while shopping at one of Sam's Club's stores. After her lawsuit was removed to federal court based on diversity jurisdiction, the district court granted summary judgment to Sam's Club. On appeal, Berbridge challenges the **[*930]** court's ruling that she failed to present evidence that Sam's Club had constructive knowledge of the slippery substance on the floor. After careful review, we agree with **[**2]** the district court and therefore affirm.

**HN1**[⬆] We review the district court's grant of summary judgment *de novo*, construing the evidence and drawing all reasonable inferences in favor of Berbridge, the non-moving party. *Carlson v. FedEx Ground Package Sys., Inc., 787 F.3d 1313, 1317 (11th Cir. 2015).* **HN2**[⬆] Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a).* **HN3**[⬆] In reviewing the propriety of summary judgment, we consider the issues anew and are not bound by the district court's reasoning. *Feliciano v. City of Miami Beach, 707 F.3d 1244, 1251-52 (11th Cir. 2013)* (stating that we may affirm on any ground supported by the record).

**HN4**[⬆] Berbridge's negligence claim arises under Florida law, which is the substantive law that we apply in this diversity case. *Carlson, 787 F.3d at 1326.* **HN5**[⬆] In Florida, a person who "slips and falls on a transitory foreign substance in a business establishment . . . must prove that the business establishment had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it." *Fla. Stat. § 768.0755(1).*

Berbridge does not claim—and the evidence does not show—that Sam's Club had actual knowledge of the liquid substance on which she slipped. Thus, to prove her claim, Berbridge needed to prove Sam's Club's constructive knowledge. **HN6**[⬆] Under *§ 768.0755*, "[c]onstructive **[**3]** knowledge may be proven by circumstantial evidence showing that: (a) The dangerous condition existed for such a length of time

Berbridge v. Sam's East, Inc.

that, in the exercise of ordinary care, the business establishment should have known of the condition; or (b) The condition occurred with regularity and was therefore foreseeable." *Id.* § 768.0755(1)(a)-(b). Berbridge relies on the "length of time" prong only.

So the question we must answer is HN7[↑] whether circumstantial evidence "give[s] rise to an inference that the foreign substance had been on the floor for a sufficient length of time to charge the store owner with constructive knowledge of its presence." *Montgomery v. Fla. Jitney Jungle Stores, Inc., 281 So. 2d 302, 306 (Fla. 1973).* Circumstantial evidence of the passage of time may include "dirt, scuffing, or tracks in a substance." *Woods v. Winn Dixie Stores, Inc., 621 So. 2d 710 (Fla. Ct. App. 1993);* *Wal-Mart Stores, Inc. v. King, 592 So. 2d 705 (Fla. 5th DCA 1991)* (stating that "signs of age" include "skid marks, smudges, or the like"); *Winn-Dixie Stores, Inc. v. Guenther, 395 So. 2d 244, 246 (Fla. Ct. App. 1981)* ("[T]estimony that the liquid was dirty and scuffed and had several tracks running through it was, in our opinion, adequate to impute constructive notice of the hazardous condition to the store manager."). But "the mere presence of [a substance] on the floor is not enough to establish constructive notice." *Delgado v. Laundromax, Inc., 65 So. 3d 1087, 1090 (Fla. Ct. App. 2011).*

In the light most favorable to Berbridge, the evidence showed that she slipped and fell on a [**4] liquid substance on the floor of the frozen-food aisle at a Sam's Club. She did not see the substance before slipping in it and did not know how long it had been there. She testified that it was "medium size" but "wasn't that big," wet but not sticky, and "dark" and "dirty." She did not know what caused the substance to be dirty. She saw no cart tracks or footprints in the substance, besides the mark caused by her shoe when she slipped. When she informed an employee of her fall and pointed out the substance, the employee [*931] noted that an overhead air conditioning unit was dripping from above where she slipped. Before she left the area, she observed a drop of liquid fall from the AC unit. She testified that it was not dripping heavily.

These facts are not disputed, but the parties disagree about what permissible inferences may be drawn from them. Berbridge contends that the water's "dark[ness]" and "dirt[iness]" supports a reasonable inference that it was on the floor for a period of time sufficient to create constructive notice. In fact, she maintains that the district court was required to draw that inference under *Mashni v. Lasalle Partners Management Ltd., 842*

*So. 2d 1035 (Fla. Ct. App. 2003).* In *Mashni*, the plaintiff slipped and fell in a puddle of water that [**5] was "dirty" and left "a black substance" on the plaintiff's hands. *Id. at 1036.* While the court acknowledged that the dirt could have been created by the plaintiff's fall, it reasoned that "the fact that the water was dirty could also create an inference that it was on the floor for a period of time sufficient to create constructive notice." *Id.*

Sam's Club responds that *Mashni* is factually distinguishable and that constructive knowledge cannot be inferred in this case without violating Florida's rule against impermissible "inference stacking." Sam's Club relies on two recent decisions that applied that rule to grant summary judgment to a business. In *Encarnacion v. Lifemark Hospitals of Florida, 211 So. 3d 275 (Fla. Ct. App. 2017),* the court held that a reasonable jury could not infer the passage of time, and therefore constructive knowledge, from the fact that the substance was "oily," "dirty," and "dark," because there was no evidence that the substance, in its original condition, was not "oily," "dirty," and "dark." *Id. at 277-78.* Similarly, in *Wilson-Greene v. City of Miami, 208 So. 3d 1271 (Fla. Ct. App. 2017),* the court held that a reasonable jury could not infer the passage of time from the fact that the soup the plaintiff slipped on was cold, since there was no evidence that the soup was hot before it spilled. *Id. at 1275.* In both cases, the court explained [**6] that the key inference—that the substance had been on the floor long enough to establish constructive knowledge—could not be drawn without assuming other facts not in evidence. *See Encarnacion, 211 So. 3d at 278;* *Wilson-Greene, 208 So. 3d at 1275.*

The district court, following the reasoning of *Encarnacion* and *Wilson-Greene,* concluded that Berbridge's evidence was insufficient to raise a triable issue for a jury. The court reasoned that basing constructive knowledge solely on the fact that the liquid substance was "dark" and "dirty" would amount to "impermissible inference stacking," because it would require assuming facts not in evidence, including that the substance was not "dark" and "dirty" in its original condition. As for Berbridge's reliance on *Mashni,* the court found that *Mashni* was not persuasive because it relied on a Florida Supreme Court case that is no longer good law and "Florida premises liability has evolved significantly since [*Mashni*] was decided."

Before we turn to the issue of whether Berbridge's circumstantial evidence is sufficient to create an inference of constructive knowledge, we pause to clarify

Berbridge v. Sam's East, Inc.

the law that we apply in making that determination. *HN8*[↑] Although Florida law provides the substantive rule of decision in this diversity [**7] case, we must decide the propriety of summary judgment "in accordance with the federal standards fixed in *Rule 56*[]" of the Federal Rules of Civil Procedure.*LightingFixture & Elec.Supply Co. v. Cont'lIns. Co., 420 F.2d 1211, 1213 [*932] (5th Cir. 1969).*[1] That is, "the sufficiency of evidence to require jury submission in diversity cases is a question of federal law." *Id.* "To be sure, in proceedings on motions for summary judgment questions of state law will arise in determining the materiality of particular facts to the claims and defenses of the parties and the factual elements required to establish the claims or defenses of the moving party, but whether a trial is necessary is a matter of federal law." *Id.* (citation omitted).

*HN9*[↑] Under federal law, an inference must be "reasonable" to defeat a motion for summary judgment. *Daniels v. Twin Oaks Nursing Home, 692 F.2d 1321, 1326 (11th Cir. 1982).* A reasonable inference is one that a "reasonable and fair-minded [person] in the exercise of impartial judgment might draw from the evidence." *Id.* Reasonable inferences may rest in part on conjecture, "for an inference by definition is at least partially conjectural." *Id.* But a jury cannot be "allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility." *Id.* "Such an inference is infirm because it is not based [**8] on the evidence."

*HN10*[↑] Because a federal standard governs our assessment of whether an inference is allowable, we do not apply state-law rules against "pyramiding" or "stacking" inferences. *Id. at 1324.* Nor are we bound by state-court decisions on issues of evidentiary sufficiency for trial under state-court summary-judgment rules. *See Carlson, 787 F.3d at 1326.* Of course, even though such state-court decisions are "not binding in the *Rule 56/*summary judgment sense," they may still be "highly informative," and "Florida's summary judgment standard is very similar to that of *Rule 56.*" *Id.* To ensure that "a case filed in federal court will be handled in the same way as it would be in the courts of the state where the federal court sits," and to discourage forum shopping, we aim to reach the same result that the Florida courts would reach based on the same facts. *See id. at 1326-*

*27.*

In this case, we conclude that the evidence is not enough for a reasonable jury to infer that the liquid substance "had been on the floor for a sufficient length of time to charge the store owner with constructive knowledge of its presence." *See Montgomery, 281 So. 2d at 306.* While Berbridge presented evidence of the source of a "dark" and "dirty" substance, there is no evidence that the substance was not [**9] "dark" and "dirty" when it fell from the AC unit, and Berbridge did not provide any additional detail about what she meant by these terms. A reasonable jury could not infer from her vague comments that the substance was "dark" and "dirty" because it was on the floor for such a length of time that Sam's Club should have known about it and acted to remedy it.

Nor are there other signs of age that could support an inference that the condition of the substance was due to the passage of time. As the district court noted, there was no "evidence of footprints, prior track marks, change in consistency, drying of the liquid, or other evidence suggesting that the substance was on the floor for such a length of time that Defendant should have known about it and taken action to remedy it." We also don't know the size of the substance. Had the puddle on the floor been large, that could have suggested, in light of the slow dripping observed by Berbridge, that the AC unit had been leaking for a while. *See Erickson v. Carnival Cruise Lines, Inc., 649 So.2d 942, 943 [*933] (Fla. 3d DCA 1995)* (concluding that "the source of the puddle (i.e. ceiling leak) as well as the size of the puddle were sufficient to create a jury question" as to constructive knowledge). In sum, the record lacks [**10] any evidence from which a reasonable jury could conclude that the substance was "dark" and "dirty" because it was present on the floor for a period long enough to charge Sam's Club with constructive knowledge.

The lack of additional circumstantial evidence distinguishes this case from *Mashni.*[2] While this case and *Mashni* share the fact of a "dirty" liquid substance, that fact cannot be viewed in isolation from the surrounding circumstances. In *Mashni*, the plaintiff, upon entering an ill-lit restroom at a shopping mall, noticed that it was "sloppy" and that there was a puddle of water on the floor. *842 So. 2d at 1036.* As he exited

---

[1] This Court adopted as binding precedent allFifth Circuit decisions prior to October 1, 1981. *Bonner v.City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)* (en banc).

[2] We do not address the district court's discussion of whether *Mashni* was decided under different substantive rules than those we apply here.

Berbridge v. Sam's East, Inc.

the restroom, about three to four minutes later, he slipped on another puddle of water, which was about three steps away from the first puddle. *Id.* After he fell, he saw black spots in the water and on his hands. *Id. at 1036-37*. Together, the unkempt condition of the premises, the length of time the plaintiff was in the bathroom, and the specific facts about the dirt supported a reasonable inference that the dangerous condition existed long enough so as to charge the store owner with constructive knowledge. *See id. at 1037*. In this case, however, there is no similar evidence of the surrounding circumstances [**11] that could support an inference of constructive knowledge.

True, the court in *Mashni* did not require the plaintiff to prove that the water was originally clean, but the context otherwise indicated that the water was dirty because it had been on the floor for a sufficient period of time. The same was true in *Colon v. Outback Steakhouse of Florida, Inc., 721 So. 2d 769, 771 (Fla. Ct. App. 1998)*, and *Camina v. Parliament Ins. Co., 417 So. 2d 1093, 1094 (Fla. Ct. App. 1982)*, two cases relied on by *Mashni*. In *Colon*, the plaintiff slipped on a potato that was "mushy" and "dirty," which suggested "that it had gone undetected on the floor for a sufficient period of time to place Outback on constructive notice." *Colon, 721 So. 2d at 771*. In *Camina*, the plaintiff slipped on ice cream that was "thawed, dirty and splattered," which was sufficient to create an inference of constructive knowledge. *Camina, 417 So. 2d at 1094*. In both cases, the facts gave some indication of the substance's original condition—that the potato was not dirty when it fell from a customer's plate or a server's tray and that the ice cream was frozen—which allowed a jury to draw an inference from its altered condition.

The situation here, however, is more akin to that in *Encarnacion, Wilson-Greene, and Bates v. Winn-Dixie Supermarkets, 182 So. 2d 309, 310 (Fla. Ct. App. 1966)*, where the evidence shows little more than the presence of dangerous condition. In *Bates*, for example, the court held that constructive knowledge could [**12] not be inferred from the fact that the plaintiff slipped on a banana peel that was "dark," "over ripe," "black," "old," and "nasty looking." *182 So. 2d at 310*. The condition of the peel itself was not enough, the court stated, because there was no evidence that "the banana peel was not already black and deteriorated when it reached defendants' floor." *Id. at 311*. Similarly, in *Encarnacion* and *Wilson-Greene*, there was no evidence that shed light on the original condition of the substance. *See Encarnacion, 211 So. 3d at 277* (no evidence that the substance, in its original condition,

was [*934] not "oily," "dirty," and "dark"); *Wilson-Greene, 208 So. 3d at 1275* (no evidence that the soup was hot prior to being spilled).

Berbridge's claim that *Mashni* is binding and required an inference of constructive knowledge misses the mark. *Mashni* is "not binding in the *Rule 56*/summary judgment sense—because federal law determines whether the evidence . . . suffices to entitle [a party] to summary judgment." *Carlson, 787 F.3d at 1326* (quotation marks omitted). Plus, while it may be true that she was not required to prove that the substance was clear in its original condition—as the proof sufficient to establish constructive knowledge is varied and contextual—she still must present sufficient circumstantial evidence of constructive [**13] knowledge. *See Montgomery, 281 So.2d at 306*.

Construing the record and drawing all reasonable inferences in Berbridge's favor, she has offered adequate proof that (1) there was a "dark" and "dirty" liquid substance on the floor; (2) the substance came from an overhead AC unit; and (3) she slipped on the substance. But as in *Bates*, there was no evidence that "the [liquid substance] was not already ["dark"] and ["dirty"] when it reached defendant['s] floor." *182 So. 2d at 311*. The fact that the substance was "dark" and "dirty" gives rise to nothing more than a "guess or mere possibility" that it was on the floor for a period of time sufficient to create constructive notice. *See Daniels, 692 F.2d at 1326*. And that is not sufficient to create a triable issue for a jury. Although the district court appears to have erred in applying the state-law rule against "stacking inferences," *see id. at 1324*, the court's reasoning nevertheless remains sound, and *HN11*[⬆] we may affirm on any ground supported by the record, *see Feliciano, 707 F.3d at 1251-52*.

For these reasons, we affirm the district court's grant of summary judgment in favor of Sam's Club.

**AFFIRMED**.

---

End of Document

 Neutral

As of: October 18, 2019 5:41 PM Z

# *Lavora v. NCL (Bah.) Ltd.*

United States District Court for the Southern District of Florida

December 15, 2016, Decided; December 16, 2016, Entered on Docket

Case No. 15-24285-Civ-COOKE/TORRES

**Reporter**

2016 U.S. Dist. LEXIS 174207 *; 2016 WL 7325592

DENA LAVORA, Plaintiff, vs. NCL (BAHAMAS) LTD., a Bermuda company doing business as Norwegian Cruise Line, Defendant.

**Subsequent History:** Costs and fees proceeding at, Magistrate's recommendation at *Lavora v. NCL (Bah.) Ltd., 2017 U.S. Dist. LEXIS 27193 (S.D. Fla., Feb. 24, 2017)*

Dismissed by, Judgment entered by *Rioseco v. Bimini SuperFast Operations LLC, 2017 U.S. Dist. LEXIS 46667 (S.D. Fla., Mar. 28, 2017)*

## Core Terms

stairs, summary judgment, hot tub, cruise, footage, surveillance, drink, dangerous condition, non-moving, genuine, deck

**Counsel:** **[*1]** For Dena Lavora, Plaintiff: Spencer Marc Aronfeld, LEAD ATTORNEY, Coral Gables, FL; Matthias Masayasu Hayashi, Aronfeld Trial Lawyers, Coral Gables, FL.

For NCL (Bahamas), Ltd., a Bermuda company, doing business as Norwegian Cruise Line, Defendant: Curtis Jay Mase, Walter Cooper Jarnagin, LEAD ATTORNEYS, Cameron Wayne Eubanks, Mase Lara, P.A., Miami, FL; Brett Michael Berman, Norwegian Cruise Line, Miami, FL.

**Judges:** MARCIA G. COOKE, United States District Judge.

**Opinion by:** MARCIA G. COOKE

## Opinion

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This is a personal injury case. Plaintiff Dena Lavora (f/k/a Dena Vaclavik) alleges she was injured when she slipped and fell on the stairs leading down from the hot tub deck aboard Defendant NCL (Bahamas) Ltd.'s cruise ship vessel, the *Getaway*. She claims Defendant's negligence caused her injury.

Pending is Defendant's Motion for Summary Judgment. (ECF No. 58). For the reasons that follow, I grant the motion.

## BACKGROUND

Plaintiff was a passenger for a cruise onboard the *Getaway* that began on October 17, 2015. (ECF No. 16 ¶¶ 7, 8). On the second evening of her cruise, she used a hot tub on the *Getaway*'s pool deck. (ECF 58-1 at 81). The hot tub is raised above the level of the **[*2]** pool deck with a short flight of stairs down. (ECF No. 58-2). Plaintiff walked approximately half-way down the stairs before pausing to put on her shoes and cover herself with a towel. (ECF No. 58-1 at 85). When she continued down the stairs, she fell and fractured her ankle in three places. (*Id.* at 43, 46).

Plaintiff claims that the stairs were wet and slippery, causing her to lose her balance and fall. (*Id.* at 94, 96, 103). She alleges, *inter alia*, that the Defendant breached its duty of care for her safety by failing to eliminate hazardous conditions, failing to properly maintain, warn, and inspect for such hazards, failing to keep the hot tub stairs dry, and negligently designing or employing hot tub stairs that lacked adequate slip resistance. (ECF No. 16).

Lavora v. NCL (Bah.) Ltd.

**STANDARD OF REVIEW**

Summary judgment "shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc., 121 F.3d 642 (11th Cir. 1997)* (quoting *Fed. R. Civ. P. 56(c)*) (internal quotations omitted); *Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1358 (11th Cir. 1999)*. Thus, the entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to **[*3]** establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*.

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991)*. "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id.*

*Rule 56* "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex, 477 U.S. at 324*. Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)* (internal quotation marks omitted).

"A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Damon, 196 F.3d at 1358*. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough **[*4]** of a showing that the jury could reasonably find for that party." *Abbes v. Embraer Servs., Inc., 195 F. App'x 898, 899-900 (11th Cir. 2006)* (quoting *Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990))*.

When deciding whether summary judgment is appropriate, "the evidence, and all inferences drawn from the facts, must be viewed in the light most favorable to the non-moving party." *Bush v. Houston County Commission, 414 F. App'x 264, 266 (11th Cir. 2011)*.

**DISCUSSION**

General maritime law applies to cases, such as this one, that allege torts committed aboard cruise ships sailing in navigable waters. *See Keefe v. Bahama Cruise Line, Inc., 867 F.2d 1318, 1321 (11th Cir. 1989)*. The basic elements of a claim for negligence under general maritime law are the same as at common law. *Whelan v. Royal Caribbean Cruises Ltd., 2013 U.S. Dist. LEXIS 147811, 2013 WL 5583970, *4 (S.D. Fla. 2013)*. Plaintiff must prove that: (1) Defendant had a duty to protect her from a particular injury; (2) Defendant breached that duty; (3) Defendant's breach was the proximate cause of her injuries; and (4) she suffered damages as a result of her injuries. *Chaparro v. Carnival Corp., 693 F.3d 1333, 1336 (11th Cir. 2012)*; *see Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S. Ct. 406, 3 L. Ed. 2d 550 (1959)* (shipowner owes passenger duty of care).

To prove that Defendant breached its duty, Plaintiff must show that: (1) a dangerous condition existed; and (2) that Defendant had actual notice of the dangerous condition. *See Adams v. Carnival Corp., 2009 A.M.C. 2588, at *3 (S.D. Fla. 2009)* (citing *Keefe, 867 F.2d 1318*). A dangerous condition is one that is not apparent and obvious to the passenger. *Smolnikar v. Royal Caribbean Cruises, Ltd., 787 F. Supp. 2d 1308, 1315 (S.D. Fla. 2009)*. The mere fact that an accident occurs does not give rise to a presumption that the setting of the accident constituted a **[*5]** dangerous condition. *See Isbell v. Carnival Corp., 462 F. Supp. 2d 1232, 1237 (S.D. Fla. 2006)*.

Here, Defendant argues four grounds for summary judgment: (1) surveillance footage proves that Plaintiff did not slip in water — rather, she missed a step and fell of her own accord; (2) there is no evidence that Defendant was on notice of the alleged risk-creating condition; (3) the risk of water being present on the hot tub stairs was open and obvious to a person through ordinary use of their senses; and (4) there is no evidence that Defendant negligently maintained or inspected the stairs, failed to train or supervise its crewmembers, or negligently designed the stairs and flooring material. (ECF No. 58).

I agree that summary judgment is warranted.

Lavora v. NCL (Bah.) Ltd.

Plaintiff cannot prove she fell because of a dangerous condition. She testified she put her shoes and cover up on while on the hot tub deck, held the handrail the "entire time" she walked down the stairs, and then slipped and fell in water. (ECF 58-1 at 81, 86). Defendant disputes that account: "Plaintiff admitted to drinking 'approximately' six (6) drinks, but purchased fourteen (14). She walked halfway down the stairs, teetered on one leg to reach back and grab her clothes, staggered back losing her balance, **[\*6]** put her hand down on the stairs to steady herself, then turned and immediately missed a step." (ECF 58 at 5-6). Defendant points to Plaintiff's drink receipts (ECF No. 58-4) and surveillance footage of the incident (conventionally filed with the Court, *see* ECF Nos. 59-60) as support for its assertions.

The evidence confirms Defendant's version of events. The drink receipts indeed indicate that Plaintiff purchased fourteen drinks — eight beers and six shots of tequila — on the day of the incident (ECF No. 58-4), and she herself admits to drinking both beer and tequila that day (ECF 58-1 at 72-77). *See Collins v. Marriott Int'l, Inc., 749 F.3d 951, 959 (11th Cir. 2014)* (evidence of plaintiff's intoxication is "normally relevant" in tort cases); *see also Frazee v. Gillespie, 98 Fla. 582, 593, 124 So. 6 (1929)* (evidence of intoxication relevant in tort case "in view of the fact that negligent and reckless conduct so frequently results from intoxication").

More importantly, however, the surveillance footage clearly shows that Plaintiff: (1) exited the hot tub area and walked part way down the stairs to the pool deck; (2) stopped, turned around and reached across the stairs on one leg to retrieve an item from the hot tub area; (3) paused to put on her shoes and a garment; (4) turned back around to continue down **[\*7]** the stairs; and (5) missed the bottom step and fell. *See Yaicel De La Caridad Sanchez v. Sears, Roebuck & Co., 2015 U.S. Dist. LEXIS 147580, 2015 WL 6599696, \*3 (S.D. Fla. 2015)* (granting summary judgment in slip-and-fall case where surveillance footage contradicts plaintiff's version of events) *Davis v. Waffle House, Inc., 2015 U.S. Dist. LEXIS 182715, 2015 WL 12643849, at \*1 (S. D. Fla. 2015)* (video documenting plaintiff's fall is "proof of the underlying facts surrounding the incident"); *Bencosme v. Target Corp., 2014 U.S. Dist. LEXIS 65610, 2014 WL 1912344, at 2 (S.D. Fla. 2014)* (granting summary judgment where plaintiff's claim "flies in the face of the undisputed surveillance video of Plaintiff's slip-and-fall incident"); *see also Mitchell v. Royal Caribbean Cruises, Ltd., 2013 U.S. Dist. LEXIS 186339, 2013 WL 8283958, at \*1 (S. D. Fla. 2013)*

(video footage "reliable evidence" in slip-and-fall case). I have reviewed the footage dozens of times and conclude that no reasonable jury could find otherwise. *See Abbes, 195 F. App'x at 899-900.*

Accordingly, summary judgment is appropriate.[1]

## CONCLUSION

It is, therefore, **ORDERED** and **ADJUDGED** that Defendant's Motion for Summary Judgment (ECF No. 58) is GRANTED. The Clerk shall CLOSE this case. All pending motions, if any, are **DENIED** *as moot*.

**DONE** and **ORDERED** in chambers at Miami, Florida, this 15th day of December 2016.

/s/ Marcia G. Cooke

MARCIA G. COOKE

United States District Judge

---

End of Document

---

[1] Because the surveillance footage is dispositive, I need not address Defendant's other arguments.

 **Neutral**
As of: October 18, 2019 5:41 PM Z

### *Palavicini v. Wal-Mart Stores East, LP*

United States Court of Appeals for the Eleventh Circuit

September 12, 2019, Decided

No. 18-14329 Non-Argument Calendar

**Reporter**

2019 U.S. App. LEXIS 27462 *; __ Fed. Appx. __; 2019 WL 4316693

EVELYN PALAVICINI, Plaintiff - Appellant, versus WAL-MART STORES EAST, LP., Defendant - Appellee.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [\*1]** Appeal from the United States District Court for the Southern District of Florida. D.C. Docket No. 1:18-cv-20708-FAM.

*Palavicini v. Wal-Mart Stores E., LP, 775 Fed. Appx. 587, 2019 U.S. App. LEXIS 15854 (11th Cir. Fla., May 29, 2019)*
*Palavicini v. Wal-Mart Stores East, LP, 2018 U.S. Dist. LEXIS 219718 (S.D. Fla., Sept. 25, 2018)*

**Disposition:** AFFIRMED.

## Core Terms

liquid, floor, leak, constructive notice, actual notice, ceiling, dangerous condition, district court, air conditioning unit, summary judgment, argues, reasonable inference, actual knowledge, regularity, foreseeable, customer, falling, footage, minutes, spilled, summary judgment motion, asserts, slipped

## Case Summary

### Overview

HOLDINGS: [1]-Summary judgment for the store in a customer's slip and fall action was proper because there was insufficient evidence to show that the store had constructive notice under *Fla. Stat. § 768.0755(1)(a)* where the facts indicated that the liquid was not on the floor for a long time period, and concluding that the store had constructive notice would require drawing a series of impermissible inferences that were unsupported by the record; [2]-Constructive notice under *Fla. Stat. § 768.0755(1)(b)* failed because employee statements were insufficient to establish that a leak occurred with such regularity that it would foreseeably reoccur on the date of the fall, an expert affidavit failed to establish the poor condition of the air conditioning unit at the time of the fall, and an isolated work order was insufficient to show that the air conditioning unit leaked regularly.

### Outcome

Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

*HN1*[ ] **Entitlement as Matter of Law, Appropriateness**

The court of appeals reviews a district court's grant of summary judgment de novo, viewing all the evidence, and drawing all reasonable factual inferences, in favor of the nonmoving party. Summary judgment must be

Palavicini v. Wal-Mart Stores East, LP

granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

Torts > ... > General Premises Liability > Dangerous Conditions > Duty to Warn

Torts > Negligence > Elements

Torts > ... > Duty On Premises > Invitees > Public Invitees

Torts > ... > Duties of Care > Duty On Premises > Reasonable Care

*HN2*[ ] **Dangerous Conditions, Duty to Warn**

To prevail on a negligence claim, a plaintiff must prove that (1) the defendant had a legal duty to protect the plaintiff from particular injuries; (2) the defendant breached that duty; (3) the defendant's breach actually and proximately caused the plaintiff's injuries; and (4) the plaintiff suffered actual harm. With respect to the duty element, a possessor of premises to which the public is invited has a legal duty to ascertain that the premises are reasonably safe for invitees. This duty to business invitees equates to two legal duties: (1) to use reasonable care to maintain the premises in a safe condition, which includes a duty to use reasonable care to learn of the existence of any dangerous conditions on the premises, and (2) to give the invitee warning of concealed perils which are or should be known to the landowner, but are unknown to the invitee and could not be discovered by him through the exercise of due care.

Torts > ... > Activities & Conditions > Slip & Fall Injuries > Elements

*HN3*[ ] **Slip & Fall Injuries, Elements**

Under Florida law, a plaintiff bringing a negligence claim based upon a transitory foreign substance on the floor of a business must prove that the business had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it. *Fla. Stat. § 768.0755(1)*.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Erie Doctrine

*HN4*[ ] **Federal & State Interrelationships, Erie Doctrine**

A federal court sitting in diversity applies the substantive law of the state in which the case arose.

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

*HN5*[ ] **Dangerous Conditions, Known Dangers**

Actual knowledge of a dangerous condition exists when a business owner's employees or agents know of or create the dangerous condition. Constructive knowledge can be established by circumstantial evidence, by either showing that: (a) The dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition; or (b) The condition occurred with regularity and was therefore foreseeable. *Fla. Stat. § 768.0755(1)*.

Civil Procedure > Judicial Officers > Magistrates > Objections

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN6*[ ] **Magistrates, Objections**

A party may raise an issue on appeal if the question was presented to the trial court for a ruling and not thereafter waived or withdrawn. A party waives its right to appeal from an issue decided through a magistrate judge's report and recommendation if the party fails to make specific and clear objections to the relevant finding of fact or law. *11th Cir. R. 3-1*. In general, it is improper for a federal appellate court to be the first judicial body to pass upon a substantive issue in a case.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN7*[ ] **Reviewability of Lower Court Decisions, Preservation for Review**

A brief mention of an issue in a complaint—without more—is not enough to permit the plaintiff to assert it on appeal.

> Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

*HN8*[⬇] **Dangerous Conditions, Known Dangers**

Under *Fla. Stat. § 768.0755(1)(a)*, a plaintiff must establish that the dangerous condition existed for such a length of time that in the exercise of reasonable care the condition would have been known to the defendant.

> Torts > ... > Activities & Conditions > Slip & Fall Injuries > Elements

> Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

*HN9*[⬇] **Slip & Fall Injuries, Elements**

The mere presence of water on the floor is not enough to establish constructive notice—rather, the record must contain additional facts to create a permissible inference regarding the amount of time the water had been on the floor.

> Evidence > Inferences & Presumptions > Inferences

*HN10*[⬇] **Inferences & Presumptions, Inferences**

An inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation. This proposition is undoubtedly sound.

> Torts > ... > Activities & Conditions > Slip & Fall Injuries > Elements

> Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

*HN11*[⬇] **Slip & Fall Injuries, Elements**

*Fla. Stat. § 768.0755(1)(b)* requires a showing that a condition occurred with regularity and was therefore foreseeable.

**Counsel:** For EVELYN PALAVICINI, Plaintiff - Appellant: Douglas F. Eaton, Eaton & Wolk, PL, MIAMI, FL.

For WAL-MART STORES EAST, LP, Defendant - Appellee: Michael John Dono, Patricia Concepcion, Jerry Dean Hamilton, Schuyler A. Smith, Hamilton Miller & Birthisel, LLP, MIAMI, FL.

For SERVICE: Richard Nicholas Conforti, III, Robert C. Solomon, Saban & Solomon, PLANTATION, FL.

**Judges:** Before WILSON, MARTIN, and NEWSOM, Circuit Judges.

# Opinion

PER CURIAM:

The Petition for Rehearing filed by Evelyn Palavicini is GRANTED. As a result, the May 29, 2019 opinion issued in this case is vacated and the following opinion is substituted in its stead.

Evelyn Palavicini slipped and fell on liquid on the floor of a Wal-Mart store. Palavicini did not know how or when the liquid got on the floor, but alleged that an unidentified female employee told her that the air conditioning vent above the incident area had been leaking for one week prior to the incident. Palavicini sued Wal-Mart Stores East, L.P. in Florida state court, alleging that Wal-Mart negligently (1) failed to maintain its property in a reasonably **[*2]** safe manner, and (2) failed to warn her of the dangerous condition posed by the liquid on the floor. Wal-Mart removed the case to federal court.

The district court granted summary judgment in favor of Wal-Mart, holding that Palavicini failed to provide sufficient evidence to support a reasonable inference that Wal-Mart had constructive notice of the liquid on the floor. Palavicini appealed. After careful review, we affirm.

## I. Factual and Procedural Background

Closed circuit television (CCTV) footage shows the store's assistant manager, Jorge Mastrapa, walking and standing in the immediate area where Palavicini slipped and fell approximately two minutes before the incident.

After falling, Palavicini observed the liquid on the floor to be "yellow" and "dirty." Palavicini testified that she did

not see any liquid before falling. She also does not know how the liquid got on the floor, the length of time it was on the floor, or whether any Wal-Mart employee knew of the liquid on the floor prior to the incident. Palavicini claims she was told by an unidentified female employee that an air conditioning vent on the ceiling had been leaking for one week prior to the incident. She testified, however, [*3] that she did not remember seeing the ceiling leak.

Palavicini's complaint alleges that Wal-Mart was negligent in (1) failing to maintain its property in a reasonably safe manner, and (2) failing to warn her of the dangerous condition posed by the water on the floor.

Wal-Mart's motion for summary judgment argues that there is no record evidence that it had actual or constructive notice of the liquid on the floor or a leak from the ceiling. Wal-Mart asserts that the record is devoid of any evidence regarding (1) the length of time the liquid was present on the floor prior to the incident, and (2) any similar slip and fall incidents involving liquid on the floor or a leak from the ceiling.

The magistrate judge issued a Report and Recommendation (R&R) to grant Wal-Mart's motion for summary judgment, reasoning that Palavicini provided insufficient evidence to support a reasonable inference that Wal-Mart had constructive notice of the liquid on the floor. Specifically, Palavicini adduced insufficient evidence to establish that (1) the liquid was present for sufficient period of time to put Wal-Mart on notice of its existence and to allow it the opportunity to remedy the condition, and (2) the **[*4]** dangerous condition occurred with such regularity that it was foreseeable. The district court adopted the magistrate judge's R&R and granted Wal-Mart's motion for summary judgment.

## II. Discussion

Palavicini contends that the district court erred in granting summary judgment because the record evidence establishes a genuine issue of material fact regarding whether Wal-Mart had actual or constructive notice of the dangerous condition posed by the liquid on the floor prior to Palavicini's fall. Palavicini asserts that the district court failed to view the evidence and all reasonable inferences in the light most favorable to her.

*HN1*[⬆] "We review a district court's grant of summary judgment de novo, viewing all the evidence, and drawing all reasonable factual inferences, in favor of the nonmoving party." *Stephens v. Mid-Continent Cas. Co.,*

*749 F.3d 1318, 1321 (11th Cir. 2014).* Summary judgment can be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a).* Summary judgment is improper, however, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

*HN2*[⬆] To prevail on a negligence claim, a plaintiff must prove that (1) the defendant had a **[*5]** legal duty to protect the plaintiff from particular injuries; (2) the defendant breached that duty; (3) the defendant's breach actually and proximately caused the plaintiff's injuries; and (4) the plaintiff suffered actual harm. *Zivojinovich v. Barner, 525 F.3d 1059, 1067 (11th Cir. 2008).* With respect to the duty element, "[a] possessor of premises to which the public is invited has a legal duty to ascertain that the premises are reasonably safe for invitees." *Skipper v. Barnes Supermarket, 573 So. 2d 411, 413 (Fla. 1st DCA 1991).* This duty to business invitees equates to two legal duties: (1) to use reasonable care to maintain the premises in a safe condition, which includes a duty to use reasonable care to learn of the existence of any dangerous conditions on the premises, and (2) to give the invitee warning of concealed perils which are or should be known to the landowner, but are unknown to the invitee and could not be discovered by him through the exercise of due care. *Id.*

*HN3*[⬆] Under Florida law, which governs this diversity case,[1] a plaintiff bringing a negligence claim based upon a transitory foreign substance on the floor of a business must prove that the business had "actual or constructive knowledge of the dangerous condition and should have taken action to remedy it." *Fla. Stat. § 768.0755(1).*

*HN5*[⬆] Actual knowledge of a dangerous condition **[*6]** exists when a business owner's employees or agents know of or create the dangerous condition. *Barbour v. Brinker Fla., Inc., 801 So. 2d 953, 957 (Fla. 5th DCA 2001).* Constructive knowledge can be established by circumstantial evidence, by either showing that:

---

[1] *HN4*[⬆] A federal court sitting in diversity applies the substantive law of the state in which the case arose. *Pendergast v. Sprint Nextel Corp., 592 F.3d 1119, 1132-33 (11th Cir. 2010).*

Palavicini v. Wal-Mart Stores East, LP

(a) The dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition; or

(b) The condition occurred with regularity and was therefore foreseeable.

*Fla. Stat. § 768.0755(1)*.

*i. Actual Notice*

Palavicini argues Wal-Mart was on actual notice there was a leaking air conditioning unit above the area where she fell. Because we agree with Wal-Mart that Palavicini did not preserve this argument for appeal, we may not consider it.

*HN6*[⬆] A party may raise an issue on appeal if the question was "presented to the trial court for a ruling and not thereafter waived or withdrawn." *Ace Am. Ins. Co. v. Wattles Co., 930 F.3d 1240, 1250 n.14, 2019 U.S. App. LEXIS 21540 (11th Cir. 2019)* (quotation marks omitted). A party waives its right to appeal from an issue decided through a magistrate judge's report and recommendation ("R&R") if the party fails to make specific and clear objections to the relevant finding of fact or law. *See Knezevich v. Ptomey, 761 F. App'x 904, 906 (11th Cir. 2019)* (per curiam) (unpublished); *11th Cir. R. 3-1*; *see also Fed. R. Civ. P. 72(b)* (setting forth the procedure for objecting to a magistrate judge's R&R). In general, it is **[*7]** improper for a federal appellate court to be the first judicial body to pass upon a substantive issue in a case. *See Strickland v. Alexander, 772 F.3d 876, 889 (11th Cir. 2014)*.

The district court record shows that Palavicini did not preserve her actual notice argument for appeal. At a conference before the magistrate judge on August 15, 2018—well into the course of litigation—Palavicini's counsel and the judge engaged in the following colloquy:

THE COURT: This is not an actual knowledge case, right? The plaintiff is not proceeding on and has adduced no evidence of actual knowledge, is that correct?

MR. CONFORTI: That's correct.

Palavicini's affirmative abandonment of her actual notice argument is reinforced by her substantive briefing before the district court. In opposition to Wal-Mart's motion for summary judgment, Palavicini briefly mentioned the possibility that Wal-Mart had actual notice of the leak, but then proceeded to argue only that

Wal-Mart had constructive knowledge. What's more, the R&R recommending that Wal-Mart's motion for summary judgment be granted states: "Plaintiff does not claim—and the evidence does not show—that Wal-Mart had actual knowledge of the liquid substance on which she slipped." Palavicini's opposition to the R&R **[*8]** mentions facts that could support allegations of actual notice, but she did not object to the R&R's finding that Wal-Mart did not have actual notice of the leak. Neither did she make any substantive arguments in support of an actual notice claim. Palavicini's actions in litigating the case before the district court simply do not show a desire to present the issue for adjudication.

On appeal, Palavicini admits her trial counsel "indicated that they were not attempting to prove that Wal-Mart had actual knowledge of the leak prior to the fall." Nevertheless, she offers a number of arguments as to why the issue was actually preserved for appeal. First, she argues it is the duty of this Court to "review[] the record evidence *de novo*." That may be so, *see, e.g., Stephens, 749 F.3d at 1321*, but we are unable to review evidence for an issue that is not properly preserved for appeal. Second, she argues her actual notice argument was preserved due to its presence in her complaint. Yet *HN7*[⬆] a brief mention of an issue in a complaint—without more—is not enough to permit the plaintiff to assert it on appeal. *See Dunster v. Metropolitan Dade County, 791 F.2d 1516, 1518-19 (11th Cir. 1986)* (concluding plaintiffs abandoned certain claims). Third, she claims her opposition to summary judgment "did contain **[*9]** language on the issue of actual notice," even if "actual knowledge [was] not a feature of" the response. Regardless of whether this argument holds up on its own, it ultimately fails because Palavicini did not object to the R&R's statement that actual knowledge was neither a component of her case nor supported by record evidence. *See Resolution Tr. Co. v. Hallmark Builders, Inc., 996 F.2d 1144, 1150 (11th Cir. 1993)*. True, Palavicini's objection made brief mention of the R&R's failure to consider the statement of a Wal-Mart employee. But even if that employee's statement were a part of Palavicini's actual notice argument, the objection was not clear or specific enough for us to understand she wanted to make an actual notice argument. *Cf. Jimenez v. Collier Transit Mgmt., Inc., 337 F. App'x 804, 809 (11th Cir. 2009)* (per curiam) (unpublished) (holding "citation to two cases that happened to discuss" the issue appellant sought to raise "did not preserve that argument for review on appeal").

Palavicini's failure to raise her claims of Wal-Mart's

Palavicini v. Wal-Mart Stores East, LP

actual notice before the district court, despite having been given several opportunities to do so, means we cannot now weigh in on the substance of those arguments. For Palavicini to succeed in this appeal, therefore, she must prove that Wal-Mart had constructive notice of the dangerous condition.

ii. Constructive **[*10]** Notice Under Fla. Stat. § 768.0755(1)(a)

HN8 ⬆ Under Fla. Stat. § 768.0755(1)(a), Palavicini must establish that the "dangerous condition existed for such a length of time that in the exercise of reasonable care the condition would have been known to the defendant." Grimes v. Family Dollar Stores of Fla., Inc., 194 So. 3d 424, 427-28 (Fla. 3d DCA 2016).

Palavicini argues that there is substantial evidence to support a finding that the liquid was present on the floor before Wal-Mart's store manager, Jorge Mastrapa, traversed the area. Palavicini asserts that, in the two and a half minutes between Mastrapa passing by the area to when Palavicini fell, CCTV footage shows that no customer spilled liquid on the floor. She argues this evidence supports a reasonable inference that the liquid had been on the floor prior to Mastrapa passing through the area. Moreover, Wal-Mart's use of a "considerable amount of spill magic"[2] to absorb the liquid supports an inference that there was enough liquid on the floor to be observable to Mastrapa. We find the evidence insufficient to support a reasonable inference that the liquid was on the floor long enough to establish Wal-Mart's constructive notice.

Taken in the light most favorable to Palavicini, the evidence shows that she slipped and fell on a liquid substance on the floor at Wal-Mart. Palavicini **[*11]** did not see the liquid before falling, did not know where the liquid came from, did not know how long it had been present before falling, and did not know of any Wal-Mart employees who were aware of the liquid on the floor immediately before falling. Although she testified that the liquid on the floor appeared to be "yellow" and "dirty," she did not know what caused the liquid to be dirty. There is no evidence of footprints, prior track marks, changes in consistency, drying of the liquid, or other evidence that would tend to show that the liquid was on the floor for an amount of time sufficient to impute constructive notice to Wal-Mart.

Palavicini asserts that no customer can be seen spilling liquid on the floor after Mastrapa passed through the area, which she argues supports an inference that the liquid was present prior to Mastrapa's passing. Palavicini cites Lynch v. Target Stores, Div. of Dayton Hudson Corp., 790 So. 2d 1193, 1194 (Fla. 4th DCA 2001), for the proposition that the lack of a potential cause for the presence of a foreign substance during a certain timeframe "supports a reasonable inference that the foreign substance had been on the floor" prior to that timeframe. But Lynch is factually distinguishable.

In Lynch, the plaintiff contended that for a period of **[*12]** fifteen minutes, she and her daughter were shopping in the cosmetics area, within view of the nearby area where she later slipped and fell on a creamy substance. Id. During that fifteen minutes, no Target employees or other customers entered or exited the area where the fall occurred. Id. The court found that the facts supported a reasonable inference that the foreign substance had been on the floor for a minimum of fifteen minutes. Id. Whether fifteen minutes was a sufficient time in which Target should have become aware of the condition was a question left to the jury. Id.

Here, unlike in Lynch, the CCTV footage shows numerous customers walking over the area where Palavicini fell. Although Palavicini asserts that the footage shows that no customer spilled liquid on the floor after Mastrapa left the area, she admits that she does not know how or when the liquid got on the floor. She also concedes that the CCTV footage does not actually show any liquid on the floor or the ceiling leaking. Simply put, Palavicini cannot identify when the liquid presented itself.

HN9 ⬆ "[T]he mere presence of water on the floor is not enough to establish constructive notice"—rather, the record must contain additional **[*13]** facts to create a permissible inference regarding the amount of time the water had been on the floor. Delgado v. Laundromax, Inc., 65 So. 3d 1087, 1090 (Fla. 3d DCA 2011). Palavicini has provided no additional facts that would support constructive notice. Rather, the facts indicate that the liquid was not on the floor for a long period of time prior to the incident.[3] See Wal-Mart Stores, Inc. v.

---

[2] Spill magic is an absorbent powder that is utilized to dry liquid.

[3] The CCTV footage shows numerous customers walking over the accident area immediately before Palavicini fell, yet there were no footprints, cart tracks, or any other signs that the puddle had been disturbed before the incident. To infer based on these undisputed facts that the liquid was on the floor for a sufficient period of time to charge Wal-Mart with constructive

Palavicini v. Wal-Mart Stores East, LP

_King, 592 So. 2d 705, 706-07 (Fla. 5th DCA 1991)_ (reversing a jury verdict in favor of a slip-and-fall plaintiff when the spilled substance displayed no "obvious signs of age, such as skid marks, smudges, dirt or the like" and there was no evidence about how or when the substance got on the floor); _see also Garcia v. Wal-Mart Stores East, L.P., No. 6:14-cv-255-Orl-40TBS, 2015 U.S. Dist. LEXIS 25557, 2015 WL 898582, at *2 (M.D. Fla. Mar. 3, 2015)_ (noting that evidence of deterioration supports constructive knowledge, while absence of such evidence disproves it).[4]

To conclude that Wal-Mart had constructive notice under _Fla. Stat. § 768.0755(1)(a)_, would require drawing a series of impermissible inferences that are unsupported by the record. _See Daniels, 692 F.2d at 1324_ **HN10**[⬆] ("[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation. This proposition is undoubtedly sound." (internal quotation marks omitted)).

_iii. Constructive Notice Under Fla. Stat. § 768.0755(1)(b)_

Palavicini **[*14]** argues that even if the record evidence is deficient to establish that the liquid was on the floor for a sufficient amount of time to impute constructive notice to Wal-Mart under _Fla. Stat. § 768.0755(1)(a)_, constructive notice can be imputed to Wal-Mart under _Fla. Stat. § 768.0755(1)(b)_. **HN11**[⬆] _Fla. Stat. § 768.0755(1)(b)_ requires a showing that a "condition

---

notice would require assuming facts not supported by the record.

[4] Palavicini relies on this Court's unpublished decision in _Doudeau v. Target Corp., 572 F. App'x 970, 971-72 (11th Cir. 2014)_, where we reversed the district court's grant of summary judgment because there was evidence that the area where the plaintiff fell was a known slip and fall area, and evidence that it was raining on the day in question. As the district court correctly pointed out, _Doudeau_ is distinguishable. The fact that the defendant had knowledge of the source of the water, and that water would accumulate in the known slip and fall area when it was raining or had rained, precluded summary judgment for the defendant. _See id. at 972_. Palavicini has failed to produce similar evidence to impute constructive notice to Wal-Mart. _See Brooks v. Phillip Watts Enters., Inc., 560 So. 2d 339, 342 (Fla. 1st DCA 1990)_ (reversing the grant of summary judgment in favor of defendant because constructive notice could be inferred from defendant's prior knowledge of the slippery condition of the floor when wet, and prior knowledge of the source of the water that caused the condition).

occurred with regularity and was therefore foreseeable." She argues that Wal-Mart knew that the air conditioning unit above the area where she fell frequently leaked, which is sufficient to place Wal-Mart on constructive notice of the leak on the date of the incident.[5] Palavicini relies on four pieces of evidence to establish that the leak occurred with regularity: (1) a former Wal-Mart employee, Angel Luis Mesa, testified that he observed a leak on a few occasions in the ceiling above where Palavicini fell; (2) Wal-Mart's Asset Protection Assistant Manager, Jose Perez Del Rio, testified that he was aware of other ceiling leaks at the store; (3) an affidavit from Palavicini's air conditioning expert, John Provenzano, explaining that the leak occurred because the air conditioning unit did not have the appropriate safety float switch; and (4) a work order issued two months before the incident that addressed a leak in **[*15]** the air conditioning unit above the area where Palavicini fell.

Although Mesa testified that he had observed on a few occasions a leak from the ceiling above the area where Palavicini fell, he had "no knowledge as to the specific date and time [he] observed the leaks" and did not know of anyone falling because of the leaks. Perez Del Rio similarly testified that he was aware of leaks at the store but did not know of any leaks regarding the specific air conditioning vent directly above where Palavicini fell. We find these statements insufficient to establish that a leak above the incident area occurred with such regularity that it would foreseeably reoccur on the date of the accident.

Palavicini also relies on Provenzano's affidavit, which expresses opinions regarding the subject air conditioning unit. Provenzano believed that the leak was caused by the lack of a "safety float switch" in the air conditioning unit. He observed water damage in the ceiling above where Palavicini fell and opined that the damage was indicative of prior water intrusions and leaks. His also noted extensive amounts of rust, sludge, and algae in the unit. But as the district court noted, Provenzano inspected the **[*16]** air conditioning unit in June 2018—four years after Palavicini's accident. The district court held that Provenzano's "opinion provides no basis from which a reasonable fact finder could conclude that the damage Mr. Provenzano witnessed in June 2018 was present at or around the time of

---

[5] The district court correctly noted that Wal-Mart contests the fact that there was a leak, but for purposes of summary judgment, we must accept Palavicini's assertion that there was a ceiling leak on the date of the incident.

Palavicini v. Wal-Mart Stores East, LP

[Palavicini's] accident." We agree. Provenzano's affidavit fails to establish that the air conditioning unit was in a similar poor condition in 2014. His affidavit is therefore insufficient to demonstrate foreseeability of a dangerous condition on the date of the accident.

Finally, Palavicini relies on a work order, which indicates that a leak in the air conditioning unit at issue was fixed two months prior to the incident. But again, to prove constructive notice under *Fla. Stat. § 768.0755(1)(b)*, Palavicini must demonstrate that the leak that caused her fall "occurred with regularity." An isolated work order that was issued two months before the incident is insufficient to show that the air conditioning unit leaked regularly.[6]

We find that Palavicini has failed to adduce evidence sufficient to establish that the dangerous condition—a ceiling leak that caused Palavicini to slip and fall—occurred with such regularity that it was foreseeable **[*17]** on the date of the incident.

## III. Conclusion

Palavicini has failed to produce sufficient evidence to support a reasonable inference that Wal-Mart had constructive notice of the liquid on the floor or a leak from the ceiling. We therefore affirm the district court's grant of summary judgment in favor of Wal-Mart.

**AFFIRMED**.

---

End of Document

---

[6] Moreover, the work order fails to indicate whether the leak from the air conditioning unit reached either the ceiling or the floor.

 Positive

As of: October 18, 2019 5:41 PM Z

# *J.B. v. Amerson*

United States Court of Appeals for the Eleventh Circuit

May 28, 2013, Decided

No. 12-14546 Non-Argument Calendar

**Reporter**

519 Fed. Appx. 613 *; 2013 U.S. App. LEXIS 10611 **; 2013 WL 2302383

J.B., A minor, who sues by and through his Mother and next friend, Stacy Brown, Plaintiff-Appellant, versus SHERIFF LARRY AMERSON, in his official and individual capacities, DEPUTY WARD, in his official and individual capacities, Defendants-Appellees.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Subsequent History:** US Supreme Court certiorari denied by *J.B. v. Amerson, 2015 U.S. LEXIS 997 (U.S., Feb. 23, 2015)*

**Prior History: [**1]** Appeal from the United States District Court for the Northern District of Alabama. D. C. Docket No. 1:11-cv-01182-RBP-HGD.

*J.B. v. Amerson, 890 F. Supp. 2d 1299, 2012 U.S. Dist. LEXIS 123541 (N.D. Ala., 2012)*

**Disposition:** AFFIRMED.

# Core Terms

de minimis, excessive force, qualified immunity, summary judgment, video, circumstances, jail, district court, injuries, spit, objectively reasonable, chokehold, grabbed, hock, matter of law, use of force, arrested, bruising

# Case Summary

**Procedural Posture**

Plaintiff minor, by and through his mother, sued defendants, a sheriff and a deputy, pursuant to *42 U.S.C.S. § 1983*, alleging excessive force under the *Fourth Amendment*. The United States District Court for the Northern District of Alabama granted summary judgment in favor of the sheriff based on qualified immunity. The minor appealed.

**Overview**

While the 14-year-old minor was participating in a county jail program for suspended students, officers at the jail allegedly threatened to lock him in a room alone with an inmate. Officers alleged that the minor aggressively resisted them and struck an officer. While the minor was shackled to a bench, the sheriff sat down next to him. When the minor turned his head and body away from the sheriff, the sheriff applied a choke hold for about 19-20 seconds. The sheriff alleged that he heard the minor "hocking," as though the minor were about to spit at him. The appellate court determined that the sheriff was entitled to qualified immunity as to the minor's excessive force claim because the sheriff's conduct was objectively reasonable under the circumstances since (1) it was reasonable for the sheriff to believe that the minor turned away and "hocked" with the intent to spit at the sheriff, considering the minor's undisputed lack of respect for the jail officers, his threats to them, and his demonstrated willingness to lash out at the them, and (2) the nature and duration of the force that the sheriff applied was not disproportionate to the perceived need for force.

**Outcome**

The appellate court affirmed.

# LexisNexis® Headnotes

J.B. v. Amerson

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

**HN1[⬇]** **Summary Judgment, Evidentiary Considerations**

A court at summary judgment can and should view the facts in the light depicted by a video where there is no contention that a video fails to depict what actually happened.

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

**HN2[⬇]** **Summary Judgment Review, Standards of Review**

An appellate court reviews de novo a district court's grant of summary judgment, drawing all inferences and construing the evidence in the light most favorable to the non-moving party.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

**HN3[⬇]** **Entitlement as Matter of Law, Appropriateness**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*.

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

**HN4[⬇]** **Summary Judgment Review, Standards of Review**

An appellate court may affirm a grant of summary judgment on the basis of any ground supported in the record.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

**HN5[⬇]** **Immunity From Liability, Defenses**

Law enforcement officers who act in their official capacities and within their discretionary authority enjoy qualified immunity from suit and are not liable for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The Supreme Court has emphasized repeatedly the importance of resolving immunity questions at the earliest possible stage in litigation.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

**HN6[⬇]** **Burdens of Proof, Nonmovant Persuasion & Proof**

In the context of an excessive force claim, to defeat an officer's summary judgment motion and qualified immunity defense, a plaintiff must show that, (1) the officer's conduct violated his constitutional right to be free from excessive force, and (2) his right was clearly established.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

**HN7[⬇]** **Law Enforcement Officials, Excessive Force**

Where a plaintiff claims that a law enforcement officer has used excessive force in the course of arresting or otherwise seizing him, a court analyzes his claim under the *Fourth Amendment's* "objective reasonableness" standard.

Civil Rights Law > ... > Scope > Law Enforcement

J.B. v. Amerson

Officials > Excessive Force

Constitutional Law > ... > Fundamental
Rights > Search & Seizure > Scope of Protection

### *HN8*[⬇] Law Enforcement Officials, Excessive Force

A law enforcement officer's application of de minimis force to a lawfully arrested person is objectively reasonable.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental
Rights > Search & Seizure > Scope of Protection

### *HN9*[⬇] Law Enforcement Officials, Excessive Force

De minimis injuries are not necessarily dispositive of an excessive force claim.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > Bill of Rights > Fundamental
Rights > Cruel & Unusual Punishment

Constitutional Law > ... > Fundamental
Rights > Search & Seizure > Scope of Protection

### *HN10*[⬇] Law Enforcement Officials, Excessive Force

The Supreme Court distinguishes between excessive force claims which arise under the *Fourth Amendment's* prohibition against unreasonable seizures and the *Eighth Amendment's* ban on cruel and unusual punishments, and requires that the validity of a plaintiff's claim be judged by reference to the specific constitutional standard which governs that right.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental
Rights > Search & Seizure > Scope of Protection

### *HN11*[⬇] Law Enforcement Officials, Excessive Force

It is well-settled that the use of de minimis force, without more, will not support a claim for excessive force in violation of the *Fourth Amendment*. Numerous cases from the court provide examples of what sort of force is, as a matter of law, de minimis, and therefore, lawful. The court has often discussed the minimal nature of the plaintiff's injuries in conjunction with a defendant's minimal use of force.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental
Rights > Search & Seizure > Scope of Protection

### *HN12*[⬇] Law Enforcement Officials, Excessive Force

The de minimis nature of a plaintiff's injury does not foreclose the possibility of his entitlement to relief. A *42 U.S.C.S. § 1983* plaintiff alleging excessive use of force is entitled to nominal damages even if he fails to present evidence of compensable injury. Similarly, the de minimis nature of an injury does not require the legal conclusion that a defendant used non-actionable, de minimis force. Objectively unreasonable force does not become reasonable simply because the fortuity of the circumstances protected the plaintiff from suffering more severe physical harm.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental
Rights > Search & Seizure > Scope of Protection

### *HN13*[⬇] Law Enforcement Officials, Excessive Force

A video can be used to establish that an officer's use of force was de minimis and lawful.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental

J.B. v. Amerson

Rights > Search & Seizure > Scope of Protection

*HN14*[⬇] **Law Enforcement Officials, Excessive Force**

The objectively reasonable application of force is permissible under the *Fourth Amendment*. The application of Graham's objective reasonableness standard requires careful attention to the facts and circumstances of each particular case. A court must judge the reasonableness of an officer's use of force from the perspective of a reasonable officer engaged in the incident, rather than from the perspective of hindsight, understanding that officers often must make "split-second judgments" in "tense, uncertain, and rapidly evolving" situations. Because the court applies an objective standard, the court does not consider an officer's "underlying intent or motivation," i.e., whether his intentions are evil or good.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

*HN15*[⬇] **Law Enforcement Officials, Excessive Force**

Graham dictates unambiguously that the force used must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight. Although it is necessary and reasonable for an officer to apply force in order to effectuate a lawful arrest, it may or may not be reasonable for an officer to apply force upon a person who is already arrested and secured in handcuffs. It just depends on the relevant facts and circumstances.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

*HN16*[⬇] **Law Enforcement Officials, Excessive Force**

A court judges the reasonableness of force from the perspective of a reasonable officer on the scene.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

*HN17*[⬇] **Law Enforcement Officials, Excessive Force**

A court considers the following factors indicating reasonableness: the need for force, the proportionality of the force applied in relation to the need, and the extent of any injuries inflicted.

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

*HN18*[⬇] **Summary Judgment, Evidentiary Considerations**

In the summary judgment context, regarding an excessive force claim, although a court must view the facts in the light most favorable to a nonmovant, the court must also consider the movant's conduct from the perspective of a reasonable officer at the scene.

**Counsel:** For J.B., A minor, who sues by and through his Mother and next friend, Stacy Brown, Plaintiff - Appellant: Elizabeth Peyton Faulk, Bush & Faulk, LLC, MONTGOMERY, AL; Anthony B. Bush, Lewis, Bush & Faulk, LLc, MONTGOMERY, AL.

For LARRY AMERSON, in his official and individual capacities, WARD, in his official and individual capacities, Defendants - Appellees: Kendrick Emerson Webb, Jamie H. Kidd, James Randall McNeill, Webb & Eley, PC, MONTGOMERY, AL; Charles Richard Hill, Jr., Fritz Hughes & Hill, LLC, MONTGOMERY, AL.

**Judges:** Before DUBINA, Chief Judge, WILSON and ANDERSON, Circuit Judges.

# Opinion

J.B. v. Amerson

[*614]  PER CURIAM:

Plaintiff-Appellant J.B., by and through his mother and next friend, Stacy Brown ("Stacy"), appeals the district court's order granting summary judgment in favor of Defendant-Appellee Sheriff Larry Amerson ("Amerson") on J.B.'s *Fourth Amendment* excessive force claim. After reviewing the record and reading the parties' briefs, we affirm.

I.

*Facts*

In February 2011, J.B., then 14 years old, was suspended from an alternative school program. Stacy elected to send her son to a **[**2]** Calhoun County Jail program for suspended students which allowed J.B. to perform community service in lieu of being sent to the Department of Youth Services. After Stacy consented to J.B.'s participation in the program and dropped him **[*615]** off for the day at the jail, J.B. changed into a jail uniform and was given an assignment to clean walls with a toothbrush. Later in the day, jail personnel took J.B. and another program participant on a tour of the jail. J.B. alleges that during and after the tour, officers threatened and intimidated him, including threatening to lock him in a room alone with an inmate. Amerson claims to be without knowledge of these events, and former defendant Corrections Officer Wendell Ward ("Ward") denies these allegations. According to several of Amerson's officers, after J.B.'s cleaning assignment, J.B. disobeyed their instructions, aggressively resisted them, cursed them, threatened to fight them, threatened to sue them, and struck an officer on the arm. J.B. and Stacy allege that J.B. was scared of his environment and wanted to call Stacy to come pick him up from the program.

According to Amerson, as a result of J.B.'s demeanor, his officers had to loosely handcuff **[**3]** and later shackle J.B. to a bench in a room used for fingerprinting. After an officer informed Amerson about their dealings with J.B., Amerson came in to talk with J.B. in an attempt to reason with him. The events of Amerson's interaction with J.B. are recorded on video, but there is no audio. The video shows Amerson sitting down next to J.B, who does not resist Amerson. At times, Amerson leans toward J.B. or put his arm around him. As J.B. acknowledges, Amerson told J.B. that Amerson was there to help him. But suddenly, after J.B.

turned his head and body away from Amerson, Amerson grabbed J.B.'s shoulder, quickly turned J.B. back toward Amerson, and then stood over J.B. applying a choke hold for about 19-20 seconds.

Amerson claims that when J.B. turned away from him, he heard J.B. "hocking,"[1] as though he were about to spit at Amerson. Amerson explains that in order to prevent J.B. from spitting, Amerson stood up, turned J.B. around, grabbed J.B. by the jaw and neck, and told J.B. that he would not be spit upon. J.B. denies that he "hocked" or tried to spit on Amerson and complains that Amerson choked him for no reason, inflicting pain and causing temporary shortness of breath and **[**4]** bruising.

After releasing J.B. from the choke hold, Amerson continued to try to counsel J.B. but was unsuccessful. At some point, Amerson momentarily grabbed J.B. again by the shoulders as J.B. resisted him.[2]  **[*616]** Officers removed J.B.'s handcuffs and moved him to another room, where J.B. used furniture to crack a window, overturned a table, and ripped wiring from a wall. J.B. explains that he believed the officers would place

---

[1] The verb "hock" is not defined in dictionaries as Amerson uses the word. Amerson's use of "hock" is slang, and we understand him to mean that J.B. made the sound that a person would make when collecting phlegm in his throat before spitting it out. The word "hock" imitates the sound a person makes when "hocking."

[2] The second amended complaint alleges vaguely that after grabbing J.B. by the neck, Amerson "assaulted **[**5]** J.B. a second time." [R. 21 at 5-6.] Likewise, J.B.'s reply brief asserts that Amerson "assaulted J.B. *twice* without justification." Reply Br. at 4 (emphasis added). Yet J.B.'s response to the summary judgment motion, [*See* R. 5 to 5-6], and J.B.'s initial brief to this court, *see* Appellant's Br. at 6-7, describe only the choking incident in their statements of facts and neglect to discuss the second application of excessive force. In his deposition, counsel asked J.B., "Do you remember if [Amerson] like grabbed you or strongly handled you in any other way besides the choking?" J.B. responded that he could not remember. [R. 75-2 at 16.]

We have reviewed the video of the second alleged application of force, [*see* R. 75 Exh. A], and we conclude that Amerson's momentary holding of J.B. by J.B.'s shoulders was *de minimis* and not actionable as a matter of law. *See* Scott v. Harris, 550 U.S. 372, 378-81, 127 S. Ct. 1769, 1775-76, 167 L. Ed. 2d 686 (2007) (holding that *HN1*[↑] a court at summary judgment can and should view the facts in the light depicted by a video where there is no contention that a video fails to depict what actually happened).

J.B. v. Amerson

inmates in the room with him. Amerson charged J.B. with criminal mischief and harassment. J.B. was transferred to at Coosa Valley Youth Services where he complained about his treatment at the jail, and Youth Services officers photographed J.B.'s injury (bruising on his neck).[3] J.B. never received medical treatment for the physical injuries he claims to have suffered.

J.B. also claims to have suffered emotional and psychological trauma related to the incident, but he has refused therapy. Since the incidents at the jail, Stacy reports that J.B., who was diagnosed with ADHD and epilepsy before this incident, has been prescribed a new medication, Focalin. Stacy also testified that J.B.'s dosage of another medication, Seroquel, has been increased. Yet there is no evidence in the record explaining the purpose of either medicine or how J.B.'s need for the prescriptions is causally related to the events at issue in this case.

*Procedural History*

J.B. sued Amerson and Ward in federal court alleging several violations of his constitutional and statutory rights. Eventually, all claims were dismissed with prejudice except for J.B.'s *42 U.S.C. § 1983* excessive force claim against Amerson. J.B. maintained that the choking incident was an unreasonable and disproportionate use of force in light of J.B.'s young age, small stature, and subdued status at the time that Amerson grabbed him. After briefing and oral argument, which included the court's review of the relevant portions of the video and a photograph of **[**7]** J.B.'s bruise, the district court granted Amerson's motion for summary judgment, concluding that Amerson did not, as a matter of law, use excessive force in violation of J.B.'s constitutional rights because Amerson used *de minimis* force, as evidenced by J.B.'s *de minimis* injuries. The court further found that even if a question of fact remained as to whether Amerson used excessive force, J.B. still could not defeat Amerson's defense of qualified immunity because J.B. failed to show that the law was clearly established that Amerson's use of force was excessive under the circumstances. J.B. brought this timely appeal.

II.

*HN2*[↑] We review *de novo* the district court's grant of summary judgment, drawing all inferences and construing the evidence in the light most favorable to the non-moving party. *Croom ↑ Balkwill, 645 F.3d 1240, 1245 (11th Cir. 2011).*[4] *HN3*[ ] Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a).* *HN4*[ ] We may affirm the grant of summary judgment on the basis of any ground supported in the record. *Lucas v.* **[*617]** *W.W. Grainger, Inc., 257 F.3d 1249, 1256 (11th Cir. 2001).*

III.

After reviewing the parties' briefs, the district court's memorandum opinion, the transcript of the district court's hearing on the motion for summary judgment, and the most relevant evidence, i.e., the video, we hold that Amerson's conduct was objectively reasonable under the circumstances and that he is therefore entitled to qualified immunity.

*Qualified immunity*

*HN5*[↑] Law enforcement officers like Amerson who act in their official capacities and within their discretionary authority enjoy qualified immunity from suit and are not liable for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Croom, 645 F.3d at 1245* **[**9]** (internal quotation marks omitted). The Supreme Court has emphasized repeatedly "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L. Ed. 2d 589 (1991)* (per curiam). *HN6*[↑] To defeat Amerson's summary judgment motion and qualified immunity defense, J.B. must show that, (1) Anderson's conduct violated his constitutional right to be free from excessive force, and (2) his right was clearly established. *See Croom, 645*

---

[3] The district court found that "[e]ven a slight bruise cannot be truly perceived **[**6]** from an examination of the photograph." [R. 87 at 13.]

---

[4] J.B. **[**8]** argues in his initial brief that the district court's memorandum opinion improperly presumes and emphasizes Anderson's good will toward troubled youths in Calhoun County. Although the opinion does suggest that Amerson's program for suspended students like J.B. was a virtuous undertaking, that Amerson intended only to help, not hurt J.B., and that J.B. didn't care about Amerson's gestures of kindness, J.B.'s allegation of error is immaterial because we are reviewing his case *de novo*.

J.B. v. Amerson

*F.3d at 1246*. *HN7*[↑] Where, as here, a plaintiff claims that a law enforcement officer has used excessive force in the course of arresting or otherwise seizing him, we analyze his claim under the *Fourth Amendment's* "objective reasonableness" standard. *Graham v. Connor, 490 U.S. 386, 388, 109 S. Ct. 1865, 1867-68, 104 L. Ed. 2d 443 (1989)*.

*De minimis force*

*HN8*[↑] A law enforcement officer's application of *de minimis* force to a lawfully arrested person is objectively reasonable. The district court concluded that J.B. could not prove a constitutional violation because J.B.'s *de minimis* injuries necessarily indicated a *de minimis* application of force. [*See.* R. 87 at 10 ("The undisputed evidence in this case establishes that the purported **[**10]** injury to the plaintiff was *de minimis*, if existent, *and thus,* that any force was *de minimis* and not excessive." (emphasis added)); *id.* at 16 ("This court concludes that there was no Constitutional violation because there was no excessive force; there was only *de minimis* physical or mental injury, if any injury.").] While we agree that there is scant evidence of J.B.'s physical or emotional injuries, we disagree with the district court that J.B.'s *de minimis* injury necessarily demonstrates that Amerson applied *de minimis* force.[5]

*HN11*[↑] It is well-settled that the use of *de minimis* force, "without more, will not support a claim for excessive force in violation of **[*618]** the *Fourth Amendment.*" *Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000)*. *But see* *Reese v. Herbert, 527 F.3d 1253,*

---

[5] J.B. similarly asserts that "[w]hether J.B.'s injuries were *de minim[i]s* is not dispositive." Appellant's Br. at 27. In support of his position, J.B. primarily discusses two Supreme Court cases on excessive force in the *Eighth Amendment* context. J.B. relies on these cases to demonstrate that the relatively minor nature of a plaintiff's injuries does not require a court to conclude that a defendant has not used excessive force. We agree with J.B. that *HN9*[↑] *de minimis* injuries are not necessarily dispositive of an excessive force claim, but we arrive at that conclusion differently. The *Eighth Amendment* excessive force cases cited by J.B. do not control here. *See* *Graham, 490 U.S. at 394, 109 S. Ct. at 1870-71* (*HN10*[↑] distinguishing between excessive force claims which arise under the *Fourth Amendment's* prohibition against unreasonable seizures and the *Eighth Amendment's* ban on cruel and unusual punishments, and requiring that "[t]he validity of [a plaintiff's] claim . . . be judged by reference to the specific constitutional standard which governs that right").

*1272 (11th Cir. 2008)* (explaining that *de minimis* force is actionable where a defendant is not legally entitled to seize the plaintiff).[6] Numerous cases from this court provide examples of what sort of force is, as a matter of law, *de minimis*, and therefore, lawful. *See, e.g., Croom, 645 F.3d at 1252-53 (11th Cir. 2011)* (officer forced an unarmed, physically weak, elderly woman to the ground and held her there with a foot or knee on her back for ten minutes); *Nolin, 207 F.3d at 1258, 1258 n.4* (officer shoved a 17-year-old male against a van, pushed a knee into his back, pushed his head against **[**12]** the van, searched his groin area in an uncomfortable manner, and handcuffed him); *Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559-60 (11th Cir. 1993)* (officer unnecessarily pushed an already-handcuffed adult male into a wall). The district court observed that we have often discussed the minimal nature of the plaintiff's injuries in conjunction with a defendant's minimal use of force. *See, e.g., Nolin, 207 F.3d at 1258 n.4.* (noting that the defendant's actions caused only "minor bruising which quickly disappeared without treatment" and reasoning that "a minimal amount of force and injury . . .will not defeat an officer's qualified immunity"); *Gold v. City of Miami, 121 F.3d 1442, 1446 (11th Cir. 1997)* (per curiam) (finding defendant's entitlement to qualified immunity and reasoning that "[t]he minor nature of [plaintiff's] injury reflects that minimal force was used"); *Jones v. City of Dothan, Ala., 121 F.3d 1456, 1460 (11th Cir. 1997)* (finding defendant's entitlement to qualified immunity and reasoning that "the actual force used and the injury inflicted were both minor in nature").

*HN12*[↑] Yet the *de minimis* nature of a plaintiff's injury does not foreclose the possibility of his entitlement to relief. *See, e.g., Slicker v. Jackson, 215 F.3d 1225, 1231-32 (11th Cir. 2000)* ("[A] *§ 1983* plaintiff alleging excessive use of force is entitled to nominal damages even if he fails to present evidence of compensable injury.") Similarly, the *de minimis* nature of an injury does not require the legal conclusion that a defendant used non-actionable, *de minimis* force. In *Lee v. Ferraro, 284 F.3d 1188 (11th Cir. 2002)*, we reasoned as follows:

> that [the plaintiff] did not suffer greater injury to her head as a result of it being slammed against the trunk of a car does not alone render the force used *de minimis*. . . . [O]bjectively unreasonable force

---

[6] J.B. has not alleged that he was unlawfully seized—only that he was unreasonably subjected to excessive **[**13]** force.

J.B. v. Amerson

does not become reasonable simply because the fortuity of the circumstances protected the plaintiff from suffering more severe physical harm.

*Id. at 1200*. Following the same logic, the fact that J.B. did not need or obtain medical or psychological treatment after Amerson applied a choke hold does not mean that Amerson applied *de minimis* force as a matter of law.[7] Consequently, we reject the district court's decision to grant summary **[\*\*14]** judgment on the basis of *de minimis* force. However, this does not end our **[\*619]** inquiry of whether J.B. has shown that Amerson violated his right to be free from excessive force.

*Objectively reasonable force*

**HN14**[⬆] The objectively reasonable application of force is permissible under the *Fourth Amendment*. The application of *Graham's* objective reasonableness standard "requires careful attention to the facts and circumstances of each particular case." *Graham, 490 U.S. at 396, 109 S. Ct. at 1872*. We must judge the reasonableness of an officer's use of force from the perspective of a reasonable **[\*\*15]** officer engaged in the incident, rather than from the perspective of hindsight, understanding that officers often must make "split-second judgments" in "tense, uncertain, and rapidly evolving" situations. *Id. at 396-97, 109 S. Ct. at 1872*. Because we apply an objective standard, we do not consider an officer's "underlying intent or motivation," i.e., whether his intentions are evil or good. *Id. at 397, 109 S. Ct. at 1872*.

**HN15**[⬆] "*Graham* dictates unambiguously that the force used . . . must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Lee, 284 F.3d at 1198*. Although it is necessary

and reasonable for an officer to apply force in order to effectuate a lawful arrest, it may or may not be reasonable for an officer to apply force upon a person who is already arrested and secured in handcuffs. It just depends on the relevant facts and circumstances. *Compare id.* (denying qualified immunity for officer who, after subduing and handcuffing a compliant plaintiff, led her to the back of her car and slammed her head against the trunk), *with Zivojinovich v. Barner, 525 F.3d 1059, 1073 (11th Cir. 2008)* **[\*\*16]** (per curiam) (upholding qualified immunity for officers who tased an already arrested and handcuffed plaintiff because one officer reasonably believed that the plaintiff intentionally sprayed blood at the officers from his broken nose when he spoke).

J.B. asserts that Amerson's application of force was unreasonable under the circumstances because, at the moment that Amerson grabbed J.B., J.B. posed no obvious threat to Amerson or others. But when we consider the totality of the circumstances, i.e., J.B.'s undisputed lack of respect for the jail officers, his threats to them, and his demonstrated willingness to lash out at them, we can safely say that it was reasonable for Amerson to believe that J.B. turned away and "hocked" with the intent to spit at Amerson. *See Post, 7 F.3d at 1559* (explaining that **HN16**[⬆] we judge the reasonableness of force from the perspective of a reasonable officer on the scene). Furthermore, the nature and duration of the force that Amerson applied to J.B. (a 19-20 second choke hold) was not disproportionate to the perceived need for force, and as the district court thoroughly explained in its analysis, the injury inflicted upon J.B. was minimal. *See Lee, 284 F.3d at 1198* **[\*\*17]** (advising that **HN17**[⬆] we consider the following factors indicating reasonableness: the need for force, the proportionality of the force applied in relation to the need, and the extent of any injuries inflicted).

J.B. contends that the video contradicts Amerson's testimony about his belief that J.B. was going to spit at him, and thus, a genuine dispute of material fact remains, precluding summary judgment. **HN18**[⬆] Although we must view the facts in the light most favorable to J.B., we must also consider Amerson's conduct from the perspective of a reasonable officer at the scene. *See Zivojinovich, 525 F.3d at 1073*. If J.B. had not been belligerent prior to meeting Amerson, this would be a different case, and we would be inclined to agree with **[\*620]** J.B.; but unfortunately for J.B., J.B.'s behavior at the jail leads us to view Amerson's application of the choke hold as an appropriate

---

[7] It is telling that the district court was unwilling to conclude, based on its viewing of the choke hold video, that Amerson applied *de minimis* force as a matter of law. *See Myers v. Bowman, 713 F.3d 1319, 2013 U.S. App. LEXIS 7216, 2013 WL 1442055 at \*6 (11th Cir. 2013)* (citing *Scott, 550 U.S. at 381 n.8, 127 S. Ct. at 1776 n.8 (2007)* for the proposition that **HN13**[⬆] a video can be used to establish that an officer's use of force was *de minimis* and lawful). Instead of concluding that the choke hold itself constituted *de minimis* force, however, the district court focused on J.B.'s weak evidence of actual injury to reach its conclusion on *de minimis* force.

J.B. v. Amerson

precaution against being spit upon.

Accordingly, we hold that Amerson's conduct was objectively reasonable under these circumstances, and therefore, J.B. suffered no constitutional violation. Because we conclude that there is no constitutional violation on this record, we need not discuss Amerson's contention that there was no clearly **[\*\*18]** established law placing him on notice that his actions were unconstitutional.

IV.

Because J.B. fails to show that Amerson's conduct was objectively unreasonable under the circumstances, we affirm the district court's grant of summary judgment based on qualified immunity in favor of Amerson.

**AFFIRMED**.

---

End of Document

 Caution
As of: October 18, 2019 5:41 PM Z

## *Carter v. Miami*

United States Court of Appeals for the Eleventh Circuit

April 19, 1989

No. 87-5665

**Reporter**

870 F.2d 578 *; 1989 U.S. App. LEXIS 5173 **; 49 Fair Empl. Prac. Cas. (BNA) 1014; 49 Empl. Prac. Dec. (CCH) P38,904

Mikele S. CARTER, Plaintiff-Appellee, v. CITY OF MIAMI, Jose Garcia-Pendrosa, Defendants-Appellants

**Prior History: [**1]** Appeal from the United States District Court for the Southern District of Florida, No. 84-1716-Civ-WJZ, William J. Zloch, Judge.

## Core Terms

replaced, fired, prima facie case, direct evidence, hired, district court, retire, protected class, city attorney, employees, pretext, protected group, non discriminatory reason, directed verdict motion, younger person, discriminatory, woman, sex, age discrimination claim, age discrimination, insistence, rebuttable

## Case Summary

**Procedural Posture**

Appellant city challenged the denial of its motions for directed verdict and judgment notwithstanding the verdict by the United States District Court for the Southern District of Florida in appellee former employee's age discrimination claim.

**Overview**

Appellee former employee was fired from her position as an attorney with the city law department. She brought an age discrimination action, and the district court found in her favor. Appellant city challenged the district court's denial of its motions for directed verdict and judgment notwithstanding the verdict. The court affirmed, holding that appellee failed to cast a doubt on the actions of appellant that was strong enough to reach the jury. In a circumstantial age discrimination claim, the plaintiff had to show that she was a member of the protected group, that she was fired, that she was replaced by a person outside the group, and that she was qualified for the job.

Then the defendant had the right to provide an explanation for the adverse work action taken against the plaintiff. Once defendant provided such a reason, the plaintiff had to show that the reason was pretextual before the jury could decide the action. Appellee failed to cast doubt on appellant's explanation, so a directed verdict or judgment notwithstanding the verdict in favor of appellant was the proper resolution.

**Outcome**

The court reversed and remanded the decision of the district court that denied appellant city's motions for directed verdict and judgment notwithstanding the verdict, holding that because appellee former employee failed to present an issue of fact that appellant fired her for pretextual reasons, her age discrimination claim could not go to the jury.

## LexisNexis® Headnotes

Labor & Employment Law > ... > Age Discrimination > Scope & Definitions > General Overview

**HN1**[ ] **Age Discrimination, Scope & Definitions**

Since January 1, 1978, the Age Discrimination in Employment Act, *29 U.S.C.S. § 621 et seq.*, has protected persons between the ages of 40 and 70, inclusive. *29 U.S.C.S. § 631(a)*. Before that time, protection ended at age 65.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

HN2[⬇] **Standards of Review, De Novo Review**

When considering whether or not a ruling on a motion for directed verdict or for judgment notwithstanding the verdict should be upheld, the standard of review to be applied by the court is the same as that applied by the district court. Thus, the court considers all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party. If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted. Conversely, if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions, then such a motion was due to be denied and the case was properly submitted to the jury.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

Civil Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

HN3[⬇] **Trials, Judgment as Matter of Law**

A mere scintilla of evidence does not create a jury question. Motions for directed verdict and for judgment notwithstanding the verdict need not be reserved for situations where there is a complete absence of facts to support a jury verdict. Rather, there must be a substantial conflict in evidence to support a jury question.

Business & Corporate Compliance > ... > Discrimination > Age Discrimination > Federal & State Interrelationships

Evidence > Burdens of Proof > Ultimate Burden of Persuasion

Labor & Employment Law > ... > Disparate Treatment > Evidence > Circumstantial & Direct Evidence

Labor & Employment

Law > Discrimination > General Overview

Labor & Employment Law > ... > Age Discrimination > Evidence > General Overview

Labor & Employment Law > ... > Age Discrimination > Evidence > Burdens of Proof

Labor & Employment Law > ... > Disparate Treatment > Evidence > General Overview

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment Law > ... > Disparate Treatment > Evidence > Burdens of Proof

Business & Corporate Compliance > ... > Disparate Treatment > Statutory Application > Age Discrimination in Employment Act

HN4[⬇] **Age Discrimination, Federal & State Interrelationships**

Under the Age Discrimination in Employment Act, *29 U.S.C.S. § 621 et seq.*, a plaintiff claiming disparate treatment bears the ultimate burden of proving that age was a determining factor in the employer's decision to fire him or her. Initially, a plaintiff must establish a prima facie case of discrimination through one of three generally accepted methods: by direct evidence of discriminatory intent; by meeting the four-pronged test set out for Title VII cases in McDonnell Douglas Corp.; or through statistical proof.

Labor & Employment Law > ... > Age Discrimination > Evidence > General Overview

Labor & Employment Law > ... > Age Discrimination > Defenses > General Overview

HN5[⬇] **Age Discrimination, Evidence**

Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption. In the face of direct evidence, an employer must prove that the same employment decision would have been made absent any discriminatory intent.

Carter v. Miami

Labor & Employment Law > ... > Age Discrimination > Evidence > Direct Evidence

Labor & Employment Law > Discrimination > Age Discrimination > General Overview

Labor & Employment Law > ... > Age Discrimination > Discriminatory Employment Practices > General Overview

**HN6**[⬇] **Evidence, Direct Evidence**

Not every comment concerning a person's age presents direct evidence of discrimination. Remarks merely referring to characteristics associated with increasing age, or facially neutral comments from which a plaintiff has inferred discriminatory intent, are not directly probative of discrimination. Rather, courts have found only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, to constitute direct evidence of discrimination.

Labor & Employment Law > ... > Age Discrimination > Evidence > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

**HN7**[⬇] **Age Discrimination, Evidence**

A plaintiff can establish a prima facie case under the Age Discrimination in Employment Act, *29 U.S.C.S. § 621 et seq.*, with circumstantial evidence by proving: (1) that he is a member of the protected group; (2) that adverse employment action was taken against him; (3) that he was replaced by a person outside the protected group; and (4) that he was qualified for the position for which he was rejected.

Labor & Employment Law > ... > Age Discrimination > Evidence > General Overview

Labor & Employment Law > ... > Age Discrimination > Discriminatory Employment Practices > General Overview

**HN8**[⬇] **Age Discrimination, Evidence**

The establishment of a prima facie case is essentially a factual question particular to the circumstances of a given case. The inquiry is whether an ordinary person

could reasonably infer age discrimination if the facts presented remained unrebutted.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

**HN9**[⬇] **Burdens of Proof, Burden Shifting**

Presentation of a prima facie case by a plaintiff raises a rebuttable inference of discrimination and shifts the burden of proof to the employer to respond with a legitimate, nondiscriminatory reason for dismissing the plaintiff.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

**HN10**[⬇] **Burdens of Proof, Burden Shifting**

Once a legitimate, nondiscriminatory reason for dismissal is put forward by the employer, the burden returns to the plaintiff to prove by significantly probative evidence that the proffered reason is a pretext for discrimination. A plaintiff may do so either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

**HN11**[⬇] **Burdens of Proof, Burden Shifting**

Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where an employer has offered extensive evidence of legitimate, non-discriminatory reasons for its actions.

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Labor & Employment

Carter v. Miami

Law > ... > Evidence > Burdens of Proof > Burden Shifting

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN12*[🔽] **Summary Judgment, Opposing Materials**

The mere establishment of a prima facie case of discrimination does not foreclose the possibility of summary judgment in favor of an employer. Neither does defendant's offer of a legitimate, nondiscriminatory reason for a discharge automatically present a jury question. Simply stated, the presentation of a prima facie case creates a rebuttable presumption of discrimination, but does not alone establish a genuine issue of material fact sufficient to go to the jury. Rather, because the plaintiff bears the burden of establishing pretext, he must present significantly probative evidence on the issue to avoid summary judgment.

**Counsel:** Arthur J. England, Jr., Fine Jacobson Schwartz Nash Block & England, Linda Ann Wells, Miami, Florida, for Defendants-Appellants.

Lucia A. Dougherty, City Atty., Leon M. Firtel, Miami, Florida, for Defendants-Appellants.

Sheridan Weissenborn, Papy, Weissenborn & Papy, Coral Gables, Florida, for Plaintiff-Appellee.

**Judges:** Fay and Kravitch, Circuit Judges, and Lynne,[*] Senior District Judge.

**Opinion by:** LYNNE

# Opinion

**[\*579]** LYNNE, Senior District Judge

In July of 1984, Plaintiff-Appellee sued the City of Miami alleging violations of the Age Discrimination in Employment Act of 1967 [hereinafter ADEA], *29 U.S.C. § 621 et seq.*, and seeking damages for violation of Florida's age discrimination act. The jury found in favor

---

[*] Honorable Seybourn H. Lynne, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

of Appellee, and the district court awarded her back pay, future pay, and an increased annual pension. The City appeals the district court's denial of its motions for directed verdict and judgment notwithstanding the verdict. We reverse.

I. FACTS

In June, 1961, **[\*\*2]** Mikele Carter, a woman born August 31, 1933 [hereinafter Carter], was hired as a policewoman by the City of Miami Police Department. In 1973, she was admitted to the Florida Bar and transferred to the City of Miami Law Department. On March 30, 1983, she was fired.

In July of 1982, Jose Garcia-Pedrosa [hereinafter Pedrosa] was appointed City Attorney. Pedrosa evaluated and reorganized the staff after he assumed the position of City Attorney and by November, 1982, he had asked three attorneys to resign. They were all male and under forty years of age.[1] Two employees who were in the age group protected by the ADEA[2] **[\*580]** retired or resigned. One, a 62 year old woman whom Pedrosa had promoted from secretary to an administrative position, was given the choice of returning to secretarial work or retiring. She retired with full pension benefits. Another female secretary was asked to resign by Pedrosa at the insistence of the attorney for whom she worked because the attorney considered her incompetent.

**[\*\*3]** Pedrosa also moved the offices to a new building and instituted various procedural reforms, such as requesting that staff members not shout in the office, requiring that attorneys keep track of their time and insisting that correspondence be free of typographical errors. Carter openly opposed these reforms: she accused Pedrosa of engaging in impropriety in leasing the new building and threatened grand jury action; she refused to account for her time, criticizing the requirement as a fraud; she took personal offense at Pedrosa's request that staff not shout at each other and in protest whispered to everyone in the office for two weeks; she impugned the character of and refused to work with a Ms. Dougherty, hired to be Deputy City Attorney, because Carter had wanted the position; and

---

[1] During the whole of Pedrosa's tenure as City Attorney, six attorneys were asked to resign or fired. With the exception of Carter, all were male and under 40.

[2] *HN1*[⬆] Since January 1, 1978, the ADEA has protected persons between the ages of 40 and 70, inclusive. *29 U.S.C. § 631(a)*. Before that time, protection ended at age 65.

Carter v. Miami

she maligned the Mayor and called his assistant a thief. Pedrosa testified that although he had considered firing Carter for these actions, he had instead tried to transfer her to the police department.

Around November, 1982, Pedrosa hired Ms. Gisella Cardonne, who was at that time thirty-two years old. Relying on a news account that Ms. Cardonne was hired to do appellate work, which was Carter's primary **[\*\*4]** responsibility, Carter asked Pedrosa whether he intended to fire her. Pedrosa assured Carter that she was not being replaced. However, Carter remembered that in August of 1982 Pedrosa had commented in reference to a sixty-two year old Jewish secretary that he did not want his office run by "little old Jewish ladies" like his mother-in-law. From this remark and a purported comment by Pedrosa that Carter's secretary was too old and made too much money, Carter concluded that Pedrosa wanted to get rid of older employees like herself in order to cut costs.

Carter interpreted several of Pedrosa's actions as personal criticisms aimed at harassing her to retire. For example, she felt she was being harassed by Pedrosa's insistence that her correspondence go out in the correct envelope, by his insistence that she refrain from shouting in the office, and by his questioning of her use of secondary research aids in her briefs. She also drew this conclusion when the Deputy City Attorney asked her when she was planning to retire. In March of 1983, Pedrosa took offense at some remarks Carter had made at a University of Miami fundraiser and either fired her or offered to let her retire. [3] When Pedrosa **[\*\*5]** came to see Carter at her office on March 30, 1983, Carter refused to speak with him without a witness present. Pedrosa considered this an act of insubordination and, when Carter insisted, told Carter to clear out her desk. Carter reverted to a position as police sergeant and remained there until her voluntary retirement on August 31, 1983. In April of 1983, Albertine Smith, a forty-six year old woman, was hired by the City Attorney's office to fill the vacancy created by Carter's departure.

Carter filed suit in state court on March 31, 1983, to enjoin the City from revoking her appointment in the City Attorney's office. The action was dismissed with

prejudice and affirmed on appeal. *Carter v. Garcia-Pedrosa, 442 So. 2d 1022 (Fla.3d DCA 1983)*, cert. denied, *451 So.2d 847 (Fla.1984)*. Carter also filed a complaint **[\*\*6]** with the Equal Employment Opportunity Commission, and on April 20, 1983, was notified of her right to institute a civil action. On July 19, 1984, Carter filed a **[\*581]** complaint against the City and against Pedrosa, both individually and in his official capacity, alleging that her termination violated the ADEA, and Title VII of the Civil Rights Act of 1964, *42 U.S.C. §§ 2000e et seq.*, on grounds of sex and religious discrimination. Carter also charged violation of two corresponding Florida statutes, §§ 760.10(8)(b) and 112.044(4). On June 12, 1985, summary judgment was entered in favor of defendants on the civil rights claim, after which Carter dismissed all remaining claims against Pedrosa.

At the close of Carter's case, the court granted an involuntary dismissal of the sex discrimination count but denied defendant's motions for directed verdict under the ADEA and Title VII. At the close of all the evidence, the court denied the City's motions for involuntary dismissal of the religious discrimination claim and for directed verdict on the age discrimination claim. The court rendered judgment for Appellant on the religious discrimination claim, and the jury found in favor of Carter on the age **[\*\*7]** discrimination claim.

The court awarded Carter $ 174,954.43 in back pay, $ 45,224.55 for future pay and $ 26,912.54 for economic benefits based on a stipulation by the parties as to when Carter would have retired had she not been fired. In addition, the district court increased Carter's annual pension from $ 30,422.88 to $ 56,045.52. Appellant's motions for judgment not withstanding the verdict and for new trial were denied, and this appeal ensued.

## II.  STANDARD OF REVIEW

*HN2*[↑] When considering whether or not a ruling on a motion for directed verdict or for judgment notwithstanding the verdict should be upheld, the standard of review to be applied by this Court is the same as that applied by the district court. [4] Thus, we consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving

---

[3] Appellant contends that Pedrosa offered to let Carter retire or to facilitate her transfer to the police department and that Carter preferred to retire and agreed to do so on her first eligible date, August 31, 1983. Pedrosa had his secretary prepare the appropriate form and send it to Carter. Carter, on the other hand, contends that Pedrosa fired her on March 14.

---

[4] *Miles v. Tennessee River Pulp and Paper Co., 862 F.2d 1525 (11th Cir.1989)* (citing *Neff v. Kehoe, 708 F.2d 639, 641 (11th Cir.1983)*).

Carter v. Miami

party. [5] If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted. Conversely, if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions, then such [**8] a motion was due to be denied and the case was properly submitted to the jury. [6]

It bears repeating that *HN3*[↑] a mere scintilla of evidence does not create a jury question. Motions for directed verdict and for judgment notwithstanding the verdict need not be reserved for situations where there is a complete absence of facts to support a jury verdict. Rather, there must be a substantial conflict in evidence to support a jury question. [7]

III.  DISCUSSION

A. THE PRIMA FACIE CASE

*HN4*[↑] Under the ADEA, a plaintiff claiming disparate treatment bears the ultimate burden of proving that age was a determining factor in the employer's decision to fire him or her. [8] Initially, a plaintiff must establish a prima facie case of discrimination through one of three generally accepted methods: by direct evidence of discriminatory intent; by meeting the four-pronged test [**9] set out for Title VII cases in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*; or through statistical proof. Because Carter did not submit statistical evidence, we need only address the first two methods.

1. *Direct Evidence of Discrimination*

*HN5*[↑] Direct evidence of discrimination would be evidence which, if believed, would [*582] prove the existence of a fact without inference or presumption. *Castle v. Sangamo Weston, Inc., 837 F.2d 1550, 1558 n. 13 (11th Cir.1988)*. In the face of direct evidence, an employer must prove that the same

employment decision would have been made absent any discriminatory intent. [9]

This Court has held that *HN6*[↑] not every comment concerning a person's age presents direct evidence of discrimination. *Young, 840 F.2d at 829*. The *Young* Court [**10] made clear that remarks merely referring to characteristics associated with increasing age, or facially neutral comments from which a plaintiff has inferred discriminatory intent, are not directly probative of discrimination. *Id.* Rather, courts have found only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, to constitute direct evidence of discrimination. [10]

[**11] Here, the only remark presented by Carter which could be construed as direct evidence of discrimination was the "little old Jewish lady" comment made by Pedrosa. However, Carter admitted at trial that the remark was not directed at her. Furthermore, Carter interpreted the comment as directed toward the other employee's religion and her status as a mother-in-law, not her age. While such a comment may be "inappropriate and condescending," it clearly falls short of the type of evidence that this Circuit has recognized as direct evidence of discrimination. *See Young, 840 F.2d at 829*; *Barnes v. Southwest Forest Industries, Inc., 814 F.2d 607, 611 (11th Cir.1987)*.

2. *The McDonnell Douglas Test*

_____

[5] *Miles, 862 F.2d at 1527-28 (11th Cir.1989)* (citing *Bonner v. City of Prichard 661 F.2d 1206, 1209 (11th Cir.1981))*.

[6] *Miles, 862 F.2d at 1527-28 (11th Cir.1989)*.

[7] *Id.*

[8] *Young v. General Foods Corp., 840 F.2d 825, 828 (11th Cir.1988)*; *Anderson v. Savage Laboratories, Inc., 675 F.2d 1221, 1224 (11th Cir.1982)*.

[9] *Young, 840 F.2d at 828*; *Castle, 837 F.2d at 1558 n. 13*; *Buckley v. Hospital Corp. of America, 758 F.2d 1525, 1529-30 (11th Cir.1985)*; *Bell v. Birmingham Linen Serv., 715 F.2d 1552, 1557-58 (11th Cir.1983)*.

[10] *See, e.g., Barnes v. Southwest Forest Industries, Inc., 814 F.2d 607, 610-11 (11th Cir.1987)* (remark by personnel manager to terminated security guard that in order to transfer "you would have to take another physical examination and at your age, I don't believe you could pass it" did not constitute direct evidence of discrimination); *Lindsey v. American Cast Iron Pipe Co., 772 F.2d 799, 801 (11th Cir.1985)* (supervisor's statement that plaintiff would not be considered for upcoming position because company would be looking for younger person than plaintiff constituted direct evidence of discrimination based on age); *Williams v. General Motors Corp., 656 F.2d 120, 129 (5th Cir. Unit B 1981)* (scrap of paper on which was written "Too old-Lay Off" constituted direct evidence); *Simmons v. McGuffey Nursing Home, Inc., 619 F.2d 369, 371 (5th Cir.1980)* (remark that board wanted younger man did not indicate that plaintiff was terminated because of his age).

Carter v. Miami

This Circuit has adopted a variation of the four-pronged test set out for Title VII claims in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. ⚓ 1817, 36 L. Ed. 2d 668 (1973)*, that allows *HN7*[ ] a plaintiff to establish a prima facie case under the ADEA with circumstantial evidence by proving: (1) that he is a member of the protected group; (2) that adverse employment action was taken against him, e.g. discharge, demotion, or failure to hire; (3) that he was replaced by a person outside **[**12]** the protected group; [11] and (4) that he was qualified for the position for which he was rejected. *Castle v. Sangamo Weston, 837 F.2d 1550, 1558 (11th Cir.1988)*; *Goldstein v. Manhattan Industries, Inc., 758 F.2d 1435, 1442* (11th Cir.), *cert. denied 474 U.S. 1005, 106 S. Ct. 525, 88 L. Ed. 2d 457 (1985)* (quoting *Pace v. Southern Railway System, 701 F.2d 1383, 1386* (11th Cir.), *cert. denied, 464 U.S. 1018, 104 S. Ct. 549, 78 L. Ed. 2d 724 (1983))*.

The City conceded at trial that Carter met the first three prongs of the test: that she was a member of the protected group, that she was a technically competent lawyer and that she was discharged. However, Appellant took the position at trial and afterward in its motion for judgment notwithstanding the verdict that Carter failed to satisfy the fourth prong by proving that she was replaced by an individual outside the protected group. Appellant argues that because Carter was replaced by a woman 46 years old and therefore within the protected class, she did not establish a **[*583]** prima facie **[**13]** case and the district court erred in allowing the case to go to the jury. The district court found that Carter was replaced by Ms. Cardonne, a woman thirty-two years old and thus outside the protected class. While Ms. Cardonne did take over two of the appeals that were being handled by Carter at the time Carter was discharged, the record clearly shows that Ms. Cardonne was hired at least four months before Carter was fired. The record further establishes that Carter's slot as an assistant city attorney was filled by Albertine Smith in April of 1983, shortly after Carter was fired. Thus, we find that Carter was replaced by Smith. Ms. Smith was forty-six years old at the time she was hired, placing her squarely within the protected class. However, this finding does not compel the conclusion urged by Appellant that Carter failed as a matter of law to prove her prima facie case.

Appellant's position fails to take into account this Court's repeated eschewal of an overly strict formulation of the elements of a prima facie case, especially in age discrimination cases. [12] Age, unlike race or sex, "is not a discreet and immutable characteristic of an employee which separates the members of **[**14]** the protected group indelibly from persons outside the protected group. Rather, age is a continuum along which the distinctions between employees are often subtle and relative ones." *Goldstein*, 758 F.2d at 1142. As we recognized in *McCorstin v. United States Steel Corp., 621 F.2d 749, 754 (5th Cir.1980)*: "Seldom will a sixty-year-old be replaced by a person in the twenties . . . . Because the discrimination involves age, rather than sex or race, a requirement that the replacement be from a nonprotected group fails to take the reality of the working place into account." [13] Thus, we have declined to hold that a plaintiff's inability to show that he was replaced by someone under forty is an absolute bar to the establishment of a prima facie case. *See, e.g., Castle, 837 F.2d 1550 (11th Cir.1988)*; *Goldstein, 758 F.2d 1435 (11th Cir.1985)*; *Pace v. Southern Ry. Sys., 701 F.2d 1383* (11th Cir.), *cert. denied, 464 U.S. 1018, 104 S. Ct. 549, 78 L. Ed. 2d 724 (1983)*; *McCorstin, 621 F.2d 749 (5th Cir.1980)*. [14] To

---

[11] This prong is treated with some flexibility in age discrimination cases, *see* discussion *infra* notes 12-14 and accompanying text.

[12] The Supreme Court has stressed that the *McDonnell* test was not intended to be a rigid or ritualistic test of disparate treatment. *See, e.g., United States Postal Service Bd. of Govs. v. Aikens, 460 U.S. 711, 715, 103 S. Ct. 1478, 1481-82, 75 L. Ed. 2d 403 (1982)*.

[13] All decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981 are binding precedent on this Court. *Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981)*.

[14] The need for increased flexibility in applying the prima facie criteria to age discrimination cases has been widely acknowledged in the courts. Some Circuits have stated explicitly that a plaintiff need only establish that he was replaced by a younger person. *See e.g., Carden v. Westinghouse Electric Corp., 850 F.2d 996, 1000 (3d Cir.1988)* (plaintiff must show replacement by younger person); *Furr v. AT & T Technologies, Inc., 824 F.2d 1537, 1542 (10th Cir.1987)* (plaintiff must show passed over for promotion in favor of younger person); *Diaz v. AT & T, 752 F.2d 1356, 1359-60 (9th Cir.1975)* (plaintiff need not be replaced by someone outside protected class); *Douglas v. Anderson, 656 F.2d 528, 533 (9th Cir.1981)* (third prong of test can be established by showing that plaintiff was replaced by substantially younger person); ***Schwager v. Sun Oil Co., 591 F.2d 58 (10th Cir.1979)*** (plaintiff must show position filled by

Carter v. Miami

the contrary, *HN8*[⬆] the establishment of a prima facie case is essentially a factual question particular to the circumstances of a given case. *Goldstein, 758* [**15] *F.2d at 1443*. The inquiry is whether an ordinary person could reasonably infer discrimination if the facts presented remained unrebutted. *Id.*

[**16]  Because Carter did at least show that she was replaced by a younger person and viewing the evidence in the light most favorable to Carter, we hold that the district court did not err in finding that Carter had presented a prima facie case of age discrimination under the *McDonnell Douglas* test. Thus, it was not error for the district [*584]  court to overrule the motion for directed verdict on the age discrimination count at the conclusion of plaintiff's case.

B. REBUTTAL

*HN9*[⬆] ] Presentation of a prima facie case by a plaintiff raises a rebuttable inference of discrimination and shifts the burden of proof to the employer to respond with a legitimate, nondiscriminatory reason for dismissing the plaintiff. *Young, 840 F.2d at 828*. [15] Here, Appellant responded that Carter was discharged for insubordination, and presented testimony supporting its assertion that Carter was a constant disruptive force throughout her tenure at the City Attorney's office. [16] Carter admitted that she whispered around the office to mock Pedrosa's request that attorneys not shout; that members of the bench had called Pedrosa's

───────────────

person younger than himself).

The First Circuit has held that a plaintiff attempting to prove a prima facie case of age discrimination need not even show that he was replaced by someone younger. *Loeb v. Textron, Inc., 600 F.2d 1003, 1012-13 (1st Cir.1979)* (*McDonnell Douglas* test did not contemplate requiring plaintiff to prove that person outside protected class was hired in complainant's place).

[15] *Cf. supra* note 9 and accompanying text regarding defendant's higher burden of rebuttal in the face of direct evidence of discrimination.

[16] For example, Appellant showed that Carter was openly critical of the administration of the first City Attorney for whom she worked, bringing charges of sex discrimination against him before the City Commission when she was denied a raise. Carter also criticized the second City Attorney for whom she worked (Knox), accusing him of playing chess and reading the newspaper during work hours and questioning his professional judgment. When Appellee was denied a raise by Knox because of her disruptive behavior, she again complained of sex discrimination.

predecessor to complain about Carter's courtroom demeanor; that she had made disparaging [**17] remarks in public about the Mayor, his assistant, and Pedrosa; that she had engaged in a scuffle in the office with a fellow employee over a pair of keys; that she had accused her co-workers and Pedrosa of immoral and illegal behavior; and that she had refused to speak with Pedrosa without a witness present. We believe that Appellant's ability to point to several specific acts of insubordination by Carter to Pedrosa, culminating in her refusal to speak with him without a witness, demonstrated a legitimate, nondiscriminatory reason for Pedrosa to fire Carter.

[**18]  C.  FAILURE TO ESTABLISH PRETEXT

*HN10*[⬆] Once a legitimate, nondiscriminatory reason for dismissal is put forward by the employer, the burden returns to the plaintiff to prove by significantly probative evidence that the proffered reason is a pretext for discrimination. *Young, 840 F.2d at 829*. A plaintiff may do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Goldstein, 758 F.2d at 1445* (citing *Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095, 67 L. Ed. 2d 207 (1981))*. Carter contends that she met that burden by showing that her personnel file was devoid of a record of insubordination. Robert Clark, chief deputy city attorney, testified, however, that disruptive behavior was not as a rule entered in an employee's personnel file.

While Carter did not attempt formally to establish statistical evidence of discrimination, she did argue that discriminatory intent could be inferred from Pedrosa's personnel actions. [17] [**20] However, the record compels the opposite conclusion. Of the six attorneys fired by [**19] Pedrosa in his tenure, only Carter was in the protected age group. [18] Neither does the record support Carter's claim that three female employees in

───────────────

[17] Carter pointed out that up until the time she filed her EEOC complaint, Pedrosa had hired only attorneys under the age of 40. Of the two people hired by Pedrosa who were in the protected age group, one was hired only after the EEOC complaint. Also, Carter presented testimony that older secretaries perceived that younger secretaries received better treatment around the office.

[18] *See supra* note 1.

Carter v. Miami

the protected class were fired. Rather, of all employees fired by Pedrosa, only Carter and the secretary described by her attorney as incompetent were in the protected class. [19] The third woman in the [*585] protected class voluntarily retired in lieu of returning to secretarial work. Despite Carter's contention that Pedrosa intended to fire older employees in order to cut costs, no older males were fired. [20] Carter's subjective conclusion that Pedrosa harassed her and created any problems he had with her, without supporting evidence, was insufficient to establish pretext. *HN11*[⬆] "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." *Young, 840 F.2d at 830*.

We find that there was not sufficient evidence from which a jury could have concluded that the reasons articulated by Appellant were merely a pretext for discrimination or that a discriminatory reason more likely motivated the employer.

## D.  FAILURE TO PRESENT JURY QUESTION

Because Carter was unable to present significantly probative evidence of pretext, as a matter of law she was not entitled to go to the jury on her age discrimination claim and the district court should have granted Appellant's motion for a directed verdict at the close of all the evidence.

Carter argues, in reliance on *United States [**21] Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 103 S. Ct. 1478, 75 L. Ed. 2d 403*, that once a plaintiff has presented evidence of discrimination and a defendant has rebutted that evidence with a legitimate, nondiscriminatory reason for rejecting the plaintiff, a factual question has been presented which must be resolved by the trier of fact. The *Aikens* Court did instruct that once the defendant

presents its rebuttal evidence, the district court should proceed directly to the question of "which party's explanation of the employer's motivation it believes." *460 U.S. at 716, 103 S. Ct. at 1482*.

In *Young v. General Foods Corp., 840 F.2d 825 (11th Cir.1988)*, however, this Court clarified that *HN12*[⬆] the mere establishment of a prima facie case of discrimination does not foreclose the possibility of summary judgment in favor of an employer. *Id. at 828*. Neither does defendant's offer of a legitimate, nondiscriminatory reason for a discharge automatically present a jury question. *Id.* Simply stated, the presentation of a prima facie case creates a rebuttable presumption of discrimination, but does not alone establish a genuine issue of material fact sufficient to go to the [**22] jury. *Id. at 829* (citing with approval *Pace v. Southern Ry. Sys., 701 F.2d 1383* (11th Cir.), *cert. denied 464 U.S. 1018, 104 S. Ct. 549, 78 L. Ed. 2d 724 (1983))*. Rather, "because the plaintiff bears the burden of establishing pretext, he must present 'significantly probative' evidence on the issue to avoid summary judgment." *Young, 840 F.2d at 829* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986)* (discussing standard for grant of summary judgment)). Here, Carter did not carry the burden of establishing pretext and thus did not create a question for the jury.

## IV.  CONCLUSION

Because we find that Carter was unable to cast doubt on Appellant's legitimate, nondiscriminatory reason for firing her, she was not entitled to go to the jury on the age discrimination claim. It was error for the district court to overrule Appellant's motion for directed verdict on the age discrimination claim at the close of all evidence. Accordingly, and for the stated reasons, we REVERSE and REMAND to the district court with direction [**23] to enter a judgment for defendant.

---

**End of Document**

---

[19] Another Court has held specifically that termination of two employees in the protected age group within a nine month period is not statistically significant in a situation where other long term employees in the protected group were maintained and a greater number outside the protected age range were fired. *Haskell v. Kaman Corp., 743 F.2d 113, 121 (2d Cir.1984)*.

[20] For example, Robert Clark, a man in his 50's whose salary was higher than Carter's, was retained while 5 male attorneys under the age of 40 were fired. *See supra* note 1.

**Q** Questioned
As of: October 18, 2019 5:41 PM Z

# *Walker v. NationsBank N.A.*

United States Court of Appeals for the Eleventh Circuit

June 12, 1995, Decided

Nos. 93-3380, 94-2134

**Reporter**

53 F.3d 1548 *; 1995 U.S. App. LEXIS 14914 **; 68 Fair Empl. Prac. Cas. (BNA) 314; 42 Fed. R. Evid. Serv. (Callaghan) 566; 9 Fla. L. Weekly Fed. C 157

Myra J. WALKER, Plaintiff-Appellant, v. NATIONSBANK OF FLORIDA N.A., a Florida Corporation, Defendant-Appellee.

**Subsequent History:** [**1] As Corrected.

**Prior History:** Appeals from the United States District Court For the Middle District of Florida. (No. 90-1091-Civ-J-20). Harvey E. Schlesinger, Judge and John H. Moore, II, Chief Judge.

## Core Terms

district court, proffered reason, termination, prima facie case, reasons, audit, proffered, discriminated, pretext, sufficient evidence, attorney's fees, sex, determination letter, factfinder, prevailing, intentional discrimination, employment decision, award of attorney's fees, summary judgment, branch manager, cases, directed verdict, probative value, matter of law, directives, pretextual, frivolous, unworthy, rating, non discriminatory reason

## Case Summary

### Procedural Posture

Appellant employee challenged the judgment from the United States District Court For the Middle District of Florida, which granted a directed verdict and attorney's fees to appellee employer in an action for sex discrimination in violation of § 703(a)(1) of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e-2(a)(1)*, and age discrimination in violation of § 4(a)(1) of the Age Discrimination in Employment Act, *29 U.S.C.S. § 623(a)(1)*.

### Overview

Appellant employee brought an action against appellee employer, alleging sex discrimination in violation of § 703(a)(1) of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e-2(a)(1)*, and age discrimination in violation of § 4(a)(1) of the Age Discrimination in Employment Act (ADEA), *29 U.S.C.S. § 623(a)(1)*. The district court granted a directed verdict and attorney's fees under *Fed. R. Civ. P. 50* to appellee. Appellant claimed an Equal Employment Opportunity Commission determination letter was erroneously excluded. On appeal, the court found that the district court did not abuse its discretion when it determined that the danger of confusing the issues to the jury by allowing admission of the EEOC letter outweighed the letter's probative value. Although appellant established a prima facie case of discrimination, she did not show that appellee engaged in intentional discrimination on the basis of a prohibited factor. Personality clashes were not a basis for relief under Title VII or the ADEA. The court affirmed the directed verdict. The award of attorney's fees was an abuse of discretion because continued prosecution of appellant's claim was reasonable.

### Outcome

The court affirmed the part of the district court's judgment which granted a directed verdict in favor of appellee employer in appellant employee's age and sex discrimination action. Appellant did not show that appellee intentionally discriminated against her on the basis of a prohibited factor. The court vacated the attorney's fees award because appellant's continued prosecution of her claim was not unreasonable.

## LexisNexis® Headnotes

Walker v. NationsBank N.A.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Evidence > Admissibility > Procedural Matters > Rulings on Evidence

**HN1**[⬇] **Standards of Review, Abuse of Discretion**

The admissibility of evidence is committed to the broad discretion of the district court, and the decision to exclude certain evidence will be reversed only upon a clear showing of abuse of discretion.

Civil Procedure > Trials > Bench Trials

Evidence > Admissibility > Procedural Matters > Limited Admissibility

Civil Procedure > Trials > Jury Trials > General Overview

**HN2**[⬇] **Trials, Bench Trials**

In the United States Court of Appeals for the Eleventh Circuit, Equal Employment Opportunity Commission determinations are generally admissible in bench trials, however, the same liberal admissibility rule does not necessarily apply to determination letters in jury trials.

Civil Procedure > Appeals > Standards of Review > General Overview

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

**HN3**[⬇] **Appeals, Standards of Review**

In reviewing the district court's disposition of a motion for directed verdict, the appellate court employs the same standard as the district court used in determining whether to grant the motion. The appellate court reviews all of the evidence in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party. If the facts and inferences are so strong and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary verdict, the grant of a directed verdict is proper. If, however, substantial evidence is presented opposed to the motion, and this evidence is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied. Nevertheless, a jury question does not exist because of the presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to create a jury question.

Labor & Employment Law > ... > Gender & Sex Discrimination > Scope & Definitions > General Overview

**HN4**[⬇] **Gender & Sex Discrimination, Scope & Definitions**

Title VII of the Civil Rights Act of 1964 proscribes discrimination on the basis of sex in a variety of employment practices.

Labor & Employment Law > ... > Age Discrimination > Scope & Definitions > General Overview

Labor & Employment Law > Discrimination > General Overview

**HN5**[⬇] **Age Discrimination, Scope & Definitions**

The Age Discrimination Employment Act proscribes age discrimination in the employment of persons at least forty years of age. *29 U.S.C.S. § 621 et seq.*

Labor & Employment Law > ... > Gender & Sex Discrimination > Scope & Definitions > General Overview

**HN6**[⬇] **Gender & Sex Discrimination, Scope & Definitions**

See *42 U.S.C.S. § 2000e-2(a)*.

Labor & Employment Law > ... > Age Discrimination > Scope & Definitions > General Overview

**HN7**[⬇] **Age Discrimination, Scope & Definitions**

Walker v. NationsBank N.A.

See 29 U.S.C.S. § 623(a).

Evidence > Burdens of Proof > Burdens of
Production

Labor & Employment
Law > ... > Evidence > Burdens of Proof > Burden
Shifting

Evidence > Burdens of Proof > Allocation

Evidence > Burdens of Proof > Initial Burden of
Persuasion

Labor & Employment
Law > Discrimination > General Overview

Labor & Employment Law > ... > Gender & Sex
Discrimination > Scope & Definitions > General
Overview

Labor & Employment
Law > ... > Evidence > Burdens of Proof > General
Overview

Labor & Employment
Law > ... > Evidence > Burdens of
Proof > Employee Burdens

**HN8**[⬇]  **Burdens of Proof, Burdens of Production**

A plaintiff must carry the initial burden of establishing a
prima facie case of sex discrimination. Once the plaintiff
establishes a prima facie case, the burden then shifts to
the defendant to produce some legitimate,
nondiscriminatory reason for the adverse employment
decision. Because the defendant need only produce, not
prove, a nondiscriminatory reason, this burden is
exceedingly light. Once the defendant carries the
burden of production, the plaintiff must prove through
presentation of a preponderance of the evidence that
the employer had a discriminatory intent.

Labor & Employment
Law > Discrimination > Actionable Discrimination

**HN9**[⬇]  **Discrimination, Actionable Discrimination**

An employee establishes a prima facie case of
discrimination in termination when the employee shows
(1) membership in a protected class, (2) qualification for

the position held, (3) termination, (4) and replacement
with a person outside the protected class.

Civil Procedure > ... > Costs & Attorney
Fees > Attorney Fees & Expenses > General
Overview

Civil Rights Law > ... > Procedural Matters > Costs
& Attorney Fees > Prevailing Parties

Labor & Employment Law > ... > Title VII
Discrimination > Remedies > Costs & Attorney Fees

Civil Rights Law > ... > Procedural Matters > Costs
& Attorney Fees > General Overview

Civil Rights Law > ... > Procedural Matters > Costs
& Attorney Fees > Statutory Attorney Fee Awards

**HN10**[⬇]  **Costs & Attorney Fees, Attorney Fees &
Expenses**

It is within the discretion of a district court to award
attorney's fees to a prevailing defendant in an action
under Title VII of the Civil Rights Act of 1964 upon a
finding that the action was frivolous, unreasonable, or
without foundation, even though not brought in
subjective bad faith. The standard is a stringent one. In
applying these criteria, the district court should resist the
temptation to conclude that because a plaintiff did not
ultimately prevail, the action must have been
unreasonable or without foundation. Therefore, in
determining whether a prevailing defendant is entitled to
attorney's fees under Title VII, the district court must
focus on the question of whether the case is seriously
lacking in arguable merit. Three general factors should
guide the inquiry: (1) whether the plaintiff established a
prima facie case; (2) whether the defendant offered to
settle; and (3) whether the trial court dismissed the case
prior to trial or held a full-blown trial on the merits.

**Counsel:** ATTORNEY(S) FOR APPELLANT(S): John
F. MacLennan, Smith, Hulsey and Busey, Jacksonville,
FL.

ATTORNEY(S) FOR APPELLEE(S), 93-3380: Steven
Arthur Werber, Foley and Lardner, Guy O. Farmer, II,
Kevin Eugene Hyde, Tracy Carlin, Jacksonville, FL.
Richard F. Kane, Blakeney, Alexander and Machen,
Michael V. Matthews, Charlotte, NC. ATTORNEY(S)
FOR APPELLEE(S), 94-2134: RICHARD F. KANE,
Blakeney & Alexander, MICHAEL V. MATTHEWS,

Walker v. NationsBank N.A.

Charlotte, NC.

**Judges:** Before HATCHETT and COX, Circuit Judges, and JOHNSON, Senior Circuit Judge.

**Opinion by:** HATCHETT

# Opinion

 **[*1551]**  HATCHETT, Circuit Judge:

In this sex and age discrimination case, appellant, Myra Jeanette Walker, appeals from the district court's granting of a directed verdict, pursuant to *Federal Rules of Civil Procedure 50*, and the awarding of attorney's fees. We affirm the directed verdict ruling, but vacate the attorney's fee ruling.

FACTS

This case involves the employment relationship of Walker, NationsBank (the bank), and her immediate supervisor, Eugenia Sefcik. In September, 1987, the bank promoted Walker to the position of branch manager of its Baymeadows Jacksonville, Florida branch. In this new position, Walker reported directly to Sefcik. [1] Sefcik's first evaluation of Walker's job performance occurred in January, 1988, and she rated Walker at "expected" or "expected plus" in all of the areas listed on the evaluation form. At a meeting in June, 1988, Sefcik angrily accused Walker of failing to offer a Baymeadows branch **[**2]** employee the office manager position at another of the bank's Jacksonville, Florida, branches, and of failing to notify another Baymeadows branch employee that the employee had been denied a salary increase as a result of excessive absenteeism. At the time of this confrontation, Walker contended that she had carried out the directives as instructed.

In June, 1988, the bank conducted an audit of its three Jacksonville branches. The audit of Walker's Baymeadows branch uncovered several deficiencies, and the branch was given an overall rating of unsatisfactory. [2] In a June 24, 1988 telephone

conversation, Sefcik angrily expressed to Walker her displeasure with Walker's job performance based on the results of the audit of the Baymeadows branch. Walker, in response, sent Sefcik a **[**3]** memorandum in which she characterized Sefcik's reaction to the Baymeadows branch's unfavorable audit as "mental harassment."

As a result of Walker's memorandum, Sefcik and Joyce Sheets, a bank personnel specialist, met with Walker on July 6, 1988. At this counseling session, Sefcik presented Walker with her concerns about Walker's substandard performance during the first six months of 1988, and also set a number of performance goals for Walker to meet in the coming months. Following this meeting, Sefcik **[**4]** documented Walker's performance deficiencies in a July 13, 1988 written performance **[*1552]** evaluation. [3] In an August 4, 1988 memorandum, Walker responded to this performance evaluation claiming that the deficiencies cited in the branch audit had been corrected.

Walker and Sefcik also held a regularly scheduled quarterly meeting on September 19, 1988, during which Sefcik instructed Walker to contact a bank employee, Nancy Moore, to ensure that the Baymeadows branch received credit for certain referrals; Sefcik also instructed Walker to contact another bank employee, Marsha Murphy, who could answer Walker's questions concerning account analysis.

In November, 1988, the bank conducted a follow-up, pre-audit check of Walker's Baymeadows branch and found more deficiencies. On November 28, 1988, Walker and Sefcik held a conference in which **[**5]** Sefcik again rated Walker's performance as unsatisfactory due to Walker's failure to meet certain goals established at the July 6, 1988 meeting. As a result of the unsatisfactory rating, Sefcik placed Walker on probation for thirty days. During this period, the bank required Walker to perform satisfactorily or face immediate termination of her employment. Sefcik also

---

[1] The bank operated three branches in Jacksonville, Florida: Downtown, Baymeadows, and DuPont. Sefcik, in her capacity as Metro Director, was responsible for branches in Jacksonville, Tallahassee, South Orlando, and Kissimmee, Florida.

[2] The audit also uncovered deficiencies in the bank's other two

---

Jacksonville, Florida, branches. The auditors did not give the DuPont branch an overall rating because it was that branch's initial audit; they did, however, document several deficiencies in the DuPont branch's internal controls. At the time of the audit, Rebecca Reams, a female under the age of forty, was the branch manager. The Downtown branch that Walter Doeschler, a male under age forty, managed also received an overall rating of unsatisfactory.

[3] Sefcik rated Walker's performance in eight categories: Walker was rated "Expected" in one category; "Needs Improvement" in four categories; and "Unsatisfactory" in three categories.

Walker v. NationsBank N.A.

provided Walker with a list of changes to be implemented at the Baymeadows branch. In a memorandum dated November 30, 1988, Walker responded to the follow-up audit's results asserting that the audit's conclusion was unfair and unfounded.

The bank contends that during the period between November 28, 1988, and Walker's dismissal on December 5, 1988, Sefcik determined that Walker had made a second misrepresentation to her: Walker had not contacted the two bank employees, Moore and Murphy, as Sefcik instructed her to do at their September 18, 1988 meeting, although Walker had told Sefcik that the directive had been carried out. Walker admits that Sefcik confronted her with the allegation that she had not contacted Moore and Murphy as instructed.

The bank scheduled Walker to attend a training class in Orlando on November **[**6]** 30, 1988. Due to a problem with Walker's mother's health, Walker did not attend the class. The parties dispute the extent of Walker's efforts to notify Sefcik that she would be unable to attend the training course.

Sefcik terminated Walker's employment on December 5, 1988. Sefcik stated as justification for the termination Walker's failure to notify Sefcik of the inability to attend the November 30 training course and Walker's two earlier misrepresentations that she had carried out Sefcik's directives.

PROCEDURAL HISTORY

On January 9, 1989 Walker filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging that her termination was due to her age and sex, in violation of § 703(a)(1) of Title VII of the Civil Rights Act of 1964, 78 Stat. 255, as amended, *42 U.S.C. § 2000e-2(a)(1)*, and § 4(a)(1) of the Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 602, *29 U.S.C. § 623(a)(1)*. On October 4, 1990, the EEOC's Miami District Office issued a determination letter in which it found no evidence that Walker's termination had been in violation of the statutes. From that determination, Walker appealed to the EEOC headquarters in Washington, D.C.

On December **[**7]** 4, 1990, Walker filed suit in the United States District Court for the Middle District of Florida. The EEOC's Washington, D.C. office issued a determination letter on December 5, 1990, in which it found reasonable cause to believe that the bank had discriminated against Walker in violation of Title VII and the ADEA. The bank moved for summary judgment on

November 18, 1991. On December 12, 1991, Walker sought leave to amend her complaint on the grounds that the Civil Rights Act of 1991 entitled her to a jury trial, compensatory damages, and punitive damages in connection with her sex discrimination claim. On June 12, 1992, the district court denied the bank's motion for summary judgment. In denying the bank's summary judgment motion, the district court assumed the admissibility of the EEOC determination **[*1553]** letter and found that the EEOC's determination was sufficient to establish a factual issue as to whether the Bank's legitimate, non-discriminatory reason for Walker's termination was pretextual. [4] Following this court's decision in *Curtis v. Metro Ambulance Service, Inc., 982 F.2d 472 (11th Cir.1993)*, holding that the Civil Rights Act of 1991 would not be applied retroactively, **[**8]** the district court denied Walker's motion to amend her complaint.

On April 8, 1993, the bank filed a motion *in limine* and a supporting memorandum of law seeking to exclude the EEOC determination letter on the grounds that it was untrustworthy under *Federal Rules of Evidence 803(8)(C)*, and unduly prejudicial under *Federal Rules of Evidence 403*. The district court granted the bank's motion on April 27, 1993, on the ground that the conflicting findings of the two EEOC offices would result in confusion of the issues for the jury. On May 28, 1993, the bank filed a motion for reconsideration of the district court's June 12, 1992 denial of the bank's summary judgment motion. The district court denied the bank's motion for reconsideration on September 17, 1993.

In October, 1993, the trial commenced. At the close of Walker's evidence, the court granted the bank's *Federal Rules **[**9]** of Civil Procedure 50* motion and entered judgment against Walker as a matter of law. The district court also awarded the bank attorney's fees in excess of $ 50,000.

ISSUES

Walker raises the following issues: (1) whether the district court committed error in excluding the EEOC determination letter; (2) whether the district court erred in granting the bank's *rule 50* motion; and (3) whether the district court committed error in awarding the bank

---

[4] At the time the district court ruled on the summary judgment motion, the bank had not sought to exclude the EEOC determination letter.

attorney's fees. [5]

CONTENTIONS

Walker contends that the district court's exclusion of the determination letter on the ground that it would confuse the jury was error, and that the probative value of the determination letter is not substantially outweighed by the potential prejudice to the bank. **[\*\*10]** The bank argues that the EEOC determination letter was properly excluded because its admission would have unduly prejudiced its defense, pursuant to *rule 403*.

Walker also contends that the bank's stated justification for her termination was pretextual. She argues that when she was terminated, Sefcik gave as a justification Walker's alleged misrepresentations, and her failure to provide Sefcik with advance notice of her inability to attend the November 30, 1988 training class. At trial, however, the bank contended that those two reasons justified Walker's termination and Walker's deficient job performance. According to Walker, this difference in the explanations for her termination suggests that the bank's stated reasons were pretextual, and the jury could have inferred that the real reasons for the termination were her gender and age. Walker buttresses this contention with the fact that the bank's Downtown branch also received an unsatisfactory rating; however, the branch manager, who was a male, was not disciplined. The bank contends that the record is devoid of any direct or circumstantial evidence that the bank terminated Walker's employment due to her gender or age.

Lastly, Walker **[\*\*11]** argues that the district court erroneously awarded the bank attorney's fees. She argues that her lawsuit was not frivolous, and supports this contention with the undisputed fact that the court denied the bank's two summary judgment motions, with the second denial of summary judgment occurring twenty-two days prior to trial, after the district court had ruled that the EEOC letter would not be admitted into evidence. The bank argues that Walker's claim was frivolous.

**[\*1554]** DISCUSSION

---

[5] Walker's claim that the Civil Rights Act of 1991 should be applied retroactively to her sex discrimination claim is foreclosed by the Supreme Court's recent decision in *Rivers v. Roadway Express, Inc., ___ U.S. ___, 114 S. Ct. 1510, 128 L. Ed. 2d 274 (1994)*.

A. *Admissibility of EEOC Determination Letter*

The significance of an EEOC determination letter in employment discrimination litigation can be ascertained through a review of the role of the EEOC in the overall statutory scheme Congress enacted. Congress enacted Title VII and its progeny to assure equality of employment opportunities regardless of race, color, religion, sex, or national origin. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800, 93 S. Ct. 1817, 1823, 36 L. Ed. 2d 668 (1973)*. To further this effort, Congress created the EEOC to investigate claims of discrimination, to institute civil actions against employers or unions, and to settle disputes through reconciliation before permitting **[\*\*12]** a party to file a lawsuit. *Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S. Ct. 1011, 1017-18, 39 L. Ed. 2d 147 (1974)*. Nevertheless, final responsibility for enforcement of the federal employment discrimination laws is vested in the federal courts. *Alexander, 415 U.S. at 44, 94 S. Ct. at 1017-18*. Therefore, we must remain mindful of the fact that Congress, in enacting the various employment discrimination statutes, thought it "necessary to provide a judicial forum for the ultimate resolution of discriminatory employment claims. It is the duty of courts to assure the full availability of this forum." *Alexander, 415 U.S. at 60 n. 21, 94 S. Ct. at 1025 n. 21*.

**HN1**[⬆] The admissibility of evidence is committed to the broad discretion of the district court, and the decision to exclude certain evidence will be reversed only upon a clear showing of abuse of discretion. [6] **[\*\*14]** *Hines v. Brandon Steel Decks, Inc., 886 F.2d 299, 302 (11th Cir.1989)*. **HN2**[⬆] In this circuit, it is well established that EEOC determinations are generally admissible in bench trials. *Barfield v. Orange County, 911 F.2d 644, 649 (11th Cir.1990)* (listing cases), *cert. denied, 500 U.S. 954, 111 S. Ct. 2263, 114 L. Ed. 2d 715* **[\*\*13]** *(1991).* [7] We have not

---

[6] In arguing the exclusion of the EEOC's Washington office determination letter, both parties briefed and argued *rules 403* and *803 of the Federal Rules of Evidence.* The district court's order stated that the court *considered* the bank's challenge under *rule 803*; however, in the next sentence the court stated that it "*applied rule 403* and determined that the report's probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." (Emphasis supplied.) Therefore, we analyze the district court's exclusion of the determination letter under *rule 403*.

[7] Administrative findings regarding claims of discrimination are

Walker v. NationsBank N.A.

seen fit, however, to apply the same liberal admissibility rule to determination letters in jury trials. [8] In particular, the distinction between a bench and a jury trial may affect the district court's analysis of a determination letter's admissibility under *Federal Rules of Evidence 403*. [9] *Barfield, 911 F.2d at 651.*

> The admission of an EEOC report, in certain circumstances, may be much more likely to present the danger of creating unfair prejudice in the minds of the jury than in the mind of the trial judge, who is well aware of the limits and vagaries of administrative determinations and better able to assign the report appropriate weight and no more.

*Barfield, 911 F.2d at 651*; *see also Johnson v. Yellow Freight System, Inc., 734 F.2d 1304, 1309* (8th Cir.) (noting that EEOC reports are not homogenous products but may vary greatly in quality and factual detail), *cert. denied, 469 U.S. 1041, 105 S. Ct. 525, 83 L. Ed. 2d 413 (1984).*

The district court determined that the danger that the EEOC letter would confuse the jury substantially outweighed its probative value. *See Fed.R.Evid. 403.* According to **[*1555]** the district court, the determination letter's admission would force the jury to resolve **[**15]** the conflict between the EEOC's Miami district office's finding that the bank had not discriminated against Walker in terminating her employment and the EEOC's Washington, D.C. office's finding that reasonable cause existed to believe that the bank discriminated against Walker. The district court was concerned that the determination letter's admission would shift the jury's focus from deciding the ultimate issue in the case--whether the bank discriminated against Walker--to resolving the conflicting findings of two administrative officials who reviewed the same

facts.

This case presents one example of the vagaries of administrative determinations which the *Barfield* court identified: two government officials knowledgeable in the area of employment discrimination law reached different conclusions after independently reviewing the same facts. The district court was properly concerned that admitting the determination letter would shift the jury's focus away from the issue of whether the bank considered a prohibited factor in terminating Walker, and towards resolving questions concerning the procedural adequacy of the investigation the two administrative hearing officers conducted. **[**16]** We cannot conclude that the trial court abused its discretion when it decided that the danger of confusing the issues to the jury substantially outweighed the admittedly probative value of the EEOC determination.

B. *Directed Verdict*

*HN3*[⬆] In reviewing the district court's disposition of a motion for directed verdict, we employ the same standard as the district court used in determining whether to grant the motion. *MacPherson v. University of Montevallo, 922 F.2d 766, 770 (11th Cir.1991).* We review all of the evidence in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party. *MacPherson, 922 F.2d at 770.* If the facts and inferences are so strong and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary verdict, the grant of a directed verdict is proper. *Verbraeken v. Westinghouse Electric Corp., 881 F.2d 1041, 1045 (11th Cir.1989)* (quoting *Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir.1969))*, *cert. dismissed, 493 U.S. 1064, 110 S. Ct. 884, 107 L. Ed. 2d 1012 (1990).* If, however, substantial evidence is presented opposed to the motion, and this evidence is **[**17]** of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied. *Verbraeken, 881 F.2d at 1045.* Nevertheless, a jury question does not exist because of the presence of a "mere scintilla of evidence"; rather, "there must be a conflict in substantial evidence to create a jury question." *Verbraeken, 881 F.2d at 1045.*

*HN4*[⬆] Title VII proscribes discrimination on the basis of sex in a variety of employment practices. [10] *HN5*[⬆]

---

admissible in a trial *de novo* under *Federal Rules of Evidence 803(8)(C)*, the public records and investigatory file exception to the hearsay rule. *Chandler v. Roudebush, 425 U.S. 840, 863 n. 39, 96 S. Ct. 1949, 1960-61 n. 39, 48 L. Ed. 2d 416 (1976).*

[8] Because Walker instituted suit before November 21, 1991, the effective date of the Civil Rights Act of 1991, her Title VII claim was tried to the district court, and her ADEA claim was tried to a jury.

[9] *Fed.R.Evid. 403* provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[10] *HN6*[⬆] Section 703(a)(1) of the Civil Rights Act of 1964 provides:

Walker v. NationsBank N.A.

The ADEA proscribes age discrimination in the employment of persons at least forty years of age. *29 U.S.C. § 621 et seq.* [11] Because Walker bears the ultimate burden of proving that age and/or sex was a determining factor in the bank's decision to terminate her employment, she must first establish a prima facie case of discrimination. *Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir.1989).* She may do so through presentation of evidence on one of three accepted methods: direct evidence of discriminatory intent; statistical evidence; or the **[*1556]** four-pronged test set out in *McDonnell Douglas v. Green, 411 U.S. 792, 93 S. Ct. 1817, [**18] 36 L. Ed. 2d 668 (1973)* which allows her to present circumstantial evidence that raises a rebuttable presumption of intentional discrimination. *Carter, 870 F.2d at 581.* This case concerns only the third method of proof.

This **[**19]** circuit has adapted the principles governing the order and allocation of proof in cases arising under Title VII to claims of age discrimination. *Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 919 (11th Cir.1993).* The analytical structure for evaluating a claim of sex-based discrimination under Title VII is provided in Supreme Court cases such as *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)* and *Texas Dept. of Community of Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Batey v. Stone, 24 F.3d 1330, 1333 (11th Cir.1994).* Under the *McDonnell Douglas/Burdine* formulation, *HN8*[↑] a plaintiff must carry the initial burden of establishing a prima facie case of sex discrimination. *McDonnell Douglas, 411 U.S. at 802, 93*

---

"It shall be an unlawful employment practice for an employer--

(1) … to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex.…"

*42 U.S.C.A. § 2000e-2(a).*

[11] *HN7*[↑] Section 4(a)(1) of the Age Discrimination in Employment Act of 1967 provides:

"It shall be unlawful for an employer--

(1) … to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."

*29 U.S.C.A. § 623(a).*

---

*S. Ct. at 1824.* Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to produce some "legitimate, nondiscriminatory reason" for the adverse employment decision. *Burdine, 450 U.S. at 254, 101 S. Ct. at 1094.* Because the defendant need only produce, not prove, a nondiscriminatory reason, this burden is "exceedingly light." *Perryman v. Johnson [**20] Products Co., Inc., 698 F.2d 1138, 1142 (11th Cir.1983).* Once the defendant carries the burden of production, the plaintiff must prove through presentation of a preponderance of the evidence that the employer had a discriminatory intent. *Burdine, 450 U.S. at 256, 101 S. Ct. at 1095.*

*HN9*[↑] An employee establishes a prima facie case of discrimination in termination when the employee shows (1) membership in a protected class, (2) qualification for the position held, (3) termination, (4) and replacement with a person outside the protected class. *Rollins v. TechSOUTH, Inc., 833 F.2d 1525, 1532 n. 14 (11th Cir.1987).* The bank does not dispute Walker's qualifications for the branch manager position, and the bank replaced her with a 24-year-old male; therefore, reviewing the evidence in the light most favorable to Walker, as we must, we find that she established a prima facie case of sex and age discrimination. [12]

**[**21]** Because Walker established a prima facie case under *McDonnell Douglas,* the burden shifted to the bank to articulate a legitimate, nondiscriminatory reason for Walker's termination. The bank pressed three legitimate business reasons for Walker's termination. First, Walker failed to follow certain of Sefcik's directives: She did not offer a Baymeadows branch employee the office manager position at another of the bank's Jacksonville, Florida, branches; she did not notify a Baymeadows branch employee that the employee's salary increase had been deferred due to excessive absenteeism; and, she did not contact bank employees Moore and Murphy as Sefcik had instructed her to during their September, 1988 meeting. Second, the bank alleged that Walker misrepresented to Sefcik that

---

[12] Our cases have repeatedly stressed that an overly strict formulation of the elements of a prima facie case is to be avoided. See, e.g., *Carter v. City of Miami, 870 F.2d 578, 583 (11th Cir.1989)* (age discrimination plaintiff's inability to show that she was replaced by someone outside of the protected class not an absolute bar to the establishment of a prima facie case). Whether a prima facie case has been established is a fact specific inquiry: Would an ordinary person reasonably infer discrimination if the facts presented remained unrebutted? *Carter, 870 F.2d at 583.*

Walker v. NationsBank N.A.

the above-mentioned directives had been carried out. Third, the bank pointed to the deficiencies which were noted in the two audits of the Baymeadows branch as proof that Walker failed to adequately perform her duties as the Baymeadows branch manager. These allegations raised a genuine issue of fact as to whether the bank discriminated against Walker; the bank, therefore, met its burden of production. *See Reynolds [**22] v. CLP Corp., 812 F.2d 671, 674 (11th Cir.1987).* Walker then had to carry the ultimate burden of persuading the trier of fact through a preponderance of the evidence that the bank intentionally discriminated against her. *Burdine, 450 U.S. at 255, 101 S. Ct. at 1094-95.*

 **[*1557]** The Supreme Court recently clarified the Title VII disparate treatment framework in *St. Mary's Honor Center v. Hicks,  U.S.  , 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).* In our earlier cases, once the defendant met its burden of production and rebutted the plaintiff's prima facie case, the plaintiff could carry the ultimate burden of persuasion either with evidence demonstrating that the defendant was more likely than not motivated through a discriminatory reason or that the defendant's nondiscriminatory reason was not worthy of belief. *See, e.g., Caban-Wheeler v. Elsea, 904 F.2d 1549 (11th Cir.1990). Hicks* makes clear that the fact-finder's disbelief of the reasons the defendant offers does not compel judgment for the plaintiff. *Hicks,  U.S. at  , 113 S. Ct. at 2749.* Rather, once the defendant has met its burden of production, the *McDonnell Douglas/Burdine* **[**23]** framework becomes irrelevant; the sole inquiry is whether the plaintiff successfully carries the burden of persuading the trier of fact that the defendant engaged in intentional discrimination on the basis of a prohibited factor. *Hicks,  U.S.  -  , 113 S. Ct. at 2747-48. Hicks,* however, does not stand for the proposition that the fact-finder's rejection of the defendant's proffered reasons is of no probative value in resolving the ultimate question of whether the defendant has engaged in intentional discrimination. "The fact-finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *Hicks,  U.S.  , 113 S. Ct. at 2749.*

In this appeal, Walker presents several arguments in support of her assertion that the bank intentionally discriminated against her on the basis of age and sex. First, she attacks Sefcik's credibility. Resolving such credibility determinations is, of course, beyond the purview of the appellate courts. *Reynolds, 812 F.2d at 675.* We are **[**24]** bound to determine the issues

based on the record made in the district court. In any event, we review the evidence in the light most favorable to Walker. Therefore, we assume the following: Walker offered the Baymeadows branch employee the office manager position at another of the bank's branches; Walker notified another Baymeadows branch employee that the employee's salary increase had been deferred due to excessive absenteeism; Walker contacted bank employees Moore and Murphy as she had been instructed; Walker did not misrepresent to Sefcik that she had carried out Sefcik's directives; and, Walker made sufficient efforts to notify Sefcik in advance that she would be unable to attend the November 1988 training class.

The second prong of Walker's attack on the bank's proffered reasons for her dismissal is an attempt to mitigate the probative value of the Baymeadows branch's two unfavorable audits. Walker alleges that Doeschler, the bank's Downtown branch manager, who was a male under the age of forty, and whose branch received an unfavorable audit, was not disciplined as a result of the unfavorable audit. The bank disputes whether Doeschler was the manager of the Downtown branch at **[**25]** the time of the audit. Our review of the record, in the light most favorable to Walker, suggests that Doeschler was the manager of the Downtown branch at the time of the unfavorable audit. [13] This evidence of the bank's different treatment of similarly situated branch managers is of probative value in determining whether the bank intentionally discriminated against Walker. Walker also alleges that the bank did not provide her with training which it provided the other two branch managers and her replacement, all of whom were outside the protected class. Nevertheless, our review of the record in the light most favorable to Walker convinces us that Walker did not prove that the bank intentionally discriminated against her on the basis of her age or sex.

 **[**26] [*1558]** Walker did not produce evidence that raised a suspicion of mendacity sufficient to permit us to find on this record that the bank intentionally discriminated against her on the basis of her age and/or sex. The record raises a suspicion of mendacity, but

---

[13] The Downtown branch's office manager testified that Doeschler was the branch manager at the time of the audit. Furthermore, it was the bank's policy to send a copy of the portion of the audit dealing with each branch to that branch's manager. The audit routing sheet listed Doeschler as the only Downtown branch personnel who received a copy of that branch's audit results.

Walker v. NationsBank N.A.

suspicion will not allow Walker to prevail under Title VII or the ADEA. As the district court noted, "obviously, there is some bad blood between Miss Sefcik and Mrs. Walker." As the district court further pointed out, "[perhaps] Miss Sefcik just didn't like [Walker]." At the very least, the record makes it clear that Sefcik and Walker's relationship was extremely strained. Walker, however, has not demonstrated that age or sex motivated the bank's termination decision.

"The ultimate question [is] discrimination *vel non.*" *Hicks, U.S. , 113 S. Ct. at 2753*. Serious personality clashes are an unwelcome reality of the workplace, and may lead, as in this case, to unfortunate consequences for employees such as Walker. Nevertheless, such clashes do not, without more, form the basis for relief under Title VII or the ADEA. Reasonable and fair-minded persons, in the exercise of impartial judgment, would not **[**27]** conclude that the bank had discriminated against Walker on either the basis of her age or sex. We therefore affirm the district court's entry of a directed verdict in favor of the bank.

C. *Attorney's Fees*

Lastly, Walker attacks the district court's award of attorney's fees to the bank as a prevailing defendant under Title VII. Although the district court did not find that Walker's Title VII claim was frivolous, the district court awarded the bank attorney's fees on the grounds that Walker maintained the Title VII claim after it became clear that it was unreasonable and groundless, and "lacked any shred of credibility." In view of our affirmance of the district court's directed verdict in favor of the bank, we can understand the court's inclination to find Walker's Title VII claim unreasonable. Nevertheless, we must review the award of attorney's fees against the standards established in the applicable case law. See *Sullivan v. School Board of Pinellas County, 773 F.2d 1182, 1188 (11th Cir.1985)*.

**HN10**[⬆️] It is within the discretion of a district court to award attorney's fees to a prevailing defendant in a Title VII action upon a finding that the action was "frivolous, unreasonable, **[**28]** or without foundation, even though not brought in subjective bad faith." *Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S. Ct. 694, 700, 54 L. Ed. 2d 648 (1978)*. The standard has been described as a "stringent" one. *Hughes v. Rowe, 449 U.S. 5, 14, 101 S. Ct. 173, 178, 66 L. Ed. 2d 163 (1980)*. [14] **[**29]** Moreover, the

Supreme Court has cautioned that in applying these criteria, the district court should resist the temptation to conclude that because a plaintiff did not ultimately prevail, the action must have been unreasonable or without foundation. *Christiansburg Garment, 434 U.S. at 421-22, 98 S. Ct. at 700-01*. Therefore, in determining whether a prevailing defendant is entitled to attorney's fees under Title VII, the district court must focus on the question of whether the case is seriously lacking in arguable merit. See *Sullivan, 773 F.2d at 1189*. [15]

**[**30]  [*1559]** Although determinations regarding the presence of any or all of the three *Christiansburg Garment* factors are to be made on a case-by-case basis, our cases have identified three general factors which should guide the inquiry: (1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits. *Sullivan, 773 F.2d at 1189*. Applying these standards to this case, we find that it was an

---

defendants in *42 U.S.C. § 1983* actions. The Court adopted the same standard which governs the award of attorney's fees to prevailing defendants in Title VII actions on the grounds that it could find "no reason for applying a less stringent standard." *Hughes, 449 U.S. at 14, 101 S. Ct. at 178*.

[15] In *Sullivan,* the district court *sua sponte* found the plaintiff's suit frivolous and invited the defendant to seek attorney's fees. The district court in this case premised the award of attorney's fees upon a finding that Walker maintained her Title VII suit "after it became clear that it was unreasonable and groundless." *Christiansburg Garment* provides three alternative grounds which may support a district court's award of attorney's fees to a prevailing defendant: "frivolous, unreasonable, or without foundation." *434 U.S. at 421, 98 S. Ct. at 700*. However, in *Sullivan,* we stated: "In determining whether a suit is frivolous, a district court must focus on the question whether the case is so lacking in arguable merit as to be groundless or without foundation...." *Sullivan, 773 F.2d at 1189* (internal quotations omitted) (quoting *Jones v. Texas Tech University, 656 F.2d 1137, 1145 (5th Cir.1981)*).

Thus, *Sullivan* suggests that the legal standard for determining the frivolousness of a Title VII plaintiff's suit is coterminous with the legal standard for determining whether a plaintiff's suit was unreasonable or without foundation. Moreover, the policy considerations which underlie the *Christiansburg Garment* Court's hesitancy to award attorney's fees to prevailing defendants make it inevitable that the legal standards for the three *Christiansburg Garment* criteria should be substantially similar, if not identical. We, therefore, apply *Sullivan* 's reasoning to this case.

---

[14] *Hughes* involved the award of attorney's fees to prevailing

Walker v. NationsBank N.A.

abuse of discretion for the district court to award the bank attorney's fees.

Although it is clear that the record supports the district court's decision on the merits of Walker's claims, we cannot conclude that her suit is so "patently devoid of merit" as to support a finding that its continued prosecution was unreasonable. See *Sullivan, 773 F.2d at 1189*. Our application of *Sullivan* 's three general factors to the facts of this case support our holding. We note that Walker has established a prima facie case of both age and sex discrimination, that the district court found no references in the record to any settlement negotiations between the parties, **[\*\*31]** and that the district court denied the bank's two summary judgment motions and allowed the case to proceed to trial. Additionally, Walker presented evidence that Doeschler, the bank's Downtown branch manager, who was male and under forty, and whose branch also received an unfavorable audit, was not disciplined. Walker also presented evidence that at least some of Sefcik's allegations against her were unwarranted.

Although the award of attorney's fees was premised on a finding that Walker continued her Title VII suit after it became clear that it was unreasonable and groundless, the district court "[could not] determine a precise point as to when the plaintiff should have considered discontinuing [the] litigation." We have held that a plaintiff's claim should not be considered groundless or without foundation for the purpose of awarding fees to a prevailing defendant when the claims are meritorious enough to receive careful attention and review. *Busby v. City of Orlando, 931 F.2d 764, 787 (11th Cir.1991)* (citing *O'Neal v. Dekalb County, Georgia, 850 F.2d 653, 658 (11th Cir.1988))*. This case merited careful review. For example, after the bank took issue with Walker's allegations, **[\*\*32]** the district court on two separate occasions denied the bank's summary judgment motions. The second denial occurred twenty-two days prior to trial and after the court had decided to exclude the EEOC determination letter. Thus, the court believed that even after the exclusion of the EEOC letter, a genuine issue of material fact remained as to whether the bank had pretextually terminated Walker's employment. Finally, the policy consideration which underlies the stringent standard governing the award of attorney's fees to prevailing defendants militates against awarding fees in this case: "Assessing attorney's fees against plaintiffs simply because they do not finally prevail would substantially add to the risks inhering in most litigation and would undercut the efforts of Congress to promote the vigorous enforcement of the provisions of Title VII." *Christiansburg Garment, 434 U.S. at 422, 98 S. Ct. at 701*.

As we stated earlier, determinations regarding the presence of any or all of the three *Christiansburg Garment* criteria are to be made on a case-by-case basis. We hold that on the facts of this case Walker's continued prosecution of her Title VII lawsuit cannot support an award **[\*\*33]** of attorney's fees against her.

CONCLUSION

Accordingly, the judgment of the district court is affirmed, except insofar as it found appellant's continued prosecution of her Title VII claim unreasonable and awarded the bank attorney's fees. The award of attorney's fees in favor of the bank is vacated.

AFFIRMED in part and VACATED in part.

**Concur by:** JOHNSON; COX (In Part)

# Concur

 **[\*1560]**  JOHNSON, Senior Circuit Judge, specially concurring:

I concur in the portions of Judge Hatchett's opinion which concern the admissibility of the EEOC determination and the award of attorneys' fees. I cannot, however, concur in Judge Hatchett's holding that a plaintiff, after making a showing by substantial evidence that an employer's proffered nondiscriminatory reasons are unworthy of credence, must offer additional indicia of mendacity to reach a jury on the issue of intentional discrimination. In my view, Judge Hatchett's holding improperly heightens the burden of proof that a plaintiff must sustain to prevail on a disparate treatment claim under the framework developed in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*, and its progeny. Nonetheless, because I believe **[\*\*34]** that there was insufficient evidence in this case for a reasonable person to find that the employer's proffered reasons were unworthy of credence, I concur in the result reached by Judge Hatchett and Judge Cox on this issue.

*Discussion*

As Judge Hatchett explains, the framework articulated by the Supreme Court in *McDonnell Douglas and Texas*

Walker v. NationsBank N.A.

*Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)* governs in disparate treatment cases brought under Title VII and the ADEA. Where an employee makes a prima facie case of discrimination, a presumption of discrimination arises. *St. Mary's Honor Ctr. v. Hicks,* __ U.S. __, __, *113 S. Ct. 2742, 2747, 125 L. Ed. 2d 407 (1993)*. The intermediate burden of production then shifts to the employer to articulate a legitimate, non-discriminatory explanation for the employment decision. *Id.* Where the employer meets his burden of articulating a legitimate, nondiscriminatory reason, "the *McDonnell Douglas* framework--with its presumptions and burdens--is no longer relevant." *Hicks,    U.S. at   , 113 S. Ct. at 2749.*

The presumption, having fulfilled **[\*\*35]** its role of forcing the defendant to come forward with some response, simply drops out of the picture. The defendant's production (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven that the defendant intentionally discriminated against [him] because of an illegitimate reason.

*Id.*

It is uncontroverted that Appellant has made a prima facie case of employment discrimination and that NationsBank has proffered nondiscriminatory reasons for Appellant's dismissal. Thus, the question in this case is whether the district court properly concluded that no reasonable person could find that NationsBank intentionally discriminated against Appellant. The answer to this question rests on two subsidiary issues: (1) whether Appellant's evidence was sufficient for a reasonable juror to disbelieve that NationsBank's proffered reasons motivated her termination--that is, whether there was sufficient evidence that the proffered reasons were pretextual--and (2) if there was sufficient evidence of pretext, whether disbelief of NationsBank's proffered reasons in combination with a prima facie case is sufficient **[\*\*36]** evidence to create a jury question on intentional discrimination.

In granting judgment as a matter of law to NationsBank, the district court found that "assuming that [the performance-related reasons proffered by NationsBank are] pretextual, you still have to have some evidence that age or gender had some bearing on the decision to terminate the employee." The district court reasoned that, even if NationsBank lied when it offered its reasons for Appellant's termination, the motivation behind the lie was equally likely to have been to conceal personal animosity as to conceal illicit discrimination. Judge Hatchett adopts the district court's reasoning and, thus, never directly addresses whether Appellant has shown pretext. [1]

**[\*\*37]**

**[\*1561]** A. Proof of Intentional Discrimination

As Judge Hatchett only focuses on the second issue, I begin my discussion there. Judge Hatchett implicitly holds that evidence of pretext in combination with a prima facie case is not sufficient evidence of discrimination to reach the jury. I believe that this holding is belied by the explicit statement in *Hicks* that upon rejection of defendant's proffered reasons, "no additional proof of discrimination is required." *    U.S. at   , 113 S. Ct. at 2749.*

Prior to *Hicks,* federal circuit courts were divided about the effect of a finding that the employer's explanation was false. In what was dubbed the "pretext-only" view, the majority of circuits held that a showing that the employer's proffered explanation was false *mandated* judgment for the *plaintiff. See Hicks,    U.S. at   , 113 S. Ct. at 2750* (cataloguing cases). [2] In contrast, "pretext-plus" circuits held that to prevail, the plaintiff must offer evidence of discrimination in addition to pretext, such that if a plaintiff could do no more than show that the employer's proffered reasons were unworthy of credence, judgment for the *employer* **[\*\*38]** was *mandated. Id.*

*Hicks* presented the Supreme Court with an opportunity to resolve this circuit split. At the conclusion of a bench trial, the district court entered judgment in favor of the employer despite evidence offered by the plaintiff that the reasons proffered by the employer were not the basis for the plaintiff's dismissal. *Hicks v. St. Mary's Honor Ctr., 756 F. Supp. 1244, 1252 (E.D.Mo.1991).* As in the case before us, the district court interposed its

---

[1] Although Judge Hatchett never actually states that Appellant presented sufficient evidence for a factfinder to disbelieve NationsBank's proffered reasons, I cannot discern any other way to understand his opinion. If it were otherwise, his discussion of the probative value of a factfinder's rejection of an employer's proffered reasons would be entirely superfluous.

[2] *See generally* Catherine J. Lanctot, *The Defendant Lies and the Plaintiff Loses: The Fallacy of the "Pretext Plus" Rule in Employment Discrimination Cases, 43 Hastings L.J. 57, 71-97 (1991).*

Walker v. NationsBank N.A.

own explanation for Hicks' dismissal, implicitly finding that the dismissal was the product of personal animus between Hicks and his employer. *See Hicks, U.S. at , 113 S. Ct. at 2748* (citing *756 F. Supp. at 1252*). Applying the pretext-only view, the Eighth Circuit reversed. *Hicks v. St. Mary's Honor Ctr., [**39] 970 F.2d 487, 492-93 (8th Cir.1992)*, *rev'd*, --U.S. __, *113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*.

In reversing the Eighth Circuit, the Supreme Court clearly rejected the pretext-only view. The Court held that where the plaintiff relies solely on evidence that the reasons proffered by the employer are false, the plaintiff retains the burden of persuading the factfinder that the false reasons proffered are a pretext *for* illegitimate discriminatory motives. *Id. at , 113 S. Ct. at 2752*. However, the Court also rejected the pretext-plus position. *See Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1123-24 (7th Cir.1994)* (explaining *Hicks'* holding). The *Hicks* Court explained that:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. *Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, "no* **[*40]** *additional proof of discrimination is required."*

*Hicks, U.S. at , 113 S. Ct. at 2749* (emphasis added). In this middle ground between the pretext-plus and pretext-only positions, *Hicks* leaves unresolved whether, where the plaintiff has supplied sufficient evidence for a jury to disbelieve the reasons proffered by the employer, a judge may find as a matter of law that the evidence is insufficient for a reasonable jury to infer discriminatory intent.

A review of cases decided after *Hicks* illustrates the uncertainty that *Hicks* has generated in the lower federal courts. For example, courts have divided over the propriety of granting summary judgment where there is a genuine issue of fact regarding the truth of the legitimate reasons proffered by the employer. *Compare Smith v. Stratus Computer, Inc., 40 F.3d 11, 16 (1st Cir.1994)* (though plaintiff created genuine issue of fact on question of whether employer's proffered reasons were pretextual, summary judgment for employer appropriate where court finds that no reasonable juror could infer

discriminatory **[*1562]** intent from evidence of pretext), *petition for cert. filed,* No. 94-1416 (February **[**41]** 21, 1995), [3] *with Courtney v. Biosound, Inc., 42 F.3d 414, 424 n. 4 (7th Cir.1994)* ("implicit in [*Hicks* '] holding is that once the plaintiff has cast doubt on the employer's proffered reasons, the issue of whether the employer had discriminated against the plaintiff is to be determined by the jury not the court"). [4] *See generally, Waldron v. SL Industries, Inc., 849 F. Supp. 996 n. 11 (D.N.J.1994)* (discussing the circuit split).

In the context of summary judgment, this Circuit has adopted a narrow view of a court's role in evaluating the **[**42]** inference to be drawn from evidence of pretext. *Howard v. BP Oil Co., Inc., 32 F.3d 520 (11th Cir.1994)*; *Batey v. Stone, 24 F.3d 1330 (11th Cir.1994)*. In *Batey,* this Court reversed the district court's grant of summary judgment for the defendant-employer where there was sufficient evidence for the factfinder to disbelieve the legitimate reasons for the employment decision proffered by the employer. *24 F.3d at 1335-36.* The Court noted that, under *Hicks,* evidence of pretext plus a prima facie case is sufficient to create a genuine issue of fact regarding intentional discrimination and, therefore, preclude summary judgment. *Id.* Similarly, in *Howard,* this Court found that evidence indicating that the employer's proffered legitimate reasons were false precluded summary judgment because "the fact finder's rejection of defendant's proffered reasons is sufficient circumstantial evidence upon which to base a judgment for the plaintiff." *32 F.3d at 527.*

Thus, the proper inquiry in this case is whether *Batey* 's and *Howard* 's reasoning in the summary judgment context should be extended to limit the scope of a judge's review of the sufficiency of the evidence in **[**43]** a jury trial. [5] Although circumstances

---

[3] *See also Theard v. Glaxo, Inc., 47 F.3d 676, 680 (4th Cir.1995)*; *Woods v. Friction Materials, Inc., 30 F.3d 255, 260 n. 3 (1st Cir.1994)*; *Bodenheimer v. PPG Indus. Inc., 5 F.3d 955, 959 n. 8 (5th Cir.1993)*.

[4] *See also Sempier v. Johnson & Higgins, 45 F.3d 724, 730-31 (3rd Cir.1995)*, *petition for cert. filed,* No. 94-1692 (April 17, 1995); *Anderson, 13 F.3d at 1124*; *Washington v. Garrett, 10 F.3d 1421, 1433 (9th Cir.1993)*.

[5] Other circuit courts have split on whether a plaintiff relying solely on evidence of pretext to prove discrimination has necessarily provided sufficient evidence to preclude granting a *Rule 50* motion for the defendant. *Compare Barbour v. Merrill, 48 F.3d 1270, 1277 (D.C.Cir.1995)* (a plaintiff presents

Walker v. NationsBank N.A.

precluding summary judgment do not necessarily preclude judgment as a matter of law, *see, e.g., American Sav. & Loan Assoc. of Florida v. Pembroke Lakes Regional Ctr. Assocs., Ltd., 908 F.2d 885, 888 n. 5 (11th Cir.1990)*, Judge Hatchett never explains what warrants differential treatment of the plaintiff's burden in these two contexts. Contrary to the position adopted by Judge Hatchett, I believe that the reasoning underlying *Batey* and *Howard* apply with equal force in the context of *Rule 50* motions.

**[**44]** Courts must, of course, make all "reasonable inferences most favorable to the party opposed to the motion" when reviewing a motion for judgment as a matter of law. *Walls v. Button Gwinnett Bancorp, Inc., 1 F.3d 1198, 1200 (11th Cir.1993)*. The crucial premise underlying our decisions in *Batey* and *Howard* is that it is reasonable for a factfinder to infer an improper discriminatory motive from the fact that an employer has proffered false reasons. *Batey, 24 F.3d at 1334-36; Howard, 32 F.3d at 527*. Accordingly, because such an inference is reasonable, the court, when considering a motion **[*1563]** for judgment as a matter of law in an employment discrimination case, is bound to make that inference in favor of the party opposing the motion.

Because evidence of invidious discrimination will not generally be preserved in the files of the employer, determination of an employer's mental process in making an employment decision will generally be difficult. *United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983)*. To facilitate the truth-seeking process, the employer has the exceedingly light burden

---

sufficient evidence to support a verdict by establishing a prima facie case and introducing evidence sufficient to discredit the employer's proffered nondiscriminatory reasons), *and E.E.O.C. v. Ethan Allen, Inc., 44 F.3d 116, 120 (2nd Cir.1994)* ("a finding of pretextuality allows a juror to reject a defendant's proffered reasons for a challenged employment action and thus permits the ultimate inference of discrimination"), *and Gaworski v. ITT Commercial Fin. Corp., 17 F.3d 1104, 1109* (8th Cir.) ("if (1) the elements of a prima facie case are present, and (2) there exists sufficient evidence for a reasonable jury to reject the defendant's proffered reasons for its actions, then the evidence is sufficient to allow the jury to determine whether intentional discrimination has occurred"), *cert. denied, __ U.S. __, 115 S. Ct. 355, 130 L. Ed. 2d 310 (1994)*; *with Nelson v. Boatmen's Bancshares, Inc., 26 F.3d 796, 801 (8th Cir.1994)* ("evidence discrediting an employer's nondiscriminatory explanation is not necessarily sufficient" for a jury to find discrimination), *and Rhodes v. Guiberson Oil Tools, 39 F.3d 537, 541-44 (5th Cir.1994)* (same), *reh'g en banc granted, 49 F.3d 127 (5th Cir.1995)*.

of proffering reasons **[**45]** for its employment decision and, thereby, narrowing the inquiry. *Id.* If the employer fails to state truthfully the basis for its employment decision, one reasonable explanation is that the employer is attempting to hide an illegal reason. *Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577, 98 S. Ct. 2943, 2949-50, 57 L. Ed. 2d 957 (1978)* ("When all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race.") (emphasis in original). *See also Hawkins v. Ceco Corp., 883 F.2d 977, 981 (11th Cir.1989)*. Though the burden of proving discriminatory intent rests with the plaintiff, a plaintiff may satisfy this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer *or indirectly by showing that the employer's proffered explanation is unworthy of credence.*" *Burdine, 450 U.S. at 256, 101 S. Ct. at 1095 (1981)* (emphasis added). [6]

**[**46]** I do not believe that *Hicks* disturbs this precedent. *113 S. Ct. at 2751-53*. Rather, the better reading of *Hicks* is that it "clarified that the only effect of the employer's nondiscriminatory explanation is to convert the inference of discrimination based upon the plaintiff's prima facie case from a mandatory one which the jury *must* draw, to a permissive one the jury *may* draw, *provided* that the jury finds the employer's explanation 'unworthy' of belief." *Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1083 (6th Cir.1994)* (emphasis in original). *See also Rhodes, 39 F.3d at 549-52* (Garza, J. dissenting). Thus, to reach a jury, a plaintiff need not supply "any additional proof of discrimination" where the factfinder rejects the employer's proffered reasons, *Hicks, __ U.S. at __, 113 S. Ct. at 2749*, because "rejection of the defendant's proffered reasons is enough to sustain a finding of discrimination." *Id. at 2749 n. 4*.

In this case, the district court and Judge Hatchett exceed their proper roles by deciding whether evidence of pretext supports an inference of intentional discrimination. Absent direct evidence of illegitimate **[**47]** bias, the source of an employer's

---

[6] *Hicks* clarified that, while this quoted passage from *Burdine* suggests the pretext-only view, the better reading of it is that disproof of the employer's reason is an auxiliary to direct evidence for proving unlawful intent. *Hicks, __ U.S. at __ - __, 113 S. Ct. at 2752-53*.

Walker v. NationsBank N.A.

hostility toward an employee is inevitably opaque. Once the factfinder concludes that the employer's proffered reason is false, it must determine whether the employer has lied to hide an illegal or merely an unsavory reason. *Shager v. Upjohn Co., 913 F.2d 398, 401 (7th Cir.1990)*. To make this determination, the factfinder must evaluate the credibility of the witnesses and the weight of the evidence. This task is peculiarly the province of the jury. *See Castle v. Sangamo Weston, Inc., 837 F.2d 1550, 1559 (11th Cir.1988)* ("assessing the weight of the evidence and credibility of witnesses is reserved for the trier of fact"). *See also Ethan Allen, 44 F.3d at 120* (the inference to be drawn from the finding that the employer's proffered reason is unworthy of credence is "better left for the jury to resolve"). As Judge Posner has explained:

> If the only reason an employer offers for firing an employee is a lie, the inference that the real reason was a forbidden one such as age, may rationally be drawn. This is the common sense behind the rule of *McDonnell Douglas*. It is important to understand however that the inference is not compelled. **[\*\*48]** The trier of fact must decide after a trial whether to draw the inference. The lie may be concealing a reason that is shameful or stupid but not **[\*1564]** proscribed, in which event there is no liability. *The point is only that if the inference of improper motive can be drawn, there must be a trial.*

*Shager, 913 F.2d at 401* (emphasis added).

Thus, a plaintiff, who has supplied sufficient evidence for a reasonable person to disbelieve the reasons proffered by an employer, is entitled to get a jury determination on the issue of discrimination. Accordingly, I believe that if Appellant provided sufficient evidence of pretext--a proposition which Judge Hatchett apparently assumes--then judgment as a matter of law in favor of the bank was error.

B. *Proof of Pretext*

There is, however, a threshold issue that neither the district court nor Judge Hatchett resolves: whether Appellant did in fact present sufficient evidence for a reasonable juror to conclude that NationsBank's proffered reasons were unworthy of credence. Because I believe that there was insufficient evidence for a reasonable juror to reach this conclusion, I would affirm the district court's grant of judgment **[\*\*49]** as a matter of law on this ground.

A plaintiff, relying on evidence that the employer's proffered reasons are unworthy of credence as the basis for an inference of intentional discrimination, will obviously only succeed if there is sufficient evidence for a reasonable person to conclude that the employer's proffered reasons were not the basis for the employment decision. *Fuentes v. Perskie, 32 F.3d 759, 764-65 (3rd Cir.1994)*; *Manzer, 29 F.3d at 1083*; *Kralman v. Illinois Dep't of Veterans' Affairs, 23 F.3d 150, 156-57* (7th Cir.), *cert. denied, __ U.S. __, 115 S. Ct. 359, 130 L. Ed. 2d 313 (1994).* To satisfy this threshold showing of pretext, a plaintiff may discredit the employer's proffered legitimate reasons by showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision. *Manzer, 29 F.3d at 1084*; *McNabola v. Chicago Transit Authority, 10 F.3d 501 (7th Cir.1993).*

In this case, NationsBank proffered numerous performance-related reasons for its employment decision, including that Appellant failed **[\*\*50]** to follow the directives of her supervisor, Eugenia Sefcik, and that she lied to Sefcik about having complied with those directives. In her effort to show that these two reasons are pretextual, Appellant relies solely on the first method described above--i.e., evidence tending to show that these reasons had no basis in fact.

Reliance on the first method, however, is problematic. *See Kralman, 23 F.3d at 156* (there is "a fine line between evidence that appropriately challenges the employer's proffered reasons as being unworthy of credence and evidence that merely shows that the employer made a mistake"). Evidence showing a false factual predicate underlying the employer's proffered reason does not unequivocally prove that the employer did not rely on the reason in making the employment decision. Instead, it may merely indicate that the employer, acting in good faith, made the disputed employment decision on the basis of erroneous information. *Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir.1991)*. *See also Lenoir v. Roll Coater, Inc., 13 F.3d 1130, 1133-34 (7th Cir.1994)* (although employee established that employer's investigation of her conduct yielded an **[\*\*51]** incorrect result, she did not show that the employer did not rely on that result in making its employment decision). It is obviously not a violation of federal employment discrimination laws for an employer to err in assessing the performance of an employee. *Moore v. Sears, Roebuck and Co., 683 F.2d 1321, 1323 n. 4 (11th*

Walker v. NationsBank N.A.

*Cir.1982). See also Russell v. Acme-Evans Co., 51 F.3d 64, 68-69 (7th Cir.1995).* Thus, establishing pretext is not merely demonstrating that the employer made a mistake, but that the employer did not give an honest account of its behavior. [7] *Elrod, 939 F.2d at 1470.*

**[\*\*52]** In the case before us, Appellant failed to adduce sufficient evidence for a reasonable **[\*1565]** factfinder to conclude that NationsBank's proffered reasons did not actually motivate the decision to terminate Appellant. As Judge Hatchett notes, Appellant offered sufficient evidence for a factfinder to conclude that she followed Sefcik's directives. However, in my view, Appellant was unable to take the crucial next step. She failed to offer sufficient evidence from which a reasonable juror could infer that Sefcik did not genuinely believe that Appellant had disobeyed and lied to her. *Cf. Elrod, 939 F.2d at 1470.* Accordingly, because I believe Appellant presented insufficient evidence for a reasonable juror to find pretext, I concur in the affirmance of the district court's grant of judgment as a matter of law for NationsBank.

**Dissent by:** COX (In Part)

# Dissent

COX, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's affirmance of the directed

verdict. The majority also correctly states the rule governing the award of attorney's fees, the factors a district court should take into account when applying that rule, and this court's abuse-of-discretion standard of review. **[\*\*53]** I disagree, however, with the majority's determination that the district court abused its discretion in awarding NationsBank attorney's fees.

As the district court found, and as the majority points out in its discussion of the directed verdict, Walker had no evidence of gender discrimination. She adduced no testimony, for example, to sexist remarks. No evidence was presented of a pervasive pattern of favoring males at NationsBank. Walker offered no other evidence indicating that the arguably pretextual reasons NationsBank offered were pretexts for preferring males over females. Thus, this was not a difficult case in which the plaintiff almost, but not quite, met her evidentiary burden. *Cf. Busby v. City of Orlando, 931 F.2d 764, 776-782, 787 (11th Cir.1991)* (vacating a fee award because the evidence presented a close case, requiring careful consideration). Walker may have presented evidence of an unjust termination, but she never came close to showing that NationsBank discriminated against her.

Discretion, by definition, allows the district court a range of choices. When this court reviews a district court for abuse of its discretion, we do not disturb the result absent a "clear **[\*\*54]** error of judgment." *United States v. Kelly, 888 F.2d 732, 745 (11th Cir.1989).* Despite the patent lack of evidence of discrimination, the majority contends that the district court abused its discretion in finding that at some point in the discovery process it should have been apparent that the suit was unreasonable or frivolous. The majority justifies this conclusion by what seems to me a de novo consideration of the appropriateness of the fee award. I find no abuse of discretion.

For these reasons, I respectfully dissent from the vacation of the fee award.

---

[7] A plaintiff may accomplish this in a variety of ways. For example, a plaintiff presenting evidence tending to show that the predicate facts underlying the proffered reason were false could also provide evidence that the employer knew them to be false at the time of his purported reliance, *see, e.g., Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1563 (11th Cir.1987)* (plaintiff demonstrated pretext where she showed that she complied with work rule and that employer knew she had complied); or, where the employee's poor performance is proffered as the basis for dismissal, an employer's contemporaneous reports of satisfactory performance will permit the factfinder to infer that the employer is lying, *see, e.g., Sempier v. Johnson & Higgins, 45 F.3d 724, 731-32 (3rd Cir.1995),* and *Cole v. Ruidoso Mun. Schs., 43 F.3d 1373, 1380 (10th Cir.1994)*; or, the proffered reason may involve a disputed fact of a kind that it is improbable that the employer could have been mistaken about it. *See, e.g., Russell, 51 F.3d at 68-69* (conduct in dispute was of a type that it was not plausible that employer could have "honestly but mistakenly believed" that the job did not require it).

 Caution
As of: October 18, 2019 5:41 PM Z

# *Abel v. Dubberly*

United States Court of Appeals for the Eleventh Circuit

April 27, 2000, Decided ; April 27, 2000, Filed

No. 99-8290.

**Reporter**

210 F.3d 1334 *; 2000 U.S. App. LEXIS 8249 **; 82 Fair Empl. Prac. Cas. (BNA) 1407; 46 Fed. R. Serv. 3d (Callaghan) 696; 13 Fla. L. Weekly Fed. C 644

Jennifer Ann ABEL, Plaintiff-Appellant, v. Ronald DUBBERLY, Gladys Dennard, and Fulton County, Defendants-Appellees.

**Prior History: [**1]** Appeal from the United States District Court for the Northern District of Georgia. (No. 97-00719-1-CV-TWT). Thomas W. Thrash, Jr., Judge.

**Disposition:** AFFIRMED.

## Core Terms

district court, matter of law, grounds, termination, similarly situated, summary judgment, county funds, personal use, register, renewed

## Case Summary

**Procedural Posture**

Plaintiff, a terminated employee, appealed the grant of a renewed motion for judgment as a matter of law under *Fed. R. Civ. P. 50* as to her claims for employment discrimination against defendant county and individuals, by the United States District Court for the Northern District of Georgia.

**Overview**

Plaintiff, the only Caucasian assigned to a branch library, was terminated after temporarily borrowing cash from the till. She sought relief in claims under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* and *42 U.S.C.S. § 1983*, alleging the reason for her firing was pretextual and that race was the real factor for her termination because, she argued, an African-American employee had also taken county money but

had not been similarly disciplined and an African-American male had taken her position. After the jury found for plaintiff on the civil rights claim and against one defendant on the *§ 1983* claim, the court entered judgment as a matter of law for defendants under *Fed. R. Civ. P. 50*. On appeal the court affirmed. Because no other employee actually confessed to taking funds, no other employee's situation was comparable to hers, and there could be no disparate treatment.

**Outcome**

Judgment affirmed because plaintiff failed to show that she was treated dissimilarly to any similarly situated fellow employees, and absent some other similarly situated but differently disciplined worker, there was no disparate treatment. Defendant's reasons for terminating plaintiff were not shown to be pretextual, or motivated by illegal intent.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

*HN1*[ ] **Standards of Review, De Novo Review**

*Fed. R. Civ. P. 50* motion for judgment as a matter of law is reviewed de novo, and an appellate court applies the same standards employed by the district court.

Abel v. Dubberly

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

**HN2[⬇]  Trials, Judgment as Matter of Law**

A court of appeals will look at the evidence in the light most favorable to the non-moving party in considering a *Fed. R. Civ. P. 50* motion for judgment as a matter of law, the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

**HN3[⬇]  Trials, Judgment as Matter of Law**

A substantial conflict in the evidence is required before a matter will be sent to the jury.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

**HN4[⬇]  Trials, Judgment as Matter of Law**

A motion for judgment as a matter of law will be denied only if reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions.

Civil Procedure > Appeals > Summary Judgment Review > General Overview

Governments > Courts > Judicial Precedent

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

**HN5[⬇]  Appeals, Summary Judgment Review**

Binding precedent in the Eleventh Circuit expressly permits consideration of a *Fed. R. Civ. P. 50* motion after the denial of summary judgment.

Civil Procedure > Trials > Judgment as Matter of Law > Directed Verdicts

Civil Procedure > Judicial

Officers > Judges > General Overview

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

**HN6[⬇]  Judgment as Matter of Law, Directed Verdicts**

Sound practical reasons may justify a trial judge's denying summary judgment even on the identical evidence supporting his granting a directed verdict.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

Civil Procedure > Appeals > Standards of Review

**HN7[⬇]  Trials, Judgment as Matter of Law**

When reviewing a trial court's resolution of a *Fed. R. Civ. P. 50(b)* motion, an appellate court compares the grounds originally argued by the movant in its *Fed. R. Civ. P. 50(a)* motion with those cited by the trial court in granting a renewed motion for judgment as a matter of law.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

Constitutional Law > Bill of Rights > Fundamental Rights > Trial by Jury in Civil Actions

**HN8[⬇]  Trials, Judgment as Matter of Law**

If the sets of grounds for a *Fed. R. Civ. P. 50(b)* motion and the prior *Fed. R. Civ. P. 50(a)* motion are closely related, then no *U.S. Const. amend. VII* violation exists, because the non-moving party was not subjected to unfair surprise; however, if the grounds are not closely related, then a district court may not rely on the later-advanced grounds in granting the motion.

Civil Procedure > Appeals > Standards of Review

<u>HN9</u>[⤓]  **Appeals, Standards of Review**

A court of appeals may not reverse a judgment of the district court if it can be affirmed on any ground, regardless of whether those grounds were used by the district court.

Civil Procedure > Appeals > Standards of Review

<u>HN10</u>[⤓]  **Appeals, Standards of Review**

An appellate court may affirm the district court, where the judgment entered is correct on any legal ground, regardless of the grounds addressed, adopted or rejected by the district court.

Labor & Employment Law > ... > Disparate Treatment > Evidence > Burdens of Proof

Labor & Employment Law > Discrimination > Disparate Treatment > General Overview

Labor & Employment Law > ... > Employment Practices > Adverse Employment Actions > Discipline

Labor & Employment Law > ... > Disparate Treatment > Evidence > General Overview

<u>HN11</u>[⤓]  **Evidence, Burdens of Proof**

An employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation and that an admission of misconduct provides sufficient foundation for an employer's good faith belief that an employee has engaged in misconduct.

Labor & Employment Law > Discrimination > Disparate Treatment > General Overview

<u>HN12</u>[⤓]  **Discrimination, Disparate Treatment**

A comparator must have engaged in at least similar or comparable misconduct to that of the disciplined worker.

Business & Corporate Compliance > ... > Discrimination > Labor & Employment Law > Discrimination

Labor & Employment Law > Wrongful Termination

<u>HN13</u>[⤓]  **Labor & Employment, Discrimination**

An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.

**Counsel:** For Abel, Jennifer Ann, Appellant: Simon, Deana L., Drewk, Eckl & Farnham, Atlanta, GA.

For Dubberly, Ronald, Dennard, Gladys, Fulton County, Appellees: Shannon, Vernitia Averett, Fulton County Attorney's Office, Atlanta, GA. Brantley, Overtis Hicks, City of Atlanta Law Department, Atlanta, GA. Hicks, Charles G., Attorney at Law, Stone Mountain, GA.

**Judges:** Before EDMONDSON and MARCUS, Circuit Judges, and HANCOCK[*], Senior District Judge.

# Opinion

 **[*1336]**  PER CURIAM:

Plaintiff Abel appeals the district court's granting of a renewed motion for judgment as a matter of law as to her Title VII claim against her former employer, Defendant Fulton County, and her *section 1983* claim against her former supervisor, Defendant Gladys Dennard. Because this Court finds **[**2]** that Abel did not show that she was treated dissimilarly to any similarly situated fellow employees, the judgment of the district court is due to be affirmed.

*I. Factual and Procedural History*

Abel was formerly employed by Defendant Fulton County as a Library Principal Associate. She was hired in October of 1994 and was initially assigned to the Washington Park Branch of the Atlanta-Fulton County Public Library, but in May of 1995, she was transferred to the South Fulton Branch. Abel was the first Caucasian to be assigned to the South Fulton Branch,

---

[*] Honorable James H. Hancock, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

Abel v. Dubberly

where Defendant Dennard, an African-American female, was her supervisor. From the start, Dennard and Abel did not have a good working relationship.

On December 8, 1995, Abel took $ 10.00 from the library's cash register to purchase gasoline for her personal car, which she then drove to the bank to deposit her pay check. Abel put a signed I.O.U. in the register after taking the cash, and replaced the $ 10.00 on December 12, 1995, her next day on the job. Dennard met with Abel on December 12 about the I.O.U. incident. Abel freely admitted taking the money, but insisted that she believed that the practice was acceptable. In fact, Abel's **[**3]** actions violated a strict policy against personal use of county funds for which the penalty was termination, and Dennard informed her that she would be charged with theft and that a record of the meeting would be made.

Abel eventually filed two grievances concerning the December 12 meeting with Dennard. At a grievance meeting with the library branch's group manager, Julie Compton, Abel again freely admitted to taking the $ 10.00 from the cash register. At a still later meeting with the library director, Defendant Ronald Dubberly, Abel also confessed to taking the $ 10.00 from the cash register. By the time she met with Dubberly, the termination process was already under way, and Abel was officially informed, on July 3 or 5, 1996, of her firing for misuse of county funds.

Abel believed that the I.O.U. incident was used merely as a pretext and that race was the real factor for her termination because, she argued, an African-American employee had also taken county money but had not been similarly disciplined and an African-American male had taken her position at South Fulton. Acting on her belief, Abel filed suit in federal court, alleging claims under _42 U.S.C. § 2000e_ **[**4]** (the Title VII claim), _42 U.S.C. § 1983_, and **[*1337]** various state law theories. The Title VII claim against Fulton County and the _section 1983_ claims against Dubberly and Dennard survived a motion for summary judgment. A jury trial was held; Defendants moved, under _Federal Rule of Civil Procedure 50(a)_, for judgment as a matter of law, which was denied; and the jury found in favor of Abel as to the Title VII claim against Fulton County and the _section 1983_ claim against Dennard. However, the jury found in favor of Dubberly on Abel's other _section 1983_ claim.

The jury verdicts in favor of Abel, though, would not stand. After the trial, Fulton County and Dennard

renewed their motion for judgment as a matter of law, under _Federal Rule of Civil Procedure 50(b)_. During a hearing approximately two months after the trial, the district court granted the Defendants' renewed motion for judgment as a matter of law. Abel timely appealed.

## II. Discussion

_HN1_[⬆] A _Rule 50_ motion for judgment as a matter of law is reviewed _de novo,_ and this Court applies the same standards employed by the district court. _See Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir.1997)._ **[**5]** We consider whether such sufficient conflicts exists in the evidence to necessitate submitting the matter to the jury or whether the evidence is so weighted in favor of one side that that party is entitled to succeed in his or her position as a matter of law. _See Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir.1999)_ (en banc). Although _HN2_[⬆] we look at the evidence in the light most favorable to the non-moving party, the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts. _See id._ (citing _Walker v. NationsBank of Florida, N.A., 53 F.3d 1548, 1555 (11th Cir.1995))._ _HN3_[⬆] A substantial conflict in the evidence is required before a matter will be sent to the jury. _See Combs, 106 F.3d at 1526._ As we very recently stated, "[_HN4_[⬆] a] motion for judgment as a matter of law will be denied only if 'reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions.' " _See Mendoza, 195 F.3d at 1244_ (quoting _Walker, 53 F.3d at 1555_).

Before turning to the merits of Abel's appeal, we must address two **[**6]** preliminary matters. First, Abel argues that _Rule 50_ motions are rarely granted when summary judgment against a plaintiff has already been denied, suggesting that we should affirm merely on the basis of that rarity. _HN5_[⬆] Binding precedent in this Circuit, [1] however, expressly permits consideration of a _Rule 50_ motion after the denial of summary judgment. _See Gross v. Southern Ry. Co., 446 F.2d 1057, 1060 (5th Cir.1971)_ ("It is settled in this Circuit, therefore, that prior denial of summary judgment does not rule out the possibility of a subsequent directed verdict."); _Gleason_

---

[1] _See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981)_ (adopting as binding precedent in the new Eleventh Circuit the decisions of the former Fifth Circuit prior to the close of business on September 30, 1981).

Abel v. Dubberly

*v. Title Guarantee Co., 317 F.2d 56, 58 (5th Cir.1963)* ("*HN6* [↑] Sound practical reasons … may justify a trial judge's denying summary judgment even on the identical evidence supporting his granting a directed verdict."); *Stanley v. Guy Scroggins Constr. Co., 297 F.2d 374, 378 (5th Cir.1961)* ("This holding [reversing a grant of summary judgment] does not rule out the possibility of a directed verdict. It may be, when the evidence is in, that the district judge will find that the case should be disposed of by a directed verdict. He is free to do so."). To this day, these **[\*\*7]** precedents continue to be applied in the Eleventh Circuit. *See Mendoza, 195 F.3d at 1241-42, 1253* (affirming the district court's granting of a *Rule 50* motion following denial of a Rule 56 motion); *Walker, 53 F.3d at 1552-53, 1558* (affirming a grant of a *Rule 50* motion after denial of a Rule 56 motion). *But see Richardson v. Leeds Police Dep't, 71 F.3d 801, 804 (11th Cir.1995)* (proscribing the district courts **[\*1338]** from granting a *Rule 50(b)* motion predicated on a failure to establish a prima facie case of employment discrimination after having denied both a Rule 56 motion and a *Rule 50(a)* motion and allowing ultimate issue of discrimination to go to the jury).

Also as a preliminary matter, **[\*\*8]** Abel argues that the district court, in granting the renewed motion for judgment as a matter of law, erred because the Defendants raised issues in their *Rule 50(b)* motion not raised at trial in their *Rule 50(a)* motion, and, therefore, she was denied her *Seventh Amendment* right to cure any defects before the case was given to the jury. "*HN7* [↑] When reviewing a trial court's resolution of a *Rule 50(b)* motion, we compare the grounds originally argued by the movant in its *Rule 50(a)* motion with those cited by the trial court in granting a renewed motion for judgment as a matter of law." *Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1289 (11th Cir.1998)*. *HN8* [↑] If the two sets of grounds are closely related, then no *Seventh Amendment* violation exists because the non-movant was not subjected to unfair surprise; however, if the grounds are not closely related, then the district court may not rely on the later-advanced grounds in granting the motion. *See id.* Here, even if we precluded the district court from relying on the grounds which Abel asserts were not raised at trial and employed the "any evidence standard" of *Rhodes, 146 F.3d at 1290*, adequate additional grounds, which were raised at trial, [2] **[\*\*9]** exist supporting our affirmance of

the district court's granting of judgment as a matter of law. *See Johnson Enters. v. FPL Group, Inc., 162 F.3d 1290, 1311 & n. 50 (11th Cir.1998)*; *Magluta v. Samples, 162 F.3d 662, 664 (11th Cir.1998)* ("We note that *HN9* [↑] we may not reverse a judgment of the district court if it can be affirmed on any ground, regardless of whether those grounds were used by the district court."); *Bonanni Ship Supply, Inc. v. United States, 959 F.2d 1558, 1561 (11th Cir.1992)* (stating "that *HN10* [↑] this court may affirm the district court where the judgment entered is correct on any legal ground regardless of the grounds addressed, adopted or rejected by the district court"). In short, regardless of the standards used in reviewing the lower court's decision, Abel would still not prevail in her appeal.

**[\*\*10]** The outcome on the merits of Abel's suit is dictated by our prior Title VII decisions, [3] as illustrated by *Jones v. Gerwens, 874 F.2d 1534 (11th Cir.1989)*. The plaintiff in *Jones*, like Abel, admitted to his employer violating the work rules for which he was disciplined and also claimed that fellow employees of another race had committed the same violations but had not been as severely punished for their transgressions. *See Jones, 874 F.2d at 1540-41*. In *Jones*, we noted that "*HN11* [↑] an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation" and that an "admission of misconduct provides sufficient foundation for an employer's good faith belief that an employee has engaged in misconduct." *See id. at 1540*. We then found that the plaintiff had not met his burden of showing that his conduct was **[\*1339]** similar to that of dissimilarly treated employees of another race. *See id. at 1541*.

**[\*\*11]** Although the setting is somewhat different in the present case, we reach the same ultimate conclusion as

---

evidence demonstrating the existence of any similarly situated but differently treated co-employee and also placed her on notice that Defendants believed she had failed to produce any evidence showing that the legitimate, nondiscriminatory reasons advanced for Plaintiff's termination were mere pretext. (Trial Tr. 229-31.) These same grounds were fully developed in their written *Rule 50(b)* motion, filed ten days after entry of judgment.

[3] The same analysis applies to the Plaintiff's *section 1983* claim against Dennard, as discriminatory intent is an element to be shown in the same manner as in an alleged Title VII violation when the two claims arise from the same conduct and constitute parallel remedies. *See Richardson v. Leeds Police Dept., 71 F.3d 801, 805 (11th Cir.1995)*; *Cross v. State of Ala., 49 F.3d 1490, 1507-08 (11th Cir.1995)*.

---

[2] In their oral *Rule 50(a)* motion at the close of Plaintiff's case-in-chief, the Defendants explicitly raised Abel's failure to offer

Abel v. Dubberly

in *Jones.* First, although Abel claims that she was similarly situated to an African-American employee who also took county funds for personal use, a key difference is readily apparent between Abel and the purported comparator. [4] [**13] Whereas Abel has always freely admitted having taken $ 10.00 from the cash register, [5] the other employee has never confessed to taking county funds for personal use; at worst, the would-be comparator has admitted to temporarily misplacing funds. Abel did not offer any evidence sufficient to show that she was similarly situated to any other employee, and absent some other similarly situated but differently disciplined worker, there can be no disparate treatment. *See Jones, 874 F.2d at 1540-41; Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185-87 (11th Cir.1984).* Furthermore, even if one grants that a similarly situated employee was treated in a different manner, Abel's admission that she took the money rebuts any prima facie case of discrimination, *Jones, 874 F.2d at 1540*, and Abel still [**12] never came close to offering evidence even suggesting either that the Defendants' explanation for her termination warrants disbelief, which would permit but not compel a jury to find in Plaintiff's favor, or that some illegal, discriminatory intent as opposed to purely personal or otherwise non-prohibited animus truly motivated the personnel involved in her termination. *See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).* Finally, we conclude that apart from her termination, Abel has not demonstrated any other conditions of her employment

or her treatment by Dennard severe enough to constitute a violation of Plaintiff's civil rights. *See Edwards v. Wallace Community College, 49 F.3d 1517, 1521-22 (11th Cir.1995)* (discussing requirements to succeed on a hostile work environment claim).

*III. Conclusion*

Although Plaintiff Jennifer Ann Abel argued that her treatment by the Defendants violated Title VII and *section 1983*, she failed to show that she was similarly situated to any differently treated employee, much less show that she was discriminated against on the basis of race or another illegal factor. Because Abel demonstrated neither disparate treatment nor discriminatory intent, the district court did not err in granting judgment as a matter of law to the Defendants Fulton County and [**14] Gladys Dennard. Therefore, the decision below is AFFIRMED.

**End of Document**

---

[4] Abel attempted to compare her treatment to that of several African-American female employees, but apparently only one of those other individuals was ever suspected or accused of taking county funds for personal use, and whether that individual was ever really suspected by anyone other than Plaintiff is a matter of contention. Because *HN12*[↑] a comparator must have engaged in at least similar or comparable misconduct to that of the disciplined worker, *Jones, 874 F.2d at 1534* & n. 12, we take time to analyze the behavior of only that co-worker that Abel claims also took county funds for personal use.

[5] Although termination may, to some, seem a draconian response given the level of the Plaintiff's offense, the reasonableness of Fulton County's disciplinary policies are not a consideration. As we have said before, *HN13*[↑] an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir.1984).*

 Caution
As of: October 18, 2019 5:41 PM Z

# *BRESCHER v. VON STEIN*

United States Court of Appeals for the Eleventh Circuit

June 27, 1990

No. 88-6136

**Reporter**
904 F.2d 572 *; 1990 U.S. App. LEXIS 10461 **

George A. BRESCHER, et al., Defendants-Appellants v. Charles H. VON STEIN, Plaintiff-Appellee

**Prior History: [**1]**   Appeal from the United States District Court for the Southern District of Florida. No. 88-6868-CIV-SM; Marcus, Judge.

**Disposition:** REVERSED.

## Core Terms

arrest, lease, district court, prostitution, probable cause, deprivation, defamation, reputation, Defendants', qualified immunity, media, state law, occurring, premises, damages, existence of probable cause, directed verdict motion, defamatory statement, notice, rights, tenant, cases, violation of section, plaintiffs', goodwill, motions, stolen, intentional infliction of emotional distress, shopping center, legal right

## Case Summary

### Procedural Posture
Defendants, sheriff and three deputies appealed the monetary judgments rendered against them by the U.S. District Court for the Southern District of Florida, contending that they qualified immunity for acts committed by them within the scope of their discretionary authority.

### Overview

Plaintiff lessor leased one of his properties to prostitution ring. Plaintiff was arrested for violation of *Fla. Stat. § 796.06(1)*, and defendant sheriff made a negative comment about plaintiff, which was publicized by the local media. The criminal charges against plaintiff were eventually dropped. Plaintiff filed two civil rights

claims under *42 U.S.C.S. § 1983*, which alleged that plaintiff was illegally arrested and that plaintiff was defamed by defendant sheriff's statements. The jury awarded plaintiff compensatory damages and punitive damages and defendants appealed. The court reversed, holding that the evidence indisputably revealed that plaintiff knew prostitution was occurring at his property, and that a reasonable law officer could have believed that *§ 796.06* applied to a landlord who leased premises which were thereafter used for prostitution.

### Outcome
The court reversed the judgment of the trial court in favor of plaintiff lessor because a reasonable officer could have believed that the statute applied to landlords who leased premises which were thereafter used for prostitution.

## LexisNexis® Headnotes

Criminal Law & Procedure > ... > Sex Crimes > Prostitution > General Overview

**HN1[↓]  Sex Crimes, Prostitution**

It shall be unlawful to let or rent any place, structure, or part thereof with the knowledge that such place will be used for the purpose of lewdness, assignation, or prostitution.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

Criminal Law & Procedure > Trials > Motions for

BRESCHER v. VON STEIN

Acquittal

Criminal Law & Procedure > Postconviction Proceedings > Motions to Vacate Judgment

*HN2*[⬇] **Trials, Judgment as Matter of Law**

The court can reverse the jury's verdict if the district court erred in not granting defendants' motions for a directed verdict and judgment notwithstanding the verdict.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

Criminal Law & Procedure > Trials > Motions for Acquittal

Criminal Law & Procedure > Postconviction Proceedings > Motions to Vacate Judgment

*HN3*[⬇] **Trials, Judgment as Matter of Law**

In determining whether the district court erred in denying defendants' motions for directed verdict and judgment not withstanding the verdict, the court applies the same standard as that applied by the district court.

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

Civil Rights Law > Protection of Rights > Section 1983 Actions > General Overview

*HN4*[⬇] **Protection of Rights, Section 1983 Actions**

*42 U.S.C.S. § 1983* provides a federal remedy for the deprivation of rights, privileges, or immunities protected by the Constitution or the laws of the United States.

Civil Rights Law > ... > Elements > Color of State Law > General Overview

Constitutional Law > Bill of Rights > State Application

*HN5*[⬇] **Elements, Color of State Law**

Under the *Fourth Amendment*, which is applicable to the States through the *Fourteenth Amendment*, persons have the right not to be arrested without probable cause.

Criminal Law & Procedure > ... > Search Warrants > Probable Cause > Personal Knowledge

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

*HN6*[⬇] **Probable Cause, Personal Knowledge**

A law enforcement officer has probable cause to arrest a suspect if the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

*HN7*[⬇] **Arrests, Probable Cause**

The existence of probable cause to arrest is based on objective standards.

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

*HN8*[⬇] **Arrests, Probable Cause**

Probable cause defines a radically different standard than beyond a reasonable doubt, and while an arrest must stand on more than suspicion, the arresting officer need not have in hand evidence sufficient to obtain a conviction.

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

*HN9*[⬇] **Arrests, Probable Cause**

Intertwined with the question of probable cause is the issue of qualified immunity. Under this doctrine, government officials performing discretionary functions generally are shielded from liability for civil damages

BRESCHER v. VON STEIN

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

**HN10**[⬇] **Arrests, Probable Cause**

The right the official is alleged to have violated must have been clearly established in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

**HN11**[⬇] **Arrests, Probable Cause**

The standard is an objective one, and therefore does not include an inquiry into the officers' subjective intent or beliefs.

Constitutional Law > Privileges & Immunities

**HN12**[⬇] **Constitutional Law, Privileges & Immunities**

Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.

Constitutional Law > Privileges & Immunities

**HN13**[⬇] **Constitutional Law, Privileges & Immunities**

In determining whether qualified immunity exists, the issue is not probable cause in fact but arguable probable cause.

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

**HN14**[⬇] **Arrests, Probable Cause**

Actual probable cause is not necessary for an arrest to be objectively reasonable. Indeed, it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

Criminal Law & Procedure > ... > Search Warrants > Probable Cause > Personal Knowledge

**HN15**[⬇] **Trials, Judgment as Matter of Law**

When there is no dispute about the material facts, the court has the duty to decide whether the defendants' conduct violated clearly established law.

**Counsel:** Robert H. Schwartz, Gunther & Whitaker, P.A., Ft. Lauderdale, Florida, for Defendant.

For Grim, Berk & Carruthers: Bruce W. Jolly, Shailer, Purdy & Jolly, P.A., Ft. Lauderdale, Florida.

Valerie Shea, Greer, Homer & Bonner, Miami, Florida, for Plaintiff.

**Judges:** Fay and Edmondson, Circuit Judges and George C. Young,[*] Senior District Judge.

**Opinion by:** YOUNG

# Opinion

 **[\*573]**  The former Sheriff of Broward County, Florida, George Brescher, and three Sheriff's  **[\*574]**  Deputies, Michael Berk, Kenneth Grimm, and Carl Carruthers, appeal monetary judgments rendered by the district court against them for acts committed by them within the scope of their discretionary authority.

The Plaintiff/Appellee in this case, Charles H. Von Stein, is President of Charles A. Von Stein, Inc. ["the company"], a family-run corporation specializing in commercial real estate and in the leasing, management and development of commercial **[\*\*2]** properties. In the early 1980s, the company managed 16 or 17 properties

---

[*] Honorable George C. Young, Senior U.S. District Judge for the Middle District of Florida, sitting by designation.

BRESCHER v. VON STEIN

which contained a total of approximately 420 commercial tenants. One of these properties was the Plaza Central Shopping Center. [1]

In June of 1983, Plaintiff was arrested for violation of section 796.06(1), Florida Statutes, which provides, in pertinent part:

> HN1[↑] It shall be unlawful to let or rent any place, structure, or part thereof . . . with the knowledge that such place . . . will be used for the purpose of lewdness, assignation, or prostitution.

The charge against Plaintiff was based on allegations that on June 1, 1983, Plaintiff was leasing a unit in Plaza Central Shopping Center to "Man's World Culture Center" [hereinafter, "Man's World"] with the knowledge that such property was being used for prostitution. Plaintiff's arrest, including the following comment by George Brescher, who was then the Sheriff of Broward County, was publicized [**3] by the local media:

> One of the big problems we think is getting to the right people. Traditionally, we've always just gone for the prostitute, but, behind every one you arrest is another to take their place so they go right back out on the street. Our feeling is we can get to the money behind them and put a hurt on them, that [sic] we can achieve some effective results.

The charge against Plaintiff was eventually nolle prossed by the State Attorney's Office. Subsequently, Plaintiff filed this action against Sheriff Brescher, as well as the three Sheriff's Deputies, who were all present at Plaintiff's arrest.

At the time of trial, the complaint contained two civil rights claims under Title 42, section 1983, which alleged that Plaintiff was illegally arrested and that Plaintiff was defamed by Sheriff's Brescher's statements to the media at the arrest scene. The complaint also included state law claims for false arrest, for malicious prosecution, and for intentional infliction of emotional distress. Plaintiff's theory at trial was that his arrest was staged as a media event in order to create favorable publicity for Defendant Brescher, who was running for re-election [**4] as Sheriff.

In a special interrogatory verdict, the jury found in favor of Plaintiff on all counts. Specifically, the jury found that the Defendants arrested Plaintiff without probable cause and that the Defendants' conduct in arresting Plaintiff

was not protected by qualified immunity; that Defendant Brescher made a false statement concerning Plaintiff at the scene of Plaintiff's arrest which damaged Plaintiff's personal reputation and the reputation and goodwill of the company, and that Defendant Brescher was not protected by qualified immunity for such conduct; that the Defendants caused Plaintiff to be falsely arrested and imprisoned; that the Defendants maliciously instituted a criminal proceeding against Plaintiff; and that the Defendants intended to inflict emotional distress upon Plaintiff. The jury awarded Plaintiff compensatory damages of $ 550,000 and punitive damages of $ 230,000. [2] This appeal seeks review of the district court's order denying Defendants' post-trial motions.

[**5]  BACKGROUND

*The Criminal Case Against Plaintiff*

The relevant facts of the case are largely undisputed. The Man's World lease called [*575] for the property to be used as "a cultural center for bridge, chess, backgammon, periodicals and newspapers, teaching of languages." The lease further provided: "It is understood and agreed that the demised premises shall be used only for those purposes expressly described above and that should the premises be put to any other use the Tenant shall be deemed to be in default of this lease agreement." The lease was for a five-year period with an option for another five years.

Plaintiff Charles Von Stein, a Fort Lauderdale businessman, has been active as an officer and employee of the company during the more than 25 years the company has been in business. Plaintiff came to believe in 1981 that prostitution was being conducted on the Man's World premises; however, no evidence suggested that Plaintiff knew that the property would be used for prostitution at the time he entered into the lease. Once Plaintiff realized that prostitution activities were occurring at Man's World, he asked Marylou Adams, a long-time broker-associate of the [**6] company who oversaw the leasing and management of Plaza Central Shopping Center, to contact the Sheriff's Department to see if it could help in getting rid of the tenant.

On July 10, 1981, and again on July 23, 1981, Marylou Adams contacted the Broward County Sheriff's Office

---

[1] The company also held a 16 2/3 percent ownership interest in Plaza Central.

[2] Compensatory damages were awarded jointly against all Defendants. Punitive damages were segregated by Defendant as follows: Brescher -- $ 150,000; Grimm -- $ 20,000; Carruthers -- $ 40,000; and Berk -- $ 20,000.

regarding Plaintiff's concern that prostitution was occurring at Man's World. Adams spoke with Lieutenant Tom Slattery, who told her that the Sheriff's Department was aware that prostitution was occurring on the premises, that Man's World had been "busted" but Slattery was not aware if it had come to court yet, and that Man's World was a "slick" operation. Slattery advised Adams that the Sheriff's Department would keep her posted with respect to its Man's World investigation.

Ms. Adams also spoke on July 23 to an attorney, Richard Michelson, about Man's World. Michelson, who was also a tenant of Plaza Central Shopping Center, asked Adams to give Lieutenant Slattery Michelson's name and telephone number, which she did. On July 24, 1981, Slattery advised Adams that he had run a "make" on the woman who had signed the property lease on behalf of Man's World, and found that she had been arrested for loitering at **[**7]** a bar and had a history of prostitution.

On January 18, 1982, Adams spoke with Agent Michael Berk, a Defendant in this case, who had been assigned to the Man's World investigation. [3] Berk, a member of the Organized Crime Vice Unit of the Broward County Sheriff's Office, was the only officer assigned to the Man's World case during the last six months of 1982. During this conversation, Berk informed her that a man named Herman Schannault had been charged with running a house of prostitution in Fort Lauderdale. Berk stated that he would continue to accumulate evidence against Man's World and asked Adams to send him a list of tenants who would be willing to testify against Man's World. Other than this request, Berk did not ask that Adams take any action in relation to Man's World. Adams mailed Berk the requested list of tenants in January of 1982.

During the remainder of 1982, further contacts occurred **[**8]** between Ms. Adams and Berk. During one of these conversations, Berk assured her that the Sheriffs' Department was trying to get rid of Man's World but that it was difficult. During another conversation, Ms. Adams furnished Berk with information concerning the name on the Man's World lease, the use clause, the name of the Von Stein company, and the name of the owners of the shopping center.

In January of 1983, the company complied with a

subpoena by producing a copy of the lease agreement, rent receipts, and a copy of the floor plan of the Man's World property. At about that time, Berk took the statements of Adams and Plaintiff concerning the activities at Man's World. From a photo line-up, Adams and Plaintiff identified Warren Inskeep, the man to whom the company had rented the property **[*576]** which was being used as Man's World. Inskeep was the same person as Herman Schannault, who had been arrested for running a house of prostitution in Fort Lauderdale. The information supplied by Plaintiff and Adams, along with other information, was used by Berk in obtaining a capias for Schannault's arrest in February of 1983. [4] Again, in May of 1983, Berk used information provided by **[**9]** Plaintiff and Adams to establish probable cause for the arrest of Schannault.

On February 17, 1983, Adams received a telephone call from Berk in which Berk stated that he wished to inform Plaintiff that the Sheriff's Department had made an arrest for prostitution at Man's World that day and that a letter stating the same would be forthcoming. Berk advised Adams that this was the evidence the company needed to evict Man's World, that the Sheriff's Department had done their part and that the rest was up to the company.

On February 23, Berk telephoned Adams to advise that the company would be receiving a letter from Assistant State Attorney James Benjamin advising of forthcoming prostitution charges against Schannault. No mention of *Section 796.06* was made in this letter, which was dated March 1, 1983. Adams discussed the letter **[**10]** with Plaintiff and, on March 4, sent a copy to attorney Michelson. Shortly thereafter, Michelson declined to take the eviction case for personal reasons.

In April of 1983, Adams called Detective Berk to tell him that Plaintiff felt they needed "stronger information," such as a conviction, in order to evict Man's World. Berk stated that he would send another letter to help with the Man's World eviction. On May 18, 1983, Berk and Defendant Kenneth Grimm [5] delivered a letter to

---

[3] Apparently, at this point, Lieutenant Slattery was no longer involved in the Man's World investigation.

---

[4] Between April 15 and May 18, 1983, Plaintiff received two subpoenas to testify against Schannault. Plaintiff was prepared to respond to the subpoenas but the trial never occurred.

[5] Beginning in January of 1983, Defendant Grimm was a detective assigned to the Organized Crime Division of the Sheriff's Department. At that time, only Grimm and Berk staffed that department. Grimm assisted in the writing of the

BRESCHER v. VON STEIN

Plaintiff which included a computer list of charges that had been filed relating to Man's World and a copy of *Section 796.06, Florida Statutes.*

Early in 1983, Defendant Grimm had brought *Section 796.06* to the attention of the Chief of the Organized Crime Section of the Broward **[**11]** State Attorney's Office, who informed Grimm that no case law existed on the statute. Assistant State Attorney Benjamin also discussed *Section 796.06* with Grimm, who inquired whether the person that leased the premises to Man's World could be prosecuted successfully under *Section 796.06.* Benjamin advised Grimm that the lessor could be so prosecuted because Benjamin interpreted the statute to apply not only at the inception of the lease, but also to on-going lease relationships. After speaking with the Chief and Benjamin, Grimm formed the opinion that *Section 796.06* applied to an on-going lease situation and that a prostitution conviction was not required in order for a landlord to be culpable under *Section 796.06.*

Upon receipt of the second letter, Plaintiff did not believe there was any urgency to act on his part; however, on May 18 he called attorney David Murray and asked him to take steps to evict Man's World. Plaintiff left for a vacation the following day and returned on May 31. The following day, Plaintiff received a telephone call from Grimm. Pursuant to Grimm's request, Plaintiff agreed to meet with Grimm at 2 p.m. Grimm asked Plaintiff during the meeting: "Is the [Man's **[**12]** World] lease still in effect?" When Plaintiff answered "yes," he was placed under arrest. [6]

Defendants Berk and Grimm testified that they believed probable cause existed to arrest Plaintiff for violation of *Section 796.06* the day of the arrest, notwithstanding Plaintiff's cooperation with law enforcement. At the time of Plaintiff's arrest, **[*577]** Defendants Brescher and Carruthers [7] did not know of Plaintiff's cooperation with the Sheriff's Department, but each testified that such information would not have affected his decision that probable cause existed to arrest Plaintiff for violation of *Section 796.06.*

Mindy Solomon, **[**13]** the Assistant State Attorney

who succeeded James Benjamin as Vice Unit prosecutor in 1983, prepared the information against Plaintiff. At that time, Solomon did not know that Plaintiff had participated in the photo line-up or that he and Adams had given sworn statements in connection with Schannault. Solomon testified, however, that this information would not have affected her determination that probable cause existed to arrest Plaintiff for violation of *Section 796.06* because Plaintiff continued to lease the property after learning that prostitution was occurring on the premises. Solomon testified that she nolle prossed the case because Plaintiff agreed to testify in a felony case against Schannault and because Man's World was being closed down.

The case against Plaintiff was dismissed on August 24.

*Procedural History*

This case was tried in August of 1987. At the close of Plaintiff's case, Defendants moved for a directed verdict on the grounds that probable cause for Plaintiff's arrest existed under *Section 796.06* and that Defendants' conduct was objectively reasonable. The motion was denied. Both Plaintiff and Defendants moved for directed verdicts at the close of the evidence, **[**14]** and both motions were denied.

Prior to charging the jury, the district court ruled on three issues that had been previously briefed by the parties. First, the court rejected Plaintiff's contention that Plaintiff was categorically outside the scope of parties to whom *section 796.06* applied by finding that the statute could apply to a landlord who does not know of an intended illegal purpose at the time of entering into the lease but who thereafter learns his tenant intends to use it for such a purpose. Second, the district court ruled that Defendants' alleged violation of state law concerning warrants for misdemeanor offenses was of no consequence to Plaintiff's civil rights claim, and, third, that a defense of qualified immunity would not be vitiated by actual malice.

After entry of final judgment, Defendants filed a Motion for Judgment in Accordance with Directed Verdict, Motion for Judgment Notwithstanding the Verdict, and Motion for New Trial. In a lengthy order, the district court found as a matter of law that Defendants were not entitled to qualified immunity. *See Von Stein v. Brescher, 696 F. Supp. 606 (S.D.Fla. 1988).* The district court was

in **[**15]** unequivocal agreement with the interpretation advanced by the Defendants. They

---

second letter to Plaintiff.

[6] In addition, prior to Plaintiff's arrest, officers had visited the Man's World property to confirm that the business was still in operation.

[7] Defendant Carruthers was Berk's and Grimm's superior.

BRESCHER v. VON STEIN

contended that [Section 796.06] would be violated *at any time* during the pendency of a lease so long as the lessor lets the place, with the knowledge that the place will *thereafter* be used for purposes of prostitution, assignment or lewdness. In short, we concluded, the statute proscribes certain conduct both at the time the lease is entered and at any time thereafter during the pendency of the lease so long as the lessor leases with "knowledge" that the place *will be* used for prostitution. So, to the extent it may be argued that the state of the law was unsettled at the time of the arrest, we have determined that the Defendants correctly anticipated the manner in which the law would be interpreted.

*Id. at 612* (emphasis in original). The district court concluded, however, that the Defendants arrested Plaintiff without probable cause because, "given the information available to the Defendants[,] a reasonable officer would have known there was no probable cause to arrest the Plaintiff . . . because the Plaintiff acted without the requisite 'knowledge' or *mens* **[**16]** *rea*." *Id.* In concluding that the Defendants lacked an objectively reasonable basis for arresting Plaintiff, the district court also found that the evidence supported Plaintiff's theory **[**578]** that his arrest was staged for political impact. [8]

REVIEW STANDARDS

*HN2*[⬆] This Court can reverse the jury's verdict if the district court erred in not granting Defendants' motions for a directed verdict and judgment notwithstanding the verdict. *Reimer v. Short, 578 F.2d 621 (5th Cir. 1978)*, cert. denied, *440 U.S. 947, 99 S. Ct. 1425, 59 L. Ed. 2d 635 (1979)*. *HN3*[⬆] In determining whether the district court erred in denying Defendants' motions for directed verdict and judgment n.o.v., we apply the same standard as that applied by the district court. *Miles v. Tennessee River Pulp and Paper Co., 862 F.2d 1525, 1528 (11th Cir. 1989)*. **[**17]** The standard for granting these motions was set out by the former Fifth Circuit in *Boeing Company v. Shipman, 411 F.2d 365 (5th Cir. 1969)* (en banc):

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence -- not just that evidence which supports the non-mover's case -- but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when **[**18]** there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question.

*Id. at 374-75* (quoted in *Miles, 862 F.2d at 1528*).

I. *SECTION 1983* ILLEGAL ARREST CLAIM

*HN4*[⬆] *Section 1983* provides a federal remedy for the deprivation of rights, privileges, or immunities protected by the Constitution or the laws of the United States. *Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 110 S. Ct. 444, 107 L. Ed. 2d 420 (1989)*. *HN5*[⬆] Under the *Fourth Amendment*, which is applicable to the States through the *Fourteenth Amendment*, persons have the right not to be arrested without probable cause. *Motes v. Myers, 810 F.2d 1055 (11th Cir. 1987)*. Violation of this right may give rise to a claim for damages pursuant to *section 1983 of Title 42, United States Code. Id.*

*HN6*[⬆] A law enforcement officer has probable cause to arrest a suspect if the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the **[**19]** suspect has committed, is

---

[8] The district court found that Plaintiff's theory was supported by Defendants' failure to obtain an arrest warrant, the notification of the media, Defendant Brescher's media statement, and the ultimate dismissal of the charges.

committing, or is about to commit an offense. [9] *United States v. Jimenez, 780 F.2d 975 (11th Cir. 1986)*; *United States v. Mastrangelo, 733 F.2d 793 (11th Cir. 1984)*. **HN7**[⬆] The existence of probable cause to arrest is based on objective standards. *United States v. Hastamorir, 881 F.2d 1551 (11th Cir. 1989)*.

**HN9**[⬆]

Intertwined with the question of probable cause is the issue of qualified immunity. Under this doctrine, "government **[\*579]** officials performing discretionary functions generally are shielded from liability for civil damages insofar **[\*\*20]** as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." [10] *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396, 410 (1982)*. "**HN10**[⬆] The right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987)*. **HN11**[⬆] The standard is an objective one, *Harlow, 457 U.S. at 818, 102 S. Ct. at 2738, 73 L. Ed. 2d at 410*, and therefore does not include an inquiry into the officers' subjective intent or beliefs. *Anderson, 483 U.S. at 639, 107 S. Ct. at 3038, 97 L. Ed. 2d at 530*. In sum, **HN12**[⬆] qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271, 278 (1986)*.

**[\*\*21]** **HN13**[⬆]

In determining whether qualified immunity exists, the

---

[9] "**HN8**[⬆] Probable cause" defines a radically different standard than "beyond a reasonable doubt," and while an arrest must stand on more than suspicion, the arresting officer need not have in hand evidence sufficient to obtain a conviction. *United States v. Pantojo-Soto, 739 F.2d 1520 (11th Cir. 1984)*, cert. denied, *470 U.S. 1008, 105 S. Ct. 1369, 84 L. Ed. 2d 389 (1985)*.

[10] "The doctrine [of qualified immunity] is intended to balance society's interest in providing a remedy for injured victims and discouraging unlawful conduct against the interest in enabling public officials to act independently without fear of consequences." *Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989)*.

issue is "not probable cause in fact but 'arguable' probable cause." *Gorra v. Hanson, 880 F.2d 95, 97 (8th Cir. 1989)* (quoting *Floyd v. Farrell, 765 F.2d 1, 5 (1st Cir. 1985))*. **HN14**[⬆] Actual probable cause is not necessary for an arrest to be objectively reasonable. Indeed, "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . in such cases those officials . . . should not be held personally liable." *Anderson, 483 U.S. at 641, 107 S. Ct. at 3040, 97 L. Ed. 2d at 531*. See *Tillman v. Coley, 886 F.2d 317 (11th Cir. 1989)* (recognizing that an officer who effects an arrest without probable cause may be protected by qualified immunity).

We find that, at the time Defendants arrested Plaintiff, the law was clearly established that an arrest without probable cause to believe a crime had been committed violated the *Fourth Amendment*. See *Herren v. Bowyer, 850 F.2d 1543 (11th Cir. 1988)*. Accordingly, applying the qualified immunity test in the context of Plaintiff's **[\*\*22]** alleged unlawful arrest, we must determine whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff for violation of *section 796.06*. We find that a reasonable officer could have so believed.

The evidence indisputably revealed that Plaintiff knew prostitution was occurring at Man's World. In fact, Plaintiff testified that, at least by 1982, he had no doubt that prostitution was occurring at Man's World. Upon review of the record, we find that, in 1983, a reasonable law officer could have believed that *Section 796.06* applied to a landlord who leases premises which were thereafter used for prostitution, if the landlord had knowledge of such use at any time during the term of the lease. The record reveals that such an interpretation was embraced not only by prosecutors Benjamin and Solomon, it was accepted by the district court below. While the district court avoided a finding of probable cause by construing *Section 796.06* to require the element of *mens rea*, we find that reasonably competent persons could disagree on this interpretation of the statute. [11] In addition, **[\*\*23]** the testimony established

---

[11] In so holding, we emphasize that we do not necessarily agree with the interpretation given *Section 796.06* by the district court and by Assistant State Attorneys Benjamin and Solomon. Such an interpretation raises difficult questions as to scienter, as illustrated by the district court's attempts to

that, prior to the instant case, *Section 796.06* had never been subject to judicial interpretation.

## *HN15*[⬆]

When there is no dispute about the material facts, the court has the duty to decide whether the defendants' conduct violated **[*580]** clearly established law. *Mitchell v. Forsyth, 472 U.S. 511, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)*. Reasonable law enforcement officers, possessing the same knowledge and in the same circumstances as Defendants, could have believed that "arguable" probable cause existed for Plaintiff's arrest. For these reasons, we find that the district court erred in denying Defendants' motions for directed verdict **[**24]** and judgment n.o.v.

## II. *SECTION 1983* "STIGMA PLUS" CLAIM

In his second claim under *section 1983*, Plaintiff asserts that Defendant Brescher, acting under color of state law, made defamatory statements to the media at the scene of Plaintiff's arrest which ultimately led to a deprivation of Plaintiff's property interest in the company's goodwill and reputation without due process of law. In addressing this issue, it is necessary to survey briefly the relevant law explicating the constitutional standards concerning defamation by public officials.

In *Wisconsin v. Constantineau, 400 U.S. 433, 91 S. Ct. 507, 27 L. Ed. 2d 515 (1971)*, the United States Supreme Court considered the constitutionality of a state statute that provided for the posting in liquor stores of a list of persons who tended to become violent after drinking and who were forbidden from purchasing alcohol for one year. The statute did not provide the persons listed with notice or opportunity for a hearing. Pursuant to this statute, a police chief caused to be posted a public notice forbidding sales or gifts of liquor to the plaintiff. Finding that the state had attached a "badge of infamy" to the plaintiff, **[**25]** the Supreme Court concluded that due process protections were required and that the statute was facially unconstitutional. The Court stated that "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *400 U.S. at 437, 91 S. Ct. at 510, 27 L. Ed. 2d at 519*.

The following year, in *Board of Regents v. Roth, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)*, the

grapple with this issue at trial.

Supreme Court again grappled with the issue of determining to what extent defamation by a state official constitutes a constitutional deprivation. *Roth* involved a non-tenured teacher at a state university who was not rehired after his one-year contract expired. No reason was given for the university's decision not to re-hire the teacher. The Supreme Court held that the teacher had no property interest in his job because state law did not guarantee him a right to renew his contract.

In discussing whether the teacher in *Roth* had been deprived of a liberty interest, the Court noted that liberty, as protected by the *Fourteenth Amendment*, included a number of rights, **[**26]** including the right of the individual "to engage in any of the common occupations of life." *408 U.S. at 572, 92 S. Ct. at 2706, 33 L. Ed. 2d at 558* (quoting *Meyer v. Nebraska, 262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042 (1923))*. The Court stated that a liberty interest might exist under certain circumstances in a case "in which a State refused to reemploy a person," but that *Roth* did not present such a case. *408 U.S. at 573, 92 S. Ct. at 2707, 33 L. Ed. 2d at 558*. The Court suggested that its holding might be different "if the nonrenewal of [the teacher's] contract [was based] on a charge, for example, that he had been guilty of dishonesty, or immorality," *id.*, or if the State had otherwise "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *408 U.S. at 573, 92 S. Ct. at 2707, 33 L. Ed. 2d at 559*.

The Court again addressed the issue of governmental defamation in *Paul v. Davis, 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976)*. In *Paul*, a police chief distributed flyers to retail stores with mug shots of persons **[**27]** considered to be "active shoplifters." The flyers contained the name and photograph of the *Paul* plaintiff, who had pled not guilty to a shoplifting charge but had not yet been tried. The plaintiff filed an action in federal court, contending that the flyers defamed him and that, under **[*581]** *Constantineau*, he was entitled to due process. Plaintiff was not discharged from his employment as a newspaper photographer, but Plaintiff alleged that as a result of the flyers, he had received a warning from his employer and that his future employment opportunities would be seriously impaired. The Supreme Court found that the plaintiff had not been deprived of either a liberty or property interest that would trigger due process protections.

Notably, the Supreme Court in *Paul* expressed concern that the *Fourteenth Amendment* not be interpreted so as to make it "a font of tort law to be superimposed" upon a

BRESCHER v. VON STEIN

state whenever a state law official commits a tort. *424 U.S. at 701, 96 S. Ct. at 1160, 47 L. Ed. 2d at 413*. The Supreme Court stated that its prior cases dealing with stigma to reputation resulting from defamation by government officials did "not establish the **[**28]** proposition that reputation alone, apart from some more tangible interests such as employment, is either a 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *424 U.S. at 701, 96 S. Ct. at 1160, 47 L. Ed. 2d at 414*.

In so stating, the Supreme Court noted that it had said in *Constantineau* that due process rights were triggered "where a person's good name, reputation, honor, or integrity is at stake *because of what the government is doing to him*." *424 U.S. at 708, 96 S. Ct. at 1164, 47 L. Ed. 2d at 418* (quoting *Constantineau*) (emphasis supplied in *Paul*). The Court acknowledged that this statement was vague and could be read to significantly broaden its prior decisional law. Rather than interpreting *Constantineau* as a broadening of the law, however, the Court found that the italicized phrase "referred to the fact that governmental action taken in that case deprived the individual of a right previously held under state law -- the right to purchase liquor in common with the rest of the citizenry." *Id.* Similarly, the Court said that, "while *Roth* recognized that governmental **[**29]** action defaming an individual in the course of declining to hire him could entitle the person to notice and an opportunity to be heard as to the defamation, its language is quite inconsistent with any notion that a defamation perpetrated by a government official but unconnected with a refusal to rehire would be actionable under the *Fourteenth Amendment*. . . ." *424 U.S. at 709, 96 S. Ct. at 1164, 47 L. Ed. 2d at 418*. The Court quoted two other passages from *Roth*, twice emphasizing the phrase: "*in declining to rehire/reemploy the respondent*." *424 U.S. at 709, 96 S. Ct. at 1164, 47 L. Ed. 2d at 419*.

After reviewing *Constantineau, Roth*, and other relevant cases, the Supreme Court concluded that its prior decisions established "no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the *Due Process Clause of the Fifth* or *Fourteenth Amendment*." *424 U.S. at 702, 96 S. Ct. at 1161, 47 L. Ed. 2d at 414*. The Court found that in each of the cases, it was the significant alteration or extinguishment of a right or status recognized by state law which supported the invocation **[**30]** of the procedural guarantees contained in the *Due Process Clause of the*

*Fourteenth Amendment*. The Supreme Court reasoned that, since the defendant state official had defamed the *Paul* plaintiff without depriving him of any right or status recognized by state law, the injury did not rise to the level of a constitutional deprivation. [12]

*Paul* has been widely construed as setting forth a "stigma-plus" test: to establish an interest sufficient to implicate Due Process safeguards, a person must be stigmatized in connection with a denial of a right or status previously recognized by state law. The quandary arises in determining precisely what is sufficient to satisfy the "plus" requirement. Other Circuit **[**31]** Courts have interpreted *Paul* to hold that governmental defamation, even if it leads **[*582]** to a significant loss of employment opportunities, is not a deprivation of a liberty or property interest unless it occurs in the course of termination of employment, or in the significant alteration of some other legal right or status. *See, e.g., Neu v. Corcoran, 869 F.2d 662* (2d Cir.) (where defamatory statements by state officials did not occur in the course of the plaintiff's dismissal from a government job or in the termination of any legal right or status enjoyed by the plaintiff under New York law, qualified immunity protected state officials from *§ 1983* action), *cert. denied*, 493 U.S. 816, 110 S. Ct. 66, 107 L. Ed. 2d 33 (1989); *Goulding v. Feinglass, 811 F.2d 1099* (7th Cir.) (defamatory statements by I.R.S. employees did not deprive tax lawyer of liberty or property interest where lawyer was not foreclosed from practicing law, even if such comments made lawyer "less attractive to clients"), *cert. denied*, 482 U.S. 929, 107 S. Ct. 3215, 96 L. Ed. 2d 701 (1987).

We do not think the law of this Circuit has **[**32]** established that defamation occurring other than in the course of dismissal from a job or in the termination or significant alteration of some other legal right or status will suffice to constitute a deprivation sufficient to state a claim under *section 1983*.

Plaintiff cites *Marrero v. City of Hialeah, 625 F.2d 499 (5th Cir. 1980), cert. denied*, 450 U.S. 913, 101 S. Ct. 1353, 67 L. Ed. 2d 337 (1981), [13] as authority for his

---

[12] Subsequent to *Paul*, the United States Supreme Court made clear that an injury to reputation in connection with an official discharge from public employment is cognizable under federal law. *See Owen v. City of Independence, 445 U.S. 622, 100 S. Ct. 1398, 63 L. Ed. 2d 673 (1980)*.

[13] In *Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)* (en banc), this Circuit adopted as precedent all of the

BRESCHER v. VON STEIN

"stigma-plus" claim. In *Marrero*, our predecessor court considered the district court's dismissal of a complaint brought under section 1983 which alleged in part that the plaintiffs had been "deprived of their right to earn a living" when the Hialeah Police Department, in connection with a state prosecutor, announced to the media that a large amount of stolen property had been recovered in a raid on a jewelry store owned by the plaintiffs. The police officers in that case had executed a warrant authorizing a search for stolen items in the store. After their search uncovered none of the items listed on the warrant, police obtained several victims of local robberies to assist in the identification of stolen items. Only **[\*\*33]** one item, a bracelet, was identified as stolen. Nevertheless, the officers seized the entire stock of jewelry on the premises and arrested the plaintiffs for receipt of stolen property under Florida law.

At the time of the arrests, the Hialeah Police Department and a state prosecutor announced to the media that more than $ 75,000 in stolen property had been recovered in the raid and that plaintiffs had been arrested. Subsequently, the state court granted the plaintiffs' motion to suppress all of the seized evidence except the gold bracelet. The items were returned to the plaintiffs and, as of the date the plaintiffs filed their section 1983 complaint, no further action had been taken against them.

On appeal, the plaintiffs argued that the district court had improperly dismissed their complaint **[\*\*34]** for failure to state a cause of action under section 1983. Our predecessor court agreed. In so holding, the former Fifth Circuit Court of Appeals found that *Paul* did not mandate the dismissal of the plaintiffs' claims of injury to their personal and business reputations because, "on at least four independent grounds," the plaintiffs' claims, unlike the claims in *Paul*, involved deprivations of constitutionally protected interests. *Id. at 513.* First, according to the Court, the plaintiffs could recover damages for injury to reputation caused by the illegal search and seizure. Second, to the extent the defamatory statements injured the plaintiffs' business goodwill without due process of law, the complaint stated a claim upon which relief could be granted. Third, to the extent the defamatory statements resulted in injury to the plaintiffs' "personal and/or business reputations and to their goodwill," the "stigma-plus" test was satisfied. *Id. at 516.* Finally, because the injury to the plaintiffs' reputation was "intimately connected with

the unlawful arrest of [the plaintiffs] and the unlawful search and seizure of practically the entire inventory **[\*583]** of their **[\*\*35]** store," the "stigma-plus" test was satisfied. *Id. at 517.*

In a subsequent case, *Bradford v. Bronner, 665 F.2d 680 (5th Cir. Unit B 1982)*, [14] former members of the State of Alabama's capitol police force brought an action challenging their termination. One of the plaintiffs alleged that he had been stigmatized by his discharge and by derogatory comments made by one of the defendants to the press which implied that the plaintiff lacked the necessary qualifications for the position and was lazy. Citing *Paul*, the former Fifth Circuit Court of Appeals affirmed the district court's dismissal of the plaintiff's complaint. The Court distinguished *Marrero* on the basis that *Marrero* involved "a *significant* loss of business goodwill." [15] *Id. at 683* (emphasis supplied).

**[\*\*36]** More recently, in *Little v. City of North Miami, 805 F.2d 962 (11th Cir. 1986)*, this Court had occasion to consider whether a complaint alleging a section 1983 claim for deprivation of a liberty interest without due process was sufficient to withstand dismissal by the district court. The complaint, filed by a University of Florida law professor, alleged that the City Council of North Miami, without affording the professor notice or a hearing, passed a resolution which "embarrassed [the professor] in his personal life" and "[degraded] him in his employment." *Id. at 969.* "Based upon the liberal principles of notice pleading," this Court concluded that the professor had "sufficiently alleged injury to his business reputation" under *Marrero* and *Paul* to withstand dismissal for failure to state a claim. [16] *Id.*

---

[14] In *Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir. 1982)*, the Eleventh Circuit adopted as precedent all decisions of Unit B of the former Fifth Circuit.

[15] The Court also distinguished *Dennis v. S & S Consolidated Rural High School District, 577 F.2d 338* (5th Cir. 1978, on the basis that, in *Dennis*, "the comments directly resulted in the plaintiff's loss of his job." *Bradford, 665 F.2d at 683. See Ray v. Tennessee Valley Authority, 677 F.2d 818 (11th Cir. 1982)* (alleged defamation by TVA officer concerning "firing" of plaintiff which occurred six years after plaintiff's discharge did not give rise to a section 1983 action), *cert. denied, 459 U.S. 1147, 103 S. Ct. 788, 74 L. Ed. 2d 994 (1983)*.

[16] *Marrero* has been cited by this Court in other cases for the proposition that Florida law recognizes business goodwill as an interest protectable under the strictures of section 1983. Like *Little* and *Marrero*, however, those cases reached us upon appeal of the district court's dismissal of the complaint.

---

decisions of the former Fifth Circuit decided prior to October 1, 1981.

BRESCHER v. VON STEIN

**[\*\*37]** Under the authority of *Paul*, we find that Plaintiff has not proved a federal cause of action actionable under *section 1983*. The *Marrero* decision does not compel us to find otherwise. As noted, *Marrero*, like *Little*, was decided at the "notice pleading" stage of proceedings. More importantly, the instant case is distinguishable from *Marrero* on its facts. While the defamatory statement in *Marrero* was made in connection with an illegal seizure, and therefore was clearly actionable under *Paul*, we have decided in this case that the Defendants in the instant case did not act unreasonably in arresting Plaintiff for violation of *Section 796.06*. In addition, the plaintiffs in *Marrero*, who were self-employed, had alleged that they were deprived of their right to earn a living by the state officials' defamatory statement. Such a claim is tantamount to a claim of defamation coupled with deprivation of employment, which precedent establishes is actionable under *section 1983*. Viewed in the light most favorable to Plaintiff, the evidence in the instant case established that Plaintiff suffered a temporary, partial loss of income as a result of Sheriff Brescher's statement. **[\*\*38]** [17] No evidence suggested that the value of Plaintiff's company has been diminished.

As misleading as Defendant Brescher's media statement may have been, in light of *Paul*, we find that Defendant Brescher's statement did not extinguish or significantly alter any right guaranteed to Plaintiff **[\*584]** by the United States Constitution or by Florida law. Accordingly, Plaintiff alleged no state action sufficient to invoke the procedural guarantees contained in the *Due Process Clause of the Fourteenth Amendment*. For these reasons, we conclude that Defendant Brescher was not liable to Plaintiff under *section 1983*. [18] Thus, the district court erred in denying Defendants' motions for directed verdict and judgment n.o.v. on this claim.

---

See *Economic Development Corp. of Dade County, Inc. v. Stierheim, 782 F.2d 952 (11th Cir. 1986)*; *Espanola Way v. Meyerson, 690 F.2d 827 (11th Cir. 1982)*, cert. denied, **460 U.S. 1039, 103 S. Ct. 1431, 75 L. Ed. 2d 791 (1983)**.

[17] Plaintiff testified that in 1981, his salary and bonus totalled $ 76,000; in 1982, $ 72,000; in 1983, $ 42,400; in 1984, $ 79,000, and in 1985, $ 80,150.

[18] We need not consider whether Plaintiff proved a claim for defamation under Florida law. *See* note 20, *infra*.

**[\*\*39]**  III.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff asserts that a finding of probable cause to arrest does not necessarily dispose of Plaintiff's claim for intentional infliction of emotional distress. [19] To establish this tort in Florida,

> the conduct as a matter of law must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency. However, the conduct is privileged and the actor is never liable where he does no more than insist upon his legal rights in a permissible way, even though the actor is well aware that such insistence is sure to cause emotional distress.

*Southland Corp. v. Bartsch, 522 So.2d 1053, 1056* (Fla. 5th DCA), *review dismissed*, 531 So.2d 167 (Fla. 1988) (quoting *§ 46(d), Restatement 2d of Torts* (1965)); *see Metropolitan Life Insurance Co. v. McCarson, 467 So.2d 277 (Fla. 1985)* (emotional distress claim arises when the defendant's conduct is so extreme and indecent as to be intolerable in a civilized community). In *Southland*, the mother of a six-year-old boy who had been caught stealing gum from a convenience store brought an action **[\*\*40]** for malicious prosecution and intentional infliction of emotional distress against the convenience store, which had pressed charges against the boy. The Florida Fifth District Court of Appeal reversed the jury verdict in favor of the plaintiff. The court found that since the undisputed facts showed that probable cause existed as a matter of law, the trial court had erred in submitting the question of malicious prosecution to the jury. The court also held that the trial court erred in submitting the emotional distress claim to the jury, finding that the convenience store was privileged because it had done nothing more than assert its rights in a legally permissible way. According to the court, an actor is never liable "where he does no more than insist upon his legal rights in a permissible way," even though he knew such insistence would cause emotional distress. *522 So.2d at 1056*.

---

[19] The finding of probable cause does dispose of the two remaining state claims, however. Under Florida law, probable cause is an affirmative defense to a claim for false arrest and lack of probable cause is an element that must be established in a malicious prosecution case. *See Weissman v. K-Mart Corp., 396 So.2d 1164 (Fla. 3d DCA 1981)*.

BRESCHER v. VON STEIN

**[\*\*41]**  While police officers may be held liable under Florida tort law "for extreme abuse of their position," *Dependable Life Insurance Co. v. Harris, 510 So.2d 985, 988 n. 7 (Fla. 5th DCA 1987)* (quoting *Restatement 2d of Torts § 46(e)*), we have found that Defendants did not act unreasonably in arresting Plaintiff for the alleged violation of *section 796.06*. Viewing the evidence in the light most favorable to Plaintiff, we conclude that a reasonable jury could not have found that Defendants' conduct was legally impermissible or was otherwise so extreme and indecent as to warrant tort damages under Florida law. [20] Accordingly, the district court erred in denying Defendants' motions for directed verdict and for judgment n.o.v. on the claim of emotional distress.

**[\*\*42]  [\*585]** CONCLUSION

For the reasons expressed, the judgment of the district court in favor of Plaintiff is REVERSED.

---

**End of Document**

---

[20] The parties stipulated at trial that although Defendant Brescher was accountable for his statements to the media under civil rights law, he possessed immunity from a defamation action under Florida law. Pursuant to this stipulation, the jury was instructed that it could not consider the Sheriff's press statement in assessing his liability for intentional infliction of emotional distress.

 Caution
As of: October 18, 2019 5:41 PM Z

# *Delgado v. Laundromax, Inc.*

Court of Appeal of Florida, Third District

June 15, 2011, Opinion Filed

No. 3D10-1492

**Reporter**
65 So. 3d 1087 *; 2011 Fla. App. LEXIS 8958 **; 36 Fla. L. Weekly D 1270

Justa Patricia Delgado, Appellant, vs. Laundromax, Inc., Appellee.

**Subsequent History:** Released for Publication July 1, 2011.

**Prior History: [**1]** An Appeal from the Circuit Court for Miami-Dade County, Pedro J. Echarte, Jr., Judge. Lower Tribunal No. 06-16942.

## Core Terms

floor, summary judgment, trial court, constructive notice, mode of operation, slipped, notice, spill, negligent operation, premises, invitee, reasonable care, breach of duty, no evidence

## Case Summary

### Procedural Posture

Appellant invitee brought a premises liability action against appellee owner of a laundromat. The Circuit Court for Miami-Dade County (Florida) entered summary judgment in favor of the owner. The invitee appealed.

### Overview

On walking through the door of the laundromat, the invitee slipped on a clear liquid which appeared to be water on the floor, and fell. The appellate court found that the invitee failed to produce any evidence that the owner had actual or constructive notice of the water. The only evidence the invitee offered was that the floor was wet and she slipped and fell. Thus, the only permissible inference was that there was water on the floor, and the invitee slipped on it. The evidence showed, to the exclusion of all permissible inferences, that the owner was not negligent. There was no evidence that the owner had actual notice of the liquid before the invitee fell. Thus, the invitee was required to present some evidence the owner had constructive notice of the hazard. Because the mere presence of the water was not enough to establish constructive notice, the record had to contain additional facts in support of liability to create a permissible inference upon which the invitee could have relied. However, no additional facts were presented that supported constructive notice. Finally, the invitee did not advance the negligent mode of operation theory through any specific evidence.

### Outcome

The judgment was affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

Civil Procedure > Appeals > Standards of Review > General Overview

*HN1*[ ] **Standards of Review, De Novo Review**

The standard in reviewing a trial court's summary judgment order is de novo. In evaluating the trial court's order, the appellate court must determine if the record evidence presented to the trial court shows there is no genuine dispute regarding the material facts. *Fla. R. Civ. P. 1.510(c).* The appellate court views the facts in the light most favorable to the non-moving party below.

Delgado v. Laundromax, Inc.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Torts > Negligence > General Overview

## HN2[⬇] Entitlement as Matter of Law, Appropriateness

Although negligence cases are not ordinarily subject to disposal on summary judgment, there is no rule under Florida law exempting negligence cases from disposition by summary judgment.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

## HN3[⬇] Burdens of Proof, Movant Persuasion & Proof

A summary judgment motion triggers evidentiary burdens on both the moving and opposing party. The moving party has the initial burden of demonstrating the nonexistence of any genuine issue of material fact, and once the moving party provides competent evidence to make that showing, the opposing party must come forward with counterevidence sufficient to reveal a genuine issue. The opposing party may meet her burden through facts or justifiable inferences from facts presented to the trial court.

Torts > Negligence > Elements

## HN4[⬇] Negligence, Elements

The elements of negligence are: (1) a duty to the plaintiff, (2) the defendant's breach of that duty, (3) injury to the plaintiff arising from the defendant's breach, and (4) damage caused by the injury to the plaintiff as a result of the defendant's breach of duty.

Evidence > Burdens of Proof > Allocation

Torts > ... > Proof > Evidence > Burdens of Proof

## HN5[⬇] Burdens of Proof, Allocation

The plaintiff in a negligence case bears the burden of proof at trial, and for the plaintiff to prevail, it must be shown that the defendant negligently failed where the law, custom, or innate danger requires diligence.

Torts > ... > Duty On Premises > Invitees > Business Invitees

Torts > ... > Activities & Conditions > Slip & Fall Injuries > General Overview

## HN6[⬇] Invitees, Business Invitees

Under Florida law, a business owner owes two duties to a business invitee: (1) to take ordinary and reasonable care to keep its premises reasonably safe for invitees, and (2) to warn of perils that were known or should have been known to the owner and of which the invitee could not discover.

Evidence > Burdens of Proof > Allocation

Torts > ... > Duty On Premises > Invitees > Business Invitees

Torts > ... > Activities & Conditions > Slip & Fall Injuries > General Overview

## HN7[⬇] Burdens of Proof, Allocation

*Section 768.0710, Fla. Stat.* (2002) shifts the burden to the plaintiff in a premises liability suit to prove that the defendant acted negligently by failing to exercise reasonable care in the maintenance, inspection, repair, warning, or mode of operation of the business premises. Although actual or constructive notice of water on the floor is not a required element of proof under *§ 768.0710(2)(b)*, the statute states that evidence of notice or lack of notice offered by any party may be considered together with all of the evidence when considering whether the plaintiff has met his or her burden of proof.

Evidence > Inferences & Presumptions > Inferences

Delgado v. Laundromax, Inc.

Torts > ... > Duty On
Premises > Invitees > Business Invitees

Torts > ... > Activities & Conditions > Slip & Fall
Injuries > General Overview

Torts > ... > Activities & Conditions > Slip & Fall
Injuries > Elements

### *HN8*[⬇] Inferences & Presumptions, Inferences

Constructive notice may be inferred in a premises
liability suit from either: (1) the amount of time a
substance has been on the floor, or (2) the fact that the
condition occurred with such frequency that the owner
should have known of its existence.

Torts > ... > Duty On
Premises > Invitees > Business Invitees

Torts > Negligence > General Overview

Torts > Premises & Property Liability > General
Premises Liability > General Overview

### *HN9*[⬇] Invitees, Business Invitees

Under former *§ 768.0710(2)(b), Fla. Stat.*, the theory of
negligent mode of operation is available to a plaintiff
seeking to prove negligence.

Torts > ... > Duty On
Premises > Invitees > Business Invitees

Torts > Negligence > General Overview

Torts > Premises & Property Liability > General
Premises Liability > General Overview

### *HN10*[⬇] Invitees, Business Invitees

Constructive or actual notice is irrelevant in a premises
liability action if the evidence establishes a specific
negligent mode of operation such that the premises
owner could reasonably anticipate that dangerous
conditions would arise as a result of its mode of
operation.

Civil Procedure > ... > Summary

Judgment > Opposing Materials > Motions for
Additional Discovery

### *HN11*[⬇] Opposing Materials, Motions for
Additional Discovery

*Fla. R. Civ. P. 1.510(f)* provides that if it appears from
the affidavits of a party opposing a summary judgment
motion that the party cannot for reasons stated present
by affidavit facts essential to justify opposition, the court
may refuse the application for judgment or may order a
continuance to permit discovery to be had.

Civil Procedure > ... > Summary
Judgment > Opposing Materials > General
Overview

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > Nonmovant
Persuasion & Proof

### *HN12*[⬇] Summary Judgment, Opposing Materials

Once a movant on summary judgment meets its burden
of showing the absence of a material dispute of fact,
non-moving party must "prove otherwise" through facts
or inferences.

Torts > ... > Duty On
Premises > Invitees > Business Invitees

Torts > Negligence > General Overview

Torts > Premises & Property Liability > General
Premises Liability > General Overview

### *HN13*[⬇] Invitees, Business Invitees

To be relevant to negligent operation, evidence must be
shown to be both related to the mode of operation of the
business and causally related to the plaintiff's injury.

**Counsel:** Law Offices of Bernardo Roman III and Yinet
Pino, for appellant.

Gaebe Mullen Antonelli & DiMatteo and Michael A.
Mullen, Elaine D. Walter and Anne C. Sullivan, for
appellee.

**Judges:** Before SHEPHERD and ROTHENBERG, JJ.,
and SCHWARTZ, Senior Judge.

Delgado v. Laundromax, Inc.

**Opinion by:** ROTHENBERG

# Opinion

[*1087] ROTHENBERG, J.

This case is an appeal of a final summary judgment in favor of the defendant, Laundromax, Inc. ("Laundromax"). The plaintiff, Justa Patricia Delgado ("Delgado"), sued Laundromax for negligence, and [*1088] in support alleged Laudromax breached its duty to her as its business invitee. Because the trial court correctly determined there was no evidence of a breach of duty, we affirm.

On August 21, 2003, upon walking through the doorway of the defendant's premises, Delgado slipped on a clear liquid, "which appeared to be water that had been left on the floor," fell, and hit her head against the door knob. Delgado was treated at the hospital for her injuries and received follow-up treatment from a local clinic. She contends the injuries are permanent or continuing in nature.

Delgado alleges Laundromax breached its duty to her as [**2] its business invitee by negligently allowing the floor to remain wet. Specifically, Delgado contends Laundromax "negligently maintained the floor" of its facility "by allowing spills and debris to accumulate on the floor for long periods of time, and by failing to regularly inspect the premises for such spills and debris and to clean such spills and debris from the floor."

Laundromax contends that as a matter of law it could not have breached its duty to Delgado because it had neither actual nor constructive notice of the spill that allegedly caused Delgado to fall. Laundromax also asserts that Delgado cannot prove notice because Delgado testified that the water was clear, and as a matter of Florida law, merely having clear water on the floor does not constitute a breach of duty to Delgado.

### Standard of Review

*HN1*[⬆] Our standard in reviewing the trial court's summary judgment order is de novo. *See Bldg. Educ. Corp. v. Ocean Bank, 982 So. 2d 37, 40 (Fla. 3d DCA 2008)*. In evaluating the trial court's order, we must determine if the record evidence presented to the trial court shows there is no genuine dispute regarding the material facts. *Fla. R. Civ. P. 1.510(c)*. We view the

facts in the light [**3] most favorable to Delgado, the non-moving party below. *Harvey Bldg., Inc. v. Haley, 175 So. 2d 780, 782 (Fla. 1965)*.

*HN2*[⬆] Although negligence cases are not ordinarily subject to disposal on summary judgment, there is no rule under Florida law exempting negligence cases from disposition by summary judgment. *See, e.g., Farrey v. Bettendorf, 96 So. 2d 889, 892 (Fla. 1957)* (holding question of negligence is "ordinarily" a question for the jury, but remanding to determine if one portion of the case "could well and properly have been determined on the motion for summary judgment"); *Vermueulun v. Worldwide Holidays, Inc., 922 So. 2d 271, 273 (Fla. 3d DCA 2006)* (affirming summary judgment and finding that "the mere happening of an accident does not give rise to an inference of negligence."); *Williams v. Sears, Roebuck & Co., 866 So. 2d 122, 124 (Fla. 4th DCA 2004)* (affirming summary judgment in favor of the defendant in a negligence case, after noting that "while the burden on a moving party seeking summary judgment is a heavy one, it is not impossible").

*HN3*[⬆] A summary judgment motion triggers evidentiary burdens on both the moving and opposing party. The moving party, Laundromax, "has the initial burden [**4] of demonstrating the nonexistence of any genuine issue of material fact," and once Laudromax provides competent evidence to make that showing, Delgado "must come forward with counterevidence sufficient to reveal a genuine issue." *Valderrama v. Portfolio Recovery Assocs., LLC, 972 So. 2d 239, 239 (Fla. 3d DCA 2007)*; *see also Dempsey v. Law Firm of Cauthen & Odham, P.A., 781 So. 2d 1141, 1143 (Fla 5th DCA 2001)*. The opposing party, Delgado, may meet her burden "through facts or justifiable inferences from facts presented to the trial court." *Carbonell v. Bellsouth Telecomms., Inc., 675 So. 2d 705, 706 [*1089] (Fla. 3d DCA 1996)*; *accord Williams v. Garden City Claims, Inc. of NY, 796 So. 2d 586, 587 (Fla. 3d DCA 2001)*.

### The Substantive Law Governing Delgado's Claim

Since our standard of review is de novo, the survival of Laundromax's summary judgment on appeal turns on whether Laundromax has demonstrated that, based on undisputed evidence, Delgado cannot prevail as a matter of law on her negligence cause of action. *HN4*[⬆] The elements of negligence are: (1) a duty to the plaintiff; (2) the defendant's breach of that duty; (3) injury to the plaintiff arising from the defendant's breach; and (4) damage caused [**5] by the injury to the

Delgado v. Laundromax, Inc.

plaintiff as a result of the defendant's breach of duty. *Westchester Exxon v. Valdes, 524 So. 2d 452, 454 (Fla. 3d DCA 1988).* As **HN5**[↑] the plaintiff, Delgado bears the burden of proof at trial, and for Delgado to prevail, "it must be shown that the owner negligently failed where the law, custom, or innate danger requires diligence." See *Heps v. Burdine's, Inc., 69 So. 2d 340, 341-42 (Fla. 1954).*

**HN6**[↑] Under Florida law, a business owner owes two duties to a business invitee such as Delgado: (1) to take ordinary and reasonable care to keep its premises reasonably safe for invitees; and (2) to warn of perils that were known or should have been known to the owner and of which the invitee could not discover. *Valdes, 524 So. 2d at 455.* It is undisputed that Delgado was a business invitee (customer) of Laundromax, and there is no evidence in the record regarding how long the water was on the floor or to suggest that Laundromax caused or had notice of the spill. Therefore, the trial court granted summary judgment on the issue of breach of duty.

### Burden of Proof

In 2001, the Florida Supreme Court in *Owens v. Publix Supermarkets, Inc., 802 So. 2d 315, 331 (Fla. 2001)*, placed the burden **[**6]** on the premises owner or operator to establish that it exercised reasonable care under the circumstances. However, the Legislature in 2002, enacted **HN7**[↑] *section 768.0710, Florida Statutes* (2002), which shifted the burden to the plaintiff to prove that the defendant "acted negligently by failing to exercise reasonable care in the maintenance, inspection, repair, warning, or mode of operation of the business premises." Although "[a]ctual or constructive notice" of water on the floor "is not a required element of proof" under *section 768.0710(2)(b)*, the statute states that "evidence of notice or lack of notice offered by any party may be considered together with all of the evidence" when considering whether the plaintiff has met his or her burden of proof. *Id.* Thus, under *Owens*, Laundromax was required to affirmatively prove its reasonable care, whereas under *section 768.0710*, Laundromax did not have to provide such proof.[1]

_____

[1] The statute has since been repealed and replaced by *section 768.0755* (2010), which defines how a breach of duty is proven by requiring proof of actual or constructive knowledge by providing that:

**[*1090]** *The Undisputed Material Facts*

Delgado failed to produce any evidence that Laundromax had actual or constructive notice of the water on the floor. **HN8**[↑] Constructive notice may be inferred from either: (1) the amount of time a substance has been on the floor; or (2) the fact that the condition occurred with such frequency that the owner should have known of its existence. *Schaap v. Publix Supermarkets, Inc., 579 So. 2d 831, 834 (Fla. 1st DCA 1991).*

Delgado testified that she "walked like three **[**8]** steps" into Laudromax's facility, and then "slid completely all the way back . . . struck the doorknob . . . [and] fell onto the floor." Although Delgado initially testified that she did not see the substance she slipped on, she stated the substance "looked like water," and, upon further consideration, concluded "it was water . . . because it was . . . transparent-like." Delgado testified she did not: (1) know where the water came from; (2) see water anywhere else other than where she slipped; (3) know how long the water was on the floor before she slipped; or (4) know of anyone at Laundromax who knew the water was on the floor before she walked in. Further, there is no evidence in the record that it was raining or that it had recently rained, or that any of the facility's washers, sinks, or other equipment was located near the door. Thus, the only evidence Delgado offered was that: (1) that the floor was wet; and (2) she slipped and fell. Consequently, the only permissible inference was that there was water on the floor, and Delgado slipped on it.

_____

(1) If a person slips and falls on a transitory foreign substance in a business **[**7]** establishment, the injured person must prove that the business establishment had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it. Constructive knowledge may be proven by circumstantial evidence showing that:

(a) The dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition; or

(b) The condition occurred with regularity and was therefore foreseeable.

(2) This section does not affect any common-law duty of care owed by a person or entity in possession or control of a business premises.

In this case, we are not required to determine the effect of such repeal.

Delgado v. Laundromax, Inc.

We therefore agree with the trial court that the evidence in the record shows, to the exclusion of all permissible inferences, that Laundromax **[\*\*9]** was not negligent. There is no evidence that Laundromax had actual notice of the liquid on the floor before Delgado fell. Therefore, Delgado was required to present some evidence Laundromax had constructive notice of the hazard. Because the mere presence of water on the floor is not enough to establish constructive notice, *see Broz v. Winn-Dixie Stores, Inc., 546 So. 2d 83, 83 (Fla. 3d DCA 1989)*, the record must contain additional facts in support of liability, to create a permissible inference upon which Delgado could rely in defense against Laundromax's motion for summary judgment. *See Winn-Dixie Stores, Inc. v. White, 675 So. 2d 702, 703 (Fla. 4th DCA 1996)*.

There were, however, no additional facts presented that would support constructive notice. In fact, all the facts regarding the spill suggest that it was not on the floor for a long period of time prior to Delgado's slip and fall. *Cf. Cisneros v. Costco Wholesale Corp., 754 So. 2d 819, 820 (Fla. 3d DCA 2000)* (finding decisive, in reversing summary judgment, that plaintiff testified she observed "a few wheel tracks and several footprints had been made" in the pool of the substance in which she slipped); *Newalk v. Fla. Supermarkets, Inc., 610 So. 2d 528, 529 (Fla. 3d DCA 1992)* **[\*\*10]** (finding testimony that spots on the floor "appeared old," was enough evidence to show notice); *Teate v. Winn-Dixie Stores, Inc., 524 So. 2d 1060, 1061 (Fla. 3d DCA 1988)* (finding that where plaintiff slipped and fell on peas in store's frozen food aisle, that water on the floor around the peas could support an inference the peas had been on the floor long enough to thaw).

### Negligent Mode of Operation

We also reject Delgado's argument that the statute allows her claim to survive summary judgment based upon a theory of negligent mode of operation. Although *HN9*[⬆] under *section 768.0710(2)(b)* that theory is available to a plaintiff seeking to prove negligence, Delgado did not advance that **[\*1091]** theory through any specific evidence in this case. *See Owens, 802 So. 2d at 332* (stating that *HN10*[⬆] constructive or actual notice is irrelevant "if the evidence establishes a *specific* negligent mode of operation such that the premises owner could reasonably anticipate that dangerous conditions would arise as a result of its mode of operation") (emphasis added).

This case has been pending since 2006, and Delgado did not direct the trial court to any evidence regarding negligent operation, and did not properly request **[\*\*11]** the trial court postpone ruling on summary judgment to allow for discovery of evidence of a negligent mode of operation. *See HN11*[⬆] ] *Fla. R. Civ. P. 1.510(f)* (providing that "if it appears from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify opposition, the court may refuse the application for judgment or may order a continuance to permit . . . discovery to be had"); *Carbonell, 675 So. 2d at 706*; *see also Leviton v. Philly Steak-Out, Inc., 533 So. 2d 905, 906 (Fla. 3d DCA 1988)*. Because Delgado presented no evidence regarding negligent operation, negligent operation cannot be the basis for reversal, as appellate review is only available for issues that were presented to, and ruled upon, by the trial court. *Mariani v. Schleman, 94 So. 2d 829, 831 (Fla. 1957)*; *Bus. Success Grp., Inc. v. Argus Trade Realty Inv., Inc., 898 So. 2d 970, 972 (Fla. 3d DCA 2005)*.

Moreover, Delgado testified that the facility was "always clean," which forecloses a theory of negligent operation. The only permissible inference from that testimony is that Laundromax reasonably operated its facility with regard to the alleged hazard of **[\*\*12]** dirt, debris, and water that caused Delgado to fall. For her cause of action to survive a motion summary judgment, Delgado must point to evidence, not allegations, but she has not provided any evidence that Laundromax employed a negligent mode of operating its laundromat that led to her alleged injury. *See Carbonell, 675 So. 2d at 706* (noting that *HN12*[⬆] once a movant on summary judgment meets its burden of showing the absence of a material dispute of fact, non-moving party must "prove otherwise" through facts or inferences); *E.H.P. Corp. v. Cousin, 654 So. 2d 976, 977 (Fla. 2d DCA 1995)* (holding that, *HN13*[⬆] to be relevant to negligent operation, evidence must be shown to be both related to the mode of operation of the business and causally related to the plaintiff's injury); *see also Owens, 802 So. 2d at 324* (explaining that negligent operation substitutes for notice in cases where the hazard is the "creation[] of the defendant" through its mode of operating its business).

### Conclusion

Laundromax has shown that under the applicable law it did not have either actual or constructive notice of the spill, and Delgado failed to present any evidence that

Delgado v. Laundromax, Inc.

Landromax employed a negligent mode of operation [**13] that led to her injury. Consequently, there are no facts upon which a jury could conclude that Laundromax acted negligently by failing to exercise reasonable care in the maintenance, inspection, or repair of its business premises. Accordingly, we conclude that the trial court correctly found that Laundromax was entitled to judgment as a matter of law.

Affirmed.

---

**End of Document**

 Caution
As of: October 18, 2019 5:41 PM Z

## *Morton v. Kirkwood*

United States Court of Appeals for the Eleventh Circuit

February 8, 2013, Decided

No. 12-11436

**Reporter**

707 F.3d 1276 *; 2013 U.S. App. LEXIS 2754 **; 23 Fla. L. Weekly Fed. C 1861; 2013 WL 471618

ALEX WAYNE MORTON, an individual, Plaintiff - Appellee, versus JEREMY KIRKWOOD, Defendant - Appellant.

**Prior History: [**1]** Appeal from the United States District Court for the Northern District of Alabama. D.C. Docket No. 5:10-cv-01658-AKK.

**Disposition:** AFFIRMED.

## Core Terms

shot, use deadly force, police officer, qualified immunity, truck, summary judgment, shooting, suspects, version of events, immunity, excessive force, arrest, rights, circumstances, accelerated, shifted, speed, reasonable officer, reasonable jury, state agent, contradicted, alteration, non-movant, parties, utterly, driver, chase, feet

## Case Summary

### Procedural Posture

Plaintiff suspect sued defendant police officer for damages under *42 U.S.C.S. § 1983* and for assault and battery under Alabama law, alleging the officer used excessive force in violation of the *Fourth Amendment* by shooting him in his car. The officer appealed the U.S. District Court for the Northern District of Alabama's denial of his motion for summary judgment on the basis of qualified immunity, including immunity under *Ala. Code § 6-5-338(a)*.

### Overview

The officer argued he shot the suspect after the suspect accelerated his car, threatening the life of a nearby officer. The suspect argued he never accelerated his car, and he was still shot 7 times after putting the car in park, which accepted as true, meant the officer violated a clearly established constitutional right. The officer had no probable cause to believe the suspect committed any crime, let alone a serious one involving an infliction or threatened infliction of serious physical harm. With car in park, there was no reason to believe a shooting was needed to prevent escape. In the suspect's version, the officer shot an unarmed man in a stationary vehicle with no reason to believe anyone's safety was in danger. A reasonable officer would not have shot him under the circumstances. Prior cases had clearly established that the use of deadly force against a non-resisting suspect who posed no danger violated the suspect's *Fourth Amendment* right to be free from excessive force. The argument was over when and how the car moved which the officer's forensic evidence did not answer. Whether the officer violated a police manual depends on whose version was believed, a jury question.

### Outcome

The denial of summary judgment was affirmed.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

*HN1*[🔖] **Entitlement as Matter of Law, Appropriateness**

Morton v. Kirkwood

At the summary judgment stage, a court must view the evidence in the light most favorable to the non-movant.

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

*HN2*[⬇] **Summary Judgment Review, Standards of Review**

An appellate court reviews a district court's denial of summary judgment on qualified immunity grounds de novo.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

*HN3*[⬇] **Entitlement as Matter of Law, Appropriateness**

A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. The court reviews all evidence and factual inferences in the light most favorable to the non-moving party, and resolves all reasonable doubts about the facts in favor of the non-movant. The court reviews the evidence this way on a defense of qualified immunity where the issues appealed concern not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of "clearly established" law. Courts acknowledge that the facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

*HN4*[⬇] **Immunity From Liability, Defenses**

Qualified immunity protects government officials who were sued individually unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances. The purpose of qualified immunity is to allow officials to carry out discretionary duties without the chilling fear of personal liability.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Evidence > Burdens of Proof > Burden Shifting

*HN5*[⬇] **Immunity From Liability, Defenses**

In order to obtain qualified immunity, an official must first establish that he acted within his discretionary authority. Where it is not disputed that official acted within his discretionary capacity, the qualified immunity analysis shifts the burden to the plaintiff, who must show that the official does not merit qualified immunity. Qualified immunity does not apply where the facts show that the official violated the plaintiff's constitutional rights and where the law clearly established those rights at the time of the alleged misconduct.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

*HN6*[⬇] **Immunity From Liability, Defenses**

Apprehension by the use of deadly force is a seizure. Determining whether the force used to effect a particular seizure is "reasonable" under the *Fourth Amendment* requires a careful balancing of the nature and quality of the intrusion on the individual's *Fourth Amendment* interests against the countervailing governmental

Morton v. Kirkwood

interests at stake. In determining the reasonableness of the force applied, courts look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate. In excessive force cases, courts are mindful that officers make split-second decisions in tough and tense situations.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

*HN7*[⬇]  **Immunity From Liability, Defenses**

In deciding whether a police officer used excessive force, a court pays careful attention to the facts and circumstances of the case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. In the deadly force context, a police officer may constitutionally use deadly force when the officer (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible. Although these factors are useful, a court cannot apply them mechanically, and must still slosh its way through the factbound morass of "reasonableness."

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

*HN8*[⬇]  **Immunity From Liability, Defenses**

An official is entitled to qualified immunity unless the plaintiff can show that the law clearly established his rights at the time of the putative misconduct. A court undertakes this analysis in light of the specific context of

the case, not as a broad general proposition. And the right must be clear enough that any reasonable official would understand that what he is doing violates that right.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

*HN9*[⬇]  **Immunity From Liability, Defenses**

A plaintiff can demonstrate that a right was clearly established for purposes of defeating qualified immunity in a few ways. He can, for instance, produce a materially similar case decided by the United States Supreme Court, the circuit's appellate court, or the highest court of the relevant state. A right can be clearly established, however, even in the absence of precedent. A plaintiff can point to a broader, clearly established principle that should control the novel facts in his situation. Finally, a plaintiff may show that an official's conduct was so far beyond the hazy border between excessive and acceptable action that the official had to know he was violating the United States Constitution even without caselaw on point. This test entails determining whether application of the standard would inevitably lead every reasonable official in the defendant's position to conclude the action was unlawful.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

*HN10*[⬇]  **Law Enforcement Officials, Excessive Force**

The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. That being said, the United States Supreme Court has recognized that the use of deadly force is not always unconstitutional. Thus, for example, an officer might

Morton v. Kirkwood

reasonably use deadly force to prevent escape where he has probable cause to believe that the suspect might cause serious physical harm to police officers or bystanders.

> Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

> Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

**HN11**[⬇] **Law Enforcement Officials, Excessive Force**

Where the plaintiff did not use or did not threaten to use his car as a weapon, courts have rejected an officer's use of deadly force.

> Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

> Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

**HN12**[⬇] **Law Enforcement Officials, Excessive Force**

Under Garner, a police officer can use deadly force to prevent the escape of a fleeing non-violent felony suspect only when the suspect poses an immediate threat of serious harm to police officers or others.

> Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

> Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

**HN13**[⬇] **Law Enforcement Officials, Excessive Force**

The use of deadly force against a non-resisting suspect who posed no danger violates a suspect's *Fourth Amendment* right to be free from excessive force.

> Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

> Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

**HN14**[⬇] **Entitlement as Matter of Law, Appropriateness**

When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. When documentary evidence blatantly contradicts a party's account so that no reasonable jury could believe it, a court should not credit that party's version on summary judgment. The United States Court of Appeals for the Eleventh Circuit has discarded a party's account when the account is inherently incredible and could not support reasonable inferences sufficient to create an issue of fact. If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted.

> Torts > ... > Liability > State Tort Claims Acts > Construction & Interpretation

> Torts > ... > Liability > State Tort Claims Acts > Exclusions From Liability

> Torts > ... > Liability > State Tort Claims Acts > Scope of Employment

**HN15**[⬇] **State Tort Claims Acts, Construction & Interpretation**

In Alabama, a state agent is immune from civil liability for acts arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties. *Ala. Code § 6-5-338(a)*. This includes acts arising from the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons. Nonetheless, a police officer loses this immunity when he acts willfully, maliciously, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law.

> Torts > ... > Liability > State Tort Claims Acts > Construction & Interpretation

> Torts > ... > Liability > State Tort Claims

Acts > Scope of Employment

HN16[⬇] State Tort Claims Acts, Construction & Interpretation

A State agent acts beyond authority and is therefore not immune under *Ala. Code § 6-5-338(a)* when he or she fails to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.

**Counsel:** For ALEX WAYNE MORTON, an individual, Plaintiff - Appellee: Harvey Bland Morris, Joseph Douglas Aiello, David J. Hodge, Morris King & Hodge, HUNTSVILLE, AL.

For JEREMY KIRKWOOD, Defendant - Appellant: Gary K. Grace, Jennifer Morton Matthews, Grace Evans & Matthews, HUNTSVILLE, AL.

**Judges:** Before MARCUS and MARTIN, Circuit Judges, and SCRIVEN,[*] District Judge.

**Opinion by:** MARCUS

# Opinion

**[*1279]** MARCUS, Circuit Judge:

In this civil rights case, Officer Jeremy Kirkwood of the City of Guntersville Police Department appeals the district court's denial of his motion for summary judgment on the basis of qualified immunity. Kirkwood shot Alex Wayne Morton late at night on January 7, 2010, while Morton was inside his car. The shots paralyzed Morton. According to Kirkwood, he shot Morton after Morton accelerated his car, threatening the life of a nearby police officer. According to Morton, he never accelerated his car, and Kirkwood nonetheless shot him seven times after he put his car in park. **[**2]** Morton sued Kirkwood for damages under *42 U.S.C. § 1983*, alleging that Kirkwood used excessive force in violation of the *Fourth Amendment*. Morton also sued Kirkwood for assault and battery under Alabama's law.

After thorough review, we conclude that Kirkwood is not entitled to qualified immunity. Viewing the evidence in the light most favorable to Morton, as we must at this stage in the proceedings, we conclude that no

reasonable police officer would have used deadly force against Morton. Also, clearly established law gave Kirkwood fair notice that his actions, as alleged by Morton, violated the *Fourth Amendment*. Similarly, accepting Morton's account of the tragic events that led to his grievous injury, state agent immunity does not apply to the assault and battery claim. We, therefore, affirm the district court's denial of summary judgment.

I.

At their depositions, Kirkwood and Morton offered sharply clashing accounts about the shooting. *HN1*[⬆] At the summary judgment stage, we must view the evidence in the light most favorable to the non-movant. See *Skop v. City of Atlanta, 485 F.3d 1130, 1136 (11th Cir. 2007)*. We therefore set forth the non-movant's account of the shooting.

Late on January **[**3]** 7, 2010, Morton sat in his car in a park. The night was frigid, so Morton let the car's engine run. He left the car's headlights on too. Morton was speaking to his aunt on his cellphone when he saw a truck enter the park. As the truck neared, Morton recognized it as a police vehicle.[1] He concluded his telephone conversation and drove away, slowly, letting the car coast. The car moved at its coasting speed, which Morton estimated at about one mile per hour.

Morton was continuing on his way out of the park at coasting speed when he noticed a police officer chasing him. At no time did Morton see anyone in front of his car. Nor did he see Nugent anywhere on the scene. He then heard the police officer shout. **[**4]** Morton said that he immediately **[*1280]** shifted his car to park and raised his hands. Kirkwood nonetheless shot at the car; seven bullets struck Morton.[2] Immediately after the shooting began, Morton scrambled to escape from the car. The car shifted to reverse and traveled in reverse until it bumped into a tree, where it stopped. Morton

---

[*] Honorable Mary S. Scriven, United States District Judge for the Middle District of Florida, sitting by designation.

[1] Officer Tim Nugent drove the truck. Beside him sat Kirkwood, his partner. According to Nugent and Kirkwood, Morton stood outside in the park, and he dashed for his car when he saw the police. Even though they lacked probable cause to arrest Morton for any crime, Nugent and Kirkwood parked the police truck and chased Morton on foot when they saw him flee. Kirkwood has conceded, however, that at this stage he cannot contest the testimony that Morton sat inside his car the entire time.

[2] Kirkwood disputes this version of events. He testified that Morton was initially on foot, that Morton got into his car and accelerated, even though Nugent was standing in front of Morton's car, and that he shot Morton only to protect Nugent.

does not remember how the car got in reverse, but he assumes that he accidentally shifted the gear while he tried to escape. It is undisputed, however, that the car shifted to reverse and traveled backward at some point and that it continued backward after the shooting.

The Alabama Bureau of Investigation examined the crime scene and found tire tracks, thirty-four feet in length, visible over fallen leaves, shattered glass thirteen feet from the car's resting place, and cartridge casings spread over a "sixteen foot area parallel to the tracks."

Morton sued Kirkwood in the U.S. District Court for the Northern District of Alabama **[**5]** alleging that Kirkwood violated his *Fourth Amendment* rights and also committed assault and battery under state law.[3] Kirkwood moved for summary judgment on qualified immunity grounds. The district court denied Kirkwood's motion, and he now appeals.

II.

*HN2*[⬆] We review a district court's denial of summary judgment on qualified immunity grounds de novo. *Fils v. City of Aventura, 647 F.3d 1272, 1287 (11th Cir. 2011)*. *HN3*[⬆] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. We review all evidence and factual inferences "in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Skop, 485 F.3d at 1136* (quoting *Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004))*. We review the evidence this way because the "issues appealed here concern 'not which facts the parties might be able **[**6]** to prove, but, rather, whether or not certain given facts showed a violation of "clearly established" law.'" *Sheth v. Webster, 145 F.3d 1231, 1236 (11th Cir. 1998)* (per curiam) (quoting *Johnson v. Jones, 515 U.S. 304, 311, 115 S. Ct. 2151, 132 L. Ed. 2d 238 (1995))*. We acknowledge that the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *McCullough v. Antolini, 559 F.3d 1201, 1202 (11th Cir. 2009)* (quoting *Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002))*.

*HN4*[⬆] Qualified immunity protects government officials who were sued individually "unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." *Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002)*. "The purpose of qualified immunity is to allow officials to carry out discretionary duties without the chilling fear of personal liability . . . ." *McCullough, 559 F.3d at 1205*.

*HN5*[⬆] In order to obtain qualified immunity, an official must first establish that he acted **[**7]** within his discretionary authority. **[*1281]** *Skop, 485 F.3d at 1136*. Morton does not dispute that Officer Kirkwood acted within his discretionary capacity when he shot Morton. The qualified immunity analysis thus shifts the burden to Morton, who must show that Kirkwood does not merit qualified immunity. See *id. at 1136-37*. Qualified immunity does not apply where the facts show that the official violated the plaintiff's constitutional rights and where the law clearly established those rights at the time of the alleged misconduct. *Pearson v. Callahan, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*. Accepting Morton's testimony as true, we conclude that Kirkwood violated a clearly established constitutional right.

A.

We have little difficulty concluding on this record that, if we accept Morton's account, as we must, Officer Kirkwood violated Morton's *Fourth Amendment* right to be free from the use of excessive force. *HN6*[⬆] "[A]pprehension by the use of deadly force is a seizure . . . ." *Tennessee v. Garner, 471 U.S. 1, 7, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)*. "Determining whether the force used to effect a particular seizure is 'reasonable' under the *Fourth Amendment* requires a careful balancing of the nature and quality of the intrusion on the individual's **[**8]** *Fourth Amendment* interests against the countervailing governmental interests at stake." *Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)* (internal quotation marks omitted). "In determining the reasonableness of the force applied, we look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough, 559 F.3d at 1206*. In excessive

---

[3] Morton also sued Nugent and the City of Guntersville, but Guntersville and Nugent were dismissed from the lawsuit by stipulation of the parties. The only remaining defendant is Kirkwood.

force cases, we are mindful that officers make split-second decisions in tough and tense situations. See *Jean-Baptiste v. Gutierrez, 627 F.3d 816, 820 (11th Cir. 2010)*.

*HN7*[ ] In deciding whether a police officer used excessive force, we pay "careful attention to the facts and circumstances" of the case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham, 490 U.S. at 396* (citing *Garner, 471 U.S. at 8-9*). In the deadly force context, we have observed that a police officer may constitutionally use deadly **[**9]** force when the officer

> (1) "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" or "that he has committed a crime involving the infliction or threatened infliction of serious physical harm"; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible.

*McCullough, 559 F.3d at 1206* (quoting *Vaughan v. Cox, 343 F.3d 1323, 1329-30 (11th Cir. 2003))*. Although these factors are useful, we cannot apply them mechanically, see *Penley v. Eslinger, 605 F.3d 843, 849-50 (11th Cir. 2010)*, and "we must still slosh our way through the factbound morass of 'reasonableness,'" *Scott v. Harris, 550 U.S. 372, 383, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)*. Here, we easily conclude that Kirkwood violated Morton's constitutional rights.

To begin with, Kirkwood had no probable cause to believe Morton committed any crime, let alone a serious crime involving the infliction or threatened infliction **[*1282]** of serious physical harm. See *Garner, 471 U.S. at 11*. Nor did he have reason to believe that Morton was a threat to anyone. Next, Morton testified that he shifted his car to **[**10]** park and raised his hands when he heard Officer Kirkwood shout at him, so, if that account is credited, Kirkwood could not have reasonably believed that he had to shoot Morton to prevent his escape. In response, Kirkwood used deadly force, which placed Morton's "fundamental interest in his own life" in jeopardy. *Id. at 9*.

To be sure, Officer Kirkwood testified that Morton accelerated the car while Officer Nugent was standing in front of the car and that he shot Morton to protect Nugent from being struck by the moving vehicle. But Kirkwood's testimony is flatly contradicted by Morton's. According to Morton, he saw no one in front of his car, he never accelerated his car -- allowing it, instead, to coast at about one mile per hour -- and, notably, he shifted his car to park before Kirkwood shot him. In Morton's version of events, Kirkwood shot an unarmed man in a stationary vehicle while having no reason to believe that the man would place anyone's safety in danger. A reasonable officer would not have shot Morton under these circumstances, and therefore Kirkwood's use of deadly force violated Morton's *Fourth Amendment* right to be free from excessive force.

B.

*HN8*[ ] Kirkwood would nonetheless **[**11]** be entitled to qualified immunity unless Morton can show that the law clearly established his rights at the time of the putative misconduct. See *Pearson, 555 U.S. at 232*. We undertake this analysis "in light of the specific context of the case, not as a broad general proposition." *Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir. 2012)* (quoting *Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011))*. And the right must be clear enough that any reasonable officer "would understand that what he is doing violates that right." *Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)* (quoting *Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987))*.

*HN9*[ ] A plaintiff can demonstrate that a right was clearly established in a few ways. He can, for instance, produce a materially similar case decided by the Supreme Court, this Court, or the highest court of the relevant state. *Hoyt, 672 F.3d at 977*. A right can be clearly established, however, even in the absence of precedent. A plaintiff can point to a "broader, clearly established principle [that] should control the novel facts in [his] situation." *Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005)*. Finally, a plaintiff may show that an "official's conduct 'was **[**12]** so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point.'" *Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000)* (alteration in original) (quoting *Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)* (per curiam)). "This test entails determining whether 'application of the [excessive force] standard would inevitably lead every reasonable officer in [the Defendants'] position to conclude the force was unlawful.'" *Id. at 926-27* (alterations in original)

Morton v. Kirkwood

(quoting *Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993))*.

Morton's *Fourth Amendment* right to be free from the use of deadly force was clearly established well before January 7, 2010, the night he was shot. In Tennessee v. Garner, a case decided in 1985, a police officer shot a burglar to impede his escape. *471 U.S. at 3-4*. The burglar died, and the Supreme Court held that the police officer **[*1283]** violated the burglar's right to be free from unreasonable seizures:

> *HN10*[⬆] The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is **[**13]** not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. . . . A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.

*Id. at 11*. That being said, the Supreme Court recognized that the use of deadly force is not always unconstitutional. Thus, for example, an officer might reasonably use deadly force to prevent escape where he has probable cause to believe that the suspect might cause serious physical harm to police officers or bystanders. Id.

We have applied Garner to car chases and have "consistently upheld an officer's use of force and granted qualified immunity" where the plaintiff "used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." *McCullough, 559 F.3d at 1207*. But *HN11*[⬆] where the plaintiff did not use or did not threaten to use his car as a weapon, we have rejected an officer's use of deadly force. Thus, for example, in Vaughan v. Cox, a 2003 case, the police gave chase to a truck they **[**14]** suspected was stolen. *343 F.3d at 1326*. The truck sped along the highway at the speed limit. Id. Despite the police presence, the truck driver would not stop. Id. According to the plaintiff -- a passenger in the truck -- the driver did not swerve from lane to lane and did not place anyone's safety at risk. *Id. at 1327* & n.2. The truck accelerated to fifteen miles beyond the speed limit. A police officer eventually shot the truck three times. Id. One bullet struck the plaintiff, paralyzing him. *Id. at 1327*. The plaintiff sued the police officer who shot him. We concluded that "a reasonable jury could find, under [the plaintiff's] version of the facts, that the . . . use of deadly force to apprehend [the

plaintiff] was unconstitutional," because "[g]enuine issues of material fact remain[ed] as to whether [the truck's] flight presented an immediate threat of serious harm . . . at the time [the officer] fired the shot." *Id. at 1330*.

And we held that the plaintiff's constitutional right was clearly established at the time of the incident. *HN12*[⬆] "Under Garner, a police officer can use deadly force to prevent the escape of a fleeing non-violent felony suspect only when the suspect poses an immediate **[**15]** threat of serious harm to police officers or others." *Id. at 1332*. Like Garner, then, Vaughan gave fair warning that *HN13*[⬆] the use of deadly force against a non-resisting suspect who posed no danger violates a suspect's *Fourth Amendment* right to be free from excessive force. While the facts of neither Vaughan nor Garner exactly match the facts here, Morton presented less of a safety and flight risk than the driver in Vaughan or the suspect in Garner. The truck in Vaughan was speeding on a highway; Morton's car was parked. In Vaughan, the driver refused to stop when the police ordered him to do so; Morton immediately raised his hands when he heard Officer Kirkwood shout. In Vaughan, the driver was suspected of car theft; Morton was suspected of no crime. And in Garner a criminal suspect sought to flee, whereas Morton did not flee and was not suspected of a crime. "[I]n the light of pre-existing law," here *Garner* and *Vaughan*, "the unlawfulness" of Kirkwood's alleged actions was "apparent," and so qualified immunity does not apply. *Terrell v. Smith, 668 F.3d 1244, 1256 (11th [*1284] Cir. 2012)* (quoting *Anderson, 483 U.S. at 640*).

III.

In fact, Kirkwood does not contest that, if we accept Morton's version **[**16]** of events, qualified immunity does not apply. Instead, Kirkwood attacks Morton's version of events, arguing that objective evidence renders Morton's testimony utterly incredible because it proves that Morton's car moved. Under Scott v. Harris, Kirkwood argues, we can reject Morton's testimony wholesale, even at the summary judgment stage. *550 U.S. at 380*. In so arguing, Kirkwood offers four pieces of forensic evidence that, he contends, utterly discredit Morton's version of events: first, shattered glass lay thirteen feet from the car's resting place; second, cartridge casings were spread over sixteen feet; third, tire tracks showed that the car traveled thirty-four feet; and, finally, one expert testified that Morton did not raise his arms before he got shot. We find Kirkwood's

Morton v. Kirkwood

argument unpersuasive.

In Scott, a video recorded a high speed chase between a police officer and a § 1983 plaintiff. Id. at 374-75. The video contradicted the plaintiff's version of events. The Supreme Court wrote that, because the plaintiff's version was "so utterly discredited by the record," it would view the "facts in the light depicted by the videotape." Id. at 380-81. The Court explained that HN14[↑] "[w]hen [**17] opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id. at 380. In Scott, the Supreme Court did not tinker with the summary judgment standard, for it merely held "that when documentary evidence 'blatantly contradict[s]' a plaintiff's account 'so that no reasonable jury could believe it,' a court should not credit the plaintiff's version on summary judgment." Witt v. W. Va. State Police, 633 F.3d 272, 276-77 (4th Cir. 2011) (alteration in original) (quoting Scott, 550 U.S. at 380). At times, we too have discarded a party's account when the account "is inherently incredible and could not support reasonable inferences sufficient to create an issue of fact." Riley v. City of Montgomery, 104 F.3d 1247, 1251 (11th Cir. 1997). "If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." Beal v. Paramount Pictures Corp., 20 F.3d 454, 459 (11th Cir. 1994). Thus, where an accurate video recording [**18] completely and clearly contradicts a party's testimony, that testimony becomes incredible. Unfortunately for Kirkwood, he does not offer a video recording of the incident. He offers, rather, forensic evidence that does not so utterly discredit Morton's testimony that no reasonable jury could believe it.

Kirkwood's argument falters because Morton's testimony may reasonably be harmonized with the circumstantial evidence that the car was moving. After all, Morton testified that he moved his car forward when he saw a truck enter the park, and no one disputes that Morton's car went backwards after the shooting. Morton and Kirkwood are not clashing over whether the car moved, but rather arguing over when and how the car moved. And the evidence to which Kirkwood points is silent on the "when" and "how" questions. Regardless, Morton's experts dispute the relevance of this evidence. One expert opined, for instance, that one cannot draw any inference from the cartridge casings: "[E]ven whatever way that they do eject, once it hits the surface,

it may bounce in any direction. So to try to [*1285] reconstruct where a person was standing by the location of the hulls is just once again speculation." Another [**19] expert opined that the shattered glass undermined Kirkwood's, not Morton's, version of events. We are, therefore, obliged to accept Morton's account at this stage of the proceeding. The record plainly yields sharply dueling accounts of what happened and why the critical shots were fired. It does not utterly discredit Morton's account.

IV.

Finally, as for the state law claims, Morton alleged that Kirkwood committed assault and battery when he fired upon the car. HN15[↑] In Alabama, a state agent is immune from civil liability for acts "arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." Ala. Code § 6-5-338(a). This includes acts arising from the "enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons." Ex parte Butts, 775 So. 2d 173, 178 (Ala. 2000). Nonetheless, a police officer loses this immunity when he "acts willfully, maliciously, fraudulently, in bad faith, beyond his . . . authority, or under a mistaken interpretation of the law." Id.

The parties agree that Morton's claim "arise[s] from a function that would [**20] entitle" Kirkwood "to immunity." Ex parte Estate of Reynolds, 946 So. 2d 450, 452 (Ala. 2006). As a result, to survive summary judgment, Morton had to show that Kirkwood "acted willfully, maliciously, fraudulently, in bad faith, or beyond his . . . authority." Id. HN16[↑] "A State agent acts beyond authority and is therefore not immune when he or she 'fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.'" Giambrone v. Douglas, 874 So. 2d 1046, 1052 (Ala. 2003) (alteration in original) (quoting Butts, 775 So. 2d at 178); see also Ex parte City of Tuskegee, 932 So. 2d 895, 906 n.6 (Ala. 2005) ("[I]f an officer is engaged in an arrest but he or she fails to discharge the arrest pursuant to detailed rules or regulations, such as those stated on a checklist, then the officer is not entitled to immunity." (alteration and internal quotation marks omitted)).

Morton asserts that Kirkwood violated the Guntersville Police Department Policy Manual ("Policy Manual"), which all parties agree applied to Kirkwood. Sections of the Policy Manual bar officers from shooting at suspects, even if they are escaping. For instance, the

Policy Manual bars officers **[**21]** from shooting their guns "in an attempt to disable moving vehicles, unless subjects from the vehicle are firing at the officer." Citing to another section of the Policy Manual, which allows police officers to shoot at suspects if the suspects are "about to kill or seriously injure the officer [or] about to kill or seriously injure another person," Kirkwood contends that he deserves state agent immunity. But, just as with his qualified immunity argument, Kirkwood asks us to wholly disregard Morton's testimony in favor of his own. As we have already explained, we cannot disregard that testimony at the summary judgment stage. Whether Kirkwood violated the Policy Manual depends on whether one believes Kirkwood or Morton. Plainly, this too is an issue for a jury to decide.

In short, if Morton's version of events is accurate, a reasonable officer on the scene with knowledge of the attendant facts would not have shot Morton, hitting him with seven bullets, while he sat stationary in his car with his hands up. This alleged conduct violated Morton's *Fourth Amendment* rights. And clearly established law gave Kirkwood fair warning that the use of deadly force under these circumstances **[*1286]** would be **[**22]** unconstitutional. Likewise, under Morton's account, Kirkwood violated the Policy Manual, which would strip Kirkwood of state agent immunity. We, therefore, affirm the district court's denial of Kirkwood's motion for summary judgment.

AFFIRMED.

---

**End of Document**

 Positive

As of: October 18, 2019 5:41 PM Z

## *Belden v. Lynch*

District Court of Appeal of Florida, Second District.

Jan. 25, 1961; Rehearing Denied Feb. 20, 1961.

No. 1357.

**Reporter**

126 So. 2d 578 *; 1961 Fla. App. LEXIS 2896 **

Frank BELDEN, Appellant, v. Daniel A. LYNCH and Sealtest Southern Dairies, Division National Dairy Products Corp., a corporation, Appellees.

## Core Terms

truck, driver, circumstances, traffic, street, reasonable inference, approaching, parked, skid

## Case Summary

### Procedural Posture

Plaintiff victim sought review of an order of a Florida trial court that directed a verdict for defendants, a driver and his employer, in plaintiff's automobile negligence action. The trial court based its decision on the inference upon inference rule.

### Overview

Plaintiff victim filed an action against defendants, a driver and his employer, after defendants' car collided with plaintiff's stopped car. The trial court directed a verdict for defendants at the close of plaintiff's case believing that the inference upon inference rule applied. On plaintiff's appeal, the court reversed and remanded, holding that a directed verdict was improper because there was evidence upon which a verdict for plaintiff could be sustained. The court found that the evidence showed that plaintiff was pulling out of a parking space and was stopped partially in the lane of traffic, that a truck in front of defendants' car safely passed plaintiff, and that defendants' car made skid marks the length of 100 feet. Based on this evidence, the court concluded that a jury could infer negligence. The court determined that the inference upon inference rule did not apply because the basic inference that defendants' car was behind the truck was established to the exclusion of all other reasonable inferences. The court ruled that

plaintiff produced sufficient evidence to permit the case to go to the jury for a determination of the reasonable inferences arising from the facts.

### Outcome

The court reversed and remanded the trial court's order that directed a verdict for defendants, a driver and his employer, in plaintiff victim's automobile negligence case. The court held that the inference upon inference rule was inapplicable and that plaintiff produced sufficient evidence for the case to be submitted to the jury.

## LexisNexis® Headnotes

Torts > ... > Elements > Duty > General Overview

### *HN1* Elements, Duty

It is the duty of the driver of a motor vehicle to operate his vehicle in such manner that he can stop it at any time within the range of his vision.

Torts > ... > Elements > Duty > General Overview

### *HN2* Elements, Duty

The operator of a vehicle approaching and passing parked cars and motor vehicles moving into the line of traffic from parking spaces at the side of the road is under a general duty of maintaining a reasonable lookout ahead and of keeping his car under reasonable control so as to be able to avoid collision with such other vehicles which are parked or which may move into the

highway in the exercise of reasonable care.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

Criminal Law & Procedure > Juries & Jurors > Jury Questions to the Court > Duty of Court to Answer Questions

*HN3*[ ] **Trials, Judgment as Matter of Law**

The power to direct a verdict is sparingly and cautiously exercised. If any reasonable theory of the evidence, including inferences that are drawn therefrom, justifies a verdict for the plaintiff, then it is the duty of the court to submit the question to the jury.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

*HN4*[ ] **Trials, Judgment as Matter of Law**

In a negligence case, the court never directs a verdict for one party unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law.

Evidence > Inferences & Presumptions > General Overview

Torts > ... > Proof > Evidence > Circumstantial & Direct Evidence

Torts > Negligence > Proof > General Overview

Torts > ... > Proof > Evidence > General Overview

Torts > ... > Proof > Evidence > Inferences & Presumptions

*HN5*[ ] **Evidence, Inferences & Presumptions**

Negligence may be inferred from circumstances properly brought into evidence, and circumstantial evidence alone may authorize the finding of negligence.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Torts > Negligence > General Overview

*HN6*[ ] **Jury Trials, Province of Court & Jury**

When the question of negligence depends upon a disputed state of facts, or when the facts, though not disputed, are such that different minds may reasonably draw different conclusions from them, the question is for the jury.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

*HN7*[ ] **Jury Trials, Province of Court & Jury**

Where on the evidence adduced there is room for a difference of opinion between reasonable men as to the existence of facts from which an ultimate fact is sought to be established, or where there is room for such differences as to the inferences which might be drawn from conceded facts, the court submits the case to the jury for their finding, as it is their conclusion, in such cases, that prevails, and not primarily the views of the judge.

Evidence > Inferences & Presumptions > General Overview

Torts > ... > Proof > Evidence > Inferences & Presumptions

Torts > Negligence > General Overview

*HN8*[ ] **Evidence, Inferences & Presumptions**

Negligence may not be inferred from the mere happening of an accident alone.

Evidence > Inferences & Presumptions > General Overview

*HN9*[ ] **Evidence, Inferences & Presumptions**

The inference upon inference rule is not applicable in all cases and does not apply where the prior or basic inference is established to the exclusion of any other reasonable theory.

**Counsel:** **[**1]** Potter, Langbein & Burdick, West Palm

Belden v. Lynch

Beach, for appellant.

Earnest, Pruitt, Newell & Schulle, and Jones, Adams, Paine & Foster, West Palm Beach, for appellees.

Opinion by: ODOM

# Opinion

[*579]  ODOM, ARCHIE M., Associate Judge.

The appeal is from a final judgment entered pursuant to a directed verdict for the defendants suffered by the plaintiff in the court below in an automobile negligence case.

The accident occurred in daylight at about 9:00 A.M. The plaintiff had backed his car partially out of a diagonal parking space into the eastbound traffic lane of a street which was 54 feet wide.  Other cars were parked to the right or west side of the plaintiff's car but none for some distance to the left or east side.  The car parked immediately to the right of plaintiff's car was long and quite close to his car.  The plaintiff had backed about three feet from the curb when he saw a truck coming in the eastbound lane of traffic; he stopped before the truck got there and waited for it to pass, which it did safely.  Then, before the plaintiff moved his car and while he had shifted gears preparatory to moving forward, the protruding left rear end of it was struck by defendant's automobile.  [**2]  The defendant's automobile proceeded on down the street toward the east after the impact, laying down skid marks until it came to rest about 100 feet away.  There is testimony indicating that the skid marks began a little before the impact and continued from there to where defendant's automobile stopped.  None of the plaintiff's witnesses saw the defendant's automobile prior to the collision, but the foregoing factual situation was substantially established by plaintiff's witnesses without contradiction insofar as the case proceeded.

The lower court directed a verdict for the defendant at the close of plaintiff's case for the reason that he felt that there would have to be an inference upon an inference, saying, "* * * first there would have to be an inference of certain actions by the defendant driver and the further inference that such actions were negligent and proximately caused the accident."

Initially, it may be stated that we have a general rule of law in this state that _HN1_[⬆] it is the duty of the driver of a motor vehicle to operate his vehicle in such manner that he can stop it at any time within the  [*580]  range of his vision.  See authorities cited under 3 Fla.Jur.,  [**3]  Automobiles, Etc., section 139, p. 620.  _HN2_[⬆] The operator of a vehicle approaching and passing parked cars and motor vehicles moving into the line of traffic from parking spaces at the side of the road is under a general duty of maintaining a reasonable lookout ahead and of keeping his car under reasonable control so as to be able to avoid collision with such other vehicles which are parked or which may move into the highway in the exercise of reasonable care.  See Annotation, _29 A.L.R.2d 107_, particularly § 12, p. 145.  A driver approaching a vehicle parked in a street is under a duty to exercise reasonable care not to collide with it, and ordinary care requires him to observe plainly visible parked automobiles in time to avoid collision. See 2A Blashfield, Cyclopedia of Automobile Law and Practice, sections 1221 and 1222, pp. 88 through 100.  See also 5A Am.Jur., Automobiles and Highway Traffic, section 716, p. 689.  These authorities are cited only for the purpose of showing general duties devolving upon motorists who approach and pass parked vehicles, and these general duties would have been applicable to any motorist approaching the plaintiff's car while it was parked and waiting [**4]  for such vehicles to pass._HN3_[⬆]]

The power to direct a verdict should be sparingly and cautiously exercised; and if any reasonable theory of the evidence, including inferences drawn therefrom, would justify a verdict for the plaintiff, then it is the duty of the court to submit the question to the jury.  _Good v. Ozer, Fla.App.1958, 100 So.2d 204, 205._  _HN4_[⬆] In a negligence case, the court should never direct a verdict for one party unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law.  _Gravette v. Turner, 1919, 77 Fla. 311, 81 So. 476._

_HN5_[⬆]  Negligence may be inferred from circumstances properly brought into evidence, and circumstantial evidence alone may authorize the finding of negligence.  _Cobb v. Twitchell, 1926, 91 Fla. 539, 108 So. 186, 188, 45 A.L.R. 865._  In that case the Supreme Court said:

"_HN6_[⬆] When the question of negligence depends upon a disputed state of facts, _or when the facts, though not disputed, are such that different minds may reasonably draw different conclusions from them, the question is for the jury._" (Emphasis supplied.)

As to different inferences which might be drawn by the

Belden v. Lynch

trier [**5] of fact, the Supreme Court said in *Haile v. Mason Hotel & Investment Co., 1916, 71 Fla. 469, 71 So. 540, 542*:

"*HN7* Where on the evidence adduced there is room for a difference of opinion between reasonable men as to the existence of facts from which an ultimate fact is sought to be established, or where there is room for such differences as to the inferences which might be drawn from conceded facts, the court should submit the case to the jury for their finding, as it is their conclusion, in such cases, that should prevail, and not primarily the views of the judge."

The principle was reiterated in *Atlantic Coast Line R. Co. v. Webb, 1933, 112 Fla. 449, 150 So. 741, 747*, as follows:

"If the testimony is conflicting, *or will admit of different reasonable inferences,* or if there is evidence tending to prove the issue, the case should be submitted to the jury for their finding on the facts."

Thus it may be concluded that where reasonable minds may differ as to reasonable inferences to be drawn from a given factual situation, then a problem is presented for jury determination.

In analyzing the present factual situation it is seen that the cause involved a rear end collision when [**6] the car that was struck should have been plainly visible to [*581] the driver of the car that struck it, since it was daylight and there was no showing of any obstruction to vision. The plaintiff's car was stopped partially in the lane of traffic and was not moving, and a truck preceding the defendant's car safely passed the plaintiff without colliding. The fact that defendant's car was proceeding eastward in the street somewhere behind the truck is shown by the fact that the impact occurred after the truck had passed, by the skid marks, and by the direction in which defendant's car skidded to rest after the impact, as well as by the traffic lane in which the accident occurred. The fact that the skidmarks started a short distance before the point of impact was reached indicates that the defendant driver applied the brakes at that time, and the 100 foot length of the skid marks constitutes some evidence indicating that the vehicle was not traveling at an ordinary rate of speed under the circumstances. Since the plaintiff saw the oncoming truck and waited for it to pass, and since defendant's car followed the truck, defendant could not possibly have been as close as the truck; [**7] and the interval of time in which the truck was passing was available to the defendant for evasive maneuvering

even if he was following immediately behind the truck. The street was wide and the uncontroverted facts are that defendant's moving car struck the plaintiff's stopped car in the rear after the truck had safely passed it by. These factual circumstances could reasonably give rise to an inference of negligence on the part of defendant driver in the operation of his vehicle. Some argument has been made that the defendant's car might have been so close to the truck that it obscured his view; but although there is no evidence indicating such to be the fact, such circumstance would be of little help to the defendant since it would seem to indicate negligence of another sort in following too closely for safety.

It is true that *HN8* negligence may not be inferred from the mere happening of an accident alone. However, this is not the case; here we have the happening of an accident coupled with surrounding circumstances from which a jury might infer negligence. This is not to say that an inference of negligence is the only reasonable inference that could be made by a jury, but such [**8] inference reasonably could be made.

The inference upon inference rule does not apply so as to preclude recovery under the facts presented. *HN9* ] This rule is not applicable in all cases and does not apply where the prior or basic inference is established to the exclusion of any other reasonable theory. See *Voelker v. Combined Ins. Co. of America, Fla.1954, 73 So.2d 403*; and *Commercial Credit Corporation v. Varn, Fla.App.1959, 108 So.2d 638*. The trial judge thought that it would first be necessary to infer certain actions by the defendant driver and then make the further inference that such actions were negligent. However, the evidence indicates that defendant necessarily was operating his car in the eastbound lane of traffic behind the truck and was approaching the point of the accident. The position of defendant's car, although not established exactly, since it was following the truck must have been more than a truck length away from the plaintiff's car when the plaintiff partially backed into the street. If it is an inference that defendant was operating his car behind the truck and approaching plaintiff's parked vehicle, then this was established to the exclusion of all other [**9] reasonable inferences. Reference has previously been made to the general duties owed by drivers approaching parked vehicles. From somewhere in the street behind the truck, the defendant proceeded to run into the plaintiff's parked car from the rear under circumstances strongly indicating negligence. The negligence is not shown by piling inference upon inference in succession, but rather is indicated, and might be found by a jury, from what may

Belden v. Lynch

be described as parallel inferences arising under the circumstances.

A directed verdict for the defendant in this case could be affirmed only if there was **[*582]** no evidence on which a verdict for the plaintiff could be sustained.  It appears that the plaintiff produced enough evidence to permit the cause to go to the jury for determination of reasonable inferences arising from the factual circumstances established by the evidence.

Reversed and remanded for new trial.

KANNER, Acting C.J., concurs.

SHANNON, J., dissents.

---

**End of Document**

 Caution
As of: October 18, 2019 5:41 PM Z

## *Winn-Dixie Stores, Inc. v. Marcotte*

Court of Appeal of Florida, Fifth District

November 2, 1989, Filed

Case No. 89-170

**Reporter**

553 So. 2d 213 *; 1989 Fla. App. LEXIS 6099 **; 14 Fla. L. Weekly 2543

WINN-DIXIE STORES, INC., Appellant, v. RAMONA F. MARCOTTE, Appellee

**Prior History: [**1]**  Appeal from the Circuit Court for Brevard County, Lawrence V. Johnston, III, Judge.

## Core Terms

possessor, premises, dangerous condition, supermarket, invitees, length of time, legal duty, inspections, use reasonable care, actual knowledge, customer

## Case Summary

**Procedural Posture**
Appellant supermarket sought review of a judgment of the Circuit Court for Brevard County (Florida), which entered a judgment from a jury verdict in favor of appellee customer in a negligence action for premises liability.

**Overview**
Appellee customer was injured when she slipped and fell on a slippery substance on the floor of appellant supermarket. Appellee brought a tort action and received a jury verdict in her favor. The appellate court reversed and held that appellant was not an insurer of the safety of customers, nor was appellant strictly liable for injuries to invitees. Appellant had a duty to ascertain that the premises were reasonably safe, and a duty to protect invitees from dangerous conditions in which appellant had knowledge. The court found that appellee failed to produce evidence that appellant was aware of the slippery substance on the floor. The court ruled that appellant had a duty to use reasonable care to timely discover the existence of dangerous conditions and that appellee failed to produce evidence of the length of time the substance was on the floor.

**Outcome**
The court reversed the judgment in favor of appellee customer. The court found that appellant supermarket was not liable for the injuries resulting from appellee's fall caused by a slippery substance on the floor because appellee failed to prove that appellant knew of the substance or that appellant failed to exercise reasonable care.

## LexisNexis® Headnotes

Torts > ... > General Premises Liability > Dangerous Conditions > General Overview

Torts > Premises & Property Liability > General Premises Liability > General Overview

*HN1*[ ]  **General Premises Liability, Dangerous Conditions**

An entity in the actual possession and control of a premises, to which members of the public are invited, is not an insurer of the safety of such persons, nor is the possessor strictly liable, or liable per se without fault, for injuries resulting to invitees from dangerous conditions on the premises.

Torts > ... > Duty On Premises > Invitees > General Overview

Torts > ... > Elements > Duty > General Overview

Winn-Dixie Stores, Inc. v. Marcotte

Torts > ... > General Premises Liability > Dangerous Conditions > General Overview

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

Torts > ... > General Premises Liability > Duties of Care > General Overview

### HN2[⬇] Duty On Premises, Invitees

A possessor of a premises basically has two legal duties to protect invitees from the harmful effects of dangerous premises conditions. First, such a premises possessor has a legal duty to ascertain that the premises are reasonably safe for invitees. This duty equates into a legal duty to use reasonable care to learn of, i.e., to acquire actual knowledge as to, the existence of any dangerous conditions on the premises. Secondly, the premises possessor has a second, entirely different, legal duty to use reasonable care to protect invitees from dangerous conditions of which the possessor has actual knowledge. This second duty is usually breached when the possessor fails to take reasonable care (a) to eliminate the known danger, (b) to protect invitees from the known danger by excluding them from the area of danger, or by providing protective devices, (c) to provide warnings as to the danger, or (d) to take some combination of these protective actions.

Torts > ... > Duty > Affirmative Duty to Act > Creators of Foreseeable Peril

Torts > ... > Elements > Duty > General Overview

Torts > ... > General Premises Liability > Dangerous Conditions > General Overview

Torts > ... > General Premises Liability > Duties of Care > General Overview

### HN3[⬇] Affirmative Duty to Act, Creators of Foreseeable Peril

As to the premises possessor's duty to use reasonable care to learn of the existence of dangerous conditions, a special situation exists when the circumstances are such that a reasonable and prudent person inviting members of the public to a premises would reasonably foresee that some such invitees, or third parties, might, from time to time, create dangerous conditions on the premises. In such situations, the premises possessor's

legal duty is to use reasonable care to timely discover the existence of such dangerous conditions.

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

Torts > Premises & Property Liability > General Premises Liability > General Overview

Torts > ... > General Premises Liability > Dangerous Conditions > General Overview

### HN4[⬇] Dangerous Conditions, Known Dangers

Where there is no evidence the premises possessor had actual knowledge of the dangerous condition prior to the injury, and there is no evidence as to the length of time the dangerous condition existed prior to the injury, the premises possessor is entitled to a judgment as a matter of law and a jury is not authorized to speculate or arbitrarily impose strict liability based on the mere contention or general assertion that the premises possessor should have known of the dangerous condition.

**Counsel:** James A. Young and Debra Kubicsek of Haas, Boehm, Brown, Rigdon, Seacrest & Fischer, P.A., Tampa, for Appellant.

Marjorie E. Smith and Robert M. Moletteire of Reinman, Harrell, Silberhorn & Graham, P.A., Melbourne, for Appellee.

**Judges:** Coward, J., Cobb and Goshorn, JJ., concur.

**Opinion by:** COWART

## Opinion

**[*214]** This case involves: torts - negligence - premises liability - duty to learn of dangerous premises conditions not created by the possessor or its agents - evidence of length of time the dangerous condition existed prior to the injury as compared to length of time between reasonable inspections.

A customer sued a supermarket because the customer slipped and fell on a slippery substance on the floor of the supermarket. Before and during trial, the customer produced no evidence that the supermarket's agents or employees caused the slippery substance to be on the

Winn-Dixie Stores, Inc. v. Marcotte

supermarket floor or that they otherwise had actual knowledge of its existence before the accident. Neither did the customer produce evidence as to how or when the substance got on the floor or the length of time it was there before the accident.

The trial court **[\*\*2]** denied the supermarket's motion for directed verdict, denied certain jury instructions requested by the supermarket, and, when the jury returned a verdict in favor of the customer, denied the supermarket's motion for a new trial. The supermarket appeals. We reverse.

_HN1_[⬆] An entity in the actual possession and control of a premises, such as a supermarket, to which members of the public are invited, is not an insurer of the safety of such persons, [1] nor is the possessor strictly liable, or liable per se without fault, for injuries resulting to invitees from dangerous conditions on the premises; _HN2_[⬆] nevertheless, such a possessor basically has two legal duties to protect invitees from the harmful effects of dangerous premises conditions. First, such a premises possessor has a legal duty to ascertain that the premises are reasonably safe for invitees. This duty equates into a legal duty to use reasonable care to learn of (i.e., to acquire actual knowledge as to) the existence of any dangerous conditions on the premises. [2] Secondly, the premises possessor has a second, entirely different, legal duty to use reasonable care to protect invitees from dangerous conditions of which the possessor has **[\*\*3]** actual knowledge. [3] This second duty is usually breached when the possessor fails to take reasonable care (a) to eliminate the known danger, (b) to protect invitees from the known danger by excluding them from the area of danger, (by fences, gates, walls, door, barricades, etc.), or by providing protective devices (safety classes, ear muffs, breathing devices, hard hats, guardrails, covers on machinery, etc.), (c) to provide warnings as to the danger, or (d) to

take some combination of these protective actions.

_HN3_[⬆] As to the premises possessor's first duty to use reasonable care to learn of the existence of dangerous **[\*\*4]** conditions, a special situation exists when the circumstances are such that a reasonable and prudent person inviting members of the public to a premises would reasonably foresee that some such invitees (or third parties) might, from time to time, create dangerous conditions on the premises. In such situations, the premises possessor's legal duty is to use reasonable care to timely discover the existence of such dangerous conditions. [4]. **[\*\*7]** This legal duty is commonly conceptualized on the basis of "constructive notice" but that description is often misleading in this context. It is a distortion of sound negligence **[\*215]** theory and a mischievous oversimplification to merely say that premises possessor has "constructive notice" of dangerous conditions not created by the possessor or his agents and not actually known by them. Such oversimplification of the legal concept of "constructive notice" to a premises possessor can result in imposing strict liability on the possessor for all injuries resulting from every dangerous condition existing on every square foot of occupied premises at every moment of time. Rather, the legal liability of a premises possessor for injuries resulting from dangers not **[\*\*5]** actually known by the possessor prior to the injury is based on a breach of the legal duty to use reasonable care to look for, and to discover, reasonably foreseeable but not actually known dangerous conditions. [5]. This is a hypothetical "reasonable man" standard as to a duty of care. This duty of a premises possessor to look for unknown dangerous conditions not created by the possessor or his agents is breached by the possessor not making a reasonably diligent search or inspection at reasonable intervals of time. Exactly how thorough and how frequent inspections would be made by a theoretical reasonable and prudent premises possessor would depend on the experience of persons similarly situated relating to many factors, including the type of premises and business or activity being conducted thereon, the type of potential dangers that are reasonably foreseeable, the type of invitees, the ways potential dangers could be created, the degree of the danger

---

[1]. _See, Night Racing Ass'n. v. Green, 71 So.2d 500, 503 (Fla. 1954); Clyde Bar, Inc. v. McClamma, 152 Fla. 118, 10 So.2d 916 (1942); Moulden v. Jefferson Standard Life Ins. Co., 147 Fla. 36, 2 So.2d 302 (1941); Sparks v. Ober, 192 So.2d 81 (Fla. 3d DCA 1966)._

[2]. _See, Springer v. Morris, 74 So.2d 781, 785 (Fla. 1954); Hall v. Holland, 47 So.2d 889 (Fla. 1950)._

[3]. _See, Ashcroft v. Calder Race Course, Inc., 492 So.2d 1309, 1311 (Fla. 1986); Burdine's v. McConnell, 146 Fla. 512, 1 So.2d 462 (1941). See also Restatement (Second) of Torts § 343A_ (1965).

---

[4]. Of course, when the performance of this duty results in the acquisition of actual knowledge of a dangerous condition, such knowledge activates the possessor's secondary duty to take action to protect invitees from the known dangerous condition.

[5]. _See, Springer, supra._

Winn-Dixie Stores, Inc. v. Marcotte

involved, etc. The trial of any such premises liability action involves (1) evidence from which the trier of fact can conceptualize a standard of conduct in the form of the action of a "reasonable man" possessor of similar premises, **[**6]** and (2) evidence as to the defendant's actual actions relating to the extent and frequency of inspections actually made, and (3) a comparison of the actual against the theoretical standard of conduct. If a reasonable inspection would have revealed the dangerous condition in question, and if the dangerous condition existed prior to the injury a length of time in excess of the time between reasonably spaced inspections, then the trier of fact should find that the possessor neglected his duty and is liable for any injury legally caused by that neglect. On the other hand, if the injured invitee fails to prove these matters, and specifically fails to prove that the dangerous condition existed a length of time prior to the injury in excess of a reasonable period between inspections, the possessor should not be held liable for injury caused by that dangerous condition. In such a case, the length of time the dangerous condition existed prior to the injury is an indispensable factor in determining liability [6.] and in such a case the pleadings, evidence, argument of counsel, and jury instructions should focus on these issues as well as any other relevant issues, such as damages, etc.

*HN4*[⬆] Where, as here, there is no evidence the premises possessor had actual knowledge of the dangerous condition prior to the injury, and there is no evidence [7.] as to the length of time the dangerous condition existed prior to the injury, the premises possessor is entitled to a judgment as a matter of law and a jury is not authorized to speculate or arbitrarily impose strict liability based on the mere contention or general assertion that the premises possessor "should have known of" the dangerous condition.

The plaintiff **[**8]** having failed to adduce competent, substantial evidence as to an issue essential to the defendant's liability, the judgment in favor of the plaintiff is

REVERSED.

---

[6.] *See* *Haynes v. Lloyd, 533 So.2d 944 (Fla. 5th DCA 1988)* and the cases in n. 2 thereto, ***Broz v. Winn-Dixie Stores, Inc., 546 So.2d 83 (Fla. 3d DCA 1989)***, and the cases cited therein.

[7.] Of course, evidence as to this issue can be circumstantial, *but see,* ***Broz v. Winn-Dixie Stores, Inc., supra.***

COBB and GOSHORN, JJ., concur.

---

**End of Document**

 Neutral

As of: October 18, 2019 5:41 PM Z

## *Winn Dixie Stores v. White*

Court of Appeal of Florida, Fourth District

June 26, 1996, Filed

CASE No. 95-2499

**Reporter**

675 So. 2d 702 *; 1996 Fla. App. LEXIS 6680 **; 21 Fla. L. Weekly D 1488

WINN DIXIE STORES, INC., Appellant, v. SARAH JANE WHITE, Appellee.

**Subsequent History: [**1]** Released for Publication July 12, 1996.

**Prior History:** Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; C. Lavon Ward, Judge;. L.T. Case No. 94-03892 (09).

**Disposition:** REVERSED AND REMANDED.

## Core Terms

directed verdict motion, trial court, floor, reversed and remanded, instant case, slipperiness, speculation, adduced, surface, infer

## Case Summary

### Procedural Posture

Appellant retail store challenged a judgment from the Circuit Court for the Seventeenth Judicial Circuit, Broward County (Florida), in an action for negligence, where the lower court denied appellant's motion for directed verdict at the close of evidence. Appellant claimed that plaintiff appellee had provided only circumstantial evidence of negligence.

### Overview

Appellant retail store challenged a jury verdict rendered in a slip-and-fall case. Evidence adduced at trial revealed that appellee slipped and fell in appellant's store, sustaining personal injuries. Although the floor surface was shiny, appellee found no wetness or other cause for her accident when she looked after falling. At the close of the evidence, the lower court denied appellant's motion for directed verdict. The Fourth Circuit Court of Appeal reversed, and held that negligence could not be inferred from the mere happening of an accident alone. Circumstantial evidence would not support a jury inference if the evidence was purely speculative and, therefore, inadequate to produce an inference that outweighed all contrary or opposing inferences. In order to find appellant liable, the jury would have had to infer that there was a dangerous condition at the situs of the fall and that appellant had actual or constructive knowledge of that condition. Such inferences could not be properly drawn from the evidence adduced. Rather, they could only be drawn from speculation and conjecture.

### Outcome

The Fourth District Court of Appeal reversed a judgment from the lower court, which denied appellant retail store's motion for a directed verdict at the close of evidence in an action by plaintiff appellee for negligence, because negligence could not be inferred from the mere happening of an accident alone. Circumstantial evidence would not support a jury inference if the evidence was purely speculative.

## LexisNexis® Headnotes

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

*HN1*[ ] **Trials, Judgment as Matter of Law**

In considering a motion for directed verdict, all inferences of fact should be construed most strictly in favor of the non-moving party.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

Evidence > Inferences & Presumptions > Inferences

Torts > ... > Duty > Affirmative Duty to Act > Failure to Act

*HN2*[⬇] **Trials, Judgment as Matter of Law**

Negligence may not be inferred from the mere happening of an accident alone. Circumstantial evidence will not support a jury inference if the evidence is purely speculative and, therefore, inadequate to produce an inference that outweighs all contrary or opposing inferences.

**Counsel:** Richard N. Blank of Richard N. Blank, P.A., Fort Lauderdale, for appellant.

R. Fred Lewis of Kuvin, Lewis, Restani & Stettin, P.A., Miami, for appellee.

**Judges:** GUNTHER, C.J., FARMER and KLEIN, JJ., concur.

**Opinion by:** GUNTHER

# Opinion

 **[*702]** GUNTHER, C.J.

Appellant, Winn Dixie Stores, Inc., defendant below, seeks review of the jury verdict rendered in a slip-and-fall case. On appeal, Winn Dixie asserts that the trial court erred in denying its motion for a directed verdict. We agree.

The evidence adduced at trial reveals that the appellee slipped and fell in Winn Dixie, sustaining personal injuries. A man with a buffer was observed near the location of appellee's fall; however, no witness had seen the man buff the particular area where appellee fell.

Although the floor surface was shiny, appellee found no wetness or other **[*703]** cause for her accident when she looked after falling. Moreover, a witness who noticed appellee's fall experienced no slipperiness on **[**2]** the floor.

Winn Dixie's store manager testified that the buffing takes place regularly and does not leave the floor surface slippery or wet. Furthermore, an examination of the area shortly after the accident revealed nothing on the floor. At the close of the evidence, the trial court denied Winn Dixie's motion for directed verdict.

*HN1*[⬆] In considering a motion for directed verdict, all inferences of fact should be construed most strictly in favor of the non-moving party. *Cooper Hotel Servs., Inc. v. MacFarland, 662 So. 2d 710 (Fla. 2d DCA 1995)*, rev. denied, 670 So. 2d 939 (Fla. 1996). *HN2*[⬆] Negligence, however, may not be inferred from the mere happening of an accident alone. *Id. at 712*; *Belden v. Lynch, 126 So. 2d 578, 581 (Fla. 2d DCA 1961)*. Circumstantial evidence "will not support a jury inference if the evidence is purely speculative and, therefore, inadequate to produce an inference that outweighs all contrary or opposing inferences." *Food Fair Stores, Inc. v. Trusell, 131 So. 2d 730, 733 (Fla. 1961)*. In order to find Winn Dixie liable in the instant case, the jury would have to necessarily infer that there was a dangerous condition at the situs of the fall and that **[**3]** Winn Dixie had actual or constructive knowledge thereof. Such inferences could not be properly drawn from the evidence adduced. Rather, they could only be drawn from speculation and conjecture.

Accordingly, the trial court erred in denying Winn Dixie's motion for a directed verdict. As such, the instant case is reversed and remanded with directions to the trial court to enter a verdict in favor of Winn Dixie.

REVERSED AND REMANDED.

FARMER and KLEIN, JJ., concur.

 Caution
As of: October 20, 2019 4:22 PM Z

## *Lester's Diner II, Inc. v. Gilliam*

Court of Appeal of Florida, Fourth District

November 15, 2000, Opinion Filed

CASE NO. 4D00-78

**Reporter**

788 So. 2d 283 *; 2000 Fla. App. LEXIS 14794 **; 26 Fla. L. Weekly D 108; 25 Fla. L. Weekly D 2662

LESTER'S DINER II, INC., Appellant/Cross-Appellee, v. MARY ANN GILLIAM, Appellee/Cross-Appellant.

**Subsequent History:** **[**1]** Motion for Rehearing Denied and Clarification of January 3, 2001, Reported at: *2001 Fla. App. LEXIS 43*.

**Prior History:** Appeal and cross-appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Leroy H. Moe, Judge; L.T. Case No. 97-8002(13).

**Disposition:** AFFIRMED IN PART; REVERSED IN PART AND REMANDED WITH DIRECTIONS.

## Core Terms

directed verdict, floor, premises, notice

## Case Summary

**Procedural Posture**

Appellant challenged an order of the Circuit Court for the Seventeenth Judicial Circuit, Broward County (Florida) denying its motion for directed verdict, arguing there was no competent substantial evidence to support the jury's verdict in appellee's slip and fall case.

**Overview**

Appellee sued appellant restaurant for injuries she sustained when she slipped and fell while being seated by a hostess. At trial, there was conflicting testimony regarding where a workman was servicing appellant's equipment and whether there was oil on the floor as a result of his work. Appellant moved for directed verdict, arguing appellee failed to prove the nature of the substance on the floor, how the substance got there, or how long it had been there. The trial court reserved ruling on the motion until the jury returned its verdict. The jury found appellant negligent and the legal cause of appellee's fall. Appellant challenged the ruling, arguing there was no competent substantial evidence to support the jury's verdict. The court held in a slip and fall action, appellee bore the burden of proving appellant was negligent, and to that end, she needed to generally prove appellant's actual or constructive notice of the dangerous condition. The court reversed, holding appellee failed to prove either of the foregoing; therefore, there was no competent substantial evidence to support the jury's verdict.

**Outcome**

Judgment reversed, because appellee failed to prove through either actual or constructive notice appellant knew or should have known of the substance on the floor or that it constituted a dangerous condition. Therefore, there was no competent substantial evidence to support the jury's verdict.

## LexisNexis® Headnotes

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

*HN1*[⤓] **Trials, Judgment as Matter of Law**

A motion for directed verdict should be granted only when the evidence, viewed in the light most favorable to the non-moving party, shows that a jury could not reasonably differ as to the existence of a material fact and that the movant is entitled to a judgment as a matter of law. If there is any evidence to support a possible verdict for the nonmoving party, a directed verdict is improper. Likewise, motions for judgment notwithstanding the verdict, should be resolved with extreme caution.

Lester's Diner II, Inc. v. Gilliam

Torts > Premises & Property Liability > General Premises Liability > General Overview

**HN2**[⬇]  **Premises & Property Liability, General Premises Liability**

To establish a breach of a duty in negligence, the plaintiff must show that the defendant failed to maintain its property in a reasonably safe condition, or that it failed to warn the plaintiff of a concealed peril of which it either knew or should have known and which could not have been discovered by the plaintiff through the exercise of ordinary care.

Torts > ... > Activities & Conditions > Slip & Fall Injuries > Elements

Torts > Premises & Property Liability > General Premises Liability > General Overview

Torts > ... > Activities & Conditions > Slip & Fall Injuries > General Overview

Torts > ... > General Premises Liability > Dangerous Conditions > General Overview

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

**HN3**[⬇]  **Slip & Fall Injuries, Elements**

In a slip and fall action, the plaintiff must generally prove that the owner of the premises had actual or constructive knowledge of the causative condition. The plaintiff bears the burden of proving that the defendant was negligent, and to that end, the plaintiff must generally prove that the owner of the premises had actual or constructive notice of the dangerous condition. Constructive knowledge may be inferred from the amount of time a substance has been on the floor.

Evidence > Inferences & Presumptions > Inferences

Torts > Negligence > Proof > General Overview

Torts > ... > Activities & Conditions > Slip & Fall Injuries > General Overview

**HN4**[⬇]  **Inferences & Presumptions, Inferences**

An inference of the existence of an essential fact to be drawn from circumstantial evidence cannot be made the basis of a further inference, unless it can be said that the initial inference was established to the exclusion of any other reasonable inference.

**Counsel:** Hinda Klein of Conroy, Simberg & Ganon, P.A., Hollywood, for appellant/cross-appellee.

Alan D. Sackrin of The Law Offices of Alan D. Sackrin, Hallandale Beach, for appellee/cross-appellant.

**Judges:** SHAHOOD, J. KLEIN and GROSS, JJ., concur.

**Opinion by:** SHAHOOD

# Opinion

[*284]  SHAHOOD, J.

This action arises from a slip and fall accident on the diner's premises. Appellee filed suit against the diner claiming that it negligently maintained machinery on its premises which leaked oil onto the floor, causing her to fall, and that appellant knew or should have known of the dangerous conditions and should have warned her of such conditions.

At trial, appellant testified that as she was following the restaurant's host to a seat, she slipped and fell on her back. She claimed that she followed the host through an area traveled by the servers, away from [*285] the customer booths. After the fall, appellant allegedly [**2] saw a man with a tool kit working on a piece of machinery and noticed a very light oil, like WD40, on her hands and clothes. She then noticed a waitress and the host wiping up the floor with paper towels.

The owner of the diner testified that a workman from Echo Industrial serviced the diner's refrigeration and air conditioning and that he was on the premises that day, but that the air compressors were on the roof and that the workman had only a tool belt with him.

At trial, appellee moved for directed verdict on the grounds that appellee failed to prove the nature of the substance on the floor, how the substance got on the floor, or how long it had been there. The trial court denied directed verdict on the failure to maintain, but granted directed verdict on the failure to warn. After appellant rested, the court reserved ruling on the parties' renewed motions for directed verdict until after the jury rendered its verdict. The jury returned a verdict finding appellant negligent and the legal cause of appellee's fall.

Appellant filed a post-trial motion for directed verdict, motion to set aside verdict, and to enter judgment in accordance with the motion for directed verdict. After [**3] hearing

Lester's Diner II, Inc. v. Gilliam

argument, the trial court denied appellant's motion, but expressed doubt as to the soundness of the jury's verdict: "there's no sense in trying to convince me about the right as to cause, because I would have voted the other way. However, it appears as though the verdict is supported by competent evidence enough to get by a directed verdict."

Because there is no competent substantial evidence to support the jury's verdict, we reverse and direct that judgment be entered in favor of appellant.

*HN1*[↑] A motion for directed verdict should be granted only when the evidence, viewed in the light most favorable to the non-moving party, shows that a jury could not reasonably differ as to the existence of a material fact and that the movant is entitled to a judgment as a matter of law. *See Barton Protective Servs., Inc. v. Faber, 745 So. 2d 968, 972 (Fla. 4th DCA 1999).* If there is any evidence to support a possible verdict for the nonmoving party, a directed verdict is improper. *See Gold, Vann & White, P.A. v. DeBerry, 639 So. 2d 47 (Fla. 4th DCA 1994).* Likewise, motions for judgment notwithstanding the verdict, should be resolved with extreme caution. **[**4]** *See Cooper Hotel Servs., Inc. v. MacFarland, 662 So. 2d 710, 712 (Fla. 2d DCA 1995),* review denied, 670 So. 2d 939 (Fla. 1996).

*HN2*[↑] To establish a breach of a duty in negligence, the plaintiff must show that the defendant failed to maintain its property in a reasonably safe condition, or that it failed to warn the plaintiff of a concealed peril of which it either knew or should have known and which could not have been discovered by the plaintiff through the exercise of ordinary care. *See Cooper, 662 So. 2d at 712.* *HN3*[↑] In a slip and fall action, the plaintiff must generally prove that the owner of the premises had actual or constructive knowledge of the causative condition. *See Soriano v. B & B Cash Grocery Stores, Inc., 757 So. 2d 514, 515 (Fla. 4th DCA),* review granted, 744 So. 2d 456 (Fla. 1999). The plaintiff bears the burden of proving that the defendant was negligent, and to that end, the plaintiff must generally prove that the owner of the premises had actual or constructive notice of the dangerous condition. *See Thompson v. Poinciana Place Condominium Ass'n, 729 So. 2d 457, 458 (Fla.* **[**5]** 4th DCA), review granted, 743 So. 2d 14 (Fla. 1999). Constructive knowledge may be inferred from **[*286]** the amount of time a substance has been on the floor. *See Id.*

In *Soriano*, this court held that *HN4*[↑] an inference of the existence of an essential fact to be drawn from circumstantial evidence cannot be made the basis of a further inference, unless it can be said that the initial inference was established to the exclusion of any other reasonable inference. *See Soriano, 757 So. 2d at 515* (patron who slipped and fell in a supermarket on a piece of brown banana peel failed to show

the length of time the peel had been on the floor, and thus failed to establish supermarket's constructive notice); *see also Markowitz v. Helen Homes of Kendall Corp., 736 So. 2d 775,* (Fla. 3d DCA), *review granted,* 743 So. 2d 509 (Fla. 1999).

In this case, appellee failed to prove through either actual or constructive notice that appellant knew or should have known of the substance on the floor or of a dangerous condition. *See Winn-Dixie Stores, Inc. v. Mazzie, 707 So. 2d 927, 929* (Fla. 5th DCA), *review denied,* 725 So. 2d 1109 (Fla. 1998) **[**6]** (premises owner is not liable for injuries sustained by invitees who slip and fall as a result of a foreign substance on the floor when the invitee provides no competent evidence of actual or constructive knowledge by the premises owner of the dangerous condition.). No one, including appellee, saw any substance on the floor. Further, there was no evidence as to how the oily substance got there or how long it had been there. Only through conjecture and pyramiding inferences can we conclude that the substance was in fact WD40 and was left there by a workman or an employee. Appellee testified that she saw a man working on machinery in the vicinity of where she slipped, but there was no testimony that the workman was repairing anything using WD40. Further, appellee claimed that she slipped in an area not traveled by patrons, but there was no evidence other than her testimony to support such conclusion.

Based on the foregoing, we reverse the trial court's denial of appellant's motion for directed verdict and direct that judgment be entered in favor of appellant. Further, as to the issue raised on cross-appeal, we affirm, finding it to be without merit.

AFFIRMED IN PART; REVERSED IN PART **[**7]** AND REMANDED WITH DIRECTIONS.

KLEIN and GROSS, JJ., concur.

---

End of Document

 Caution

As of: October 20, 2019 4:22 PM Z

## *Silver Springs Moose Lodge No. 1199 v. Orman*

Court of Appeal of Florida, Fifth District

January 14, 1994, Filed

CASE Nos. 93-1390, 93-1985

**Reporter**

631 So. 2d 1119 *; 1994 Fla. App. LEXIS 77 **; 19 Fla. L. Weekly D 121

SILVER SPRINGS MOOSE LODGE NO. 1199, etc., Appellant, v. MARION ORMAN and KARL ORMAN, Appellees.

**Subsequent History:** [**1]  Petition for Rehearing Denied February 16, 1994. Released for Publication March 7, 1994.

**Prior History:** Appeal from the Circuit Court for Marion County, Thomas D. Sawaya, Judge.

**Disposition:** REVERSED.

## Core Terms

bingo, floor, dangerous condition, no evidence, supermarket, entrance, puddle, length of time, arrived, constructive notice, race track, slipped, summary judgment, umbrella, inside, liquid

## Case Summary

**Procedural Posture**

Appellant business owner sought review of the decision of the Circuit Court for Marion County (Florida), which denied appellant's motions for a directed verdict and judgment notwithstanding the verdict, and which entered a judgment in favor of appellee invitees in a slip and fall accident.

**Overview**

Appellant business owner sought review of the decision of the trial court to deny appellant's motion for a directed verdict and judgment notwithstanding the verdict in appellee invitees' claim for a slip and fall accident. Appellant claimed that appellees failed to present any evidence of notice. The court reversed and remanded the denial of the motions because appellees provided no evidence that appellant had any actual or constructive notice of the condition prior to the injury. There were no smudges, streaks, tracks, or footprints that evidenced the liquid existed for an extended period of time. The inferences and speculations provided by appellees would have amounted to impermissible stacking by the jury to reach the conclusion that the water was on the floor for approximately one hour.

**Outcome**

The court reversed the decision of the trial court and remanded with instruction to enter judgment in favor of appellant business owner because appellee invitees failed to provide any evidence of actual or constructive notice of the dangerous condition or as to the length of time the condition existed prior to appellees' fall.

## LexisNexis® Headnotes

Torts > ... > Elements > Duty > General Overview

*HN1*[ ]  **Elements, Duty**

If a reasonable inspection would have revealed the dangerous condition in question, and if the dangerous condition existed prior to the injury a length of time in excess of the time between reasonably spaced inspections, then the possessor neglected his duty and is liable for any injury legally caused by that neglect. On the other hand, if the injured invitee fails to prove these matters, and specifically fails to prove that the dangerous condition existed a length of time prior to the injury in excess of a reasonable period between inspections, the possessor should not be held liable for injury caused by that dangerous condition. The length of time the dangerous condition existed prior to the injury is an indispensable factor in determining liability.

Silver Springs Moose Lodge No. 1199 v. Orman

Torts > ... > Elements > Duty > General Overview

**HN2**[⬇]  **Elements, Duty**

In appropriate cases, constructive knowledge of a dangerous condition may be proven by circumstantial evidence.

**Counsel:** Matthew R. Danahy of Shofi, Smith, Hennen, Jenkins, Stanley & Gramovot, P.A., Tampa, for Appellant.

Keith H. Lefevre and John Sanders of Jacobs & Goodman, P.A., Altamonte Springs, for Appellees.

**Judges:** GOSHORN, PETERSON, GRIFFIN

**Opinion by:** GOSHORN

# Opinion

[*1119] GOSHORN, J.

Silver Springs Moose Lodge No. 1199 (Moose Lodge) appeals the final judgment [*1120] entered in favor of Marion and Karl Orman stemming from Marion Orman's slip and fall accident that occurred inside the Moose Lodge. The Moose Lodge argues that the trial court improperly submitted this case to the jury because the Ormans presented no evidence that the slippery condition existed for a sufficient period of time to place the Moose Lodge on constructive notice of its existence. We reverse.

Orman and her sister, Jean Hensley, regularly attended bingo games held at the Moose Lodge. Usually, they arrived at the bingo hall well before the starting time in order to purchase bingo packets, have a cup of coffee, visit with their friends, and set up their boards. However, because it was raining on this [**2] particular afternoon, they delayed their departure by approximately 15 minutes, and arrived between 5:25 and 5:30 P.M.

When they arrived at the "bingo entrance," Orman and Hensley noticed that rainwater coming from an overhang had caused a puddle to accumulate outside the building. Patrons had to step over the puddle to enter the bingo hall. Once inside, there were no signs or cones warning patrons that the floor was slippery or wet. No workers were mopping up any water or giving verbal warnings as to any danger. Also, there was no umbrella stand at the entrance, so bingo players carried their umbrellas with them across the hall to their seats.

Orman testified that she observed between 25 and 30 people already inside when she entered the hall. Hensley estimated the number to be between 35 and 40. Some were in the front

of the hall purchasing admission tickets, while others were along the side in the nonsmoking area or back, playing cards and socializing.

Both Orman and Hensley testified that, as they walked into the hall, they did not notice any water on the floor inside the door. Orman and Hensley walked approximately 35 to 40 feet inside the bingo hall, made a right turn at the [**3] third or fourth row of tables and while rounding that turn, Orman lost her footing and fell. Orman did not know how the liquid on which she fell got onto the floor, nor could she say how long it had been there before the fall. There were no smudges, streaks, tracks, or scuff marks which would indicate that it had been on the floor for a considerable amount of time.

The only other witness who testified as to the circumstances surrounding the liquid was Hensley. She stated that what she saw appeared to be "drops of water" and speculated that possibly they had dripped off of someone's umbrella or shoes. She did not see a puddle of water, nor did she see a trail from the entrance leading toward the spot where Orman fell. No evidence was presented as to the origin of the water drops or the length of time they were on the floor before Orman's accident occurred.

Moose Lodge made a motion for a directed verdict at the close of the plaintiff's case and again at the close of all the evidence. The trial court reserved ruling on these motions until the jury rendered its verdict. After the jury ruled in favor of the Ormans, Moose Lodge made a motion for judgment notwithstanding the verdict [**4] (JNOV). Thereafter, the court denied Moose Lodge's motions for directed verdict and JNOV. Moose Lodge appeals.

We agree with the Moose Lodge that the Ormans failed to present any evidence demonstrating that Moose Lodge had constructive notice [1] of the liquid on its floor prior to Orman's accident. The duty to learn of dangerous conditions in premises liability cases was set forth by this court in *Winn-Dixie Stores, Inc. v. Marcotte, 553 So. 2d 213 (Fla. 5th DCA 1989).* In *Marcotte*, a customer sued a supermarket after she slipped and fell on a slippery substance on the supermarket's floor. The customer failed to produce any evidence that the supermarket's agents or employees caused the substance to be on the floor or that they had actual or constructive knowledge of its existence before the incident occurred. This court, in discussing the legal duty commonly referred to as "constructive notice," stated:

**HN1**[⬆] If a reasonable inspection would have revealed

---

[1] It is undisputed there was no actual notice of the dangerous condition.

the dangerous condition in question, and if the dangerous condition existed prior [*1121] to the injury a length of time in excess of the time between reasonably spaced inspections, then the trier of fact [**5] should find that the possessor neglected his duty and is liable for any injury legally caused by that neglect. On the other hand, if the injured invitee fails to prove these matters, and specifically fails to prove that the dangerous condition existed a length of time prior to the injury in excess of a reasonable period between inspections, the possessor should not be held liable for injury caused by that dangerous condition. In such a case, the length of time the dangerous condition existed prior to the injury is an indispensable factor in determining liability . . . .

*Id. at 215* (footnote omitted). This court reversed the order denying the supermarket's motion for a directed verdict, noting that a landowner "is not an insurer of the safety of such persons, nor is the possessor strictly liable, or liable per se without fault, for injuries resulting to invitees from dangerous conditions on the premises . . . ." *Id. at 214* (footnote omitted).

[**6] Here, the Ormans presented no evidence that Moose Lodge had either actual or constructive notice of the liquid's presence on the floor. No evidence was introduced as to how the substance got onto the floor or how long it had been there prior to Orman's fall. Further, there were no smudges, streaks, tracks or foot prints in or around the liquid evidencing it was there for a sufficient period of time for the Moose Lodge to be charged with constructive knowledge of a potentially dangerous condition. Thus, as in *Marcotte*, there was no evidence of actual or constructive knowledge, the trial court should have granted the defendant's motion for a directed verdict. *See also Wal-Mart Stores, Inc. v. King, 592 So. 2d 705 (Fla. 5th DCA 1991)*, review denied, 602 So. 2d 942 (Fla. 1992) (holding that without some evidence of the length of time the condition existed, liability cannot be determined and summary judgment is proper).

We recognize that *HN2* [⬆️] in appropriate cases, constructive knowledge may be proven by circumstantial evidence. *Newalk v. Florida Supermarkets, Inc., 610 So. 2d 528, 529 (Fla. 3rd DCA 1992)*; [**7] *Teate v. Winn-Dixie Stores, Inc., 524 So. 2d 1060, 1061 (Fla. 3rd DCA 1988)*. In an attempt to apply this principle, the Ormans argue that the jury could infer that the water had come from a dripping umbrella used by one of the patrons. Based on that inference, the jury could further infer that because the hall opened at 4:30 P.M. and 30 or so patrons were already there when Orman arrived, the water that inferentially dripped from an umbrella could have been on the floor for one hour before Orman's fall. These multiple inferences would then enable the

jury to conclude that the dangerous condition existed for a sufficient length of time before the accident to charge Moose Lodge with constructive notice thereof.

The Florida Supreme Court reviewed the use of this type of circumstantial evidence in a slip and fall case in *Food Fair Stores, Inc. v. Trusell, 131 So. 2d 730 (Fla. 1961)*. In *Trusell*, the plaintiff fell on a piece of lettuce in the defendant-supermarket's aisle. There was no evidence presented which established how the lettuce ended up on the floor. However, the defendant's employees were responsible for keeping [**8] grocery carts free of debris, and it was suggested that one of the employees could have negligently performed his duty, resulting in the lettuce being in the aisle. The court rejected the argument that this type of circumstantial evidence justified the jury making such an inference:

It is apparent that a jury could not reach a conclusion imposing liability on the petitioner without indulging in the prohibited mental gymnastics of constructing one inference upon another inference in a situation where, admittedly, the initial inference was not justified to the exclusion of all other reasonable inferences.

*Id. at 733. See also Wilson v. Winn-Dixie Stores, Inc., 559 So. 2d 263, 264* (Fla. 2nd DCA), *review denied,* 574 So. 2d 145 (Fla. 1990).

Similarly, the inferences and speculations proposed by the Ormans would require a juror to place "an inference on an inference" in order to reach the conclusion that the water was on the floor for approximately one hour. Such action would amount to an impermissible [*1122] stacking of inferences and speculation.

The Ormans also cite *Scott v. Florida Supermarkets, Inc., 580 So. 2d 312 (Fla. 3rd DCA 1991)* [**9] to support their assertion that the trial court's ruling was proper in the present case. In *Scott*, on a rainy day the plaintiff slipped and fell in a puddle near the front entrance of the defendant's supermarket. The lower court granted summary judgment in favor of the defendant. However, the appellate court reversed, finding that genuine issues of material fact existed as to whether the supermarket had constructive notice of the dangerous condition. The court reasoned that because evidence was presented showing the premises owner had a recurring problem of puddles forming at the entrance during rain storms, and the accident occurred on a rainy day, summary judgment was improper.

*Scott* is clearly distinguishable from the present case. There, the court based its holding on the fact that the plaintiff slipped and fell in the puddle at the front entrance where others had slipped and fallen. In the instant case, not only is there no

Silver Springs Moose Lodge No. 1199 v. Orman

evidence of other slip and fall instances at the Moose Lodge, but further, there was no evidence that the water Orman slipped upon was in any way connected to the puddle that formed outside the Moose Lodge entrance.

The same distinctions exist between [**10] the instant case and *Brooks v. Phillip Watts Enterprises, Inc., 560 So. 2d 339* (Fla. 1st DCA), *review denied*, *567 So. 2d 435 (Fla. 1990)*. In *Brooks*, the plaintiff's slip and fall accident occurred on a rainy morning as he crossed the threshold of the defendant's supermarket. Although the trial court granted summary judgment in favor of the defendant, the appellate court reversed. The court emphasized that summary judgment was improper because the record contained evidence the store "had knowledge that water came in the front area of the store in rainy weather." *Id. at 342.* Again, in the case at bar, there is no evidence that Orman's accident was related to the puddle which formed at the Moose Lodge bingo entrance. In fact, both Orman and Hensley stated they did not observe any substance on the floor when they walked from the bingo entrance, down several aisles to the place where Orman fell.

Finally, the Ormans assert that the elevated standard of care imposed upon race track operators [2] should be extended to charity bingo events. To support their proposition, the Ormans compare the scene [**11] present at a race track with that of a bingo hall and assert they are similar:

> Race tracks typically confine spectators to certain areas, and bettors are preoccupied with carrying programs, pencils, and are continually peering up at computerized toteboards showing the latest odds, results and payoffs. Losing tickets are routinely scattered about the floor, and each bettor is racing the clock to study the next race program, fill out betting slips, and count his cash prior to lining up at the window.

At the bingo hall, players carry "bingo bags" containing pertinent materials for the event. They purchase admission tickets, assemble their game cards and concentrate during the game to increase their chances of being the first to call "Bingo!" should their card be a winner. We reject this argument.

[**12] *Sub judice*, no testimony was given to suggest the atmosphere resembled the hustle and bustle of the race track. On the contrary, when asked whether she and her sister were rushing to obtain their seats because of their late arrival,

Hensley stated that they were in no hurry. Although Orman testified that she preferred to arrive at the bingo hall early to get organized for the evening's festivities, she also asserted that she liked to arrive early to "get my little cup of coffee and enjoy myself." Clearly, the facts in the present case do not support applying the law set forth in the line of race track cases cited by the Ormans.

Because there is no evidence the Moose Lodge had actual knowledge of the dangerous condition prior to the injury, and no [*1123] evidence was presented as to the length of time the dangerous condition existed prior to Orman's fall, the Moose Lodge is entitled to judgment as a matter of law. To hold otherwise would essentially make premises owners insurers of their business invitees' safety which is contrary to the law in Florida. *See Marcotte*; *Haynes v. Lloyd, 533 So. 2d 944 (Fla. 5th DCA 1988)*. Accordingly, we reverse the final [**13] judgment in favor of the Ormans and remand with directions to enter judgment in favor of the Moose Lodge.

REVERSED.

PETERSON J., concurs.

GRIFFIN, J., dissents without opinion.

---

**End of Document**

---

[2] *See* *Wells v. Palm Beach Kennel Club, 160 Fla. 502, 35 So. 2d 720, 721 (Fla. 1948)* (stating that "reasonable care as applied to a race track requires a higher degree of diligence than it does when applied to a store, bank or such like place of business."); *McCurry v. Investment Corp. of Palm Beach, 548 So. 2d 689, 690 (Fla. 4th DCA 1989)* (same).

Michael Dono

 Cited

As of: October 20, 2019 4:22 PM Z

## *Miami-Dade Cty. v. Jones*

Court of Appeal of Florida, Third District

November 8, 2017, Opinion Filed

No. 3D16-2266

**Reporter**

232 So. 3d 1127 *; 2017 Fla. App. LEXIS 16365 **; 42 Fla. L. Weekly D 2382; 2017 WL 5162706

Miami-Dade County, Appellant, vs. Wanda Jones, Appellee.

**Prior History: [**1]** An Appeal from the Circuit Court for Miami-Dade County, Jacqueline Hogan Scola and Bronwyn C. Miller, Judges. Lower Tribunal No. 12-4944.

## Core Terms

grease, sidewalk, spill, ordinances, dangerous condition, trial court, constructive notice, notice, introduce, post-trial, barbeque, inspections, off-duty

## Case Summary

### Overview

HOLDINGS: [1]-In a slip and fall case in which a jury found the owners and operators of a barbeque stand 50% liable and a county 50% liable for plaintiff's injuries, the trial court erred by denying the county's post-trial motion for judgment notwithstanding the verdict because plaintiff failed to present any evidence that a grease spill occurred on a discolored sidewalk even once before plaintiff's fall, let alone with such frequency that the county should have known about it; [2]-The trial also erred by permitting plaintiff to introduce irrelevant and prejudicial county ordinances and by permitting plaintiff to testify that the barbeque stand owners and operators were off-duty county employees; [3]-The trial court's limiting instruction did not limit, and in fact exacerbated the unfair prejudice and confusion caused by the introduction of the county ordinances.

### Outcome

Reversed and remanded.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > Trials > Judgment as Matter of Law > Directed Verdicts

Civil Procedure > Trials > Judgment as Matter of Law > Judgment Notwithstanding Verdict

*HN1*[ ] **Standards of Review, Abuse of Discretion**

The appellate court reviews the trial court's denial of a motion for a directed verdict and a motion for judgment notwithstanding the verdict de novo.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Evidence > Admissibility > Procedural Matters > Rulings on Evidence

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

*HN2*[ ] **Standards of Review, Abuse of Discretion**

The trial court's evidentiary rulings and denial of a motion for a new trial are reviewed for an abuse of discretion.

Torts > ... > General Premises Liability > Dangerous Conditions > Duty to Maintain

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

Torts > ... > Duties of Care > Duty On Premises > Invitees

**HN3**[⬇️]  **Dangerous Conditions, Duty to Maintain**

All premises owners owe a duty to their invitees to exercise reasonable care to maintain their premises in a safe condition. In order for a plaintiff to recover for injuries received in a slip and fall, the plaintiff must show that the defendant responsible for the premises had actual or constructive notice of the dangerous condition. Constructive knowledge of a dangerous condition may be inferred from either: (1) the amount of time a substance has been on the floor; or (2) the fact that the condition occurred with such frequency that the owner should have known of its existence.

Torts > Negligence > Elements > Duty

Torts > Public Entity Liability > Liability

**HN4**[⬇️]  **Elements, Duty**

Governments must be able to enact and enforce laws without creating new duties of care and corresponding tort liabilities that would, in effect, make the governments and their taxpayers virtual insurers of the activities regulated.

**Counsel:** Abigail Price-Williams, Miami-Dade County Attorney, and Altanese Phenelus, Assistant County Attorney, for appellant.

Lawrence J. Bohannon, P.A., and Keith E. Hope (Fort Lauderdale), for appellee.

**Judges:** Before ROTHENBERG, C.J., and SUAREZ and SALTER, JJ.

**Opinion by:** ROTHENBERG

# Opinion

[*1129]  ROTHENBERG, C.J.

Miami-Dade County ("the County") appeals an adverse final judgment and an order denying the County's motion for a directed verdict, a judgment notwithstanding the verdict, and a new trial ("post-trial motion") entered after a jury verdict finding the County negligent for allowing a grease spill to remain on a County-owned sidewalk, which Wanda Jones ("Jones") alleged caused her to slip and fall. For the following reasons, we find that the trial court erred by denying the

County's post-trial motion because Jones failed to introduce evidence from which the jury could infer that the County had notice of the dangerous condition that caused Jones to slip and fall. We also find that the trial court erred by permitting Jones to introduce irrelevant and prejudicial County ordinances.

## BACKGROUND [**2]

Jones slipped and fell on a greasy sidewalk owned by the County while visiting a barbeque stand located on private property that was operated by V-II Sports Club, Inc. ("the Sports Club"). Jones contended that a faulty grease disposal system underneath the barbeque stand caused grease to spill out onto the sidewalk. Jones suffered injuries from her fall and sued the County and the Sports Club. In her operative complaint, Jones alleged that the Sports Club was responsible for creating the dangerous condition on the sidewalk, and she alleged that the County negligently maintained the sidewalk by allowing the dangerous condition to remain on the sidewalk.

After a trial, the jury found the Sports Club 50% liable, the County 50% liable, and Jones 0% liable. Thereafter, the County filed its motion for a directed verdict, judgment notwithstanding the verdict, and a new trial. The County argued, in relevant part, that there was no evidence that the County had notice of the dangerous condition on the sidewalk and that the trial court erred by permitting Jones to introduce County ordinances and other irrelevant and prejudicial evidence in an attempt to prove that the County had notice. After the [**3] trial court denied the County's post-trial motions, the County appealed.

## ANALYSIS

**HN1**[⬆️]  We review the trial court's denial of a motion for a directed verdict and a motion for judgment notwithstanding the verdict de novo. *Marriott Int'l, Inc. v. Am. Bridge Bahamas, Ltd., 193 So. 3d 902, 905 (Fla. 3d DCA 2015).* **HN2**[⬆️]  The trial court's evidentiary rulings and denial of a motion for a new trial are reviewed for an abuse of discretion. *Weatherly v. Louis, 31 So. 3d 803, 805 (Fla. 3d DCA 2009)*; *Padilla v. Buell, 797 So. 2d 609 (Fla. 3d DCA 2001).*

We begin with the general principle in premises liability cases that **HN3**[⬆️]  "[a]ll premises owners owe a duty to their invitees to exercise reasonable care to maintain their premises in a safe condition." *Owens v. Publix Supermarkets, Inc., 802 So. 2d 315, 320 (Fla. 2001).* "In order for a plaintiff to recover for injuries received in a slip and fall, the plaintiff must show that the defendant responsible for the premises had

Miami-Dade Cty. v. Jones

actual or constructive notice of the dangerous condition." *Wilson-Greene v. City of Miami, 208 So. 3d 1271, 1274 (Fla. 3d DCA 2017)* (quoting *Maryland Maint. Serv., Inc. v. Palmieri, 559 So. 2d 74, 76 (Fla. 3d DCA 1990)); see also Encarnacion v. Lifemark Hosps. of Fla., 211 So. 3d 275, 278 (Fla. 3d DCA 2017)*. Constructive knowledge of a dangerous condition "may be inferred from either: (1) the amount of time a substance has been on the floor; or (2) the fact that the condition occurred with such frequency that the owner should have known of its existence." *Delgado v. Laundromax, Inc., 65 So. 3d 1087, 1090 (Fla. 3d DCA 2011)*.

 [*1130]  In the instant case, Jones concedes that the County did not cause the grease to spill onto its sidewalk and that the County did not have actual knowledge of the grease on the [**4] sidewalk. We also find no evidence in the record indicating how long the grease was present on the sidewalk on the day that Jones fell. To the contrary, Jones testified at trial that she did not know how long the grease had been on the ground that day, but that it appeared "fresh." Thus, the County's appeal reduces down to a very specific question: whether Jones presented evidence at trial to support her allegation that the grease was present on the sidewalk with such frequency that the County should have known about it.

Jones relies heavily upon photographs of a discoloration on the sidewalk next to the barbeque stand in order to prove that the County had constructive notice of a frequently occurring dangerous grease spill. However, even when we consider the evidence in the light most favorable to Jones, we cannot find any record evidence or testimony regarding what caused the discoloration on the sidewalk, whether there were grease spills on that area of the sidewalk in the past, and whether anyone had identified a grease spill on the sidewalk at any point before Jones fell. As a matter of fact, Jones testified that she did not know what caused the discoloration in the sidewalk, and [**5] no evidence was presented indicating that anyone had ever complained about or noticed a grease spill on the sidewalk before. Simply put, Jones failed to present any evidence that a grease spill occurred on the discolored sidewalk even once before Jones's fall, let alone with such frequency that the County should have known about it.

The remainder of the evidence that Jones points to in order to show that the County had constructive notice does not actually tend to show that the County should have had notice of the grease spill. For example, Jones introduced evidence that County inspectors and employees were present in the area numerous times over a course of years. However, Jones did not introduce any evidence to suggest that there was grease on the sidewalk during any of these inspections which could have put the County on notice that the grease collection system employed by the Sports Club was insufficient. There was also no evidence introduced that suggested that the inspections were conducted in response to a call relating to a grease spill or that anyone had ever reported or otherwise witnessed a grease spill in the area prior to Jones's fall. Accordingly, the trial court should [*6] have granted the County's post-trial motion and entered a judgment in favor of the County.

Although our finding that Jones failed to introduce any evidence as to the County's constructive notice of the grease spill is dispositive, we additionally find that the introduction, over objection, of County ordinances, relating to inspections and permits for public food establishments, as evidence tending to show that the County had constructive notice of the grease spill was error. The mere fact that an ordinance may cover the subject of inspecting food establishments does not imply that the County had constructive notice of a dangerous condition created by a food establishment. In fact, the ordinances would **only** be relevant in this case if they were introduced to show that the County should have but failed to comply with its duty to inspect the barbeque stand. However, the County has sovereign immunity from liability for enforcing or failing to enforce its laws. *See Trianon Park Condo. Ass'n, Inc. v. City of Hialeah, 468 So. 2d 912, 922 (Fla. 1985) (HN4[↑]* ] "Governments must be able to enact and enforce laws without creating new duties of care and corresponding tort liabilities  [*1131]  that would, in effect, make the governments and their taxpayers virtual insurers of the activities regulated."). [**7]

The trial court's limiting instruction did not limit, and in fact exacerbated the unfair prejudice and confusion caused by the introduction of the County ordinances. The trial court specifically told the jury that it could use the ordinance for the purpose of determining whether the County had notice of the grease spill (even though the ordinances are not relevant for this purpose) and told the jury that it could not use the ordinances to establish that the County was liable for failing to enforce its ordinances (even though that is the only way to make the ordinances pertinent).[1]

Lastly, we also conclude that it was error to allow Jones to testify that the barbeque stand was owned and operated, in part, by off-duty County bus drivers. Such testimony was irrelevant, as the County was not sued for the actions of its off-duty bus drivers who clearly were not acting within the scope of their employment. The testimony unfairly prejudiced the jury because it allowed the jury to infer that the County

---

[1] The existence of unfair prejudice and confusion is not hypothetical because the record demonstrates that the questions the jury asked during deliberations related to permitting and zoning.

Michael Dono

Miami-Dade Cty. v. Jones

was or should have been put on notice by these off-duty employees that there existed a dangerous condition on a County-owned sidewalk. Worse still, the jury might have concluded that the County **[**8]** should be held liable for the negligence of its off-duty employees—a theory that was neither pled nor argued, and which counsel for Jones admits would have been improper.

## CONCLUSION

In summary, we find that Jones failed to introduce any evidence to show that the County had constructive notice of the grease spill that caused Jones to slip and fall, and therefore, the trial court erred by denying the County's post-trial motion. We also find that the trial court abused its discretion by permitting Jones to introduce irrelevant and prejudicial County ordinances and by permitting Jones to testify that the barbeque stand owners and operators were also off-duty County employees. If the only errors below were the improperly introduced evidences, we would have remanded this case to the trial court for a new trial. However, because Jones also failed to introduce any evidence to support a finding that the County had constructive notice of the dangerous condition, we reverse the final judgment and the trial court's order denying the County's post-trial motion and remand for the entry of a judgment in favor of the County.

Reversed and remanded.

---

End of Document

Michael Dono